No. 14-5042

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

### RICHARD HIGBIE,

Plaintiffs-Appellant,

v.

### UNITED STATES

Defendant-Appellee,

---

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN
CASE NO. 13-270, JUDGE EDWARD DAMICH

---

## CORRECTED BRIEF WITH APPENDIX OF RICHARD HIGBIE, PLAINTIFF-APPELLANT

---

SCHULMAN | MATHIAS PLLC

Damon Mathias
Cary Schulman
LBJ Tower
8390 LBJ Freeway, Suite 500
Dallas, Texas 75243
Telephone: (214) 739-0100
Facsimile: (214) 739-0151

Dated:   April 23, 2014

**ATTORNEYS FOR PLAINTIFF-APPELLANT
RICHARD HIGBIE**

**FORM 9.   Certificate of Interest**

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

RICHARD HIGBIE _____ v. UNITED STATES _____

No. 14-5042

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

_____ APPELLANT _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

RICHARD HIGBIE

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4. ☒   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

CARY W. SCHULMAN

April 23, 2014 _____
Date

/s/ Damon Mathias
Signature of counsel

DAMON MATHIAS
Printed name of counsel

Please Note: All questions must be answered

cc: _____

---

**CORRECTED BRIEF OF RICHARD HIGBIE, PLAINTIFF APPELLANT**                    i

# TABLE OF CONTENTS

**Page(s)**

Statement of Related Cases …………………………………………………………..1

Statement of Jurisdiction …………………………………………………………1

Statement of the Issues ……………………………………………………..………1

Statement of the Case ………………………………………………………………2

Statement of Facts………………………………………………………………………3

Summary of Argument ………………………………………………………………9

Standards of Review …………………………………………..……………………10

Arguments and Authorities ………………………………………………………11

Conclusion ……………………………………………..…………………………..23

Addendum:                Opinion and Order Granting Motion to Dismiss

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Boyle v. United States*,
200 F.3d 1369 (Fed. Cir. 2000)…………………………………………..…………11

*Canadian Lumber Trade Alliance v. United States*,
517 F.3d 1319 (Fed. Cir. 2008)…………………………………………..………11

*Cornejo-Ortega v. United States*,
61 Fed. Cl. 371 (2004)…………………………………………………….……14

*Dan Cohen v. Cowles Media Company, d/b/a Minneapolis Star and Tribune Company*
457 N.W.2d 199, 202-3 (Minn S.Ct 1990)…………………………..………20

*Ferreiro v. United States*,
501 F.3d 1349 (Fed. Cir. 2007)…………………………….………………13

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005)…………………………………………13

*Foxgate Homeowners' Assn. v. Bramalea,*
26 Cal.4th 1 (2001)……………………………….………………………7

*Frymire v. United States*,
51 Fed. Cl. 450 (2002)………………………….…………………..…………12

*Hall v. United States*,
74 Fed. Cl. 391 (2006)………………………………………………………12

*Hamlet v. United States*,
873 F.2d 1414 (Fed. Cir. 1989)…………………………………..………11

*Harbuck v. United States*,
58 Fed. Cl. 266 (2003)…………………………………………………11

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)…………………………………………………………11

**CORRECTED BRIEF OF RICHARD HIGBIE, PLAINTIFF APPELLANT**                    iii

*Health Ins. Plan of Greater N.Y. v. United States*,
    62 Fed. Cl. 33 (2004)……………………………………..……………14

*Henke v. United States*,
    60 F.3d 795 (Fed. Cir. 1995)……………………………..……………12

*Holmes  v.  United  States*,
    657  F.3d 1303 (Fed.  Cir.  2011)………………………..…………13, 15, 16, 18

*Jan's  Helicopter  Serv.,  Inc.  v.  Fed.  Aviation  Admin.*,
    525  F.3d  1299 (Fed. Cir. 2008)………………………..…………………13

*Kunkel v. Topmaster Int'l Inc.*,
    906 F.2d 693 (Fed. Cir.1990)…………………………………………11

*Lechliter v. United States*,
    70 Fed. Cl. 536 (2006)…………………………………………………12

*Manville Sales Corp. v. Paramount Systems, Inc.*,
    917 F.2d 544 (Fed. Cir. 1990)………………………..…….…………11

*Naskar v. United States*,
    82 Fed. Cl. 319 (2008)…………………………………………….……11

*Reynolds v. Army & Air Force Exch. Serv.*,
    846 F.2d 746 (Fed. Cir. 1988)………………………………………11

*Rocovich v. United States*,
    933 F.2d 991 (Fed. Cir. 1991)………………………………………12

*San Carlos Irr. & Drainage Dist. v. United States*,
    877 F.2d 957 (Fed. Cir. 1989)………………………………..………14

*Sanders  v.  United  States*,
    252 F.3d 1329 (Fed. Cir. 2001)………………………..………………13

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974)…………………………………………………11

*Sioux Honey Ass'n v. Hartford Fire Ins. Co.*,
   672 F.3d 1041 (Fed. Cir. 2012)……………………………………..…….11

*Tindle v. United States*,
   56 Fed. Cl. 337 (2003)……………………………………………………12

*Trauma Serv. Group. v. United States*,
   104 F.3d 1321 (Fed. Cir. 1997)……………………………………..……14

*United Pac. Ins. Co. v. Roche*,
   401 F.3d 1362 (Fed. Cir. 2005)……………………………………..……14

*United States v. Mitchell*,
   463 U.S. 206 (1983)……………………………………………,,,,………12

*United States v. Navajo Nation*,
   129 S.Ct. 1547 (2009)……………………………………………………15

*United States v. Testan*,
   424 U.S. 392 (1976)……………………………………………………..13

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996)……………………………………………………13

## STATUTES

28 U.S.C. § 651-658…………………………………………………………19

28 U.S.C. § 1295(a)(3)………………………………………………..…..1,2

28 U.S.C. § 1491(a)(1) …………………………………………….………12

28 U.S.C. § 1491(a)(2)…………………………………………………………1

## REGULATIONS

29 C.F.R. 1614.102(b)(2)……………………………………..…………18

## RULES

Fed. Cir. R. 47.5……………………………………………………………1

Fed. R. Civ. P. 12(b)(1)................................................................1, 14, 23

Rules of the Court of Federal Claims ("RCFC") 12(b)(1) and 12(b)(6)

RCFC 12(B)(1) ................................................................................2, 11

RCFC 12(h)(3) ...................................................................................12

RCFC 12(b)(6) ....................................................................................2

Alternative Dispute Resolution Act of 1998, Pub. L. No. 105-315, 112 Stat. 2998
(105th Cong. 2nd Sess.) (Oct. 30, 1998) ..................................19

**SECONDARY SOURCES**
Paul Dayton Johnson, Jr., Note, Confidentiality in Mediation: What can Florida
Glean from the Uniform Mediation Act? , 30 FLA . ST . U.L. REV . 487, 489
(2003)....................................................................................15

Ellen E. Deason, Predictable Mediation Confidentiality in the U.S. Federal
System , 17 OHIO ST . J. DISP . RESOL . 239, 245 (2002).................15

Laurence Freedman, Confidentiality: A Closer Look, in CONFIDENTIALITY IN
MEDIATION: A PRACTITIONER'S GUIDE 47, 19 (Anne Clare ed., 1985)
....................................................................................20

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, appellants provide as follows:

(a)      There have been no previous appeals in this case.

(b)      Appellant is aware of no other case that will be directly affected by the Court's decision in this case.

## STATEMENT OF JURISDICTION

This is an appeal from a final decision by the Court of Federal Claims ("COFC") on November 14, 2013. The COFC had jurisdiction over this case pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(2). On January 10, 2013, Richard Higbie timely filed a notice of appeal that was docketed on January 10, 2013 . This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUES

(1) Whether the District Court erred in dismissing Plaintiff's case pursuant to Rule 12(b)(1) concluding immunity bars suits against the United States Government, as a matter of law, for breach of confidentiality under an agreement to mediate?

SUB-ISSUE 1:         Can the Mediation Agreement fairly be interpreted as contemplating money damages in the event of breach?

## STATEMENT OF THE CASE

Plaintiff's initial complaint in district court was filed on October 5, 2011, and later amended on June 25, 2012. (A230). On January 29, 2013, Plaintiff filed a Motion for Leave to File a Second Amended Complaint and contemporaneously an Unopposed Motion to Transfer Venue for his breach of contract claims. (A141, 144). On February 5, 2013, the district court ordered Plaintiff's breach of contract claims severed from case 3:11-cv-2636-L and transferred to the Court of Federal Claims. (A148). On May 20, 2013, Plaintiff filed his transfer complaint in the Court of Federal Claims. (A13) The Government filed a motion to dismiss, pursuant to Rules of the Court of Federal Claims ("RCFC") 12(b)(1) and 12(b)(6), and the briefing was completed October 25, 2013.  (A36, A59, A126) On November 14, 2014 the court ordered final judgment 28 USC 1295 finding that the Government's Tucker Act challenge required dismissal of the case. (A1)

## STATEMENT OF FACTS

A.    BACKGROUND

Higbie is an employee of the Bureau of Diplomatic Security ("BDS"), a division of the U.S. Department of State ("State Department"). (A14). At all material times, Higbie was and is a Senior Criminal Investigator assigned to the Dallas office which comes under the command of the Houston Field Office. (A152). On January 15, 2009, Higbie contacted an EEO counselor complaining of reprisal for prior protected activity by the State Department. (A15). Higbie filed a formal complaint on April 13, 2009 and submitted an ADR Election form requesting that his formal EEO complaint be processed through the State Department's ADR program. (A120) After review, it was determined by the Government that the Higbie's case was appropriate for mediation. (A84).

B.   NEGOTIATION OF TERMS OF AGREEMENT TO MEDIATE

Higbie retained counsel who communicated with the Government regarding the agreement to mediate. (A84-86, A89-125). From early May 2009 until the date of the mediation on May 29, 2009, Higbie's attorney and Arlene Brandon, an EEO/ADR Specialist with the Office of Civil Rights for the Department of State ("Brandon"), negotiated in detail the process, terms and conditions for the mediation, including verifying the confidentiality of the mediation. (A89-125) On May 14, 2009, Higbie's attorney inquired about the

length of the mediation, the parameters "or procedures if any, and any other information which may be necessary to properly represent my client." (A125). Brandon responded and on May 15, 2009, Higbie's counsel wrote back that he could not "confirm the May 29th day and time until I receive some clarification as to the procedures for the mediation." (A122)

Brandon clarified many items including the fact that the three complained of supervisors from the HFO would be attending the ADR and the format included direct confrontations between Higbie and HFO supervisors. (A120-121) The Government required the "responding officials" to attend to "respond to Mr. Higbie's allegations" and one of the stated purposes for the mediation was to "resolve...conflict" between the disputing employees, not merely settle a claim or potential lawsuit. (A116-118). Higbie's counsel then contacted the Government's attorney, Kimberly Jackson ("Jackson") to further work out the terms of the Agreement to Mediate. (A112 & 114)

C.    NEGOTIATION OF CONFIDENTIALITY

Higbie and the Government specifically negotiated the confidentiality of the process. (A111). In an email to Brandon and Jackson, Higbie's counsel wrote:

> "In summary, please let me know if a mediator has been requested, the identity of the mediator, whether you are opposed to me providing the

mediator with a position statement, and **whether all information conveyed or used in the mediation is confidential and cannot be used by any person, party or participant, outside of the mediation.**"(emphasis added).

The email continued, "...I do not wish to reach the day before mediation without resolution to my procedural inquiries if at all possible." Id. In response to the confidentiality clarification, Brandon responded:

> "Attorney's position statements are not provided to mediators in the Department of State's EEO/ADR mediations because as written in the ADR Fact Sheet (copy provided) - **ARE NOT** an advocate for the **Aggrieved Person, Complainant, or Management**, nor is he or she a decision-maker and cannot impose a solution on the parties.? Also, written in the Agreement to Mediate (copy provided) - The parties understand that the mediator(s) have **NO AUTHORITY** to decide the case and are not acting as advocates or attorneys for any party. In addition, mediation is not a discovery process.

> As written in the Agreement to Mediate (copy provided) - **Mediation is a confidential process**. Any documents submitted to the mediator(s) and statements made during the mediation are for settlement purposes only. Confidentiality will not extend to threats of imminent physical harm, threats of violence, criminal activity, waste, fraud or abuse. The parties agree not to subpoena the mediator(s) or any documents prepared by or submitted to the mediator(s). In no event will the mediator(s) voluntarily testify on behalf of any party or submit any type of report in connection with this mediation."(A110).[1]

---

[1] The response by Brandon of the Office of Civil Rights grossly mistakes the purpose for parties providing position statements to a mediator to familiarize the mediator with the case so save time at the mediation. See A97, 107-108,110,122

**CORRECTED BRIEF OF RICHARD HIGBIE, PLAINTIFF APPELLANT** 5

Higbie questioned the Government's wisdom of requiring the employee supervisors accused of the discrimination to attend and participate in negotiations at the EEO ADR mediation in what was certain to amount to a mini-trial.[2] (A108,119,122). Brandon, concealing the name of the mediator, inhibited Higbie's ability to communicate confidential material to the mediator which was memorialized in an email stating:

> "Secondly, as you already know, the mediator may be given confidential information by a party and as you stated before, the mediator may be asked to keep some information confidential. I have information I would like to communicate with the mediator. Yet, you ask that I send it to you so that you can decide whether or not you would like to give it to the mediator. Apparently, you would also give it to the responding officials if you liked.

───────────────

[2] Since the Government intended to have three witnesses attend, Higbie inquired as to whether he would be permitted to bring a witness.(A116). Brandon acknowledge that: "Agencies may be flexible in designing their ADR programs to fit their environment and workforce, provided the programs confirm to the core principles set forth in EEOC's policy statement on ADR. Neutrality is one of the ADR core principles, therefore for the Department's EEO/ADR Program to be effective, an ADR proceeding must be impartial and must be independent of any control by either party, in both perception and reality. " (A104). The Government maintained control over the mediator selection process concealing correspondence with the agency providing the mediator, the Government selected who attends and  participates in the mediation oft confusing parties and responding officials and the Government controlled all other important aspects of the "voluntary" mediation including ability to provide the mediator with a position statement pre-mediation. (A89–124).  Brandon conveys to Higbie the mediator's positions and the Government's lawyer's positions, on pre-ADR matters.  (A97).  Yet the Government contends that this process "is not an adversarial process."  (A115)

**CORRECTED BRIEF OF RICHARD HIGBIE, PLAINTIFF APPELLANT**                    6

Why do I have to go through you to speak with the mediator? The Department apparently is speaking with the mediator. And you refuse to give me the correspondence. Why? How can one not see that this procedure is impartial? How can one not be given at a minimum, the appearance of such? Clearly, you control the process. You control what the mediator sees. You control who the mediator is. You control how the mediator is obtained. You control the requesting documents and the correspondence between the mediator and the Department prior to the mediation and with that control you are exercising, you deny my client access to the same information.

This proceeding is tainted and smothered with the appearance of improper control and one sidedness. Why must you hide in the shadows? How do I know that the mediator was chosen impartially? Am I to simply take your word for it? In any system of government of procedural avenue for justice and remediation which spouts the principals of justice, fairness and impartiality, one cannot have concealment of the selection process, one sided access to the mediator and total control of all events leading up the the mediation." (A104).

Because of Higbie's concerns over three complained of supervisors attending the mediation and the Government's requirement of a joint conference where the participants would be permitted to confront each other on the facts and issues, and because of the concerns stated above, Higbie purposefully negotiated for confidentiality of the entire mediation confirming it with the Government. (A94, 97, 98, 104, 110, 111, 131, 127-129). This was especially important so that no person would leave the mediation and communicate to other employees any of the events of the mediation and

**CORRECTED BRIEF OF RICHARD HIGBIE, PLAINTIFF APPELLANT**                    7

further, to prevent Higbie's supervisors from using anything that occurred during the mediation against him in his employment. After all, they are supervisors in the chain of his command.

D.   AGREEMENT TO MEDIATE AND THE GOVERNMENT'S BREACH: [3]

The Government and Higbie entered into a written agreement to mediate the dispute (hereinafter the "Mediation Agreement") and the matter was mediated on May 29, 2009. (A127-129).   On May 29, 2009, the following Responding Officials signed an "EEO/ Alternative Dispute Resolution – Agreement to Mediate" ("ADR Agreement"): Marian Cotter, Paul Vallee and Jeffrey Thomas. (A15; see also A128). Among other provisions, the parties agreed to the following confidentiality clause:

> "**Mediation is a confidential process.** Any documents submitted to the mediators and statements made during the mediation are for settlement purposes only.  Confidentiality will not extend to threats of imminent physical harm, threats of violence, criminal activity, waste, fraud or abuse" (A127) (emphasis in original).

The parties did not settle the case at the mediation and Higbie's case continued in the administrative process. (A89). As part of the EEO

---

[3] The simple confidentiality provisions required confidence of the mediator, but the written and oral communications as well. Foxgate Homeowners' Assn. v. Bramalea, 26 Cal.4th 1 (2001)(stating that "confidentiality is essential to effective mediation" and interpreting a provision much like the one at issue and finding that it "prohibits any person, mediator and participants alike, from revealing any written or oral communication made during mediation").

investigation into Plaintiff's claims, officials Marian Cotter (the Special Agent in Charge of the Houston Field Office) and Jeffrey Thomas (Supervisory Special Agent of the Houston Field Office) disclosed communications made and matters occurring during the mediation violating the negotiated confidentiality provision of the ADR Mediation Agreement. (A15-16) Further, breach of confidentiality occurred by the Houston managers the subject of the EEO discrimination complaint and attendees of the mediation and signatories to the written Mediation Agreement. *Id.* [4]

In her EEO investigative affidavit, Marian Cotter answered a question asking if there was anything she wanted to add by revealing:

> "Much of Mr. Higbie's complaint seems to lack specificity. This was glaringly apparent at the Alternate Dispute Resolution when Mr. Higbie and his attorney declined to make any opening statement at all and terminated the ADR after Department's statement and a private sidebar with the mediator, basically refusing to participate in the process. At a minimum, this tactic demonstrated a complete lack of sincerity to resolve any issues in an   open and transparent forum. One could come to believe there is some cynical, ulterior motive driving this complaint. Mr. Higbie has routinely demonstrated a lack of perspective with regard to how his work and the work of the Dallas Resident Office fit in perspective into the big picture of the Diplomatic Security mission. It

---

[4] Some evidence of the multiple breaches has been submitted in the transferor Court in the Northern District of Texas case, under seal. See Case No. 3:11-cv-02636-L, Dkt No. 98. These documents were produced by the Government and designated as covered by a protective order and were therefore, not yet presented in the Court of Federal Claims out of an abundance of caution. (A256)

**CORRECTED BRIEF OF RICHARD HIGBIE, PLAINTIFF APPELLANT**

would be disappointing for this EEO process to reinforce his misinterpretation of reality. Moreover, it is disappointing to witness the abuse of a process designed to protect employees from real wrongs."(A16)

Thomas, in responding to the same question, divulged:

"On May 29, 2009, all parties agreed to part of an Alternative Dispute Resolution meeting. It was a teleconference. Mr. Higbie refused to travel to Houston to meet with the respondents. The mediator asked Mr. Higbie's attorney to state his case. The only statement the attorney made was that Mr. Higbie plans to file an amended complaint and that he was willing to discuss Higbie's opportunities to obtain a GS 14 position. The attorney then asked to go off-line to talk to the mediator. One hour later the teleconference was terminated. Nothing was ever discussed and nothing was resolved." (A16)

The affidavits of Cotter & Thomas eventually appeared in the March 3,

2010 EEO Report of Investigation for EEO Case #DOS-F-062-09.  (A31-A35)

## SUMMARY OF ARGUMENT

The mediation agreement at issue in this case can reasonably be

interpreted as contemplating money damages. Plaintiff has provided prima

facie showing of jurisdictional facts in order to survive a motion to dismiss.

Higbie has demonstrated that money damages are fairly contemplated

through 1) the contract itself; 2) negotiations demonstrating the importance of

the provision; and 3) instances of legislative and judicial support for awarding

money damages for such a breach.

A litigant entering into a confidentiality with the Government by way of a written agreement, as with all contracts with private parties, expects to hold the Government to its agreement and if breached, expects recourse and damages associated with such breach. Plaintiff specifically negotiated and emphasized the importance of the confidentiality provision and the binding nature such provision must have on all participants at the mediation, including the complained of officials which were also in Plaintiff's direct chain of command.

Exclusion of evidence is not an adequate nor "logical" remedy in the Plaintiff's case . The parties entered into the mediation agreement early in the processing of Plaintiff's discrimination complaint, prior to any election for a hearing before the EEOC administrative law judge and prior to the filing of a lawsuit. There is no judicial oversight or sanction available, no applicability of the Federal Rules of Evidence or exclusionary mechanism and no potential administrative remedy available which comes into play if and after a complainant requests a hearing before an administrative law judge at the earliest.  This mediation took place at an early stage prior to to attachment of the deterrents and punishments for which the Defendant relies (sanctions) and therefore the remedies addressed by the Defendant are inapplicable.

## STANDARDS OF REVIEW

Standard of review for motion to dismiss for lack of subject matter jurisdiction is de novo. The Court reviews questions concerning subject matter jurisdiction de novo. *Kunkel v. Topmaster Int'l Inc.*, 906 F.2d 693, 695, 15 USPQ2d 1367, 1368 (Fed.Cir.1990), *Manville Sales Corp. v. Paramount Systems, Inc.* 917 F.2d 544 (Fed. Cir. 1990). The Court applies a de novo standard of review to a trial court's dismissal for failure to state a claim for which relief can be granted. *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000); *see also Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1330-31 (Fed. Cir. 2008)." *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1049 (Fed. Cir. 2012).

## ARGUMENTS & AUTHORITIES

A.   LEGAL STANDARD: RCFC 12(B)(1):

In ruling upon a motion to dismiss for lack of subject matter jurisdiction, the Court accepts as true the undisputed allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989) (*citing Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), abrogated on other grounds by, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). Plaintiff need only make a prima facie showing of

jurisdictional facts in order to survive a motion to dismiss. *Harbuck v. United States*, 58 Fed. Cl. 266, 267 (2003). Plaintiff bears the burden of establishing subject-matter jurisdiction. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F. 2d 746, 748 (Fed. Cir. 1988); *see also Naskar v. United States*, 82 Fed. Cl. 319, 320 (2008).

In determining whether the plaintiff has met this burden, the Court may look "beyond the pleadings and `inquire into jurisdictional facts' in order to determine whether jurisdiction exists." *Lechliter v. United States*, 70 Fed. Cl. 536, 543 (2006) (*quoting Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)). When deciding a motion to dismiss for lack of subject-matter jurisdiction, the Court assumes all factual allegations to be true and construes "all reasonable inferences in plaintiff's favor." *Hall v. United States*, 74 Fed. Cl. 391, 393 (2006) (*quoting Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." RCFC 12(h)(3); *see also Tindle v. United States*, 56 Fed. Cl. 337, 341 (2003). The Court will dismiss for lack of subject matter jurisdiction only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him

to relief. *See Frymire v. United States*, 51 Fed. Cl. 450, 454 (2002) (quotations omitted).

B.    TUCKER ACT JURISDICTION:

Jurisdiction under the Tucker Act permits the Court of Federal Claims to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006). Sovereign immunity under the Tucker Act is waived in such instances. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). However, the Tucker Act does not confer any substantive rights. *Ferreiro v. United States*, 501 F.3d 1349, 1351 (Fed. Cir. 2007); *United States v. Testan*, 424 U.S. 392, 398 (1976). "Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation or constitutional provision." *Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1306 (Fed. Cir. 2008); Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005).

"When referencing the money-mandating inquiry for Tucker Act jurisdiction, the cases logically put to one side contract-based claims," because "in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." *Holmes v. United States*, 657 F.3d 1303, 1313-4 (Fed. Cir. 2011) (*quoting Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001). "[I]n a contract case," therefore, "the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption . . . with no further inquiry being necessary." Id.; *see also United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (plurality opinion) (noting that "damages are always the default remedy for breach of contract"). In this case, Plaintiff Richard Higbie comes armed with the "presumption" and the Government is unable to rebut such presumption.

Contracts including confidentiality provisions are like all other contracts and in any claim of breach of contract, a "plaintiff must establish, ab initio, that a valid contract, promising confidentiality, existed between it and the government." *Lublin Corp. citing San Carlos Irr. & Drainage Dist. v. United*

*States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Health Ins. Plan of Greater N.Y. v. United States*, 62 Fed. Cl. 33, 43 (2004); *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 373 (2004). To establish such a contract, plaintiff must show a mutual intent to contract including an offer, an acceptance, and consideration. *United Pac. Ins. Co. v. Roche*, 401 F.3d 1362, 1366 (Fed. Cir. 2005); *Trauma Serv. Group. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).

Higbie attached to his response to the 12(b)(1) dismissal motion the Mediation Agreement, a confirming letter delivered by the office of civil rights and emails exchanged prior to the execution of the mediation agreement where in Plaintiff negotiated and required the confidentiality of the proceeding in order to participate in the mediation. (A93). Higbie, in making a showing in the trial court that jurisdiction is conferred, relied upon the evidence, the "presumption" under the contract, public policy favoring mediation and the commonality in awarding money damages in confidentiality settings to establish jurisdiction and the "contemplation" requirement. (A92-95) and (A97-102). On the other hand, the Government relied upon the exclusionary rule.

Confidentiality in Government mediations is as commonplace as the mediations themselves.[5]  Confidentiality protects both the mediators and the parties.  *Id.*  In *Holmes*, this Court held that where a contract could reasonably be interpreted to involve purely non-monetary relief, this Court may require a plaintiff to render proof that the contract can "fairly be interpreted as mandating compensation by the Federal Government." Holmes, 657 F.3d at 1310 (*quoting United States v. Navajo Nation,* 129 S.Ct. 1547, 1551-52 (2009)).  The Trial Court found that Higbie failed to make a showing of such proof and that the Mediation Agreement does not fairly contemplate money damages in the event of breach.

The Trial Court reasoned:

"Instead, where a contract could reasonably be interpreted to involve purely nonmonetary relief, this Court may require a plaintiff to render proof that the contract can "fairly be interpreted as mandating compensation by the Federal Government." Id. (quoting *United States v. Navajo Nation*, 129 S.Ct. 1547, 1551-52 (2009)). In this instance, the contract clearly does not contemplate money

_____

[5] Plaintiff asks the Court to take judicial notice of the ADR Act and Congress' intent as well as the ADR "Fact Sheets" disseminated regularly by the Department.  Further, the confidentiality associated with mediations in the Department is common knowledge and is widely understood.  See Also Dtk. 9-1, p. 2; Paul Dayton Johnson, Jr., Note, Confidentiality in Mediation: What can Florida Glean from the Uniform Mediation Act? , 30 FLA . ST . U.L. REV . 487, 489 (2003); see also Ellen E. Deason, Predictable Mediation Confidentiality in the U.S. Federal System , 17 OHIO ST . J. DISP . RESOL . 239, 245 (2002).

damages. As with all forms of mediation, the contract is driven by the hope that parties will fully and fairly discuss settlement, secure in the knowledge that their statements cannot be used against them in future proceedings. As the Government argues, the logical "remedy" for a breach is the exclusion from proceedings any evidence uncovered by way of the breach.

Higbie next attempts to demonstrate that the Mediation Agreement can fairly be interpreted to mandate money damages. The basis for this argument is unclear, at best. For example, Higbie again relies on Holmes, which addressed settlement agreements pursuant to Title VII and found that the settlement agreements could fairly be construed to include monetary. See Holmes, 657 F.3d at 1315. The Federal Circuit did not accidentally stumble on that conclusion, as Higbie would have this Court do, but instead reached its conclusion based on the evidence. As the Federal Circuit reasoned, the purpose of the Agreements was to prevent the plaintiff from being denied future employment based on his record. "In short, the agreements inherently relate to monetary compensation through relationship to Mr. Holmes's future employment. Id. at 1316.
No such issue arises here...." (A7)

Focusing on the proof requirement, Higbie notes that the Trial Court never "required" him to make such a showing and in fact, Higbie took it upon himself to include such proof in his response. The Trial Court in distinguishing Higbie's case from those with the presumption, indicates that Higbie sought to have the court "stumble" upon the conclusion whereas Holmes was based upon the evidence. *Id.* However, Higbie initially points out that the only evidence the Court in Holmes relied upon was the agreement at issue. *Id.* Higbie relied upon the express written agreement contract itself and

additionally demonstrated generally, that confidentiality under the law generally prescribes money damages as relief. Higbie was unable to locate a case involving breach of confidentiality in a mediation agreement and the the Trial Court misinterpreted Higbie's survey of law as being cited for just that purpose when it was merely cited in support of the argument that Higbie contemplated money damages for breach of confidentiality, therefore going to the proof requirement. The cases involving confidentiality in different situations and different contracts cited in Higbie's Response to Motion to Dismiss is merely meant to demonstrate that money damages are in fact contemplated in breach of confidentiality situations and that while although it is difficult at times to attach a monetary value to such breach, it is clear that Courts and legislatures across the country frequently "contemplate" doing so.

In this regard, Higbie directed the trial court to state statutory authority expressly providing for money damages for the breach of mediation confidentiality. For instance, Florida has enacted 44.406 (Confidentiality; civil remedies) which reads:

> (1) Any mediation participant who knowingly and willfully discloses a mediation communication in violation of s. 44.405 shall, upon application by any party to a court of competent jurisdiction, be subject to remedies, including:

> (a)     Equitable relief.

(b)    Compensatory damages. (c) Attorney's fees, mediator's fees, and costs incurred in the mediation proceeding.

(c)    Attorney's fees, mediator's fees, and costs incurred in the mediation proceeding.

Obviously, this authority would be improperly cited in an effort to demonstrate a basis for an award of attorney's fees in this matter, except to show that one does contemplate money damages for a breach of confidentiality and therefore, again a showing of proof. What other proof should be required of a litigant to provide to demonstrate that money damages are fairly contemplated for such a breach other than 1) the contract itself; 2) negotiations demonstrating the importance of the provision; and 3) instances of legislative and judicial support for awarding money damages for such a breach? After all, it seems logical that if courts are awarding damages in cases for breach of confidentiality in other situations and legislatures are enacting statutes providing for money damages for breach of confidentiality specifically in the mediation context, money damages are reasonably contemplated when entering into a confidentiality agreement with the Government in the event of the Government's breach.

Higbie is simply meeting his proof requirement by pointing to situations, cases, statutes and policy, in addition to the Mediation Agreement and the emails, supporting the reasonable conclusion that money damages are

contemplated in breaches of confidentiality. See Title 29, Code of Federal Regulations, Part 1614.102(b)(2)(requiring Federal agencies to establish or make available an ADR program).[6]

2.  THE MEDIATION AGREEMENT FAIRLY CONTEMPLATES MONEY DAMAGES:

The Mediation Agreement at issue in this case can reasonably be interpreted as contemplating money damages. *See Holmes v. United States*, 657 F.3d 1303, 1313-4 (Fed. Cir. 2011).

As an initial observation, confidentiality in the contract at issue satisfies the legislative intent to promote ADR's in federal EEO proceedings and any finding that the Government is permitted to breach such confidentiality with impunity is certainly not fairly contemplated by litigants entering such mediation agreements. Conversely, a litigant entering into such confidentiality with the Government by way of a written agreement, as with all contracts with private parties, expects to hold the Government to its agreement and if breached, expects recourse and damages associated with such breach. Congress, in encouraging mediation confidentiality in federal proceedings,

---

[6] Federal Agencies websites and other published information hold out that the mediations are "confidential" encouraging employees to early efforts at resolution. See e.g. http://www.blm.gov/pgdata/etc/medialib/blm/ak/aktest/equal_employment_opportunity.Par. 64729.File.dat/Rights%20and%20Protections%20Under%20Federal%20EEO%20Laws%20and%20WPA%20-%20No%20Fear.doc.

**CORRECTED BRIEF OF RICHARD HIGBIE, PLAINTIFF APPELLANT**          21

enacted the Alternative Dispute Resolution Act of 1998, Pub. L. No. 105-315,

112 Stat. 2998 (105th Cong. 2nd Sess.) (Oct. 30, 1998) codified at 28 U.S.C.

§§651-658. ("ADR Act"). In Section 2 of the Act, Congress finds among other

things, that:

> "(1) alternative dispute resolution, when supported by the bench and bar, and utilizing properly trained neutrals in a program adequately administered by the Court, has the potential to provide a variety of benefits, including greater satisfaction of the parties, innovative methods of resolving disputes, and greater efficiency in achieving settlements;
>
> (2) certain forms of alternative dispute resolution, including mediation, early neutral evaluation, mini-trials, and voluntary arbitration, may have potential to reduce the large backlog of cases now pending in some federal courts throughout the United States, thereby allowing the courts to process their remaining cases more efficiently. . . ."

The U.S. Equal Employment Opportunity Commission states on its website

that:

> The EEOC maintains strict confidentiality in its mediation program. The mediator and the parties must sign agreements that they will keep everything that is revealed during the mediation confidential. The mediation sessions are not tape-recorded or transcribed. Notes taken during the mediation by the mediator are destroyed. Furthermore, in order to ensure confidentiality, the mediation program is insulated from the EEOC's investigative and litigation functions.[7]

---

[7] http://www.eeoc.gov/eeoc/mediation/qanda.cfm

**CORRECTED BRIEF OF RICHARD HIGBIE, PLAINTIFF APPELLANT**      22

Confidentiality is an important and necessary component in the mediation and ADR process.[8] To find that one does not contemplate money damages in the event of a breach or to find that one does not have an expectation that one will have a means of enforcing a breach is unsound.

Plaintiff specifically negotiated and emphasized the importance of the confidentiality provision and the binding nature such provision must have on all participants at the mediation, including the complained of officials which were also in Plaintiff's direct chain of command. Because management officials could potentially learn and disclose information obtained at the mediation, including: demands made or not made; claims made and positions taken; communications; offers; or matters which most certainly could effect Plaintiff's employment, Plaintiff cautiously proceeded to mediation expressing openly his concerns and requiring the confidentiality by all of the participants. But in this case, the management officials, which deal with

---

[8] "Confidentiality" commonly means that communications made in mediation will not be disclosed to a judge, jury, or others connected with a legal proceeding and that the information sought will not be released or utilized in any manner. See Laurence Freedman, Confidentiality: A Closer Look, in CONFIDENTIALITY IN MEDIATION: A PRACTITIONER'S GUIDE 47, 19 (Anne Clare ed., 1985). The Minnesota Supreme Court has stated that, "...to break a promise of confidentiality which has induced a source to give information is dishonorable. Dan Cohen v. Cowles Media Company, d/b/a Minneapolis Star and Tribune Company 457 N.W.2d 199, 202-3 (Minn S.Ct 1990).

confidentiality each day as law enforcement officers for Diplomatic Security, used the information in investigative affidavits in direct contravention of the EEOC stated purpose of confidentiality of insulating the process from the EEOC's investigative and litigation functions. Given that the breaching management officials to a large degree control Plaintiff's employment setting and therefore income, the importance of the matter cannot be overstated.

Moreover, the Defendant's argument that the exclusionary rule is the "logical" remedy for a breach that was seemingly accepted by the Trial Court is misplaced. The Government argues that only one remedy is available to the Plaintiff, exclusion of the evidence in legal proceedings. The Defendant premises the argument on the reference to statements being made "are for settlement purposes only." However, this is not the entirety of the provision, the clause cannot be read to expressly provide the sole remedy for breach and the argument ignores the harm and damage done from such a breach of confidentiality such as in this case.

The parties entered into the mediation agreement early in the processing of Plaintiff's discrimination complaint, prior to any election for a hearing before the EEOC administrative law judge and prior to the filing of a lawsuit. There is no judicial oversight or sanction available, no applicability of

the Federal Rules of Evidence or exclusionary mechanism and no potential administrative remedy available which comes into play if and after a complainant requests a hearing before an administrative law judge at the earliest.  This mediation took place at an early stage prior to to attachment of the deterrents and punishments for which the Defendant relies (sanctions) and therefore the remedies addressed by the Defendant are inapplicable.

Even if the "exclusion" of evidence is permitted at some later event or time, such sanction does not apply to the  type of breach at issue because "evidence" has nothing to do with the breach.  Plaintiff is not alleging that Defendant took evidence learned from the mediation and later breached confidentiality by somehow using it or conveying it to another, but rather that Defendant is utilizing the statements made regarding settlement and other communications against the Plaintiff, expressly so, in affidavits.

Additionally, the fact that a court may be able to sanction a party and exclude evidence pursuant to the Rules of Procedure, which the Defendant argues is the "normal" remedy, does not preclude one from asserting and bringing a cause of action predicated upon the same conduct. The Defendant cites no authority for their argument.

Defendant argues that permitting causes of action for breach of confidentiality would discourage participation in mediation (A48). But this would only be true for those disrespecting the confidentiality of the process. In fact, the exact opposite is true. If Defendant is permitted to violate confidentiality without recourse, since it argues a cause of action seeking money damages should not be available and the case is at too early of a stage to seek sanctions, exclusion of evidence or other relief from the administrative judge, the outcome will be to render confidentiality provisions entered into by the Defendant at the early processing of discrimination complaints meaningless discouraging early resolution of cases.

Plaintiff negotiated and stressed entering into confidentiality with the government, in part, because three management officials in his chain of command were going to participate and he did not want the management officials, for which he had already filed a formal complaint of discrimination against, to utilize anything he did or said during the mediation against him in his continued employment.  However, despite his efforts and despite clarifying the confidentiality of the process before engaging in it and despite entering into a contractual agreement, Defendant did exactly what Plaintiff desired to

prevent; the management officials utilized the events occurring in mediation process against Plaintiff outside of the mediation process.

## CONCLUSION

Plaintiff has shown that the Mediation Agreement can fairly be interpreted as contemplating money damages in the event of breach, and as such Trial Court erred in dismissing Plaintiff's case pursuant to Rule 12(b)(1) concluding immunity bars suits against the United States Government, as a matter of law, for breach of confidentiality under an agreement to mediate.

Respectfully submitted,

**SCHULMAN | MATHIAS PLLC**

/s/ Damon Mathias
Damon Mathias
Texas Bar No.: 24080170
Cary Schulman
Texas Bar No.: 00797390
8390 LBJ Freeway
Suite 500
Dallas, Texas 75243
Telephone: (214) 739-0100
Facsimile: (214) 739-0151
damon@dallaslegalteam.com

**ATTORNEYS FOR PLAINTIFF–APPELLANT
RICHARD HIGBIE**

CASE PARTICIPANTS ONLY Case: 14-5042 Page: 35 Filed: 04/23/2014

# ADDENDUM

# In the United States Court of Federal Claims

No. 13-270C

(Filed November 14, 2013)

```
*************************************
                                    *
RICHARD HIGBIE,                     *
                                    *
                    Plaintiff,      *
                                    *
        v.                          *
                                    *
THE UNITED STATES,                  *
                                    *
                    Defendant.      *
                                    *
*************************************
```

## OPINION AND ORDER

In this action, Plaintiff Richard Higbie ("Higbie") alleges that the United States (the "Government") breached the confidentiality provision of an "Agreement to Mediate" ("Mediation Agreement"). Higbie seeks $500,000 in compensation for this alleged breach. Higbie's original action was filed in the United States District Court for the Northern District of Texas and the pertinent portion of that action was transferred to this Court on April 17, 2013. Higbie filed his transfer complaint in this Court on July 15, 2013. The Government then filed the instant motion to dismiss, pursuant to the Rules of the Court of Federal Claims ("RCFC") 12(b)(1) and 12(b)(6), and the briefing was completed on October 25, 2013.

Because the Court finds that the Government's Tucker Act challenge requires dismissal of this case, it does not reach the merits of the Government's 12(b)(6) arguments. For the reasons that follow, the Government's motion to dismiss is GRANTED.

## I.    Background[1]

Higbie is an employee of the Bureau of Diplomatic Security ("BDS"), a division of the U.S. Department of State ("State Department"). Compl. at ¶ 2. On January 15, 2009, Higbie contacted an EEO counselor complaining that the State Department had

---

[1] Unless specifically stated, all "Dkt." references in this section refer to the docket filings in Higbie's case pending in the Northern District of Texas at Case No. 3:11-cv-02636-L. Any citations to "Compl." refer to Higbie's Transfer Complaint, found at Docket No. 5 in this Court's record.

1

discriminated against him. *Id*. at ¶ 5. The case was referred to mediation. *Id*. at ¶ 6. Prior to engaging in mediation, the parties signed a document entitled "EEO/Alternative Dispute Resolution Agreement to Mediate" ("Mediation Agreement"). *Id*. After the mediation fell apart, an EEO investigator undertook an investigation and prepared a report. *Id*. at ¶ 7. During the investigation, Government officials Marion Cotter ("Cotter") and Jeffrey Thomas ("Thomas") provided affidavits. *See id*. at ¶¶ 8-9.

On October 5, 2011, Higbie filed suit in the Northern District of Texas. Higbie alleged that the State Department retaliated against him (Count I), created a hostile work environment (Count II), and that the agency had breached the confidentiality clause of the 2009 Mediation Agreement (Count III). Count III was rooted in the affidavits filed by Cotter and Thomas. Higbie took the position that the affidavits violated the confidentiality provision of the Mediation Agreement by disclosing "information held under strict confidentiality guidelines set by the aforementioned [Mediation Agreement]." *See* Dkt. 1 ("Texas Compl.") at ¶ 54. Higbie alleged that the affidavits "demonstrated a willful attempt by [Cotter and Thomas] to further discriminate and retaliate against the Plaintiff for engaging in related protected activity." *Id*. at ¶ 55. Higbie also asserted that the breach of the confidentiality clause constituted a violation of the Alternative Dispute Resolution Act of 1996 ("ADRA"). *Id*. at ¶ 86.

The State Department filed a motion to dismiss Count III and Higbie was granted leave to file an amended complaint, which he filed on June 25, 2012. The Amended Complaint was similar to the original complaint; the major difference was that, instead of asserting a violation of the ADRA, Higbie's amended complaint alleged that the same actions created a cause of action "[p]ursuant to the common laws of the State of Texas." *Compare id*. at ¶ 86 *with* Dkt. 10 ("Texas Am. Compl.") at ¶ 97.

On January 29, 2013, Higbie filed a motion for leave to file a second amended complaint and a motion to transfer his contract claim to this Court. Both motions were granted and, on February 8, 2013, Higbie filed another amended complaint which still stated a cause of action for breach of the confidentiality clause of the Mediation Agreement. *See* Dkt. 35 ("Texas Sec. Am. Compl.") at ¶ 109.

The contract claim was transferred to this Court on April 17, 2013. Unlike the various complaints filed in the Northern District of Texas, Higbie's Complaint here states only one cause of action for the breach of the Mediation Agreement. *See* Compl. at ¶¶ 11-12. On September 13, 2013, pursuant to RCFC 12(b)(1) and 12(b)(6) the Government moved to dismiss Higbie's action in front of this Court.

## II.    Legal Standard

A motion brought pursuant to RCFC 12(b)(1) challenges the Court's subject matter jurisdiction. *See* RCFC 12(b)(1). When faced with a motion to dismiss for lack of subject matter jurisdiction, a court must assume that all undisputed facts alleged in the complaint are true, and it must draw all reasonable inferences in the plaintiff's favor.

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

### III. Discussion

The Government raises two arguments as to why this Court lacks jurisdiction to hear Higbie's case. First, it argues that Higbie's Complaint here is barred by operation of 28 U.S.C. § 1500. Second, the Government argues that the Court lacks jurisdiction because the Mediation Agreement does not create a right to money damages.

### a. *28 U.S.C. § 1500 Does Not Bar Higbie's Action in this Court*

The Government first argues that Higbie's claim is barred by operation of 28 U.S.C. § 1500, which provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

"The rule is more straightforward than its complex wording suggests. The CFC has no jurisdiction over a claim if the plaintiff has another suit *for or in respect to* that claim pending against the United States or its agents." *United States v. Tohono O'Odham Nation*, 131 S.Ct. 1723, 1727 (2011) (emphasis added). This statutory provision "effects a significant jurisdictional limitation" upon this Court; it is designed to "save the Government from burdens of redundant litigation." *Id.* at 1729-30.

The Supreme Court emphasized in *Tohono* that § 1500 "bars jurisdiction in the CFC not only if the plaintiff sues on an identical claim elsewhere—a suit 'for' the same claim—but also if the plaintiff's other action is related although not identical—a suit 'in respect to' the same claim." *Id.* at 1728. Thus, the Supreme Court determined that "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on *substantially the same operative facts*, regardless of the relief sought in each suit." *Id.* at 1731 (emphasis added). Applying the Supreme Court's ruling in *Tohono*, the Federal Circuit has explained that, "[t]o determine whether § 1500 applies, a court must make two inquiries: (1) whether there is an earlier-filed 'suit or process' pending in another court, and, if so, (2) whether the claims asserted in the earlier-filed case are 'for or in respect to' the same claim(s) asserted in the later-filed Court of Federal Claims action." *Brandt v. United States*, 710 F.3d 1369, 1374 (Fed. Cir. 2013).

The first *Brandt* inquiry must be answered in the affirmative. Because Higbie's claim before this Court was removed from his already-pending action in the Northern District of Texas, the Texas case qualifies as an earlier-filed suit. *See Griffin v. United*

*States*, 590 F.3d 1291, 1293 (Fed. Cir. 2009) ("if a plaintiff files multiple related claims in district court, and the court transfers one of those claims to the Court of Federal Claims, the original claims are 'pending' at the time the transferred claim is considered filed, and § 1500 *may* deprive the Court of Federal Claims of jurisdiction over the transferred claim.") (emphasis added).

The true dispute revolves around the second *Brandt* inquiry. The Government asserts that Higbie's claim here revolves around substantially the same operative facts as his action in the Northern District of Texas, such that the Texas action is "for or in respect to" the same claim asserted here. *See* Gov't Mot. at 9-10. Essentially, the Government argues that the breach of the confidentiality clause is cited by Higbie in support of his retaliation claim, such that Higbie's claim here is "in respect to" his retaliation claim in Texas.

Higbie responds that the contract claim was severed from the Texas case, while the non-contract claims in the Texas case are unrelated to the breach of the confidentiality clause. His position appears to be that the severance of the contract claim from the Texas case renders his action here unrelated to the Texas proceedings. Further, Higbie claims that his case in Texas no longer asserts the breach of the confidentiality clause as part of his retaliation claim.

Although the parties dispute which version of Higbie's Texas complaint—the Second Amended Complaint or the Third—controls, that point is irrelevant to the Court's decision. The true question is whether Higbie's claims in Texas are "for or in respect to" substantially the same operative facts as is his case here. *See Tohono*, 131 S.Ct. at 1727. It is clear that they are not.

Higbie's claim here is for breach of contract, while his claims in Texas are for discrimination and retaliation. It appears to the Court that the only indication that these claims are remotely based on the same operative facts are two paragraphs which appear in both Higbie's Second and Third Amended Complaints. The first of these paragraphs states:

> In separate affidavits, both "Responding Officials" Marion Cotter (Special Agent in Charge of the Houston Field Office) and Jeffery Thomas (Supervisory Special Agent of the Houston Field Office) provided the EEO assigned Investigator, Robert Maddern, information held under strict confidentiality guidelines set for by the aforementioned ADR Mediation [Agreement]. Both respective Responding Officials included in their affidavits information concerning the underlying facts of the ADR proceeding and records generated as part of the proceeding that are strictly prohibited from being made part of the EEO complaint record.

Second Am. Compl. at ¶ 54; Third Am. Compl. at ¶ 54. Immediately after this paragraph, both versions of Higbie's Texas complaint state that "[t]his demonstrated a

willful attempt by the Responding Officials to *further discriminate and retaliate* against the Plaintiff for engaging in related protected activity." Second Am. Compl. at ¶ 55; Third Am. Compl. at ¶ 55 (emphasis added). In other words, in the Texas proceedings Higbie has asserted that the Government's alleged breach of the Mediation Agreement supports his claim for retaliation. The Government relies on these two paragraphs in support of its assertion that Higbie's claim here is barred by §1500 due to the Texas case.

Higbie responds that the breach of confidentiality is "incapable of serving as an adverse employment action that would allow Plaintiff to prevail on his retaliation claim or hostile work environment claim…" Pltf. Resp. at 6. The Court is not concerned with this point, and makes no judgment as to the viability of Higbie's assertion of the breach in support of his retaliation claim. In this Court's mind, the key is that the alleged disclosure of confidential information is a single fact which, if true, would be dispositive as to Higbie's contractual claim. Meanwhile, Higbie's retaliation claim requires *far more* than the simple fact of disclosure. In an instance such as this, where a single fact would be dispositive in one case and somewhere between completely irrelevant and minimally relevant in another, the two cases are not "based on substantially the same *operative* facts." *Tohono*, 131 S.Ct. at 1730 (emphasis added).

Because the operative facts in the case before this Court differ substantially from the operative facts before the Eastern District of Texas, this Court concludes that § 1500 does not divest the Court of jurisdiction to hear Higbie's claim. This is not dispositive, however, because the same cannot be said for the Government's other argument for dismissal.

### b. The Mediation Agreement is Not Money-Mandating

The Government posits that the Mediation Agreement did not contemplate the award of money damages in the case of a breach, such that this case falls beyond the jurisdiction circumscribed by the Tucker Act. Pursuant to the Tucker Act, 28 U.S.C. § 1491, this Court maintains jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any *express or implied contract* with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (emphasis added). The Tucker Act itself does not create a substantive cause of action, which means that "a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc* in part). "In the parlance of Tucker Act cases, that source must be 'money-mandating.'" *Id*. (citations omitted).

The Government argues that nothing in the Mediation Agreement indicates the intent to allow money damages in the event of a breach. Instead, it argues that the logical remedy for breach of a confidentiality clause in a mediation agreement is excluding from judicial proceedings any evidence derived from the mediation. *See* Gov't Mot. at 13. Higbie responds that there is a presumption, in the civil context, that a damages remedy is

available upon the breach of an agreement.  Pltf. Resp. at 9 (citing *Holmes*, 657 F.3d at 1313-14).

Higbie is correct, of course, that there is a presumption that a damages remedy is available in the civil context.  *See Holmes*, 657 F.3d at 1314; *see also Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) ("[I]n the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement.").  However, the same case that Higbie cites for that presumption also states that in circumstances where a contract "could involve purely nonmonetary relief… it [i]s proper for the court to require a demonstration that the agreements could fairly be interpreted as contemplating money damages in the event of breach."  *Holmes*, 657 F.3d at 1315.  If this Court were to blindly follow the money damages presumption, which is basically what Higbie asks it to do, it would run afoul of the Federal Circuit's admonishment that "consent to suit under the Tucker Act does not extend to every contract."  *Id*. at 1309.

Instead, where a contract could reasonably be interpreted to involve purely nonmonetary relief, this Court may require a plaintiff to render proof that the contract can "fairly be interpreted as mandating compensation by the Federal Government."  *Id*. (quoting *United States v. Navajo Nation*, 129 S.Ct. 1547, 1551-52 (2009)).  In this instance, the contract clearly does not contemplate money damages.  As with all forms of mediation, the contract is driven by the hope that parties will fully and fairly discuss settlement, secure in the knowledge that their statements cannot be used against them in future proceedings.  As the Government argues, the logical "remedy" for a breach is the exclusion from proceedings any evidence uncovered by way of the breach.

Higbie next attempts to demonstrate that the Mediation Agreement can fairly be interpreted to mandate money damages.  The basis for this argument is unclear, at best.  For example, Higbie again relies on *Holmes*, which addressed settlement agreements pursuant to Title VII and found that the settlement agreements could fairly be construed to include monetary.  *See Holmes*, 657 F.3d at 1315.  The Federal Circuit did not accidentally stumble on that conclusion, as Higbie would have this Court do, but instead reached its conclusion based on the evidence.  As the Federal Circuit reasoned, the purpose of the Agreements was to prevent the plaintiff from being denied future employment based on his record.  "In short, the agreements inherently relate to monetary compensation through relationship to Mr. Holmes's future employment."  *Id*. at 1316.

No such issue arises here.  The Mediation Agreement did not address anything remotely monetary; it is limited to the parties' conduct during and after the mediation process.  The entire document is full of statements pertaining to the limitations upon mediation.  *See* Docket No. 5-1 at 9-11.  While Higbie notes that the *Holmes* court attached significance to the fact that "there is no language in the agreements indicating that the parties did not intend for money damages to be available in the event of breach," *Holmes*, 657 F.3d at 1316, this agreement is wholly unlike those in *Holmes*.

After arguing that *Holmes* mandates a finding that the Mediation Agreement provides for money damages, Higbie turns to a series of citations that speak generally to the issue of confidential mediation. *See* Pltf. Resp. at 10-11. Nothing in these citations indicates that money damages are awarded for breach of mediation confidentiality.

Although Higbie does not raise another argument in direct response to the Government's assertion that the Mediation Agreement does not contemplate money damages, his response to the Government's 12(b)(6) argument touches on the same issue. There, the Government argued that Higbie's claim for $500,000 is completely arbitrary (it is). Higbie's response to this argument attempts to raise the specter of money damages for a breach of confidentiality, so the Court deems it appropriate to consider that portion of Higbie's argument here. Most of Higbie's citations here fail once again to raise anything resembling a money award for breach of mediation confidentiality, but a few of the sources do at least require further analysis.

Higbie first relies on a case from the Supreme Court of California which notes that "confidentiality is essential to effective mediation." *Foxgate Homeowner's Ass'n, Inc. v. Bramalea California, Inc.*, 26 Cal.4th 1, 15 (2001). Although Higbie himself fails to point this out, the case did address the possibility of money sanctions for a violation of court-ordered mediation. *Foxgate*, however, is unpersuasive for two reasons. First, it is a California case analyzing California law, and it is therefore not controlling over a Texas contract claim. Second, the actions that gave rise to the request for sanctions had nothing to do with a breach of confidentiality in mediations. Rather, they mirror Higbie's actions as alleged in the Cotter and Thomas affidavits: a refusal to participate in mediation in good faith. Even with these points in mind, the monetary sanctions in *Foxgate* were overturned, and the court recognized that the appropriate remedy was exclusion of the evidence or, in cases where the evidence was disclosed during proceedings, a new hearing or trial. *See id.* at 18 ("Any reference to a mediation during any subsequent trial is an irregularity in the proceedings of the trial… Any reference to a mediation during any other subsequent noncriminal proceeding is grounds for vacating or modifying the decision in that proceeding, in whole or in part, and granting a new or further hearing on all or part of the issues, if the reference materially affected the substantial rights of the party requesting relief."). Thus, aside from the overturned monetary sanctions, this decision actually undermines Higbie's argument by showing that the proper remedy for breach of mediation confidentiality is exclusion of the improper evidence or a new hearing. This is precisely the point that the Government makes.

After another long series of citations to sources that have absolutely nothing to do with money damages, Higbie refers this Court to a series of confidentiality cases that do award money damages. The first is *Hallmark Cards v. Murley*, 703 F.3d 456 (8th Cir. 2013), and the second Higbie only refers to as "*Southwestern Energy Co.*"[2] In *Hallmark*,

---

[2] It appears that this case is *Southwestern Energy Production Co. v. Berry-Helfand*, -- S.W.3d ---, 2013 WL 3461644 (Tex. App. July 10, 2013). The Court assumes this is the case to which Higbie refers because Higbie states that the jury awarded a verdict of $11.4 million and the Court of Appeals of Texas upheld an award of $11,445,000.

the jury awarded damages of $860,000 for disclosing confidential information while the *Southwestern* jury awarded $11.4 million. Higbie's reference to these cases borders on frivolous. These are *trade secret* cases. The confidentiality concerns in trade secret cases differ dramatically from the concerns of confidentiality in mediation because the confidentiality of a trade secret is the source of its economic value. *See* Uniform Trade Secrets Act § 1.4 (defining trade secret, in part, as something that "derives *independent economic value*, actual or potential, from *not being generally known…*"). To the extent that such cases are even remotely relevant to this action, it is only to demonstrate that trade secret nondisclosure agreements are a type of contract which may not expressly reference money damages but which inherently provide a basis for a monetary award.

Finally, Higbie informs the Court that statutes "providing causes of action for money damages [for breaching mediation confidentiality] are becoming more common each year." Pltf. Resp. at 18. In support of this point, Higbie cites *one* law—a Florida state law. Meanwhile, Higbie's Complaint makes clear that all the facts relevant to his case occurred in Texas. The Florida law is irrelevant to his cause of action.

In sum, the Government has properly raised concerns over the question of whether the Mediation Agreement contemplates the award of money damages in case of breach. Higbie, by relying only on unrelated or otherwise uninformative sources instead of the contract at issue, has failed to respond to the Government's argument. Dismissal is therefore appropriate on the basis that the Mediation Agreement cannot fairly be interpreted as contemplating money damages in the event of breach.

## IV.    Conclusion

As the foregoing makes clear, this Court lacks jurisdiction over Higbie's claim. Although Higbie's action is not barred here because it is not "for or in respect to" the same claim that he has asserted in the Northern District of Texas, his action is barred because the Mediation Agreement cannot fairly be interpreted as contemplating money damages in the event of breach.

For these reasons, the Government's motion to dismiss is GRANTED and this action is dismissed. The Clerk is directed to mark this case closed and enter judgment accordingly.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on    April 23, 2014
by:

- ☐ US mail
- ☐ Fax
- ☐ Hand
- ☒ Electronic Means
     (by email or CM/ECF)

DAMON MATHIAS                                    S/ DAMON MATHIAS
Name of Counsel                                   Signature of Counsel

Law Firm    SCHULMAN MATHIAS PLLC

Address    8390 LBJ FREEWAY, SUITE 500

City, State, ZIP    DALLAS, TEXAS 75243

Telephone Number    214-739-0100

FAX Number    214-739-0151

E-mail Address    damon@dallaslegalteam.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 6,131 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Apple Pages in Helvetica 14 point font.


Dated:    April 23, 2014

/s/ Damon Mathias
Damon Mathias

Attorney for Appellant

No. 14-5042

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

**RICHARD HIGBIE,**

Plaintiff-Appellant,

v.

**UNITED STATES**

Defendant-Appellee,

---

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN
CASE NO. 13-270, JUDGE EDWARD DAMICH

---

## CORRECTED APPENDIX (A000001-A000257)

---

SCHULMAN | MATHIAS PLLC

Damon Mathias
Cary Schulman
LBJ TOWER
8390 LBJ Freeway, Suite 500
Dallas, Texas 75243
Telephone: (214) 739-0100
Facsimile: (214) 739-0151

Dated: April 23, 2014

**ATTORNEYS FOR PLAINTIFF-APPELLANT
RICHARD HIGBIE**

## CORRECTED APPENDIX TABLE OF CONTENTS

### JUDGMENTS AND ORDERS APPEALED FROM

Judgment of November 14, 2013………………………………….A000001

Opinion and Order Granting Motion to Dismiss…..……….……….A000002

Order Granting Plaintiff's Unopposed Motion to Transfer Venue..…A000148

### PLEADINGS AND OTHER PAPERS

Transfer Complaint……………………………………………………A000013

Exhibit A of Transfer Complaint - US Dept. of State Alternative Dispute Resolution Fact Sheet…………………………..…………………A000019

Exhibit B of Transfer Complaint - EEO Investigative Affidavit………A000030

Exhibit C of Transfer Complaint - EEO Investigative Affidavit….. …A000033

Defendant's Motion to Dismiss……………………..…………………A000036

Plaintiff's Memorandum of Law in Opposition of Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1) & Fed. R. Civ. P. 12(B)(6) ……………………………………………………………………….A000059

Exhibit A of Plaintiff's Memorandum of Law in Opposition of Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1) & Fed. R. Civ. P. 12(B)(6)…………………………………………………..……………A000083

Exhibit B of Plaintiff's Memorandum of Law in Opposition of Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1) & Fed. R. Civ. P. 12(B)(6)……………………………………….……………………A000088

Exhibit C of Plaintiff's Memorandum of Law in Opposition of Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1) & Fed. R. Civ. P. 12(B)(6)…………………………………………………….……A000126

Defendant's Reply In Support of Motion to Dismiss………….…….A000130

Plaintiff's Notice of Appeal……………………………………………..A000140

Plaintiff's Opposed Motion For Leave to File Plaintiff's Second Amended Complaint………………………………………………………………..A000141

Plaintiff's Unopposed Motion to Transfer Venue……………………..A000144

Plaintiff's Third Amended Complaint……………………….…………A000149

Plaintiff's Second Amended Complaint……………………….……..A000189

Plaintiff's Original Complaint……………………………………..……A000230

Agreed Motion For Protective Order…………………………………..A000256

**US COURT OF FEDERAL CLAIMS DOCKET SHEET**…………………………………………………………………..A000010

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on  April 23, 2014
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
    (by email or CM/ECF)

DAMON MATHIAS

Name of Counsel

S/ DAMON MATHIAS

Signature of Counsel

Law Firm  SCHULMAN MATHIAS PLLC

Address  8390 LBJ FREEWAY, SUITE 500

City, State, ZIP  DALLAS, TEXAS 75243

Telephone Number  214-739-0100

FAX Number  214-739-0151

E-mail Address  damon@dallaslegalteam.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

# In the United States Court of Federal Claims

### No. 13-270 C

**RICHARD HIGBIE,**

**JUDGMENT**

**v.**

**THE UNITED STATES**

Pursuant to the court's Opinion and Order, filed November 14, 2013,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the complaint is dismissed.

Hazel C. Keahey
Clerk of Court

**November 14, 2013**            By:     s/Lisa L. Reyes

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $455.00.

# In the United States Court of Federal Claims

No. 13-270C
(Filed November 14, 2013)

```
*************************************
                                    *
RICHARD HIGBIE,                     *
                                    *
                Plaintiff,          *
                                    *
        v.                          *
                                    *
THE UNITED STATES,                  *
                                    *
                Defendant.          *
                                    *
*************************************
```

## OPINION AND ORDER

In this action, Plaintiff Richard Higbie ("Higbie") alleges that the United States (the "Government") breached the confidentiality provision of an "Agreement to Mediate" ("Mediation Agreement"). Higbie seeks $500,000 in compensation for this alleged breach. Higbie's original action was filed in the United States District Court for the Northern District of Texas and the pertinent portion of that action was transferred to this Court on April 17, 2013. Higbie filed his transfer complaint in this Court on July 15, 2013. The Government then filed the instant motion to dismiss, pursuant to the Rules of the Court of Federal Claims ("RCFC") 12(b)(1) and 12(b)(6), and the briefing was completed on October 25, 2013.

Because the Court finds that the Government's Tucker Act challenge requires dismissal of this case, it does not reach the merits of the Government's 12(b)(6) arguments. For the reasons that follow, the Government's motion to dismiss is GRANTED.

## I.      Background[1]

Higbie is an employee of the Bureau of Diplomatic Security ("BDS"), a division of the U.S. Department of State ("State Department"). Compl. at ¶ 2. On January 15, 2009, Higbie contacted an EEO counselor complaining that the State Department had

---

[1] Unless specifically stated, all "Dkt." references in this section refer to the docket filings in Higbie's case pending in the Northern District of Texas at Case No. 3:11-cv-02636-L. Any citations to "Compl." refer to Higbie's Transfer Complaint, found at Docket No. 5 in this Court's record.

A000002

discriminated against him.  *Id.* at ¶ 5.  The case was referred to mediation.  *Id.* at ¶ 6.
Prior to engaging in mediation, the parties signed a document entitled "EEO/Alternative
Dispute Resolution Agreement to Mediate" ("Mediation Agreement").  *Id.*  After the
mediation fell apart, an EEO investigator undertook an investigation and prepared a
report.  *Id.* at ¶ 7.  During the investigation, Government officials Marion Cotter
("Cotter") and Jeffrey Thomas ("Thomas") provided affidavits.  *See id.* at ¶¶ 8-9.

On October 5, 2011, Higbie filed suit in the Northern District of Texas.  Higbie
alleged that the State Department retaliated against him (Count I), created a hostile work
environment (Count II), and that the agency had breached the confidentiality clause of the
2009 Mediation Agreement (Count III).  Count III was rooted in the affidavits filed by
Cotter and Thomas.  Higbie took the position that the affidavits violated the
confidentiality provision of the Mediation Agreement by disclosing "information held
under strict confidentiality guidelines set by the aforementioned [Mediation Agreement]."
*See* Dkt. 1 ("Texas Compl.") at ¶ 54.  Higbie alleged that the affidavits "demonstrated a
willful attempt by [Cotter and Thomas] to further discriminate and retaliate against the
Plaintiff for engaging in related protected activity."  *Id.* at ¶ 55.  Higbie also asserted that
the breach of the confidentiality clause constituted a violation of the Alternative Dispute
Resolution Act of 1996 ("ADRA").  *Id.* at ¶ 86.

The State Department filed a motion to dismiss Count III and Higbie was granted
leave to file an amended complaint, which he filed on June 25, 2012.  The Amended
Complaint was similar to the original complaint; the major difference was that, instead of
asserting a violation of the ADRA, Higbie's amended complaint alleged that the same
actions created a cause of action "[p]ursuant to the common laws of the State of Texas."
*Compare id.* at ¶ 86 *with* Dkt. 10 ("Texas Am. Compl.") at ¶ 97.

On January 29, 2013, Higbie filed a motion for leave to file a second amended
complaint and a motion to transfer his contract claim to this Court.  Both motions were
granted and, on February 8, 2013, Higbie filed another amended complaint which still
stated a cause of action for breach of the confidentiality clause of the Mediation
Agreement.  *See* Dkt. 35 ("Texas Sec. Am. Compl.") at ¶ 109.

The contract claim was transferred to this Court on April 17, 2013.  Unlike the
various complaints filed in the Northern District of Texas, Higbie's Complaint here states
only one cause of action for the breach of the Mediation Agreement.  *See* Compl. at ¶¶
11-12.  On September 13, 2013, pursuant to RCFC 12(b)(1) and 12(b)(6) the Government
moved to dismiss Higbie's action in front of this Court.

## II.      Legal Standard

A motion brought pursuant to RCFC 12(b)(1) challenges the Court's subject
matter jurisdiction.  *See* RCFC 12(b)(1).  When faced with a motion to dismiss for lack of
subject matter jurisdiction, a court must assume that all undisputed facts alleged in the
complaint are true, and it must draw all reasonable inferences in the plaintiff's favor.

A000003

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

**III.     Discussion**

The Government raises two arguments as to why this Court lacks jurisdiction to hear Higbie's case.  First, it argues that Higbie's Complaint here is barred by operation of 28 U.S.C. § 1500.  Second, the Government argues that the Court lacks jurisdiction because the Mediation Agreement does not create a right to money damages.

*a.   28 U.S.C. § 1500 Does Not Bar Higbie's Action in this Court*

The Government first argues that Higbie's claim is barred by operation of 28 U.S.C. § 1500, which provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

"The rule is more straightforward than its complex wording suggests.  The CFC has no jurisdiction over a claim if the plaintiff has another suit *for or in respect to* that claim pending against the United States or its agents."  *United States v. Tohono O'Odham Nation*, 131 S.Ct. 1723, 1727 (2011) (emphasis added).  This statutory provision "effects a significant jurisdictional limitation" upon this Court; it is designed to "save the Government from burdens of redundant litigation."  *Id.* at 1729-30.

The Supreme Court emphasized in *Tohono* that § 1500 "bars jurisdiction in the CFC not only if the plaintiff sues on an identical claim elsewhere—a suit 'for' the same claim—but also if the plaintiff's other action is related although not identical—a suit 'in respect to' the same claim."  *Id.* at 1728.  Thus, the Supreme Court determined that "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on *substantially the same operative facts*, regardless of the relief sought in each suit."  *Id.* at 1731 (emphasis added).  Applying the Supreme Court's ruling in *Tohono*, the Federal Circuit has explained that, "[t]o determine whether § 1500 applies, a court must make two inquiries: (1) whether there is an earlier-filed 'suit or process' pending in another court, and, if so, (2) whether the claims asserted in the earlier-filed case are 'for or in respect to' the same claim(s) asserted in the later-filed Court of Federal Claims action."  *Brandt v. United States*, 710 F.3d 1369, 1374 (Fed. Cir. 2013).

The first *Brandt* inquiry must be answered in the affirmative.  Because Higbie's claim before this Court was removed from his already-pending action in the Northern District of Texas, the Texas case qualifies as an earlier-filed suit.  *See Griffin v. United*

3

A000004

*States*, 590 F.3d 1291, 1293 (Fed. Cir. 2009) ("if a plaintiff files multiple related claims in district court, and the court transfers one of those claims to the Court of Federal Claims, the original claims are 'pending' at the time the transferred claim is considered filed, and § 1500 *may* deprive the Court of Federal Claims of jurisdiction over the transferred claim.") (emphasis added).

The true dispute revolves around the second *Brandt* inquiry.  The Government asserts that Higbie's claim here revolves around substantially the same operative facts as his action in the Northern District of Texas, such that the Texas action is "for or in respect to" the same claim asserted here.  *See* Gov't Mot. at 9-10.  Essentially, the Government argues that the breach of the confidentiality clause is cited by Higbie in support of his retaliation claim, such that Higbie's claim here is "in respect to" his retaliation claim in Texas.

Higbie responds that the contract claim was severed from the Texas case, while the non-contract claims in the Texas case are unrelated to the breach of the confidentiality clause.  His position appears to be that the severance of the contract claim from the Texas case renders his action here unrelated to the Texas proceedings.  Further, Higbie claims that his case in Texas no longer asserts the breach of the confidentiality clause as part of his retaliation claim.

Although the parties dispute which version of Higbie's Texas complaint—the Second Amended Complaint or the Third—controls, that point is irrelevant to the Court's decision.  The true question is whether Higbie's claims in Texas are "for or in respect to" substantially the same operative facts as is his case here.  *See Tohono*, 131 S.Ct. at 1727. It is clear that they are not.

Higbie's claim here is for breach of contract, while his claims in Texas are for discrimination and retaliation.  It appears to the Court that the only indication that these claims are remotely based on the same operative facts are two paragraphs which appear in both Higbie's Second and Third Amended Complaints.  The first of these paragraphs states:

> In separate affidavits, both "Responding Officials" Marion Cotter (Special Agent in Charge of the Houston Field Office) and Jeffery Thomas (Supervisory Special Agent of the Houston Field Office) provided the EEO assigned Investigator, Robert Maddern, information held under strict confidentiality guidelines set for by the aforementioned ADR Mediation [Agreement].  Both respective Responding Officials included in their affidavits information concerning the underlying facts of the ADR proceeding and records generated as part of the proceeding that are strictly prohibited from being made part of the EEO complaint record.

Second Am. Compl. at ¶ 54; Third Am. Compl. at ¶ 54.  Immediately after this paragraph, both versions of Higbie's Texas complaint state that "[t]his demonstrated a

A000005

willful attempt by the Responding Officials to *further discriminate and retaliate* against the Plaintiff for engaging in related protected activity."  Second Am. Compl. at ¶ 55; Third Am. Compl. at ¶ 55 (emphasis added).  In other words, in the Texas proceedings Higbie has asserted that the Government's alleged breach of the Mediation Agreement supports his claim for retaliation.  The Government relies on these two paragraphs in support of its assertion that Higbie's claim here is barred by §1500 due to the Texas case.

Higbie responds that the breach of confidentiality is "incapable of serving as an adverse employment action that would allow Plaintiff to prevail on his retaliation claim or hostile work environment claim…"  Pltf. Resp. at 6.  The Court is not concerned with this point, and makes no judgment as to the viability of Higbie's assertion of the breach in support of his retaliation claim.  In this Court's mind, the key is that the alleged disclosure of confidential information is a single fact which, if true, would be dispositive as to Higbie's contractual claim.  Meanwhile, Higbie's retaliation claim requires *far more* than the simple fact of disclosure.  In an instance such as this, where a single fact would be dispositive in one case and somewhere between completely irrelevant and minimally relevant in another, the two cases are not "based on substantially the same *operative* facts."  *Tohono*, 131 S.Ct. at 1730 (emphasis added).

Because the operative facts in the case before this Court differ substantially from the operative facts before the Eastern District of Texas, this Court concludes that § 1500 does not divest the Court of jurisdiction to hear Higbie's claim.  This is not dispositive, however, because the same cannot be said for the Government's other argument for dismissal.

### b.  The Mediation Agreement is Not Money-Mandating

The Government posits that the Mediation Agreement did not contemplate the award of money damages in the case of a breach, such that this case falls beyond the jurisdiction circumscribed by the Tucker Act.  Pursuant to the Tucker Act, 28 U.S.C. § 1491, this Court maintains jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any *express or implied contract* with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (emphasis added).  The Tucker Act itself does not create a substantive cause of action, which means that "a plaintiff must identify a separate source of substantive law that creates the right to money damages."  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc* in part).  "In the parlance of Tucker Act cases, that source must be 'money-mandating.'"  *Id*. (citations omitted).

The Government argues that nothing in the Mediation Agreement indicates the intent to allow money damages in the event of a breach.  Instead, it argues that the logical remedy for breach of a confidentiality clause in a mediation agreement is excluding from judicial proceedings any evidence derived from the mediation.  *See* Gov't Mot. at 13.  Higbie responds that there is a presumption, in the civil context, that a damages remedy is

A000006

available upon the breach of an agreement.  Pltf. Resp. at 9 (citing *Holmes*, 657 F.3d at 1313-14).

Higbie is correct, of course, that there is a presumption that a damages remedy is available in the civil context.  *See Holmes*, 657 F.3d at 1314; *see also Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) ("[I]n the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement.").  However, the same case that Higbie cites for that presumption also states that in circumstances where a contract "could involve purely nonmonetary relief... it [i]s proper for the court to require a demonstration that the agreements could fairly be interpreted as contemplating money damages in the event of breach."  *Holmes*, 657 F.3d at 1315.  If this Court were to blindly follow the money damages presumption, which is basically what Higbie asks it to do, it would run afoul of the Federal Circuit's admonishment that "consent to suit under the Tucker Act does not extend to every contract."  *Id*. at 1309.

Instead, where a contract could reasonably be interpreted to involve purely nonmonetary relief, this Court may require a plaintiff to render proof that the contract can "fairly be interpreted as mandating compensation by the Federal Government."  *Id*. (quoting *United States v. Navajo Nation*, 129 S.Ct. 1547, 1551-52 (2009)).  In this instance, the contract clearly does not contemplate money damages.  As with all forms of mediation, the contract is driven by the hope that parties will fully and fairly discuss settlement, secure in the knowledge that their statements cannot be used against them in future proceedings.  As the Government argues, the logical "remedy" for a breach is the exclusion from proceedings any evidence uncovered by way of the breach.

Higbie next attempts to demonstrate that the Mediation Agreement can fairly be interpreted to mandate money damages.  The basis for this argument is unclear, at best.  For example, Higbie again relies on *Holmes*, which addressed settlement agreements pursuant to Title VII and found that the settlement agreements could fairly be construed to include monetary.  *See Holmes*, 657 F.3d at 1315.  The Federal Circuit did not accidentally stumble on that conclusion, as Higbie would have this Court do, but instead reached its conclusion based on the evidence.  As the Federal Circuit reasoned, the purpose of the Agreements was to prevent the plaintiff from being denied future employment based on his record.  "In short, the agreements inherently relate to monetary compensation through relationship to Mr. Holmes's future employment."  *Id*. at 1316.

No such issue arises here.  The Mediation Agreement did not address anything remotely monetary; it is limited to the parties' conduct during and after the mediation process.  The entire document is full of statements pertaining to the limitations upon mediation.  *See* Docket No. 5-1 at 9-11.  While Higbie notes that the *Holmes* court attached significance to the fact that "there is no language in the agreements indicating that the parties did not intend for money damages to be available in the event of breach," *Holmes*, 657 F.3d at 1316, this agreement is wholly unlike those in *Holmes*.

A000007

After arguing that *Holmes* mandates a finding that the Mediation Agreement provides for money damages, Higbie turns to a series of citations that speak generally to the issue of confidential mediation. *See* Pltf. Resp. at 10-11. Nothing in these citations indicates that money damages are awarded for breach of mediation confidentiality.

Although Higbie does not raise another argument in direct response to the Government's assertion that the Mediation Agreement does not contemplate money damages, his response to the Government's 12(b)(6) argument touches on the same issue. There, the Government argued that Higbie's claim for $500,000 is completely arbitrary (it is). Higbie's response to this argument attempts to raise the specter of money damages for a breach of confidentiality, so the Court deems it appropriate to consider that portion of Higbie's argument here. Most of Higbie's citations here fail once again to raise anything resembling a money award for breach of mediation confidentiality, but a few of the sources do at least require further analysis.

Higbie first relies on a case from the Supreme Court of California which notes that "confidentiality is essential to effective mediation." *Foxgate Homeowner's Ass'n, Inc. v. Bramalea California, Inc.*, 26 Cal.4th 1, 15 (2001). Although Higbie himself fails to point this out, the case did address the possibility of money sanctions for a violation of court-ordered mediation. *Foxgate*, however, is unpersuasive for two reasons. First, it is a California case analyzing California law, and it is therefore not controlling over a Texas contract claim. Second, the actions that gave rise to the request for sanctions had nothing to do with a breach of confidentiality in mediations. Rather, they mirror Higbie's actions as alleged in the Cotter and Thomas affidavits: a refusal to participate in mediation in good faith. Even with these points in mind, the monetary sanctions in *Foxgate* were overturned, and the court recognized that the appropriate remedy was exclusion of the evidence or, in cases where the evidence was disclosed during proceedings, a new hearing or trial. *See id.* at 18 ("Any reference to a mediation during any subsequent trial is an irregularity in the proceedings of the trial… Any reference to a mediation during any other subsequent noncriminal proceeding is grounds for vacating or modifying the decision in that proceeding, in whole or in part, and granting a new or further hearing on all or part of the issues, if the reference materially affected the substantial rights of the party requesting relief."). Thus, aside from the overturned monetary sanctions, this decision actually undermines Higbie's argument by showing that the proper remedy for breach of mediation confidentiality is exclusion of the improper evidence or a new hearing. This is precisely the point that the Government makes.

After another long series of citations to sources that have absolutely nothing to do with money damages, Higbie refers this Court to a series of confidentiality cases that do award money damages. The first is *Hallmark Cards v. Murley*, 703 F.3d 456 (8th Cir. 2013), and the second Higbie only refers to as "*Southwestern Energy Co.*"[2] In *Hallmark*,

---

[2] It appears that this case is *Southwestern Energy Production Co. v. Berry-Helfand*, -- S.W.3d ---, 2013 WL 3461644 (Tex. App. July 10, 2013). The Court assumes this is the case to which Higbie refers because Higbie states that the jury awarded a verdict of $11.4 million and the Court of Appeals of Texas upheld an award of $11,445,000.

A000008

the jury awarded damages of $860,000 for disclosing confidential information while the *Southwestern* jury awarded $11.4 million. Higbie's reference to these cases borders on frivolous. These are *trade secret* cases. The confidentiality concerns in trade secret cases differ dramatically from the concerns of confidentiality in mediation because the confidentiality of a trade secret is the source of its economic value. *See* Uniform Trade Secrets Act § 1.4 (defining trade secret, in part, as something that "derives *independent economic value*, actual or potential, from *not being generally known…*"). To the extent that such cases are even remotely relevant to this action, it is only to demonstrate that trade secret nondisclosure agreements are a type of contract which may not expressly reference money damages but which inherently provide a basis for a monetary award.

Finally, Higbie informs the Court that statutes "providing causes of action for money damages [for breaching mediation confidentiality] are becoming more common each year." Pltf. Resp. at 18. In support of this point, Higbie cites *one* law—a Florida state law. Meanwhile, Higbie's Complaint makes clear that all the facts relevant to his case occurred in Texas. The Florida law is irrelevant to his cause of action.

In sum, the Government has properly raised concerns over the question of whether the Mediation Agreement contemplates the award of money damages in case of breach. Higbie, by relying only on unrelated or otherwise uninformative sources instead of the contract at issue, has failed to respond to the Government's argument. Dismissal is therefore appropriate on the basis that the Mediation Agreement cannot fairly be interpreted as contemplating money damages in the event of breach.

## IV.    Conclusion

As the foregoing makes clear, this Court lacks jurisdiction over Higbie's claim. Although Higbie's action is not barred here because it is not "for or in respect to" the same claim that he has asserted in the Northern District of Texas, his action is barred because the Mediation Agreement cannot fairly be interpreted as contemplating money damages in the event of breach.

For these reasons, the Government's motion to dismiss is GRANTED and this action is dismissed. The Clerk is directed to mark this case closed and enter judgment accordingly.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge

A000009

APPEAL,CLOSED,ECF

# US Court of Federal Claims
## United States Court of Federal Claims (COFC)
## CIVIL DOCKET FOR CASE #: 1:13-cv-00270-EJD
## Internal Use Only

HIGBIE v. USA
Assigned to: Judge Edward J. Damich
Cause: 28:1491 Tucker Act

Date Filed: 04/17/2013
Date Terminated: 11/14/2013
Jury Demand: None
Nature of Suit: 134 Contract - Other
Jurisdiction: U.S. Government
Defendant

**Plaintiff**
**RICHARD HIGBIE**                    represented by    **Cary W. Schulman**
Schulman Mathias, PLLC
8390 LBJ Freeway
Suite 500
Dallas, TX 75243
(214) 739-0100
Fax: (214) 739-0151
Email: cary@dallaslegalteam.com
*TERMINATED: 07/15/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Damon E. Mathias**
Schulman Mathias, PLLC
8390 LBJ Freeway
Suite 500
Dallas, TX 75243
(214) 739-0100
Fax: (214) 739-0151
Email: damon@dallaslegalteam.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**
**USA**                               represented by    **Michael Paul Goodman**
U.S. Department of Justice - Civil
Division
1100 L Street, NW
Room 12144
Washington, DC 20530
(202) 305-2087

A000010

Fax: (202) 514-8624
Email: michael.goodman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/09/2014 | 13 | NOTICE OF APPEAL as to 11 Order on Motion to Dismiss - Rule 12(b)(1) and (6), 12 Judgment, filed by RICHARD HIGBIE. Filing fee $ 505, receipt number 9998-2296128. Copies to judge, opposing party and CAFC. (Mathias, Damon) (Entered: 01/09/2014) |
| 11/14/2013 | 🔒 | (Court only) ***Civil Case Terminated. (lld) (Entered: 11/14/2013) |
| 11/14/2013 | 12 | JUDGMENT entered pursuant to Rule 58, that the complaint is dismissed. (Copy to parties) (lld) (Entered: 11/14/2013) |
| 11/14/2013 | 11 | ORDER granting 8 Granting Motion to Dismiss - Rule 12(b)(1) and (6). The Clerk is directed to mark this case closed and enter judgment accordingly. Signed by Judge Edward J. Damich. (jm) Copy to parties. (Entered: 11/14/2013) |
| 10/25/2013 | 10 | REPLY to Response to Motion re 8 MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) , filed by USA. (Goodman, Michael) (Entered: 10/25/2013) |
| 10/15/2013 | 🔒 | (Court only) Set Deadline: Defendant's Reply to 9 Response due by 11/1/2013. (dls) (Entered: 10/18/2013) |
| 10/15/2013 | 9 | RESPONSE to 8 MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) , filed by RICHARD HIGBIE. **Reply due 11/1/13.** (Attachments: # 1 Exhibit)(Mathias, Damon) Modified on 10/18/2013 to edit docket text and add reply due date. (dls). (Entered: 10/16/2013) |
| 09/13/2013 | 8 | MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) , filed by USA.**Response due by 10/15/2013.**(Goodman, Michael) (Entered: 09/13/2013) |
| 08/14/2013 | 7 | SPECIAL PROCEDURES ORDER. Signed by Judge Edward J. Damich. (EJ1) Copy to parties. (Entered: 08/14/2013) |
| 08/13/2013 | 6 | NOTICE of Appearance by Michael Paul Goodman for USA . (Goodman, Michael) (Entered: 08/13/2013) |
| 07/15/2013 | 5 | TRANSFER COMPLAINT against USA (One copy to Department of Justice), filed by RICHARD HIGBIE. **Answer due by 9/13/2013. Nunc pro tunc 5/20/2013.** (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(hw1) (Entered: 07/15/2013) |
| 07/15/2013 | 4 | Consented MOTION to Substitute Attorney DAMON MATHIAS in place of CARY SCHULMAN , filed by RICHARD HIGBIE. (Attachments: # 1 Text of Proposed Order)(Mathias, Damon) (Entered: 07/15/2013) |

A000011

| 04/17/2013 | 🔒 | (Court only) Remark - Copies of the Notice of filing transfer case, Transfer complaint instructions, instructions and application for attorney admission sent to plaintiff's attorney this day via certified mail return receipt [7012 3460 0001 7791 6046]. (hw1) (Entered: 04/17/2013) |
|---|---|---|
| 04/17/2013 | | **NOT MEMBER OF BAR.** Our records indicate that plaintiff's attorney is not admitted to practice before the U.S. Court of Federal Claims. In order to practice before the U.S. Court of Federal Claims, and obtain an ECF account, an attorney must be admitted to the court's bar. Attorney admissions instructions and forms are on the court's website: www.uscfc.uscourts.gov. Please contact our admissions clerk at 202-357-6429 for any additional assistance. The attorney admission process should be completed by 6/6/2013. (hw1) (Entered: 04/17/2013) |
| 04/17/2013 | 3 | NOTICE of Designation of Electronic Case. (hw1) (Entered: 04/17/2013) |
| 04/17/2013 | 2 | NOTICE of Assignment to Judge Edward J. Damich. (hw1) (Entered: 04/17/2013) |
| 04/17/2013 | 1 | There has been filed this day, on behalf of the parties, the record as transferred from the United States District Court for the District of Texas Dallas Division, Case No.3:11-CV-2636-L. Original File consisting of Transfer Order and Docket Sheet. Transfer Complaint due by 5/20/2013. (Attachments: # 1 Docket Sheet from Transferring court, # 2 Transfer Order) (hw1) (Entered: 04/17/2013) |

A000012

*Substitute*

# ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED

MAY 2 0 2013

U.S. COURT OF
FEDERAL CLAIMS

| | | |
|---|---|---|
| **RICHARD HIGBIE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **NO: 1:13-cv-00270-EJD** |
| **THE UNITED STATES OF AMERICA** | § | |
| | § | |
| **Defendant.** | § | |

## TRANSFER COMPLAINT

Plaintiff Richard Higbie, by and through undersigned counsel, brings this Complaint against the United States of America, and states as follows:

## I.
## INTRODUCTION

1.     This case arose out of multiple instances of acts of retaliation, reprisal and harassment against Plaintiff due to prior protected activity, under Title VII of the Civil Rights Act of 1964 by the United States Department of State against Plaintiff who is an employee of the United States Government and employed by the Bureau of Diplomatic Security, within the U.S. State Department, as a Civil Service employee. The EEOC claim out of which this matter arises was filed in 2009 through the respective administrative EEOC complaint process and the contract at issue in the present case relates to an EEO/ADR Agreement to Mediate entered into between the parties in May 2009.  Plaintiff's Title VII and breach of contract claims were filed in the US District Court for the Northern District Texas. Plaintiff's Title VII claims are currently pending in litigation styled *Richard Higbie v.*

1

A000013

*Hillary Rodham Clinton*, in her Official Capacity as Secretary of State, Civil Action No. 3:11-cv-02636-L, N.D. Texas (Dallas Division). Plaintiff's breach of contract claim was ordered transferred to this Court on February 5, 2013 by the Honorable Judge Lindsay.

## II.
## PARTIES & JURISDICTION

2.     Plaintiff, Richard Higbie is a United States citizen employed by the Bureau of Diplomatic Security, within the U.S. State Department, as a Civil Service employee and a legal resident of the State of Texas.

3.     Defendant is the United States of America, acting by and through the U.S. Department of State.

4.     This Court has subject matter jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), as the claims set forth herein are founded in the Constitution, or an Act of Congress, or upon express or implied contract with the United States, for unliquidated damages not sounding in tort. This Court has jurisdiction to award attorney's fees for the Defendant's breach pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, which makes the federal government liable for fees where any other party would be liable under common law 28 U.S.C. § 2412(b) or in any civil action (other than cases sounding in tort) brought against the United States in any court having jurisdiction of that action. 28 U.S.C. § 2412(d)(1)

## III.
## FACTS

A000014

5.      On January 15, 2009, following numerous retaliatory acts of discrimination, Plaintiff

timely contacted an EEO Counselor to begin the process of filing a discrimination

complaint.  Plaintiff timely filed a formal complaint of discrimination on April 13, 2009.

6.      The case was referred to mediation and on May 29, 2009, the following

Responding Officials signed an "EEO/ Alternative Dispute Resolution – Agreement to

Mediate" ("ADR Agreement"): Marian Cotter, Paul Vallee and Jeffrey Thomas. (See Exhibit

"A") Among other provisions, the parties agreed to the following confidentiality clause:

> "**Mediation is a confidential process** (emphasis in original). Any documents
> submitted to the mediators and statements made during the mediation are for
> settlement purposes only."

7.      On March 3, 2010, an EEO Investigation Report was submitted. The report

included the affidavits of Marian Cotter and Jeffrey Thomas. In separate affidavits dated

12/17/2009, both "Responding Officials" Marion Cotter (Special Agent in Charge of the

Houston Field Office) and Jeffrey Thomas (Supervisory Special Agent of the Houston Field

Office) disclosed to EEO assigned Investigator, Robert Maddern, information that was

protected under the strict confidentiality guidelines set by the aforementioned ADR

Mediation.  Both Responding Officials included in their affidavits information concerning the

underlying facts of the ADR proceeding and records generated as part of the proceeding

that are strictly prohibited from being made part of the EEO complaint record.

8.      In response to EEO Complaints Investigator Robert E. Maddern's question "Is there

anything you would like to add to your affidavit and/or do you have any documents you

A000015

would like to submit in support of your testimony...? Marian Cotter voluntarily disclosed

confidential information about the mediation process in an effort to undermine Plaintiff's

claim, as she stated:

> "Much of Mr. Higbie's complaint seems to lack specificity. This was glaringly
> apparent at the Alternate Dispute Resolution when Mr. Higbie and his attorney
> declined to make any opening statement at all and terminate the ADR after the
> Department's statement and a private sidebar with the mediator, basically
> refusing to participate in the process. At minimum, this tactic demonstrated a
> complete lack of sincerity to resolve any issues  in an open and transparent
> forum." (See Exhibit B)

9.      Similarly, Mr. Thomas provided Mr. Maddern an affidavit that provided the following

statement:

> "On May 29, 2009, all parties agreed to be part of an Alternative Dispute
> Resolution meeting. It was a teleconference. Mr. Higbie refused to travel to
> Houston to meet with the respondents. The mediator asked Higbie's attorney to
> state his case. The only statement the attorney made was that Mr. Higbie plans
> to file an amended complaint and that he was willing to discuss Higbie's
> opportunities to obtain a GS 14 position. The attorney then asked to go off-line
> to talk to the mediator. One hour later the teleconference was terminated.
> Nothing was ever discussed and nothing was resolved." (See Exhibit C)

10.     The  Privacy Act Notice that accompanied the form affidavits completed by Ms.

Cotter  and Mr. Thomas in no uncertain terms informed the affiants of the purpose for the

sworn statement:  "this information will be used to adjudicate complaints of alleged

discrimination, " and further states "...this information maybe disclosed....in a legal

proceeding..." (See Exhibit B & C) The Responding Officials knowingly and unequivocally

breached the confidentiality agreement entered into on May 29, 2009.

<div align="center">

**IV.**
**<u>CAUSE OF ACTION</u>**

</div>

<div align="center">

4

</div>

A000016

BREACH OF CONTRACT

11.    Defendant, by and through its employees and agents, entered into a valid contract

with Plaintiff to participate in mediation. Plaintiff entered into this agreement relying upon

the confidentiality provisions present in the contract. Defendant breached the contract

when it violated the confidentiality provisions of the contract by disclosing confidential

information about the mediation process in an effort to undermine Plaintiff's claim. An

agreement providing for confidentiality procedures is binding on anyone who signs the

agreement. 5 USC § 574 (d)(1)[1]

12.    The breach of the mediation agreement was done by "resolving officials" and/or

responsible management officials in furtherance and in the scope of their employment with

the Department.  The acting officials for the Defendant entered as "parties" and or

"resolving officials" to the contractual mediation agreement. The Defendant is liable to the

Plaintiff under vicarious liability as the officials, agents and or employees were acting in

their official capacity with authority when entering and violating the agreements.

Defendant's breach was the direct and proximate cause of damages to the Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pray that the Court enter judgment against Defendant

and award the following relief:

---

[1] "While there is no parallel provision for parties, the exclusive wording of this subsection should not be
construed as limiting parties' ability to agree to alternative confidentiality procedures. Parties have a
general right to sign confidentiality agreements and there is no reason this should change in a mediation
context." *Confidentiality: Guide to Confidentiality in Federal Alternative Dispute Resolution
Programs*" (guide to assist federal agencies in developing ADR programs)(December 29, 2000)<http://
www.adr.gov/guidance.html>

5

A000017

a)    Money damages to compensate Plaintiff for the breach of confidentiality on behalf of the government, in an amount no less than $500,000.

b)    Attorney's Fees pursuant to 28 U.S.C. § 2412

c)    Any other relief the Court deems proper.

Respectfully submitted,

SCHULMAN | MATHIAS PLLC

Damon Mathias
Texas Bar No.: 24080170
Cary Schulman
Texas Bar No.: 00797390
8390 LBJ Freeway
Suite 500
Dallas, Texas 75243
Telephone: (214) 739-0100
Facsimile: (214) 739-0151
Damon@schulmanmathias.com

**ATTORNEYS FOR PLAINTIFF RICHARD HIGBIE**

6

A000018



A000019

# United States Department Of State
## *Office Of Civil Rights*

# ALTERNATIVE DISPUTE RESOLUTION
# FACT SHEET



**ALTERNATIVE DISPUTE RESOLUTION (ADR)** encompasses a range of problem solving processes designed to resolve disagreements without extensive administrative processing or the need for civil litigation. These processes may include mediation, fact-finding conferences, peer review panels, and arbitration. The Department's Office of Civil Rights employs Mediation as its primary ADR process.

## AUTHORITY

**The Administrative Dispute Resolution Act of 1996,** H.R. 4194, Public Law No. 104-320, signed into law on October 19, 1996, by the President (142 Cong. Rec. H12303-12304) permanently reauthorized the 1990 ADR Act, which requires all Federal Agencies to develop policies implementing ADR in their administrative programs.

Effective **November 9, 1999, the Equal Employment Opportunity Commission (EEOC)** revised regulations at **29 C.F.R. 1614.102 (b) (2)** to require all agencies to have in place or make available by January 2000 an Alternative Dispute Resolution Program. The purpose of the change was to promote greater use of alternative dispute resolution (ADR) procedures in both the pre-complaint and formal complaint processes. In the pre-complaint stage, **29 C.F.R. 1614.105 (f)** provides for an extension of pre-complaint processing from **30 days to 90 days** when an aggrieved person chooses to participate in an established ADR procedure.

A000020

# MEDIATION

**Mediation** is an informal structured process, which provides a forum for discussion of the issues in dispute and the opportunity to enter an agreement that satisfies the interests of all parties. Participation in this alternative process requires a trained Mediator, the Aggrieved Person/Complainant, and the Responding and Resolving Officials.

While consenting Aggrieved Persons/Complainants and Management Officials are required to appear at a scheduled mediation session and engage in good faith attempts to resolve the matter, parties may conclude the mediation session without reaching an agreement.

# THE OFFICE OF CIVIL RIGHTS' EEO/ADR PROCESS

- ❏ The Department's Office of Civil Rights' Intake and Resolution Section utilizes mediation as the primary method of dispute resolution.

- ❏ All employees (including applicants for employment) of the Department of State who wish to file EEO complaints of discrimination will have the opportunity to select ADR.

- ❏ Participation in the EEO/ADR process is at the discretion of the Aggrieved Person or Complainant.

- ❏ Management's participation in the EEO/ADR process is mandatory.

- ❏ Final authority for granting access to the EEO/ADR process rests with the Office of Civil Rights' (S/OCR) Intake and Resolution Section.

- ❏ The objective of mediation is to assist the parties to voluntarily reach an acceptable resolution of the issues in dispute.

- ❏ Mediation techniques have been found to be most useful in highly polarized disputes where the parties have either been unable to initiate a productive dialogue, or in cases where the parties have been talking and reached a seemingly insurmountable impasse.

- ❏ It is expected that the mediation process will be relatively fast and inexpensive compared to resolving a dispute through formal complaint mechanisms.

- ❏ The mediation conference is conducted by an impartial third party, **the Mediator.**

- 2 -

A000021

# PARTICIPANTS IN THE MEDIATION PROCESS

### A. The Mediator

- A trained neutral third party who facilitates communication between the Aggrieved Person or Complainant and Management and also assists each side in gaining a clearer perspective on the issues in dispute.

- Makes all of the primary procedural suggestions regarding how the parties can reach an agreement and resolve the dispute.

- Will suggest substantive options as a means of encouraging the parties to expand the range of possible resolutions under consideration.

- **IS NOT** an advocate for the **Aggrieved Person, Complainant,** or **Management,** nor is he or she a decision-maker and can not impose a solution on the parties.

### B. The Co-Mediator (optional)

- A neutral third party who assists the Mediator and is often in the process of final certification as a Mediator.

### C. The Aggrieved Person or Complainant

- The person who brought the complaint. If the person's complaint is in the informal process, the person is referred to as the **Aggrieved Person,** if the person's complaint is in the formal process, the person is referred to as the **Complainant.**

### D. The Aggrieved Person or Complainant's Representative

- Any person the **Aggrieved Person** or **Complainant** chooses to accompany or represent him/her, who may speak in an **advisory or representative capacity.**

### E. The Responding Official(s)

- The Individual(s) who is/are responsible, in whole or in part, for the actions or conditions under dispute.

### F. The Resolving Official

- The Individual who has the authority to provide relief or resolve matters. (Executive Director, Senior Bureau Official or Deputy Assistant Secretary)

- 3 -

A000022

G. **The Responding or Resolving Official's Representative**

- The **Responding or Resolving Officials** may be accompanied by an attorney from the Department's Office of the Legal Advisor (L) at the discretion of the Office of Civil Rights' Assistant Secretary or the Principal Deputy.

H. **S/OCR's Representative**

- A senior member of S/OCR's Intake and Resolution staff and/or appropriate designee.

## PROCESSING STEPS IN EEO/ADR

1. An Aggrieved Person must seek EEO counseling within 45 calendar days of an alleged discriminatory act in accordance with 29 C.F.R. 1614.105. At that time, the EEO Counselor should inform the Aggrieved person of his/her option to utilize the EEO/ADR process. The EEO Counselor should emphasize that the ADR process is available in the informal and formal stages of the complaint.

2. If the Aggrieved Person chooses to use the ADR process, he/she must inform his/her EEO Counselor and submit an ADR Election form to S/OCR's Intake and Resolution Section. Attention: **Intake and Resolution Section Chief, U.S. Department of State, S/OCR— Intake and Resolution Section, Room 7428, 2201 C Street, N.W., Washington, D.C. 20520.**

3. Upon receipt of the ADR Election form and the EEO Counselor's EEO Counseling Worksheet/Referral Report, S/OCR's Intake and Resolution Section will acknowledge the request and provide written notification to the Aggrieved Person or Complainant of acceptance or non-acceptance for the EEO/ADR mediation processing.

   o If the complaint is **NOT accepted** for ADR, the Aggrieved Person or Complainant will be notified and returned to conventional pre-complaint counseling (or at which point the formal process ceased).

   o If, however, the complaint **IS accepted** for ADR, the Aggrieved Person or Complainant, (the Aggrieved Person or Complainant's representative), the Bureau Officials, (the Bureau Official's representative) will be notified and a Mediator will be identified, and a mediation conference will be scheduled to mediate the case.

4. S/OCR's Intake and Resolution Section will notify all parties involved of the date, place, and time of the mediation conference.

5. If the mediation **IS successful** and an agreement is reached:

- 4 -

A000023

o   the Aggrieved Person or Complainant, the Aggrieved Person or Complainant's representative, the Bureau Officials, the Bureau Official's representative, and the Mediator will sign a Settlement Agreement.

o   the Settlement Agreement will specifically state what both parties have agreed to during the mediation.

o   S/OCR is responsible for monitoring the implementation of the Settlement Agreement.

o   Should the terms of the Mediated Settlement Agreement not be met, as determined by S/OCR, the Aggrieved Person or Complainant may request reinstatement of the complaint consistent with the requirements of 29 C.F.R. 1614.504, Compliance with Settlement Agreements and Final Agency Decisions.

6.  If the mediation **IS NOT successful**:

o   an Aggrieved Person will be given the opportunity to pursue a formal complaint under the provisions of 29 C.F.R. 1614 and a Complainant will be given the opportunity to continue in the formal complaint process from the point the formal process ceased.

o   S/OCR's Intake and Resolution Section will issue the Aggrieved Person the Notice of Right to File A Discrimination Complaint no more than 90 days from the initial contact.

## INAPPROPRIATE CASES FOR THE EEO/ADR PROCESS

❖   **The Administrative Dispute Resolution Act of 1996 provides guidelines for determining if ADR may not be appropriate.**

1.  A definitive and authoritative decision is needed as a precedent;

2.  The matter involves significant issues of government policy that require procedural development and ADR will not assist policy development;

3.  Maintaining established policy and/or avoiding variations in decision is of special importance;

4.  The matter significantly affects non-parties;

5.  A full public record of the proceeding or resolution is important; or

6.  The agency must maintain continuing jurisdiction over the matter with the right to alter the resolution as circumstances demand.

- 5 -

A000024

❖ Other considerations that may render ADR use inappropriate.

1. **Fraud -** If a party to a proposed ADR attempt is under criminal investigation for conduct related to the dispute to be submitted to ADR, the ADR use is inappropriate.

2. **Injunctive relief required:** Matters in which injunctive relief is required are not appropriate for ADR.

3. **Inspector General Investigations:** Agency personnel should be careful to coordinate will all appropriate offices when using ADR to resolve matters that they believe are the subject of an agency inspector general investigation.

4. **Class complaints and other complaints dealing with sensitive issues** may not be suitable for the EEO/ADR process.

5. **Cases brought by applicants or contractors; cases involving security and cases involving workplace violence** are not appropriate for the EEO/ADR process.

## TIME LIMITS FOR THE EEO/ADR PROCESS

❑ Based on the provisions of 29 C.F.R. 1614.105 (f), the time for conducting EEO counseling and mediation during the pre-complaint stage of an EEO complaint shall not exceed a total of 90 days.

❑ If the ADR process is utilized after a formal complaint has been filed, the time for conducting Mediation will not exceed 90 days (from the time ADR is elected.

## WHY MEDIATION

Experience has shown that over 50% of the discrimination complaints submitted for mediation are resolved. Even when a case is not resolved, mediation may be helpful in clarifying issues.

- **Protection of the Relationship:** Mediation generally results in a settlement that both parties can accept and support, promotes better communications between them, and encourages a respectful and cooperative relationship.

- **Time Savings:** Mediation is generally quicker and available on short notice. The speed and schedule of mediation is entirely dependent on the parties' willingness to address and reach agreement on the issues.

- 6 -

A000025

- **Cost Savings:** Mediation is less costly and involves direct negotiations between the parties.

- **Greater Flexibility in Possible Settlements:** Mediation, because of its more flexible format and lack of structural constraints, allows the parties to address relationship, procedural and substantive issues. It allows people to get to the "root of the problem" without having to "force-fit" a problem into an inappropriate process. Mediation also allows parties to develop customized creative solutions, which are tailored to meet specific concerns or interests.

- **Keeps the Decision-Making Authority in the Hands of the Parties:** Procedures such as litigation, administrative hearings, and binding arbitration rely on third-party decision makers to break deadlocks and render a decision. These procedures remove decision-making authority and responsibility from the parties who often are the most informed about the issues and options. Mediation keeps the decision-making authority with the people who best know the problems, and it preserves both individual and organizational authority. While legal advisors may be present and offer assistance, key managers are the decision makers.

- **A**n Aggrieved Person **DOES NOT** give up the right to pursue the dispute formally under the provisions of 29 C.F.R. 1614, unless mediation results in a signed settlement agreement.

## QUESTIONS CONCERNING THE EEO/ADR PROCESS SHOULD BE ADDRESSED TO:

**U.S. Department of State**
**Office of Civil Rights**
**Intake and Resolution Section**
**HST Bldg., Room 7428**
**2201 C Street, N.W.,**
**Washington, D.C. 20520**
**202-647-9295**

*12/08.*

A000026

Case: 14-5042 Document: 76 Page: 76 Filed: 04/23/2014

JUN-04-2009 15:55 DIPLOMATIC SECURITY 713 209 3470 P.002

# United States Department of State
*Office of Civil Rights (S/OCR)*

 ## EEO/ALTERNATIVE DISPUTE RESOLUTION AGREEMENT TO MEDIATE

- ☐ The parties agree to engage in mediation in an effort to resolve issues raised in the Complainant, Richard P. Higbie's formal EEO complaint #DOS-F-062-09.

- ☐ While consenting Aggrieved Person/Complainants and management officials are required to appear at a scheduled mediation conference and engage in good faith attempts to resolve the matter, parties may withdraw from the mediation session and will not be forced into an agreement.

- ☐ The Aggrieved Person/Complainant has been informed of grievance and EEO processes, and the time frames associated with them. This agreement to mediate does not negate or suspend the statutory time frames of the EEO process. The negotiated or administrative grievance time frames may only be modified by mutual agreement of the parties.

- ☐ No admission of guilt or wrongdoing by any party is implied, and none should be inferred, by participating in this process.

- ☐ The parties understand that the mediator(s) have NO AUTHORITY to decide the case and are not acting as advocates or attorneys for any party.

- ☐ The Aggrieved Person/Complainant understand that they have the right to have a representative assist them during the mediation process.

- ☐ <u>Mediation is a confidential process</u>. Any documents submitted to the mediator(s) and statements made during the mediation are for settlement purposes only. Confidentiality will not extend to threats of imminent physical harm, threats of violence, criminal activity, waste, fraud or abuse.

- ☐ The parties agree not to subpoena the mediator(s) or any documents prepared by or submitted to the mediator(s). In no event will the mediator(s) voluntarily testify on behalf of any party or submit any type of report in connection with this mediation.

- ☐ No party shall be bound by anything said or done at the mediation unless a written settlement is reached and executed by all necessary parties. If a settlement is reached, the agreement shall be reduced to writing and, when signed and approved by the appropriate authorities for all parties, shall be binding upon all parties to the agreement.

- ☐ The parties understand that, where negotiated bargaining agreements exist, settlements may not violate the terms or intent of the agreement.

A000027

- 2 -

By signature below, we acknowledge that we have read, understand, and agree to this Mediation Agreement.

| | |
|---|---|
| Aggrieved Person/Complainant | Date |
| Representative | Date |
| Responding Official | 5/27/2009 |
| Resolving Official | Date |
| Party | 5/29/09 |
| Party | 5/29/09 |
| Party | Date |
| Party | Date |
| Mediator | Date |
| Co-Mediator | Date |

05/02.

A000028

- 2 -

By signature below, we acknowledge that we have read, understand, and agree to this Mediation Agreement.

| | |
|---|---|
| Aggrieved Person/Complainant | Date |

| | |
|---|---|
| Representative | Date |

| | |
|---|---|
| Responding Official | Date 6/5/09 |

| | |
|---|---|
| Resolving Official | Date |

| | |
|---|---|
| Party | Date |

| | |
|---|---|
| Party | Date |

| | |
|---|---|
| Party | Date |

| | |
|---|---|
| Party | Date |

| | |
|---|---|
| Mediator | Date |

| | |
|---|---|
| Co-Mediator | Date |

05/02.

A000029



A000030

| EEO Investigative Affidavit *(Witness)* | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **1** | **9** | **DOS-F-062-09** |

| 1. Affiant's Name (Last, First, MI) <br> **Cotter, Marian J.** | 2. Employing Facility <br> Department of State | | |
|---|---|---|---|
| 3. Position Title <br> **Special Agent** | 4. Grade Level <br> FS-01 | 5. Employment Address <br> 2201 C St. NW, Washington, DC | 6. Unit Assigned <br> **FSI** |

**Privacy Act Notice**

**Privacy Act Notice.** The collection of this information is authorized by the Equal Employment Opportunity act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the Agency is a party or has an interest; to a government agency in order to obtain information relevant to a Agency decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the agency to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of agency finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the FLRA/National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for agency employees and other witnesses.

Statement *(Continue on Form 2569 if additional space is required. Form will auto-create if using Microsoft Word)*

1. Please state your full name, work address, title, email address, and current phone number.

Name/Title: Marian Julia Cotter, Special Agent
Work Address: 2201 C St. NW, Washington, DC 20520
E-mail address: cottermj@state.gov
Personal cell number: 281-687-4759

2. How long have you been in your current assignment?

**Current Assignment:** July 2009 to present
Training -- Russian language at the Foreign Service Institute, Arlington, VA
**Previous Assignment:** July 2007 to July 2009
Special Agent in Charge of the Diplomatic Security Houston Field Office (DS/ICI/HFO)
**Entry on Duty with Department of State:** October 1991

3. How long have you known Complainant?

I have known Mr. Higbie since approximately August 2007.

4. What management role do you have over Complainant? How long have you been in that role over Complainant?

From July 2007 to July 2009, as Special Agent in Charge, I had supervisory authority over all staff of the Houston Field Office, to include Mr. Higbie. Mr. Higbie reported directly to the Resident Agent in Charge of the Dallas Resident Office, who reported directly to the Assistant Special Agent in Charge of the Houston Field Office, who reported directly to me. **I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| *[signature]* | **Affidavit B** <br> **Page 1 of 20** | 12/17/2009 |

Form **2568-B**, March 2007

| EEO Investigative Affidavit (Continuation Sheet) | Page No. | No. Pages | Case No. |
|---|---|---|---|
|  | 9 | 9 | DOS-F-062-09 |

Much of Mr. Higbie's complaint seems to lack specificity. This was glaringly apparent at the Alternate Dispute Resolution when Mr. Higbie and his attorney declined to make any opening statement at all and terminated the ADR after the Department's statement and a private sidebar with the mediator, basically refusing to participate in the process. At minimum, this tactic demonstrated a complete lack of sincerity to resolve any issues in an open and transparent forum. One could come to believe there is some cynical, ulterior motive driving this complaint. Mr. Higbie has routinely demonstrated a lack of perspective with regard to how his work and the work of the Dallas Resident Office fit in perspective into the big picture of the Diplomatic Security mission. It would be disappointing for this EEO process to reinforce his misinterpretation of reality. Moreover, it is disappointing to witness the abuse of a process designed to protect employees from real wrongs. THIS IS THE END OF MY STATEMENT AND NOTHING ELSE FOLLOWS.



**Affidavit B**
Page 9 of 20

I declare under penalty of perjury that the foregoing is true and correct.

Affiant's Signature

Date Signed

Form 2569, March 2001

A000032



A000033

# EEO Investigative Affidavit *(Witness)*

| Page No. | No. Pages | Case No. |
|---|---|---|
| 1 | 9 | DOS-F-062-09 |

| 1. Affiant's Name (Last, First, MI) | 2. Employing Facility |
|---|---|
| **Thomas, Jeffrey A** | **US Dept. of State - Diplomatic Security Service** |

| 3. Position Title | 4. Grade Level | 5.Employment Address | 6. Unit Assigned |
|---|---|---|---|
| **FS-2501** | **FS-02** | **2230 Gallows Road Dunn Loring, VA 22027** | **DS/TMD/ATA** |

## Privacy Act Notice

Privacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the Agency is a party or has an interest; to a government agency in order to obtain information relevant to a Agency decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits;

to a congressional office at your request; to an expert, consultant, or other person under contract with the agency to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of agency finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for Investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the FLRA/National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for agency employees and other witnesses.

Statement (Continue on Form 2569 if additional space is required. Form will auto-create if using Microsoft Word)

1. Please state your full name, work address, title, email address, and current phone number.

   Jeffrey A. Thomas
   Division Chief – Training Management Division
   Anti Terrorism Assistance
   2230 Gallows Road, Dunn Loring VA 22027
   Thomasja@state.gov
   571-226-9590

2. How long have you been in your current assignment?

   5 months

3. Prior to your current assignment, where you assigned to the Houston FO and if so, in what capacity and over what period of time

   Houston Field Office – Unit Supervisor - July 2007 to July 2009

4. How long have you known Complainant?

   I had professional contact with the complainant briefly in February, 2008. I do not know him. I was never formally introduced to him personally or professionally.

**I declare under penalty of perjury that the foregoing is true and correct.**

Affiant's Signature

Date Signed

Form 2568-B. March 2001

Affidavit  D
Page  1  of  17

A000034

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. P... | Case No. |
|---|---|---|
| 8 | 9 | DOS-F-062-09 |

conversation with him and that was in early February of 2008. The conversation lasted less than five minutes. He called me and he was the aggressor.

I have closely read and re-read Mr. Higbie's EEO complaint and his allegations against me. I believe he is perpetrating a fraud and he has deceived the Department into accepting his complaints against me. His allegations are unfounded and have no basis of fact. He lacks specifics and his allegations are devoid of any factual occurrence as it pertains to any discussions, exchanges, or interpersonal dynamics between the two of us.

In his complaint, Mr. Higbie alludes to nothing but generalities and is so bold as to speak on behalf of others in the Dallas office. As other members of the Dallas Resident Office are not signatories to the complaint, his statements, where he speaks for others, have neither credibility nor basis for acceptance.

Mr. Higbie's prescribed relief includes "fair opportunity for promotion to a supervisory civil service grade position when a supervisory position is first made available." Another statement mentions "equal and fair leadership opportunities for civil service personnel." I consider these proposed settlement actions to be self-serving and they are the true basis for this EEO complaint. There is no nexus of any past protected EEO activity to validate his complaint as it concerns me and the time period I served in Houston.

On May 29, 2009, all parties agreed to be part of an Alternative Dispute Resolution meeting. It was a teleconference. Mr. Higbie refused to travel to Houston to meet with the respondents. The mediator asked Mr. Higbie's attorney to state his case. The only statement the attorney made was that Mr. Higbie plans to file an amended complaint and that he was willing to discuss Higbie's opportunities to obtain a GS-14 position. The attorney then asked to go off-line to talk to the mediator. One hour later the teleconference was terminated. Nothing was ever discussed and nothing was resolved.

On November 11, 2008 the RAIC, Laviris Stubblefield, of the Dallas office submitted a document to DS-HQ entitled the Dallas Strategic Plan. This document was sent to the Director of the Diplomatic Security Service. The document advocated Dallas breaking away from operational control of Houston and become a full field office. Portions of this document mentioned having additional GS-14 positions for Dallas made available. This document was submitted by all seven Dallas agents -- Richard Higbie was noted as being the top drafter. This document was drafted and submitted without the guidance, approval or notification of the SAC of Houston. The document was universally debunked as unrealistic and non-factual. It was quickly dismissed and the entire Dallas office was admonished for failing to follow the routine and accepted chain of command. This incident was the beginning of a serious downturn in communications between the two offices culminating in a HQ visit to Houston and Dallas in March, 2009. Higbie asserts that the HQ review was sent to Texas due to a hostile work environment. This is a fabrication. Houston actually welcomed the review and the Dallas agents were cited for failing to follow the established chain of command.

In Mr. Higbie's EEO complaint he cites: "growing responsibilities to take managerial roles and assume supervisory responsibilities as it is feasible the complainant's role will present supervisory grade position opportunities…"

---

I declare under penalty of perjury that the foregoing is true and correct.

**Affidavit D**

Page 8 of 17

Affiant's Signature

Date Signed

**Form 2569**, March 2001

No. 13-270
(Judge Damich)

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**RICHARD HIGBIE,**

Plaintiff,

v.

THE UNITED STATES,

Defendant.

## DEFENDANT'S MOTION TO DISMISS

**STUARY F. DELERY**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**STEVEN. J. GILLINGHAM**
**Assistant Director**

**MICHAEL P. GOODMAN**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**P.O. Box 480; Ben Franklin Station**
**Washington, D.C. 20044**
**Tel: (202) 305-2087**

September 13, 2013                        **Attorneys for Defendant**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

STATEMENT OF THE ISSUES................................................................................1

STATEMENT OF THE CASE...................................................................................2

I.      Nature Of The Case .........................................................................................2

II.     Statement Of The Facts....................................................................................2

SUMMARY OF THE ARGUMENT .........................................................................4

ARGUMENT ..............................................................................................................5

I.      Standards Of Review .......................................................................................5

        A.      Standard For Motions To Dismiss For Lack Of Subject Matter Jurisdiction ..........5

        B.      Standard For Motions To Dismiss For Failure To State A Claim Upon Which
                Relief Can Be Granted ............................................................................6

II.     The Court Of Federal Claims Lacks Jurisdiction To Consider Mr. Higbie's Claim
        Because A Claim Based On Substantially The Same Operative Facts Was Already
        Pending When This Case Was Filed.................................................................7

III.    The Court Of Federal Claims Lacks Jurisdiction To Consider Mr. Higbie's Allegation
        That The Department Of State Breached The Agreement To Mediate Because That
        Agreement Is Not Money Mandating .............................................................11

IV.     The Complaint Fails To State A Claim Because The Allegations In The Complaint Do
        Not Plausibly Suggest A Breach Of The Agreement......................................14

V.      The Complaint Fails To State A Claim Because The Relief Sought Has No Relationship
        To The Alleged Breach Of The Mediation Agreement ..................................16

CONCLUSION...........................................................................................................18

i

A000037

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Alfa Laval Separation, Inc. v. United States,*
    47 Fed. Cl. 305 (2000) ...................................................................................14

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................................7, 16

*Berdick v. United States,*
    612 F.2d 533 (Ct. Cl. 1979) ..............................................................................6

*Booth v. United States,*
    990 F.2d 617 (Fed. Cir. 1993)............................................................................ 5

*Brandt v. United States,*
    710 F.3d 1369 (Fed. Cir. 2013)..................................................................... 7-10

*Cary v. United States,*
    552 F.3d 1373 (Fed.Cir. 2009)....................................................................... 6-7

*Catellus Development Corp. v. United States,*
    31 Fed. Cl. 399 (1994) ....................................................................................... 6

*Energy Capital Corp. v. United States,*
    302 F.3d 1314 (Fed. Cir. 2002) ....................................................................... 16

*Facebook Inc. v. Pacific Northwest software, Inc.,*
    640 F.3d 1034 (9th Cir. 2011) .......................................................................14

*Fisher v. United States,*
    402 F.3d 1167 (Fed. Cir. 2005)(en banc)........................................................ 11

*Goodyear Tire & Rubber Co. v. Chiles Power Supply,*
    332 F.3d 1097 (6th Cir. 2003) ....................................................................... 13

*Griffin v. United States,*
    590 F.3d 1291 (Fed. Cir. 2009)......................................................................... 8

*Gould, Inc. v. United States,*
    935 F.2d 1271 (Fed. Cir. 1991)......................................................................... 6

*Holmes v. United States,*
    657 F.3d 1303 (Fed. Cir. 2011).................................................................11, 14

A000038

Henke v. United States,
   60 F.3d 795 (Fed. Cir. 1995).................................................................................. 6

Indiana Michigan Power Co. v. United States,
   422 F.3d 1369 (Fed. Cir. 2005)..................................................................... 5, 16-17

Keene Corp. v. United States,
   508 U.S. 200 (1993)................................................................................... 8, 10

Land v. Dollar,
   330 U.S. 731 (1947)....................................................................................6

Lindsay v. United States,
   295 F.3d 1252 (Fed. Cir. 2002)........................................................................7

Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992)....................................................................................6

Marshall N. Dana Const., Inc. v. United States,
   229 Ct. Cl. 862: (1982)...............................................................................6

McNutt v. General Motors Acceptance Corp of Indiana,
   298 U.S. 178 (1936)...................................................................................6

Old Stone Corp. v. United States,
   450 F.3d 1360 (Fed. Cir. 2006)......................................................................17

Outar v. Greno Industries, Inc.,
   No. 03-cv-0916, 2005 WL 2387840 (N.D.N.Y. Sept. 27, 2005)................................16

Overall Roofing & Construction Inc., v. United States,
   929 F.2d 687, 688 (Fed. Cir. 1991)...................................................................5

PlanetSpace, Inc. v. United States,
   92 Fed. Cl. 520 (2010)...............................................................................15

Ramada Development Co. v. Rauch,
   644 F. 2d 1097 (5th Cir. 1981) .......................................................................13

Reynolds v. Army & Air force Exchange Services,
   846 F.2d 746 (Fed. Cir. 1988)......................................................................... 6

Rick's Mushroom Services, Inc. v. United States,
   521 F.3d 1338 (Fed. Cir. 2008)......................................................................11

A000039

*San Carlos Irrigation & Drainage District v. United States,*
111 F.3d 1557 (Fed. Cir. 1997)..........................................................................16

*Scheuer v. Rhodes,*
416 U.S. 232 (1974)............................................................................................6

*Tecon Engineers, Inc. v. United States,*
343 F.2d 943 (Ct. Cl. 1965)..............................................................................10

*Trusted Integration, Inc. v. United States,*
659 F. 3d. 1159 (Fed. Cir. 2011)...................................................................8, 10

*United States v. County of Cook III,*
170 F. 3d 1084 (Fed. Cir. 1999)..........................................................................8

*United States v. King,*
395 U.S. 1 (1969)..............................................................................................11

*United States v. Mitchell,*
463 U.S. 206 (1983)..........................................................................................11

*United States v. Navajo Nation,*
129 S.Ct. 1547 (2009)........................................................................................11

*United States v. Technic Services, Inc,*
314 F.3d 1031 (9th Cir. 2002) ..........................................................................15

*United States v. Testan,*
424 U.S. 392 (1976).......................................................................................5, 11

*United States v. Tohono O'odham Nation,*
131 S.Ct. 1723 (2011) .....................................................................................7, 9

## **FEDERAL STATUTES**

28 U.S.C. § 1491................................................................................................7, 11

28 U.S.C. § 1500................................................................................................7-19

28 U.S.C. § 1631....................................................................................................8

A000040

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **RICHARD HIGBIE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 13-270C** |
| **THE UNITED STATES,** | ) | **(Judge Damich)** |
| | ) | |
| **Defendant.** | ) | |

## <u>DEFENDANT'S MOTION TO DISMISS</u>

Pursuant to Rule 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests dismissal of the complaint filed by plaintiff, Richard Higbie, for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

## <u>STATEMENT OF THE ISSUES</u>

1. Whether this Court has jurisdiction to consider Mr. Higbie's claim, which is based on the same operative facts as the claims pending in a U.S. District Court.

2. Whether this Court has jurisdiction to consider Mr. Higbie's claim that the Department of State breached an "agreement to mediate" that does not mandate the payment of money.

3. Whether Mr. Higbie's claim that the Department of State breached that agreement to mediate by informing the Equal Opportunity Office (EEO) about the status of mediation efforts presents a claim that is sufficiently plausible on its face such that it states a claim upon which relief can be granted.

4. Whether the complaint fails to state a claim upon which relief can be granted because the relief sought, $500,000.00, is neither related to, nor a result of, the alleged breach.

A000041

## STATEMENT OF THE CASE

### I.   Nature Of The Case

This case involves plaintiff, Richard Higbie's, allegation that the Department of State breached an "EEO/Alternative Dispute Resolution Agreement to Mediate," which the parties signed prior to engaging in mediation to resolve Mr. Higbie's allegation of discrimination. *See* Compl. ¶ 6; Dkt. 5-1. Specifically, Mr. Higbie alleges that two of the Government's signatories breached the mediation agreement by disclosing to an EEO investigator "confidential information about the mediation process." Compl. ¶ 8. The "confidential information" that was allegedly disclosed is routine information about the status of mediation efforts, including one Government official's description of that mediation in an affidavit stating that "Mr. Higbie and his attorney declined to make any opening statement at all," and were "basically refusing to participate in the process," and another Government official's statement that summarized the mediation process by stating that "[n]othing was ever discussed and nothing was resolved." Compl. ¶ 8-9; Dkt. 5-2 at 3; Dkt. 5-3 at 3.

### II.   Statement Of The Facts

Mr. Higbie is an employee of the Bureau of Diplomatic Security within the U.S. Department of State. Compl. ¶ 2. On January 15, 2009, Mr. Higbie contacted an EEO counselor complaining that the Department of State discriminated against him. *Id*. ¶ 5. The case was referred to mediation. *Id*. ¶ 6. After mediation was unsuccessful, an EEO investigator conducted an investigation and prepared an investigation report. *Id*. ¶ 7. During that investigation, Government officials Marion Cotter and Jeffrey Thomas provided affidavits. *See Id*. ¶ 8-9; Dkt. 5-2 and 5-3.

2

In October 2011, Mr. Higbie filed suit in the Federal District Court for the Northern District of Texas, alleging that the Department of State retaliated against him (Count I), created a hostile work environment (Count II), and that the agency breached the confidentiality clause of the 2009 mediation agreement (Count III). *See* Case No. 3:11-cv-02636-L, Dkt. 1. The complaint stated that "[i]n separate affidavits, both 'Responding Officials' Marion Cotter (Special Agent in Charge of the Houston Field Office) and Jeffrey Thomas (Supervisory Special Agent of the Houston Field Office) provided to the EEO assigned Investigator, Robert Maddern, information held under strict confidentiality guidelines set by the aforementioned ADR Mediation." *Id.* ¶ 54. Mr. Higbie alleged that the affidavits "demonstrated a willful attempt by the Responding Officials to further discriminate and retaliate against the Plaintiff for engaging in related protected activity." *Id.* ¶ 55. Mr. Higbie also alleged that the "breach of the mediation agreement" violated the Alternative Dispute Resolution Act of 1996 (ADRA). *Id.* ¶ 86.

After the Department of State filed a motion to dismiss Count III, the contract count, on the grounds that the ADRA did not provide a cause of action or damages, Mr. Higbie was granted leave to file an amended complaint. *Id.* at Dkt. 7. 9. On June 25, 2012, Mr. Higbie amended his complaint to include a Texas common law breach of contract claim based upon the same alleged facts. *Id.* at Dkt. 10. The new claim was substantially similar to the contract claim presented in Mr. Higbie's initial complaint except that instead of solely alleging that the alleged breach was a "violation of the confidentiality clause of the mediated agreement done pursuant to the [ADRA]," Mr. Higbie's amended complaint alleged that the same actions create a cause of action "[p]ursuant to the common laws of the State of Texas." *Compare id.* at Dkt. 1 ¶ 86 *with* Dkt. 10 ¶ 97.

3

A000043

On January 29, 2013, Mr. Higbie filed a motion to file a second amended complaint, and

a motion to transfer his contract claim to this Court.  *Id*., Dkt. 28, 29.  On February 5, 2013, the

District Court granted both motions by ordering Mr. Higbie's breach of contract claims to be

transferred to this Court, and ordering Mr. Higbie to file a second amended complaint.  *See id*.,

Dkt. 31, 33.  On February 8, 2013, Mr. Higbie filed a second amended complaint in that court.

Despite the district court's order transferring his contract claims, in that second amended

complaint Mr. Higbie continues to raise substantially the same breach allegation contained in the

prior versions of his complaint, asserting that:

> Defendant, acting by and through their employees and agents,
> entered into a contractual relationship with the Plaintiff to mediate,
> the Defendant, by and through its employees and agents, violated
> the contract to mediate in that they violated the confidentiality
> provisions of the agreement, and such breach was the direct and
> proximate cause of damages to the Plaintiff.

Case No. 3:11-cv-02636-L, Dkt. 35 ¶ 109.[1]

## SUMMARY OF THE ARGUMENT

Mr. Higbie's claim is that the Department of State breached the parties' mediation

agreement when two signatories submitted affidavits to the EEO investigator referring to the

mediation.  This Court does not possess subject matter jurisdiction to consider that claim for two

independent reasons.  First, Mr. Higbie's claims in the District Court for the Northern District of

Texas are based upon the same operative facts.  Second, the mediation agreement at issue in this

case does not fairly contemplate the payment of money.

---

[1]    On September 12, 2013, the District Court for the Northern District of Texas granted Mr. Higbie leave to file a third amended complaint.

4

In addition, even if this Court possessed subject matter jurisdiction to consider Mr.

Higbie's complaint, there are two reasons that the complaint does not state a claim upon which

relief can be granted.  First, the complaint does not plausibly suggest entitlement to relief

because the allegations in the complaint do not describe a breach of the agreement.  Rather,

according to the complaint, the Government officials simply referred to the status of mediation,

which cannot constitute a breach of mediation's promise of confidentiality.

Second, the relief sought by Mr. Higbie has no relationship to the alleged breach of the

mediation agreement.  Mr. Higbie seeks one-half million dollars for the alleged breach.  Even if

the Government had breached the mediation agreement, the complaint contains no explanation

for how Mr. Higbie was in any way damaged by the alleged breach or how the breach was "a

substantial causal factor in the damages."  *Indiana Michigan Power Co.* v. *United States*, 422

F.3d 1369, 1373 (Fed. Cir. 2005).  Rather, the compliant simply seeks an arbitrary amount,

$500,000.00, which has no relationship to the alleged breach, and certainly does not establish the

"reasonable certainty" of damages required by law.  *Id.*

## ARGUMENT

## I.    Standards Of Review

### A.    Standard For Motions To Dismiss For Lack Of Subject Matter Jurisdiction

The United States Court of Federal Claims is a court of limited jurisdiction.  *See* 28

U.S.C. §§ 1491-1509; *see also Overall Roofing & Construction Inc.,* v. *United States*, 929 F.2d

687, 688 (Fed. Cir. 1991).  Like all Federal courts, this Court's jurisdiction to entertain claims

and to grant relief depends upon, and is circumscribed by, the extent to which the United States

has waived its sovereign immunity.  *United States* v. *Testan*, 424 U.S. 392, 399 (1976).  Subject

A000045

matter jurisdiction may be challenged at any time by the parties, by the Court *sua sponte*, or

upon appeal.  *Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993).  The burden of

establishing the Court's subject matter jurisdiction rests with plaintiff, who must establish

jurisdiction by a preponderance of the evidence.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

561 (1992); *McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936).

 If a defendant challenges jurisdiction under RCFC 12(b)(1), a plaintiff cannot merely rely

on allegations in the complaint, but must bring forth relevant, competent proof to establish

jurisdiction.  *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947); *Reynolds v. Army & Air Force Exch.*

*Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988); *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399,

404-05 (1994).  Still, when ruling on a 12(b)(1) motion, this Court must assume that all disputed

facts alleged in the complaint are true, and "in passing on a motion to dismiss, whether on the

ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the

allegations of the complaint should be construed favorably to the pleader."  *Scheuer v. Rhodes*,

416 U.S. 232, 236 (1974); *Henke v. United States*, 60 F.3d 795, 799 (Fed. Cir. 1995).

 "The mere transfer of the case to this court does not establish jurisdiction; we must

always assess jurisdiction for ourselves."  *Marshall N. Dana Const., Inc. v. United States*, 229

Ct. Cl. 862, 865 (1982) (citing *Berdick v. United States*, 612 F.2d 533, 536 (Ct. Cl. 1979)

(vacated and modified on other grounds)).

 **B.** **Standard For Motions To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted**

 When considering a motion to dismiss for failure to state a claim upon which relief may

be granted, the Court must "presume that the facts are as alleged in the complaint, and make all

reasonable inferences in favor of the plaintiff."  *Cary v. United States*, 552 F.3d 1373, 1376 (Fed.

<div align="center">6</div>

Cir. 2009) (*citing Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).  "To state

a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a

showing of entitlement to relief."  *Cary* at 1376 (quoting *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 557 (2007)).  "The factual allegations must be enough to raise a right to relief above

the speculative level."  *Id*.  "This does not require the plaintiff to set out in detail the facts upon

which the claim is based, but enough facts to state a claim to relief that is plausible on its face."

*Id*.  A complaint will therefore be dismissed pursuant to RCFC 12(b)(6) "when the facts asserted

by the claimant do not entitle him to a legal remedy."  *Lindsay v. United States*, 295 F.3d 1252,

1257 (Fed. Cir. 2002).

**II.    The Court Of Federal Claims Lacks Jurisdiction To Consider Mr. Higbie's Claim Because A Claim Based On Substantially The Same Operative Facts Was Already Pending When This Case Was Filed**

Title 28 U.S.C. § 1500 "effects a significant jurisdictional limitation" upon this Court,

which is designed to "save the Government from burdens of redundant litigation."  *United States*

*v. Tohono O'odham Nation*, 131 S.Ct. 1723, 1729–30 (2011).  Where Section 1500 applies, the

Court of Federal Claims lacks subject matter jurisdiction and must dismiss the complaint.  *Id*. at

1727.  As the Federal Circuit has recently explained, "[t]o determine whether § 1500 applies, a

court must make two inquiries: (1) whether there is an earlier-filed 'suit or process' pending in

another court, and, if so, (2) whether the claims asserted in the earlier-filed case are 'for or in

respect to' the same claim(s) asserted in the later-filed Court of Federal Claims action."  *Brandt*

*v. United States*, 710 F.3d 1369, 1374 (Fed. Cir. 2013).  Both inquiries must be answered in the

affirmative here.

7

A000047

First, there can be no dispute that a claim filed in the District Court for the Northern District of Texas is a "suit or process" within the meaning of Section 1500. S*ee Trusted Integration, Inc*. *v*. *United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) ("the statute was enacted to prevent a claimant from seeking recovery in district court and the Court of Claims for the same conduct pleaded under different legal theories."). "Whether an earlier-filed 'suit or process' is 'pending' for § 1500 purposes is determined at the time the complaint is filed with the Court of Federal Claims." *Brandt*, 710 F.3d at 1375. However, the complaint in this Court was filed as a result of a transfer from the district court pursuant to 28 U.S.C. § 1631. Through operation of that statute, the complaint in this Court is deemed to have been filed when Mr. Higbie filed the claim that the district court ordered transferred. *See United States v*. *County of Cook III*., 170 F.3d 1084, 1090 (Fed. Cir. 1999). In this case, Mr. Higbie asked the district court to transfer the third count of his amended complaint, which was titled "Texas Common Law Breach of Contract." *See* Case No. 3:11-cv-02636-L, Dkt. 10 ¶¶ 96-108. Accordingly, the complaint is deemed to have been filed simultaneously with the filing of Mr. Higbie's amended complaint in the district court on June 25, 2012. *Id*.; *County of Cook*, 170 F.3d at 1090. For purposes of Section 1500, this Court must compare the transferred claims with the non-transferred claims. As the Federal Circuit has explained, "if a plaintiff files multiple related claims in district court, and the court transfers one of those claims to the Court of Federal Claims, the original claims are 'pending' at the time the transferred claim is considered filed, and § 1500 may deprive the Court of Federal Claims of jurisdiction over the transferred claim." *Griffin v*. *United States*, 590 F.3d 1291, 1293 (Fed. Cir. 2009). This is so even if the claim not

8

A000048

transferred has since been dismissed.  *See Keene Corp. v. United States,* 508 U.S. 200, 207

(1993) (noting that jurisdiction turns on "the state of things at the time of the action brought").

When comparing those claims, the relevant inquiry is "whether the claims asserted in the

earlier-filed case are 'for or in respect to' the same claim(s) asserted in the later-filed Court of

Federal Claims action." *Brandt*, 710 F.3d at 1374.  "[T]wo suits 'are for or in respect to' the

same claim' . . . if they are based on substantially the same operative facts, regardless of the

relief sought.'" *Id.* (quoting *Tohono*, 131 S.Ct. at 1731).  In his amended complaint in the

district court, Mr. Higbie alleged, in addition to his transferred contract claim, that by breaching

the ADR agreement, the agency committed retaliation/reprisal, s*ee* Case No. 3:11-cv-02636-L,

Dkt. 10 ¶¶ 89-90 (Count I), and discriminated against him by creating a hostile work

environment.  *Id.* ¶¶ 93-95 (Count II).  Both counts are based upon the same operative facts as

the contract claim that was transferred to this Court.  The primary factual allegation upon which

the complaint in this Court is based is found at paragraph seven of the complaint.  In that

paragraph, Mr. Higbie describes the fact that two affidavits were provided by Marian Cotter and

Jeffrey Cotter, both of which Mr. Higbie contends breached the mediation agreement.  In his

amended complaint in the district court, Mr. Higbie describes the same affidavits.  Using

identical language to that he has now used in this Court, Mr. Higbie alleged:

> In separate affidavits, both "Responding Officials" Marion Cotter
> (Special Agent in Charge of the Houston Field Office) and Jeffrey
> Thomas (Supervisory Special Agent of the Houston Field Office)
> provided to the EEO assigned Investigator, Robert Maddern,
> information held under strict confidentiality guidelines set by the
> aforementioned ADR Mediation. Both respective Responding
> Officials included in their affidavits information concerning the
> underlying facts of the ADR proceeding and records generated as
> part of the proceeding that are strictly prohibited from being made
> part of the EEO complaint record.

<p style="text-align:center">9</p>

*Compare* Case No. 3:11-cv-02636-L, Dkt. 10 ¶ 54 *with* Compl., Dkt. 5 ¶ 7.  In this Court, Mr.

Higbie has alleged that, in filing those affidavits, Ms. Cotter and Mr. Thomas "violated the

confidentiality provisions of the contract by disclosing confidential information about the

mediation process in an effort to undermine Plaintiff's claim."  Compl., Dkt. 5 ¶ 11.  In the

district court action, Mr. Higbie has alleged that the same action "demonstrated a willful attempt

by the Responding Officials to further discriminate and retaliate against the Plaintiff for

engaging in related protected activity."  Case No. 3:11-cv-02636-L, Dkt. 10 ¶ 55.  Thus, the only

difference between the complaints is the legal theory upon which Mr. Higbie is seeking relief.

On the one hand, he asserts that filing the affidavits breached a contract and on the other he

asserts that filing the affidavits amounted to discrimination and retaliation.  The operative facts

in both complaints are the same.  That is all that matters to establish the applicability of Section

1500.  As the Federal Circuit has explained, "[i]mportantly, the legal theories underlying the

asserted claims are irrelevant to this inquiry.  *Brandt*, 710 F.3d at 1374 (citing *Trusted*

*Integration*, 659 F.3d at 1164); *see also Keene*, 508 U.S. at 212 ("That the two actions were

based on different legal theories [does] not matter."))[2]

---

[2]      The "order-of-filing rule" described by *Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965), makes irrelevant to the section 1500 inquiry the fact that Mr. Higbie has filed a second amended complaint in district court containing a contract claim nearly identical to the claim he has filed in this Court.  That rule of law is "contrary to the plain purpose and language of § 1500" and the Supreme Court's decision in *Tohomo O'Odham Nation*, 131 S.Ct. 1723.  *See generally Brandt*, 710 F.3d at 1380-82 (Prost, concurring).  Nonetheless, because Mr. Higbie's retaliation, hostile work environment, and contract actions are based upon the same operative facts, Section 1500 mandates dismissal of the complaint despite the "order-of-filing rule."

10

A000050

III.   **The Court Of Federal Claims Lacks Jurisdiction To Consider Mr. Higbie's Allegation That The Department Of State Breached The Agreement To Mediate Because That Agreement Is Not Money Mandating**

Mr. Higbie's allegation that the Army breached his settlement agreement should be dismissed because the agreement is not money-mandating and this Court lacks jurisdiction to consider breaches of contracts that are not money-mandating.  The Tucker Act, which provides a grant of jurisdiction and a waiver of sovereign immunity in the Court of Federal Claims, provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1); *United States v. Mitchell*, 463 U.S. 206 (1983).  However, the Tucker Act creates no substantive right enforceable against the United States.  *Testan*, 424 U.S. at 392.  Therefore, "a plaintiff must identify a separate source of substantive law that creates the right to money damages," *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc), which must be for "actual, presently due money damages from the United States," *United States v. King*, 395 U.S. 1, 3 (1969).

For this Court to have jurisdiction over a contract pursuant to the Tucker Act, that contract must "fairly be interpreted as mandating compensation by the Federal Government." *Holmes v. United States,* 657 F.3d 1303, 1309 (Fed. Cir. 2011) (quoting *United States v. Navajo Nation*, 129 S.Ct. 1547, 1551 -1552 (2009)).  The Federal Circuit has explained that while money damages are the presumptive remedy for contract breaches, the Federal Government's "consent to suit under the Tucker Act does not extend to every contract." *Id.* (quoting *Rick's*

11

A000051

*Mushroom Service, Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008)).  That court recently rejected an argument that the presumption of money damages is always sufficient, explaining that it is proper for this Court "to require a demonstration that the agreements could fairly be interpreted as contemplating money damages in the event of breach."  *Id.* at 1315.  The court explained that if an agreement involves "purely nonmonetary relief," this Court does not possess subject matter jurisdiction to consider an allegation of breach of that agreement.  *Id.*  In sum, in order to establish jurisdiction Mr. Higbie must establish that the mediation agreement can "fairly be interpreted as contemplating money damages in the event of breach."  *Id.*

There is no indication that the mediation agreement that Mr. Higbie alleges the Government breached contemplates money damages in the event of breach.  *See* Dkt. 5-1. Rather, the agreement is wholly unrelated to fiscal matters and is instead designed to inform the parties of the process involved when they engage in mediation.  Mediation is a process designed to facilitate and promote conciliation, compromise, and the ultimate resolution of a dispute. There is no dispute that the goal of mediation is furthered by maintaining the confidentiality of certain disclosures made during the mediation process.  If parties may not rely upon the confidentiality of the mediation proceedings, they will have little incentive to cooperate and compromise and the very purpose of mediation will be undermined.  Consistent with that notion, the agreement to mediate in this case includes a clause stating that "Mediation is a confidential process.  Any documents submitted to the mediator(s) and statements made during the mediation are for settlement purposes only."  Dkt. 5-1 at 9.  That is the clause that Mr. Higbie alleges has been breached.  *See* Compl. ¶ 6.

12

While a critical aspect of mediation is the confidentiality of those proceedings, the appropriate remedy for breach of that confidentiality is that disclosures that are improperly made will not be considered by an adjudicator.  As the clause explicitly provides, statements made during mediation "are for settlement purposes only."  Dkt. 5-1 at 9.  That means that the mediation is to be treated similarly to any other proceeding subject to Rule 408 of the Federal Rules of Evidence in that "[e]vidence of conduct or statements made in compromise negotiations" is likewise not admissible. Fed. R. Evid. Rule 408.  The normal and appropriate remedy for violation of the confidentiality of a mediation proceeding is therefore to exclude any evidence derived from those proceedings.  *See, e.g.*, *Ramada Development Co. v. Rauch*, 644 F.2d 1097, 1106-07 (5th Cir. 1981) (affirming a district court's refusal to admit an architect's report "because the report was a tool in an unsuccessful settlement attempt."); *see also*, *Goodyear Tire & Rubber Co. v. Chiles Power Supply*, 332 F.3d 976, 981 (6th Cir. 2003) (holding that there is a settlement privilege that protects against discovery of settlement negotiations).

In contrast to that normal remedy, Mr. Higbie seeks, as a remedy for the alleged breach of the confidentiality of mediation, the creation of another lawsuit and payment of money.  Just as permitting disclosures made during mediation would discourage parties from participating in mediation, permitting parties who allege breach of that duty of confidentiality to maintain a lawsuit based upon that breach would discourage parties from engaging in mediation in the first place.  The cost to the Government of defending lawsuits such as this one would have the effect of discouraging the Government from participating in mediation.  Based upon the plain language of the agreement, the remedy available to the parties when the agreement is breached is that any

13

A000053

statements made during mediation are not admissible in any legal proceedings.  *See, e.g.*

*Facebook, Inc. v. Pacific Northwest Software, Inc.*, 640 F.3d 1034 (9th Cir. 2011) (upholding

district court's exclusion of evidence based upon a confidentiality agreement entered into prior to

mediation).  The mediation agreement in this case explicitly provided for a non-monetary

remedy upon breach of the confidentiality provision: that statements made during mediation "are

for settlement purposes only" and will not therefore be used in any legal proceeding. *See, e.g.*

*Facebook*, 640 F.3d at 1040-41 (upholding district court's exclusion of evidence based upon a

confidentiality agreement entered into prior to mediation).  That provision, and the agreement as

a whole, cannot "fairly be interpreted as mandating compensation by the Federal Government."

*Holmes,* 657 F.3d at 1313.  Accordingly, this Court does not possess jurisdiction to consider Mr.

Higbie's claim.

**IV.**  **The Complaint Fails To State A Claim Because The Allegations In The Complaint Do Not Plausibly Suggest A Breach Of The Agreement**

The sole allegation in the complaint is that the Government breached the agreement to

mediate by submitting two affidavits.  *See* Compl. ¶ 8-9; Dkt. 5-2 at 3; Dkt. 5-3 at 3.  Mr. Higbie

alleges that two of the Government's signatories breached the mediation agreement by

disclosing, to the EEO investigator, "confidential information about the mediation process."

Compl. ¶ 8.  As we already established, the remedy for that alleged breach, if it were a breach, is

that the EEO would not consider those statements.  In addition, on their face, Mr. Higbie's

allegations do not constitute a breach of the agreement to mediate.

The "confidential information" that was allegedly disclosed to the EEO is routine

information about the status of mediation efforts, including one Government official's

description of that mediation in an affidavit stating that "Mr. Higbie and his attorney declined to

14

A000054

make any opening statement at all," and were "basically refusing to participate in the process," and another Government official's statement that summarized the mediation process by stating that "[n]othing was ever discussed and nothing was resolved."  *See* Compl. ¶ 8-9; Dkt. 5-2 at 3; Dkt. 5-3 at 3.

It is well-established that parties may inform an adjudicator about the status of settlement discussions.  *See, e.g., Alfa Laval Separation, Inc. v. United States*, 47 Fed. Cl. 305, 307 (2000) ("The parties notified the court of the particulars of ongoing settlement discussions on December 8, 1999. They had reached agreement as to nonmonetary relief."); *PlanetSpace, Inc. v. United State*s, 92 Fed. Cl. 520, 530 (2010) (permitting a party to justify a delay based upon "the parties' good faith, but ultimately unsuccessful, settlement negotiations.").  Much of the content that Mr. Higbie finds objectionable in the Government officials' affidavits is nothing more than informing the EEO about the status of the mediation.  *See* Compl. ¶¶ 8-9.

The only other statements made in the affidavits that Mr. Higbie directs the Court's attention to are those statements informing the EEO investigator that Mr. Higbie refused to participate in mediation.  That is not the kind of statement that the confidentiality clause was designed to keep secret, even from the adjudicator who will ultimately resolve any unsettled dispute.  As provided in the Federal Rules of Evidence, the confidentiality of settlement discussions may be pierced when the statements are not used to prove liability but instead are used to demonstrate bad faith.  *See, e.g., United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1045 (9th Cir. 2002) (overruled on other grounds) (holding that evidence from settlement negotiations was admissible to prove "obstruction of the EPA's investigation").  Accordingly, courts have allowed the admission of evidence that a party did not engage in mediation in good

15

A000055

faith. *See, e.g., Outar v. Greno Industries, Inc.,* 2005 WL 2387840, at *3 (N.D.N.Y. Sept. 27, 2005) (sanctioning plaintiff who refused to participate in mediation in good faith).

On its face, the agreement to mediate at issue in this case incorporates a requirement that the parties "engage in good faith attempts to resolve the matter." Dkt. 5-1 at 9. Thus, by it terms, the agreement recognizes that the parties may bring to an adjudicators' attention a parties' unwillingness to engage in good faith during the mediation process. Mr. Higbie's contention that the Government breached the agreement by attesting that Mr. Higbie was "basically refusing to participate in the process" therefore does not raise a claim that is "plausible on its face." *Twombly,* 550 U.S. at 557. Because that claim does not plausibly suggest that Mr. Higbie is entitled to relief, Mr. Higbie has failed to state a claim upon which relief can be granted.

## V.     The Complaint Fails To State A Claim Because The Relief Sought Has No Relationship To The Alleged Breach Of The Mediation Agreement

"The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Mich. Power Co.,* 422 F.3d at 1373 (citing *San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1562 (Fed. Cir. 1997)). "Damages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Id.* (citing *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1320 (Fed. Cir. 2002)). "While the amount of damages need not be 'ascertainable with absolute exactness or mathematical precision,' recovery for speculative damages is precluded." *Id.* (quoting *San Carlos Irrigation & Drainage Dist.,* 111 F.3d at 1563).

16

A000056

The damages Mr. Higbie seeks in his complaint do not meet any of those standards, as any damage, if there were any, has no relationship at all to the alleged breach of the mediation agreement.  First, it cannot have been reasonably foreseeable to the Government officials who submitted affidavits to the EEO investigator that by informing the investigator that "[n]othing was ever discussed and nothing was resolved," Mr. Higbie would thereby incur $500,000.00 in damages.  *See* Dkt. 5-3 at 3.  Second, Mr. Higbie has provided no indication of how the alleged breach caused that amount of damage, or, indeed, caused Mr. Higbie any damage at all.  Because the disclosures Mr. Higbie objects to already may not be used in any other proceeding, the only conceivable effect of those disclosures is to undermine the mediation efforts.  But in this case, the mediation had already been terminated.  Indeed, the mediation's failure is precisely what was disclosed.  The disclosures Mr. Higbie complains about therefore had no effect whatsoever.  Third, there is no certainty in Mr. Higbie's damages calculation; the arbitrary figure of one-half million dollars is, at best, entirely speculative.

Mr. Higbie is not seeking damages to place him in "as good a position as [he] would have been had the breaching party fully performed."  *Indiana Mich. Power Co.*, 422 F.3d at 1373.  Rather, Mr. Higbie is seeking a windfall, which he may not do.  *See Old Stone Corp. v. United States,* 450 F.3d 1360, 1378 (Fed. Cir. 2006) ("[T]he non-breaching party should not be placed in a better position through the award of damages than if there had been no breach.").  Even if the actions that Mr. Higbie alleges constituted a breach of the agreement to mediate, in order to place Mr. Higbie in as good a position as he would have been had the breaching party fully performed, all that is required is that an adjudicator not consider any of the allegedly "confidential

17

information about the mediation process" when reaching a decision.  Compl. ¶ 8.  Not

coincidentally, that is the very relief contemplated by the agreement.

### **CONCLUSION**

Based upon the foregoing, defendant respectfully requests that this Court dismiss

plaintiff's complaint due to lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) and for

failure to state a claim pursuant to RCFC 12(b)(6).

<div style="margin-left: 50%;">

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General


JEANNE E. DAVIDSON
Director

s/Steve Gillingham
STEVE GILLINGHAM
Assistant Director

s/Michael P. Goodman
MICHAEL P. GOODMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480; Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-2087

</div>

September 13, 2013                                    Attorneys for Defendant

<div style="text-align: center;">18</div>

No. 13-270
(Judge Damich)

_____

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

RICHARD HIGBIE

Plaintiff

v.

THE UNITED STATES,

Defendant

_____

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(1) & FED. R. CIV. P. 12(B)(6)**

_____

DAMON MATHIAS
State Bar No.: 24080170

CARY SCHULMAN
State Bar No.: 00797390

**SCHULMAN | MATHIAS** PLLC

8390 LBJ Freeway
Suite 500
Dallas, Texas 75243
Telephone:    214-739-0100
Facsimile:    214-739-0151
Email:        damon@schulmanmathias.com

October 15, 2013                    **ATTORNEYS FOR PLAINTIFF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................i

STATEMENT OF FACTS ..................................................................................................1

LEGAL ARGUMENT ........................................................................................................3

CONCLUSION...................................................................................................................?

## TABLE OF AUTHORITIES

**CASES:**

*Alfa Laval Separation, Inc. v. United States*, 47 Fed. Cl. 305, 307 (2000)..........................13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)................................................................12

*Branch v. United States*, 29 Fed. Cl. 606, 609 (1993)..........................................................5

*Cooke v. United States* 77 Fed. Cl. 173, 175 (2007)..............................................................7

*County of Cook, Ill. v. United States*, 170 F.3d 1084 (Fed. Cir. 1999)...................................4

*d'Abrera*, 78 Fed. Cl. at 57-58......................................................................................5, 8

*Ferreiro v. United States*, 501 F.3d 1349, 1351 (Fed. Cir. 2007)..........................................8

*Fisher v. United States*, 402 F.3d 1167, 1172 (Fed.Cir.2005)...............................................8

*Foxgate HOA v. Bramalea* 26 Cal.4th 1(2001).................................................................15

*Frymire v. United States*, 51 Fed. Cl. 450, 454 (2002)..........................................................3

*Griffin v. United States*, 590 F.3d 1291, 1293 (Fed. Cir. 2009).............................................4

*Hallmark Cards v. Murley*, 703 F.3d 456 (8th Cir. Jan. 15, 2013........................................18

*Hand v. Walnut Valley Sailing Club*, 2012 WL 1111137,*3 (C.A.10 (Kan))..........................17

*Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989............................................3

*Harbuck v. United States*, 58 Fed. Cl. 266, 267 (2003).................................................3,4,5

*Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).................................................3

*Heritage Minerals, Inc. v. United States*, 71 Fed. Cl. 710, 716 (2006).................................5

*Holmes v. United States*, 657 F.3d 1303, 1313-4 (Fed. Cir. 2011)......................................9

*Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1567 (Fed. Cir. 1988....................5

*J.R. Simplot v. Chevron Pipeline Co.*, 563 F.3d 1102, 1116 (10th Cir. 2009)....................15

*Kania v. United States*, 227 Ct.Cl 458, 650 F.2d 264, 268 (Ct.Cl. 1981).........................9

*Lake Utopia Paper Ltd. v. Connelly Containers*, Inc., 608 F.2d 928, 930 (2d Cir.1979),cert. denied, 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980) ......................................1

*Laudes Corp. v. United States*, 86 Fed. Cl. 152, 160 (2009).............................................12

*Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1548 (Fed. Cir. 1994)....4, 5

*Lechliter v. United States*, 70 Fed. Cl. 536, 543 (2006).....................................................3

*Morse Diesel Int'l, Inc. v. United States*, 66 Fed. Cl. 788, 797 (2005)..............................12

*Naskar v. United States*, 82 Fed. Cl. 319, 320 (2008).......................................................3

*Nez Perce Tribe v. United States*, 83 Fed. Cl. 186, 190 (2008).............................................4

*Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)...............3

*OSI, Inc. v. United States*, 73 Fed. Cl. 39, 44 (2006)........................................................4

Reid v. United States, 95 Fed. Cl. 243, 247 (2010)..........................................................8

*PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 530 (2010).....................................13

*Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)........................................3

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)................................................................3

*Tindle v. United States*, 56 Fed. Cl. 337, 341 (2003).........................................................3

*Tohono O'odham Nation* 131 S. Ct. 1723, 1731 (2011).....................................................6

*United Keetowah Band of Cherokee Indians in Okla. v. United States*, 86 Fed. Cl. 183, 187 (2009)..................................................................................................................4, 5

*United States v. Mitchell*, 463 U.S. 206, 212 (1983).........................................................8

**STATUTES:**
28 U.S.C.
§§651-658.............................................................................................................15,16

28 U.S.C. § 1491(a)(1) (2006)........................................................................................4,8

28 U.S.C. § 1500.............................................................................................................4

29 USC §
1614...............................................................................................................................10

RCFC 12(h)
(3)....................................................................................................................................3

**SECONDARY SOURCE:**

Freedman, Confidentiality: A Closer Look, in CONFIDENTIALITY IN MEDIATION: A
PRACTITIONER'S GUIDE 47, 19 (Anne Clare ed.,
1985)..................................................................15

A000063

## INTRODUCTION

It is essential to the proper functioning of the Alternative Dispute Resolution program that all matters discussed at these conferences remain confidential. The guarantee of confidentiality permits and encourages counsel and the parties to discuss matters in an uninhibited fashion. If participants cannot rely on the confidential treatment of everything that transpires during these sessions then counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute. This atmosphere if allowed to exist would surely destroy the effectiveness of a program. *Lake Utopia Paper Ltd. v. Connelly Containers*, Inc., 608 F.2d 928, 930 (2d Cir.1979),cert. denied, 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980).

## STATEMENT OF FACTS

On January 15, 2009, following numerous retaliatory acts of discrimination, Plaintiff timely contacted an EEO Counselor to begin the process of filing a discrimination complaint. Plaintiff timely filed a formal complaint of discrimination on April 13, 2009. Compl. ¶ 5

On May 21, 2009, a mediation confirmation for EEO Case #DOS-F-062-09 was sent to all mediation participants by Jacqueline A. Canton, Chief Intake and Resolution Section. Marian Cotter & Jeffrey Thomas were both listed as responding officials.(See Exhibit A) In the days leading up to the mediation,counsel for the Plaintiff engaged in extensive correspondence negotiating  the terms for the mediation and was assured it was affirmatively represented by Office of Civil Rights that the process was confidential. (See Exhibit B) The mediation agreement was provided to counsel in a separate correspondence on May 21 and  that signing of the agreement was mandatory for all parties. Id.

On May 29, 2009, the following Responding Officials signed an "EEO/ Alternative Dispute Resolution – Agreement to Mediate" ("ADR Agreement"): Marian Cotter, Paul Vallee and Jeffrey Thomas. Compl. ¶ 6; see also Exhibit B. Among other provisions, the parties agreed to the following confidentiality clause:

"**Mediation is a confidential process** (emphasis in original). Any documents submitted to the mediators and statements made during the mediation are    for settlement purposes only." Compl. ¶ 6

On December 17, 2009, as part of an EEO investigation into Plaintiff's claims of discrimination, responding officials Marian Cotter (Special Agent in Charge of the Houston Field Office) and Jeffrey Thomas (Supervisory Special Agent of the Houston Field Office) disclosed to EEO assigned Investigator, Robert Maddern, information that was protected under the strict confidentiality guidelines set by the aforementioned ADR Mediation. Compl.¶ 7,8

In the investigative affidavit Ms. Cotter, was asked the following :

"Is there anything you would like to add to your affidavit and/or do you have any documents you would like to submit in support of your testimony? If so please indicate and attach the relevant information" Compl.¶ 8

Ms. Cotter provided (in-part) the following response:

"Much of Mr. Higbie's complaint seems to lack specificity. *This was glaringly apparent at the Alternate Dispute Resolution when Mr. Higbie and his attorney declined to make any opening statement at all and terminated the ADR after Department's statement and a private sidebar with the mediator, basically refusing to participate in the process. At a minimum, this tactic demonstrated a complete lack of sincerity to resolve any issues in an open and transparent forum.* One could come to believe there is some cynical, ulterior motive driving this complaint. Mr. Higbie has routinely demonstrated a lack of perspective with regard to how his work and the work of the Dallas Resident Office fit in perspective into the big picture of the Diplomatic Security mission. It would be disappointing for this EEO process to reinforce his misinterpretation of reality. Moreover, it is disappointing to witness the abuse of a process designed to protect employees from real wrongs." Compl.¶ 8

In the investigative affidavit Thomas, was asked the following :

Is there anything you would like to add to your affidavit and/or do you have any documents you would like to submit in support of your testimony? If so please indicate and attach the relevant information? Compl.¶ 7

Thomas provided (in-part) the following response::

"On May 29, 2009, all parties agreed to part of an Alternative Dispute Resolution meeting. It was a teleconference. Mr. Higbie refused to travel to Houston to meet with the respondents. *The mediator asked Mr. Higbie's attorney to state his case. The only statement the attorney made was that Mr. Higbie plans to file an amended complaint and that he was willing to discuss Higbie's opportunities to obtain a GS 14 position. The attorney then asked to go off-line to talk to the mediator.* One hour later the teleconference was terminated. Nothing was ever discussed and nothing was resolved." Compl.¶ 9

A000065

The affidavits of Cotter & Thomas eventually appeared in the March 3, 2010 EEO Report of Investigation for EEO Case #DOS-F-062-09.

Plaintiff's initial complaint in district court was filed on October 5, 2011, and later amended on June 25, 2012. *See* Case No. 3:11-cv-02636-L, Dkt. 1, 10. On January 29, 2013, Plaintiff filed a Motion for Leave to File a Second Amended Complaint and contemporaneously an Unopposed Motion to Transfer Venue for his breach of contract claims. *Id.*, Dkt. 28 & 29. On February 5, 2013, the district court ordered Plaintiff's breach of contract claims severed from case 3:11-cv-2636-L and transferred to the Court of Federal Claims. *Id.*, Dkt. 31. On May 20, 2013, Plaintiff filed his transfer complaint in the Court of Federal Claims. Dkt. 5

## ARGUMENT

## I.   Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction

In ruling upon a motion to dismiss for lack of subject matter jurisdiction, the Court accepts as true the undisputed allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), abrogated on other grounds by, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). Plaintiff need only make a prima facie showing of jurisdictional facts in order to survive a motion to dismiss. *Harbuck v. United States*, 58 Fed. Cl. 266, 267 (2003). Plaintiff bears the burden of establishing subject-matter jurisdiction. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); see also *Naskar v. United States*, 82 Fed. Cl. 319, 320 (2008). In determining whether the plaintiff has met this burden, the Court may look "beyond the pleadings and `inquire into jurisdictional facts' in order to determine whether jurisdiction exists." *Lechliter v. United States*, 70 Fed. Cl. 536, 543 (2006) (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)). When deciding a motion to dismiss for lack of subject-matter jurisdiction, the Court assumes all factual allegations to be true and construes "all reasonable inferences in plaintiff's favor." Hall v. United States, 74 Fed. Cl. 391, 393 (2006) (quoting *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." RCFC 12(h)(3); see also *Tindle v. United States*, 56 Fed. Cl. 337, 341 (2003). The Court will dismiss for lack of subject matter jurisdiction only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. See *Frymire v. United States*, 51 Fed. Cl. 450, 454 (2002) (quotations omitted).

## A.   28 U.S.C. § 1500 Does Not Divest the Court of Jurisdiction in this Instance.

A000066

The Tucker Act confers jurisdiction upon this Court to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress. . . or upon any express or implied contract with the United States. . . ." 28 U.S.C. § 1491(a)(1) (2006).  The Tucker Act's jurisdictional grant is limited by 28 U.S.C. § 1500, which provides:

The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any  other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in any respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

The underlying purpose of the statute was "to force plaintiffs to choose between pursuing their claims in the Court of [Federal] Claims or in another court" and "to prevent the United States from having to litigate and defend against the same claim in both courts." *Harbuck v. United States*, 378 F.3d 1324, 1328 (Fed. Cir. 2004) (en banc) (citing *UNR Indus., Inc.*, 962 F.2d at 1021); see also *OSI, Inc. v. United States*, 73 Fed. Cl. 39, 44 (2006).

Historically, the Court has interpreted § 1500 to apply when the claimant "has pending in any other court any suit or process against the United States." *Keene Corp. v. United States*, 508 U.S. 200, 206 (1993); *County of Cook, Ill. v. United States*, 170 F.3d 1084 (Fed. Cir. 1999); *United Keetowah Band of Cherokee Indians in Okla. v. United States*, 86 Fed. Cl. 183, 187 (2009). Whether another claim is "pending" for purposes of § 1500 depends upon "the state of things at the time of the action brought." *Keene Corp.*, 508 U.S. at 207; *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1548 (Fed. Cir. 1994) (stating that another claim is considered `pending' for purposes of § 1500 "at the time at which the suit in the Court of Federal Claims is filed, not the time at which the Government moves to dismiss the action."). Thus, a claim is considered "pending" whenever "another claim has already been filed in a different court at the time the complaint is filed in this [C]ourt." *Nez Perce Tribe v. United States*, 83 Fed. Cl. 186, 190 (2008) (emphasis in original).

If a plaintiff files multiple claims in district court, and the court transfers one of those claims to the Court of Federal Claims, the original claims are "pending" at the time the transferred claim is considered filed, and § 1500 will deprive the Court of Federal Claims of jurisdiction over the transferred claim only if the claim pending in another court arises from the same operative facts as the other district court claims, and seeks the same relief." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1551 (Fed.Cir.1994) (en banc). *Griffin v. United States*, 590 F.3d 1291, 1293 (Fed. Cir. 2009)

Plaintiff's initial complaint in district court was filed on October 5, 2011, and later amended on June 25, 2012. *See* Case No. 3:11-cv-02636-L, Dkt. 1, 10. On January 29, 2013, Plaintiff filed a Motion for Leave to File a Second Amended Complaint and Unopposed Motion to Transfer Venue. *Id.*, Dkt. 28 & 29 On February 5, 2013, the Court ordered Plaintiff's breach of contract claims <u>severed</u> from case 3:11-cv-2636-L and transferred to the Court of Federal Claims. As such any cause of action and operative facts relating to  Plaintiff's breach of contract claim remaining in Plaintiff's Second Amended Complaint were transferred in their entirety to the CFC.

On May 20, 2013, Plaintiff filed his transfer complaint in the Court of Federal Claims alleging breach of a 2009 confidentiality agreement. Dkt. 5. Defendant erroneously argues that Plaintiff's claims before this Court and the district court are the same for purposes of § 1500. *Loveladies Harbor Inc.*, 27 F.3d at 1550-51. In order for two claims to be considered the "same claim" under § 1500, they must arise from the same operative facts and seek the same relief. *United Keetowah Band of Cherokee Indians in Okla.,* 86 Fed. Cl. at 187; *Harbuck*, 378 F.3d at 1328. Only if both of these conditions are met will this Court be divested of subject matter jurisdiction. *United Keetowah Band of Cherokee Indians in Okla.*, 86 Fed. Cl. at 187; *Heritage Minerals, Inc. v. United States*, 71 Fed. Cl. 710, 716 (2006); *Harbuck*, 378 F.3d at 1328-39.  Plaintiff's district court suit and the instant suit are based upon different operative facts; therefore, Plaintiff has not run afoul of 28 U.S.C. § 1500.

"Deciding if the claims are the same or distinctly different requires a comparison between the claims raised in the Court of Federal Claims and in the other lawsuit." *Loveladies Harbor Inc.*, 27 F.3d at 1549. When comparing the claims as § 1500 requires, the Court "looks to the set of operative facts alleged and not the legal theory that is argued."*Harbuck*, 58 Fed. Cl. at 269; *Keene Corp.*, 508 U.S. at 212 ("That . . . two actions [are] based on different legal theories [does] not matter."); *Yankton Sioux Tribe*, 84 Fed. Cl. at 231 (noting that "it is the similarity of the operative facts . . . that controls, rather than the underlying theories."); *Loveladies Harbor, Inc.*, 27 F.3d at 1549 ("[I]t is the operative facts and not the legal theories by which claims may be distinguished under § 1500. . . . ").

On the one hand, "claims are the same where they arise from the same operative facts even if the operative facts cannot all be brought in one court." *Harbuck*, 378 F.3d at 1329(quoting *Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1567 (Fed. Cir. 1988)). On the other hand, where a material factual difference exists between the two claims, they are not considered the same for purposes of § 1500. *d'Abrera*, 78 Fed. Cl. at 57-58. Thus, it is only where the material facts supporting each claim are the same or similar will § 1500 be implicated. See *Branch v. United States*, 29 Fed. Cl. 606, 609 (1993); see also *Griffin v. United States*, 85 Fed. Cl. 179, 185 (2008), aff'd, 590 F.3d 1291, 1294-93 (Fed. Cir. 2009); *Harbuck*, 58 Fed. Cl. at 269 ("[I]t is sufficient that [the facts] are substantially the same.").

In *Tohono O'odham Nation* 131 S. Ct. 1723, 1731 (2011), the Supreme Court held that this court does not have jurisdiction to hear a case if two claims share the same nucleus of operative facts and are filed in district court and the CFC, regardless of whether the relief sought by the plaintiff in the two suits is different. As the Court explained, "two suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on *substantially the same* operative facts, regardless of the relief sought in each suit." *Id.* at 1731. Unlike in *Tohono*, where the Court found that the plaintiff had pled "almost identical" claims and noted that plaintiff "could have filed two identical complaints, save the caption and prayer for relief, without changing either suit in any significant respect"   there is a vast discrepancy in the operative facts between the Plaintiff's district court case and his claim before the CFC.

The factual overlap between Plaintiff's CFC claim and district court claim is clearly not sufficient to trigger the jurisdictional bar. In its motion to dismiss, the Government asserts that "...the only difference between the complaints is the legal theory upon which Mr. Higbie is seeking relief....The operative facts in both complaints are the same." Def. Mot. to Dismiss at 10. Nothing could be farther from the truth.

A simple comparison of the facts in Plaintiff's amended district court complaint and his suit filed in the CFC demonstrates that Plaintiff's claims of retaliation in the district court case and the breach of contract in CFC are grounded in different sets of operative facts. Plaintiff's district court complaint fact section contains seventy-eight paragraphs upon which Plaintiff's claims of retaliation and hostile work environment are premised. *See* Case No. 3:11-cv-02636-L, Dkt. 123 at ¶9-87.  In these seventy-eight paragraphs, Plaintiff asserts among other things: Plaintiff engaged in protected activity by participation and opposition; that the Department took materially adverse employment actions; causal connection exists between the protected activities and adverse actions; and that Plaintiff was subject to a hostile work environment. *Id.* The adverse actions alleged are 1) Defendant's refusal to permit Higbie to act as the acting RAIC in Dallas or lead teams on complex investigations (December 2008); 2) Derogation of employment by stripping Higbie of his title and rank and the duties, responsibilities and privileges with such (January 2011); and 3) Removal of the major job duty as the primary liaison to Consular Affairs (March of 2011).  *See Id.*

The breach of confidentiality that is the subject of this lawsuit is conduct that is neither material nor operative to Plaintiff's retaliation claim and hostile work environment claims in district court. The breach of confidentiality that is alleged in this case is incapable of serving as an adverse employment action that would allow Plaintiff to prevail on his retaliation claim or hostile work environment claim and a material fact in Plaintiff's district court claim. See 42 U.S.C §2000e-2(a)(1). The adverse employment actions that comprise the operative facts of  Plaintiff's forty-page complaint in the district court complaint are wholly absent from Plaintiff's six-page transfer complaint because they are neither material

A000069

nor operative to his breach of contract claims. *See* Case No. 3:11-cv-02636-L, Dkt. 123 & Compl.

In *Cooke v. United States*, the plaintiff filed a complaint in district court alleging unequal pay in violation of the Equal Pay Act ("EPA") and retaliatory action by the government under the Fair Labor Standards Act ("FLSA"). 77 Fed. Cl. 173, 175 (2007). The plaintiff later amended her district court claim by withdrawing the FLSA claim and moving to transfer the EPA claim to the Court of Federal Claims. Id. at 175-76. After the district court granted the transfer and the Court of Federal Claims accepted the new filing, the plaintiff filed a new claim in the district court alleging retaliatory action by the government in violation of the FLSA. Id. at 176. The Court found that a material difference existed in the operative facts between the plaintiff's two claims in district court and the Court of Federal Claims. *Id*. at 178. The Court reasoned that while the plaintiff's district court claim was premised on gender discrimination, her Court of Federal Claims action was not. *Id*. The Court therefore denied the defendant's motion to dismiss pursuant to § 1500, holding that the plaintiff "asserted a separate and distinct claim from her [d]istrict [c]ourt case." *Id*. at 177. (emphasis added).

Other cases finding § 1500 inapplicable have reasoned that a material factual difference exists between the plaintiff's two claims. In *d'Abrera*, for example, the Court concluded that while the plaintiff's Lanham Act claim involved allegations that the defendant misrepresented the plaintiff's photographs as his own, the plaintiff's copyright infringement claim involved allegations that defendant reproduced and distributed plaintiff's photographs without permission. 78 Fed. Cl. at 58-59. Section 1500 therefore did not divest the Court of jurisdiction because the claims involved different conduct. Id. at 60. Similarly, in *Heritage Mineral, Inc.*, the plaintiffs appealed a claim in the Third Circuit concerning the Navy's alleged contamination of their groundwater, and then brought a claim in the Court of Federal Claims pertaining to the installation and maintenance of groundwater monitoring wells. 71 Fed. Cl. at 711. Reasoning that the installation and maintenance of the monitoring wells involved "different conduct" than the contamination issue before the court of appeals, the Court found that the two claims did not involve the same operative facts and therefore dismissed the defendant's motion to dismiss. Id. at 716.

The operative facts underlying the district court suit are the Department of State's discriminatory and retaliatory actions in response to Plaintiff's prior EEO activity. In contrast, the operative facts underlying the instant action are the Department of State's breach of a 2009 confidentiality agreement. Indeed, Plaintiff's district court complaint is premised on him being retaliated against by his supervisors due to his prior EEO activity.  Plaintiff's claim in this Court, however, focuses on the "responding officials"  failing to comply with the 2009 confidentiality agreement by communicating information concerning the underlying facts of the strictly confidential ADR process in affidavits submitted to the EEO investigator. Like the plaintiff in *Cooke*, Plaintiff asserted a "separate and distinct" breach of contract

A000070

claim in this Court in comparison to his district court ADA retaliation/hostile work environment claims. 77 Fed. Cl. at 177. Like the situation with the photographs in *d'Abrera,* the Plaintiff is alleging in the one case that officials disclosed confidential information via affidavits and is distinctly alleging that the same officials have misrepresented factual matters pertaining to the Plaintiff, in those same affidavits. Further, the affidavits, as used in the District Court, demonstrate state of mind of the officials and pretext in the discrimination/retaliation matter. However, this is not alleged in Federal Claims Court and the case is merely whether the statements published by the officials constitute a breach of mediation confidentiality. In the Federal Claims Court, the contractual agreement and the allegations of one, are material operative facts. This is not so in the District Court case.

While the fact that Plaintiff's district court and Court of Federal Claims actions pursue different legal theories is not dispositive, the fact that his claims are based on different sets of operative facts is significant. There is very little "overlap" in the facts of both cases and 99% of the operative facts alleged in the District Court case are not operative facts and do not appear in the Federal Claims Court action. 1%, if any, overlaping facts cannot be said to be substantial overlap as the term is ued by the Supreme Court. Because Plaintiff's district court claims involve distinct government conduct, with different material facts relevant to one claim and not the other, Plaintiff's actions do not arise from the same operative facts. There is a material difference between the operative facts in each case rendering § 1500 inapplicable.

**B.      The Mediation Agreement at Issue in this Case Does Fairly Contemplate the Payment of Money.**

The Tucker Act, 28 U.S.C. § 1491 (2006), "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and ... it waives the Government's sovereign immunity for those actions," *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed.Cir.2005) (en banc). The Tucker Act confers jurisdiction upon the Court to hear claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Act provides a waiver of sovereign immunity enabling a plaintiff to sue the United States for money damages. *United States v. Mitchell*, 463 U.S. 206, 212 (1983); Reid v. United States, 95 Fed. Cl. 243, 247 (2010) (citing *Mitchell*, 463 U.S. at 212). However, the Tucker Act only provides jurisdiction; it does not create a stand-alone, substantive right, enforceable against the United States for monetary relief. *Ferreiro v. United States*, 501 F.3d 1349, 1351 (Fed. Cir. 2007) (*quoting United States v. Testan*, 424 U.S. 392, 398 (1976)). "[A] plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). The separate source of substantive law must be a "money-mandating constitutional provision, statute or regulation that has been violated, or an

express or implied contract with the United States." *Lovedies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

The government's consent to suit under the Tucker Act does not extend to every contract. *Kania v. United States*, 227 Ct.Cl 458, 650 F.2d 264, 268 (Ct.Cl. 1981); accord Sanders v. United States, 252 F.3d 1329, 1335 (Fed.Cir.2001). Although "[t]he other source of law need not explicitly provide that the right or duty it creates is enforceable through a suit for damages, . . .it triggers liability only if it 'can fairly be interpreted as mandating compensation by the Federal Government.'" *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009)(quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)). There is a presumption, in the civil context, that a damages remedy will be available upon the breach of an agreement." *Holmes v. United States*, 657 F.3d 1303, 1313-4(Fed. Cir. 2011). Plaintiff attaches to this Response to Defendant's 12(b)(1) Motion to Dismiss, a copy of the Contract entered into by and between Plaintiff and the United States (Exhibit "C") and a letter confirming the mediation sent by the Office of Civil Rights (Exhibit "A"). Further, Plaintiff attaches emails exchanged prior to the execution of the mediation agreement where in Plaintiff negotiated and required the confidentiality of the proceeding in order to participate in the mediation (Exhibit "B"),

Defendant argues that despite entering the express contract to mediate and expressly agreeing to keep such matters confidential, it is not subject to suit for money damages for its breach and therefore, jurisdiction is lacking in this Court. Defendant relies upon *Rick's Mishroom Services, Inc. v. U.S.*, 521 F.3d 1338 (Fed. Cir. 2008) in its position, a case decided prior to *Holmes* which clarified that the Tucker Act gives the jurisdiction to claims for an alleged breach of a Title VII settlement agreement. *Id.* Mr. Holmes was required to "show that the 1996 and 2001 Agreements could support a fair inference that he was entitled to the payment of money damages for breach, or was required to demonstrate that the two agreements could fairly be interpreted that way." *Id.*

However, Defendant's failure to cite and address *Holmes* looms large. In particular, the Federal Circuit explained that "when referencing the money-mandating inquiry for Tucker Act jurisdiction, the cases logically put to one side contract-based claims" because "'normally contracts do not contain provisions specifying the basis for the award of damages in case of breach.'" *Holmes v. United States*, 657 F.3d 1303, 1313-4 (Fed. Cir. 2011) 1314. This is because, with respect to "government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." Id at 1313-4. In sum, the Federal Circuit clarified that "when a breach of contract claim is brought in the Court of Federal Claims under the Tucker Act, the plaintiff comes armed with the presumption that money damages are available, so that normally no further inquiry is required." Id at 1314. Exceptions to this presumption rule, for example, is "[a] contract expressly disavowing money damages" or in the case of an agreement 'entirely concerned with the conduct of the parties in a criminal case.'" Id. The contract at issue in Homes were settlement agreements made pursuant to Title VII. The Holmes Court highlighted

A000072

the fact that "there is no language in the agreements indicating that the parties did not intend for money damages to be available in the event of breach" *Id.* at 1316.

So too, the contract at issue does not disallow a claim for money damages.  And like *Holmes* contracts at issue, the contract in this case was entered into freely by the Defendant and Plaintiff on a voluntary basis and done so in connection with a discrimination claim.  For purposes of jurisdiction, there is no difference between the *Holmes* settlement agreement done pursuant to Title VII and the mediation agreement entered into by the parties in this matter in connection with a disability discrimination case between the United States and one of its employees.  Further, there is no shortage of support for the need and importance of confidentiality in the mediation process.[1]  Indeed, as the negotiations conducted prior to the execution of the mediation agreement demonstrate, confidentiality was essential to Higbie's participation in the mediation.  On more than one occasion, Plaintiff's lawyer inquired about the confidentiality of the mediation and stressed its importance (Exhibit "B").  Thereafter, the agreement was executed by Plaintiff and management officials for Defendant.  Despite the promises, assurances and written contract providing for confidentiality, the United States violated the covenant.  Violation of confidentiality provisions in numerous types of agreements, including labor and employment agreements, are routinely met in this country with actions seeking money damages.  The contract at issue is no different and the presumption that the money damages would be available for a breach of the contracted entered into by the parties holds in this case.

Defendant argues that the "normal and appropriate remedy" for their breach is some sort of sanctionable conduct or exclusion of evidence (Docket No. 8, p. 13).  But this argument fails on multiple fronts.  First, Mr. Higbie and the United States entered into this contract prior to any federal court having jurisdiction, on a voluntary basis (See Exhibit "C").  As the Office of Civil Rights for the Department of State indicated, the EEOC requires "each agency...make reasonable efforts to voluntarily settle complaints discrimination as early as possible, in and throughout the administrative processing of complaints...." (Exhibit "B").  The U.S. Equal Employment Opportunity Commission's regulation at Title 29, Code of Federal Regulations, Part 1614.102(b)(2) requires Federal agencies to establish or make available an Alternative Dispute Resolution (ADR) program. The ADR program must be available during both the pre-complaint stage and the formal complaint stage of the equal employment opportunity (EEO) complaint process. ADR is a range of problem-solving approaches used for resolving conflict in lieu of more formal and/or adversarial processes, such as court litigation. The different agencies websites and other published information to federal employees boosts that the mediation processes are "confidential" encouraging employees to early efforts at resolution through the voluntary mediation process.[2]

---

[1] See argument below under "Relief's Relationship to Breach of Confidentiality."

[2] See e.g. http://www.blm.gov/pgdata/etc/medialib/blm/ak/aktest/equal_employment_opportunity.Par.64729.File.dat/Rights%20and%20Protections%20Under%20Federal%20EEO%20Laws%20and%20WPA%20-%20No%20Fear.doc.

A000073

The parties entered into the mediation agreement early in the processing of Plaintiff's discrimination complaint, prior to any election for a hearing before the EEOC administrative law judge and prior to the filing of a lawsuit. *Id.* There is no judicial oversight or sanction available, no applicability of the Federal Rules of Evidence or exclusionary mechanism and no potential administrative remedy available which comes into play if and after a complainant requests a hearing before an administrative law judge. This mediation took place at an early stage prior to to attachment of the deterrents and punishments for which the Defendant relies and therefore the remedies addressed by the Defendant are inapplicable. Additionally, the fact that a court may be able to sanction a party and exclude evidence pursuant to the Rules of Procedure, which the Defendant argues is the "normal" remedy, does not preclude one from asserting and bringing a cause of action predicated upon the same conduct. The Defendant cites no authority for their argument.

Defendant argues that permitting causes of action for breach of confidentiality would discourage participation in mediation (Docket No. 8, p. 13). But this would only be true for those disrespecting the confidentiality of the process, which is a rarity by Plaintiff's accounts, considering the authority available on this very issue. In fact, the exact opposite is true. If Defendant is permitted to violate confidentiality without recourse, since it argues a cause of action seeking money damages should not be available and the case is at too early of a stage to seek sanctions, exclusion of evidence or other relief from the administrative judge, the outcome will be to render confidentiality provisions entered into by the Defendant at the early processing of discrimination complaints meaningless discouraging early resolution of cases. Defendant argues that the cost of defending actions such as this one will cause the government to not participate in mediations. *Id.* But Plaintiff fails to see the logic in justifying flagrant and intentional violations of breach of confidentiality with this argument as the government can avoid the costs simply by not breaching the confidentiality agreements it enters.

The government argues that only one remedy is available to the Plaintiff, exclusion of the evidence in legal proceedings. *Id.* at 14. The Defendant premises the argument on the reference to statements being made "are for settlement purposes only." Id. However, this is not the entirety of the provision, the clause cannot be read to expressly provide the sole remedy for a breach and the argument ignores the harm and damage done from such a breach of confidentiality such as in this case. Plaintiff negotiated and stressed entering into confidentiality with the government, in part, because three management officials in his chain of command were going to participate and he did not want the management officials, for which he had already filed a formal complaint of discrimination against, to utilize anything he did or said during the mediation against him in his continued employment (see Exhibit "B").

However, despite his efforts and despite clarifying the confidentiality of the process before engaging in it and despite entering into a contractual agreement, Defendant did exactly what Plaintiff desired to prevent; the management officials utilizing the events occurring in mediation process against Plaintiff outside of the

A000074

mediation. *Id.* Not only did the management officials provide the information to the EEO investigator (not an adjudicator) in the EEO investigation -- who then included the information in the Report of Investigation which becomes public record and may be introduced into a court of law and utilized for the proceedings or in other manners. The emails of these management officials and the reckless disregard for which they divulged the confidential information, indicates that other breaches of the confidential information have likely occurred.[3]

Contrary to the Defendant's assertions, the contract can be fairly interpreted as mandating compensation and the presumption of such controls this issue. Jurisdiction is appropriate in this matter.

## II.     Defendant's Motion to Dismiss for Failure to State a Claim

When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all of the allegations in the complaint, . . . and [the Court] must indulge all reasonable inferences in favor of the non-movant." *Laudes Corp. v. United States*, 86 Fed. Cl. 152, 160 (2009) (citing *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001)). To state a claim, the complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief. *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). The factual allegations must be "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp.*, 550 U.S. at 555. Plaintiff need not set out in detail the facts upon which the claims are based; however, there must be enough facts to state "a claim to relief that is plausible on its face." *Cary*, 552 F.3d at 1376. A complaint will therefore only be dismissed pursuant to RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." Laudes Corp., 86 Fed. Cl. at 160 (citing *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)); *see also Morse Diesel Int'l, Inc. v. United States*, 66 Fed. Cl. 788, 797 (2005) (noting that dismissal is only proper where a plaintiff can "prove no set of facts in support of his claim which would entitle him to relief.").

## A.     Defendant's Actions Clearly Constitute a Breach of the Agreement to Mediate.

---

[3] Plaintiff received the emails three weeks before the discovery closed in the District Court action and has not been able to conduct follow-up discovery. Further, Plaintiff was unaware of the information when he deposed Paul Vallee in the EEO administrative proceedings March of 2011 and has not deposed Jeff Thomas as of yet.

The statements of the responding officials in their EEO investigative affidavits represents a unequivocal breach of the confidentiality agreement entered into between the Plaintiff and the government. The terms of the agreement were clear:

> "**Mediation is a confidential process** (emphasis in original). Any documents submitted to the mediators and statements made during the mediation are    for **settlement purposes only.**"

Both responding officials by their signature on 5/29/09 acknowledged that they had read, understood and agreed to the mediation agreement. See Compl. Ex. A. Further, the Privacy Act Notice in the EEO Investigative Affidavit form filled out by Marian Cotter and Jeffrey Thomas a few months later explicitly stated: "This information will be used to **adjudicate** complaints of alleged discrimination...where pertinent, in a legal proceeding to which the Agency is party..." See Compl. Ex. B & C.

As high ranking agents within Diplomatic Security, Cotter and Thomas are have intimate knowledge regarding the the importance of confidentiality. Further, the confidentiality agreement entered into was unambiguous that any statements made during the process were for "settlement purposes only." See Exhibit C. The terms of the EEO investigative affidavit explicitly put the affiants Cotter and Thomas on notice that the information would be used for adjudicatory purposes and/or legal proceedings. As such, the disclosure of the statements and events made during the mediation process was in direct contravention of the mediation agreement.

The government would like this Court to believe that what the responding officials submitted was "routine information about the status of mediation efforts." (pg. 15) In support of this contention the government cites two cases, *Alfa Laval Separation, Inc. v. United States*, 47 Fed. Cl. 305, 307 (2000)  and *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 530 (2010). In *Alfa Laval* the settlement discussions of the parties were required to be disclosed via a court mandated joint status report. *Alfa Laval Separation, Inc.* 47 Fed. Cl. at 307, 308. Notably this status report, did not require the disclosure of any statements or summary of events occurring in a confidential mediation process, but rather was a "routine" status report that is commonly required by federal courts. *See Id.* *PlanetSpace* involved a case where evidence of conduct or statements made in compromise negotiations to prove a claim's validity was deemed admissible when presented for a purpose other than those proscribed by governing rules Fed.Rules Evid.Rule 408(a)(1) & (2), including for the purpose of negating contention of undue delay. *See PlanetSpace, Inc.* at 530. Once again, this case does not address the disclosure of statements or summary of events occurring in a confidential mediation process to an adjudicator. Further the disclosures in *PlanetSpace* and *Alfa Laval* were made to adjudicators whereas the disclosure in the present case was made to an investigator. As such, these cases a clearly distinguishable from the instant case and provide no support for Cotter and Thomas' disclosure.

Cotter & Thomas used the EEO Investigative Affidavit as an opportunity to engage in a vitriolic commentary on Mr. Higbie and his claims, this commentary included the disclosure of confidential information. Neither Cotter nor Thomas were ordered to provide the confidential mediation information to an adjudicator nor was the information they provided about mediation routine in any fashion. In an attempt to bolster their diatribe, Cotter & Thomas used events and statements at the mediation, thereby engaging in an unquestionable breach of the terms of the confidentiality agreement.

Even if the court were to accept the defense's argument that the "good faith" requirement of the contract implicitly recognizes the right of a party to bring to an "adjudicator"'s  attention the unwillingness of party to engage in good faith during the mediation process, the disclosure of this information to an EEO contract investigator cannot be fairly interpreted as a disclosure to an adjudicator **and most certainly the disclosure of such information to Scott Messick, a fellow DS agent, cannot in any way be considered a disclosure to an adjudicator.** (Def. Mot. Dismiss, 8) As such the feeble attempts to justify the egregious breach of the confidentiality agreement by Thomas and Cotter fail and Plaintiff has clearly raised a claim "plausible on its face." *Twombly*, 550 U.S. at 557.

## B.    The Relief Sought by Mr. Higbie has No Relationship to the Alleged Breach of the Mediation Agreement.

Plaintiff is seeking damages for an actual harm which has occurred, which cannot be remedied and which is difficult to measure; breach of the confidentiality.  However, simply because it is difficult to quantify or measure the harm does not mean that actual harm and damages have occurred as a result of the Defendant's breach.  Plaintiff is of the belief that confidentiality in this matter was vitally important, Plaintiff negotiated for it prior to the mediation and the harm done by the breaches of management officials is immeasurable. Like slander, or a privacy act violations, breaching confidentiality is very damaging even though often difficult to measure.  It is too late for plaintiff to obtain injunctive relief preventing the disclosures as they have already occurred and plaintiff is most likely not entitled to such relief against the United States as it would not be money mandating.  But like the basis for a litigant to obtain injunctive relief, which requires a showing of irreparable harm will likely occur absent the court's order for which money damages would not be able to adequately compensate the aggrieved party, Plaintiff sought the confidentially agreement in order to avoid what then occurred.  Defendant cannot put the genie back into the bottle at this point and so money damages are appropriate.  Plaintiff, in his best wisdom and judgment, placed a value on the harm.  The fact that Defendant does not appreciate the harm done or the value Plaintiff places on the harm done, has no bearing on whether or not the relief sought, whatever the amount of money requested, is related to the breach of the mediation agreement.  Plaintiff argues it is directly related to the harm caused by the Defendant and the motion to dismiss should be denied.

The California Supreme Court in *Foxgate HOA v. Bramalea* (2001) held that "confidentiality is essential to effective mediation. (2001) 26 Cal.4th 1.  In that case, in interpreting very simple mediation confidentiality provisions, the Court stated that the statutes are clear and unambiguous. Id.  The California Supreme Court was interpreting a statute which "prohibits any person, mediator and participants alike, from revealing any written or oral communication made during mediation." Id.  The provision negotiated in this matter is similarly simple, but no less clear and unambiguous then the provision interpreted by the California Supreme Court in *Foxgate*.  Indeed, Defendant does not argue that the provision is unclear or ambiguous.  It is clear that the Defendant was fully aware of the nature of confidentiality stemming from the agreements and the very persons for the government which entered into the contracted and confidentiality of the mediation process, intentionally violated it.  Plaintiff contends that it is undeniable that actual damages have been incurred as a result of the breach; they are just not easy to measure, ascertain, or put a price tag on.

Defendant attempts to dismiss the Complaint at this early stage seeking, prior to discovery, arguing that the money damages sought, and particularly the amount sought, is not related to the breach.  However, for the failure to state a claim argument to prevail, the Defendant must have issue with Plaintiff's elements of his cause of action, not whether Plaintiff's believe of the amount of damages is too high.  Irrespective, defendant downplays the importance of confidentiality in the mediation process and the seriousness of breaching such.[4]

"Confidentiality" commonly means that communications made in mediation will not be disclosed to a judge, jury, or others connected with a legal proceeding and that the information sought will not be released or utilized in any manner.   See Laurence Freedman,  Confidentiality: A Closer Look,  in CONFIDENTIALITY IN MEDIATION: A PRACTITIONER'S GUIDE 47, 19 (Anne Clare ed., 1985).  Without this sense of security, the parties may not disclose all of the relevant facts, especially facts detrimental to one party.[5]  Mediation confidentiality in federal proceedings arises under the Alternative Dispute Resolution Act of 1998, Pub. L. No. 105-315, 112 Stat. 2998 (105th Cong. 2nd Sess.) (Oct. 30, 1998) codified at 28 U.S.C. §§651-658. ("ADR Act"). In Section 2 of this Act, Congress finds among other things, that:

---

[4] The Minnesota Supreme Court has stated that, "...to break a promise of confidentiality which has induced a source to give information is dishonorable.  Dan Cohen v. Cowles Media Company, d/b/a Minneapolis Star and Tribune Company 457 N.W.2d 199, 202-3 (Minn S.Ct 1990).

[5] Paul Dayton Johnson, Jr., Note, Confidentiality in Mediation: What can Florida Glean from the Uniform Mediation Act? , 30 FLA . ST . U.L. REV . 487, 489 (2003); see also  Ellen E. Deason, Predictable Mediation Confidentiality in the U.S. Federal System , 17 OHIO  ST . J. DISP . RESOL . 239, 245 (2002).

A000078

(1) alternative dispute resolution, when supported by the bench and bar, and utilizing properly trained neutrals in a program adequately administered by the Court, has the potential to provide a variety of benefits, including greater satisfaction of the parties, innovative methods of resolving disputes, and greater efficiency in achieving settlements;

(2) certain forms of alternative dispute resolution, including mediation, early neutral evaluation, mini-trials, and voluntary arbitration, may have potential to reduce the large backlog of cases now pending in some federal courts throughout the United States, thereby allowing the courts to process their remaining cases more efficiently. . . .

    In Section 3, Congress authorizes the district courts to adopt, by local rule, the use of alternative dispute resolution ("ADR") processes that include not only mediation, but early neutral evaluation, mini-trials and voluntary arbitration, as well.
Section 4 (28 U.S.C. §652) addresses "Jurisdiction" and confidentiality:
(d) Confidentiality Provisions – Until such time as rules are adopted under Chapter 131 of this title providing for confidentiality of alternative dispute resolution processes under this chapter, each district court shall, by local rule, adopted under section 2071(a), provide for the confidentiality of the alternative dispute resolution processes and to prohibit disclosure of confidential dispute resolution communications.

    The Agency in this case, desired to have at the early mediation not only a resolving official to discuss settlement, but the complained of management officials as well (Exhibit "A", "B", "C"; see also Plaintiff's Complaint).[6]  In this case, Plaintiff specifically negotiated and emphasized the importance of the confidentiality provision and the binding nature such provision must have on all participants at the mediation, including the complained of officials which were also in Plaintiff's direct chain of command. Id.  Because the management officials could disclose information stated, demands made or not made, claims made and positions taken, to other employees in the Agency and or could use the information in the managing of Plaintiff or in the discipline of him or any other purpose, Plaintiff cautiously proceeded to mediation expressing openly this concerns and requiring the confidentiality by all of the participants. Id.  Not only did Defendant wrongfully disclose confidential information in the affidavits as alleged, recently it was discovered that Defendant disclosed the information to other individuals, the extent of which remains to be discovered.

    Federal appellate cases, addressing violations of mediation confidentiality rules are not common and cases dealing with causes of action brought for violation of confidentiality in the mediation process is even less common.  While breach of mediation contract suits involving a confidentiality provision are not common, breach of confidentiality provisions in a slew of other contract situations are.  There is or should be no significant justification for

---

[6] The complained of officials signed and participated in the mediation.

treating confidentiality breaches in the mediation context any different then in other breach of contract matters.

Recently the Tenth Circuit Court of Appeals had the occasion to consider a case involving court ordered mediation, although not pursuant to a cause of action, but pursuant to a sanction request. The Court took the opportunity to stress the importance of confidentiality in mediation and it uphold a severe sanction in the face of a litigant's intentional breach of mediation confidentiality. *Hand v. Walnut Valley Sailing Club*, 2012 WL 1111137,*3 (C.A.10 (Kan)). While the case is a sanction case, Plaintiff contends it demonstrates seriousness of the harm in this case and supports the money damages sought. In the Hand case, the parties did not settle at the mediation. *Id.* According to the opinion, Mr. Hand subsequently sent a number of club members emails which discredited positions taken by the club at the mediation and disclosed details of what happened at the mediation including comments of the mediator, positions taken by the parties and the club's offers of settlement. *Id.* Upon learning of this, the club filed a motion to dismiss the plaintiff's complaint as a sanction for his violation of the confidentiality rule. Id. The plaintiff did not contest violating the rule, but argued that dismissal of his case with prejudice was too severe. *Id.* Nevertheless the trial judge did, in fact, dismiss the plaintiff's case with prejudice. *Id.* The district court found that Mr. Hand had "demonstrated complete disrespect for the confidential mediation process" notwithstanding confidentiality's central role in the process. Id, quoting the Alternative Dispute Resolution Act of 1998 (28 U.S.C. §652 (d) with respect to the requirement that the District courts "provide for the confidentiality of the alternative dispute resolution processes and… prohibit disclosure of confidential dispute resolution communications." The district court also noted that confidentiality is the bedrock of mediation in that it allows parties to participate with candor. *Id.* This, according to the court, is particularly important in court ordered mediations where, if the process is to work at all, parties must be assured that statements and documents are protected from further disclosure or use. Id. The court also noted that without sanctions, litigants would view the confidentiality rule as unenforceable. *Id.* This, the court's reasoning continued, would dissuade involuntary mediation participants from open and candid discussions. *Id.* The Court of Appeals found that the district court's dismissal of the case with prejudice did not amount to an abuse of discretion since Mr. Hand had intentionally divulged many prejudicial details about the mediation to a significant number of people. Id. The United States Circuit Court of Appeals for the Tenth Circuit affirmed the dismissal with prejudice of his lawsuit on the grounds that he had violated the confidentiality rules in a court ordered mediation. *Id.*

Plaintiff would argue that an equivalent sanction, if available at the time, and according to Defendant's sanctions arguments in its brief, would have been to render a verdict for Plaintiff in his discrimination lawsuit and award him all potential damages he sought, an amount near approximately to what he seeks in this action for the breach of confidentiality. The Hand case demonstrates the seriousness of the matter and the harm caused as well as the potential money damages necessary to compensate a person for

the breach.[7]  It is certainly treated in this fashion by the Defendant and held out to federal employees with a similar level of importance.  For example, the EEOC calls it a "core principle," stating that "[c]onfidentiality allows the parties to freely engage in candid, informal discussions of their interests and concerns in order to reach the best possible resolution of the dispute and contends that confidentiality allows the parties to speak openly without fear that statements made during mediation will be used against them...." .[8]

    Damages incurred as a result of an breach of confidentiality provisions in a contract, to state a non-speculative claim for damages, can be attorney's fees incurred in one phone call.  While incurring fees for one phone call may not state a sizeable claim for damages, it is certainly a plausible claim for damages stemming from the alleged breach. See *J.R. Simplot v. Chevron Pipeline Co*., 563 F.3d 1102, 1116 (10th Cir. 2009) (measure of damages for breach of contract may include attorneys' fees incurred as a result of the breach).

    Plaintiff's damages are related to Defendant's breach and are not out-of-line with other cases.  In *Hallmark Cards v. Murley*, 703 F.3d 456 (8th Cir. Jan. 15, 2013), an employee who breached a confidentiality clause in a severance agreement was held liable by a jury for damages of $860,000 for disclosing confidentiality data to a competition.  An arbiter ruled in 2007 that Monitor Company Group had breached its confidentiality agreement, and the company agreed to pay Hallmark $12.5 million for breach of contract. A Texas jury has ordered a unit of oil and natural gas company *Southwestern Energy Co*. to pay over $11.4 million in damages for allegedly violating a confidentiality agreement and stealing trade secrets related to two prospects in the state's James Lime formation.[9]

And legislative statutes providing causes of action for money damages are becoming more common each year.  For example, Florida has enacted 44.406 (Confidentiality; civil remedies) which reads:

    (1) Any mediation participant who knowingly and willfully discloses a mediation communication in violation of s. 44.405 shall, upon application by any party to a court of competent jurisdiction, be subject to remedies, including:
    (a) Equitable relief.
    (b) Compensatory damages.
    (c) Attorney's fees, mediator's fees, and costs incurred in the mediation proceeding.

---

[7] The Minnesota Supreme Court has stated that, "...to break a promise of confidentiality which has induced a source to give information is dishonorable.  *Dan Cohen v. Cowles Media Company, d/b/a Minneapolis Star and Tribune Company* 457 N.W.2d 199, 202-3 (Minn S.Ct 1990).

[8] EEOC's Handbook for its Resolve Program: http://www.eeoc.gov/federal/adr/resolvehandbook.cfm

[9] http://www.law360.com/articles/215213/jury-slaps-southwestern-unit-with-11-4m-verdict

A000081

(d) Reasonable attorney's fees and costs incurred in the application for remedies under this section. Chapter 44, Florida Statutes, Mediation Alternatives to Judicial Action Mediation Confidentiality and Privilege Act.

Plaintiff's damages are related to the breach and the relationship is sufficiently present precluding dismissal.

### CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court deny Defendant's  motions to dismiss the Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12b(1) & Fed. R. Civ. P. 12(b)(6).

A000082



**United States Department of State**

*Office of Civil Rights*

*Washington, D.C. 20520–7428*

May 21, 2009

PERSONNEL SENSITIVE
MEMORANDUM

TO:      **MEDIATION PARTICIPANTS**
        Mr. Richard P. Higbie, Complainant
        Atty. Cary Schulman, Complainant's Representative
        Mr. Jeff Thomas, Responding Official
        Ms. Marian Cotter, Responding Official
        Mr. Paul Vallee, Responding Official
        Mr. Stephen J. Mergens, Resolving Official
        Atty. Kimberly Jackson, Department's Representative
        Ms. Valentine S. Liu, Mediator
        Ms. Marilyn Cano, Co-Mediator

FROM:    S/OCR - Jacqueline A. Canton, Chief   *Eloisa Doré for*
        Intake and Resolution Section

SUBJECT:  EEO Mediation Confirmation – Richard P. Higbie
        **EEO Case #DOS-F-062-09**

*The Equal Employment Opportunity Commission (EEOC) states ..... each agency shall make reasonable efforts to voluntarily settle complaints of discrimination as early as possible in, and throughout, the administrative processing of complaints, including the pre-complaint counseling stage. Management Directive 110, Chapter 12 states ..... parties are encouraged to be creative in resolving an employment dispute and may agree to settle a complaint for relief that may be different than that which a court might order, as long as it is no greater than what a court might order.*

The Office of Civil Rights (S/OCR) is confirming your participation in the mediation on the formal complaint filed by Mr. Richard P. Higbie which will be conducted via telephone conference. The logistics for the Washington, DC participants (Mr. Mergens, Atty. Jackson, Ms. Liu & Ms. Cano) are as follow:

      Date:     **Friday, May 29, 2009**
      Time:     **2:00 P.M.** (Washington, DC time)
      Location:  **U.S. Department of State**
              **Office of Civil Rights, Room 7428**
              **2201 C Street, NW**
              **Washington, DC 20520**

A000084

-2-

The logistics for the Dallas, TX participants (Mr. Higbie & Mr. Schulman) are as follow:

| | |
|---|---|
| Date: | **Friday, May 29, 2009** |
| Time: | **1:00 P.M.** (Dallas, Texas time) |
| Location: | **Cary Schulman Law Firm** |
| | **5910 N. Central Expressway** |
| | **Suite 1040** |
| | **Dallas, TX 75206** |

The logistics for the Houston, TX participants (Mr. Thomas, Ms. Cotter & Mr. Vallee) are as follow:

| | |
|---|---|
| Date: | **Friday, May 29, 2009** |
| Time: | **1:00 P.M.** (Houston, Texas time) |
| Location: | **U.S. Department of State** |
| | **Mickey LeLand Federal Bldg.** |
| | **1919 Smith Street, Suite 2100** |
| | **Houston, TX 77002** |

The mediation which will be conducted via telephone conference from Washington, DC to Houston and Dallas is expected to last no longer than 6:00 P.M. (Washington, DC time) due to time constraints. If there is a need to reconvene the mediation, that decision will be jointly made by the participants and the Mediator. Participants are required to appear at mediation and to engage in good faith attempts to resolve the matter. However, participants are not obligated to come to an agreement.

Confidentiality is a critical part of the process and will not be compromised by the Mediator, even if both participants desire that the Mediator testify in the future.

The following allegations and remedies are scheduled to be addressed during the mediation:

**Complainants Accepted Allegations**

He was subjected to a hostile work environment in reprisal for his prior protected EEO activity, characterized but not limited to, harsh scrutiny of his decisions by senior management, abrasive and hostile e-mails, and a decision not to permit him to function as the Acting Regional Agent in Charge (RAIC).

A000085

-3-

## Complainant's Requested Remedies

1.  Bureau of Diplomatic Security formally instruct the Houston Field Office management, to cease abusive, hostile, intimidating, threatening, and discriminatory language when communicating with the complainant;

2.  Bureau of Diplomatic Security require the Houston Field Office senior management to enroll and complete leadership and S/OCR EEO training to prevent future discriminatory actions;

3.  Complainant be allowed to return to his normal duties as outlined in his work requirement statement;

4.  Houston Field Office senior management's "gag order" placed on complainant be rescinded and allowed autonomy to communicate with members within the Department and outside agencies as deemed necessary;

5.  Bureau of Diplomatic Security issue a directive to the Houston Field Office outlining personnel procedures pertaining to modifying approved work requirement statements as defined by the Foreign Affairs Manual;

6.  Bureau of Diplomatic Security direct the Houston Field Office senior management to provide equal and fair leadership opportunities for civil service personnel serving in the Dallas Resident Office, and any and all mention of complainant's status as "non-promotable" be removed from all official records without cause.

7.  Complainant be allowed an equitable and fair opportunity for promotion within his current area of responsibility to a supervisory civil service grade position when a supervisory position is first made available.

8.  Bureau of Diplomatic Security authorize complainant to attend additional senior management leadership training courses at the Foreign Service Institute.

9.  Bureau of Diplomatic Security provide guidance and direction to Houston Field Office senior management relating to effective communication techniques with the Dallas Resident Office, specifically when the complainant assumes any acting supervisory role.

A000086

-4-

Attached is a copy of the Alternative Dispute Resolution Fact Sheet and the Agreement to Mediate.  Participants will be asked to sign the Agreement to Mediate before the start of the mediation.

If you have any questions or concerns regarding the mediation, please contact Arlene M. Brandon, EEO/ADR Specialist at (202) 647-8104 or me at (202) 647-9295.

Attachments:
    As stated.

PERSONNEL SENSITIVE

A000087



A000088

Confidentiality Rhyme & Notice

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§ 2510-2521),
and is legally privileged yeah that's where its at.
And much of what we send is covered by attorney-client privilege and such,
so honor this American cornerstone and if its not yours don't touch.
Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,
and you should not do that or you are a wrongful taker.
If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),
you are directed to contact the sender by telephone or e-mail you see,
and immediately destroy this message along with all copies & attachments because this stuff ain't free.
And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,
you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.
If you fail to honor this, rest assure,
we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
And we may throw in injunctive or declaratory relief just to scare you.
So now you know all about Confidentiality
and what will happen if you invade or violate our confidentiality & privacy.
So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

Subject: No Agreement, re: EEO/ADR Mediation, Richard Higbie, #DOS-F-062-09
Date: Tue, 2 Jun 2009 16:52:16 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com; HigbieR@state.gov
CC: DoneEJ@state.gov

Atty. Schulman/Mr. Higbie,

　　　An EEO/ADR mediation was conducted on Friday, May 29, 2009, for your client, Richard Higbie's formal EEO complaint #DOS-F-062-09, however no agreement was reached through this process.  Therefore, this is to advise that pursuant to 29 C.F.R. 1614, processing of EEO complaint #DOS-F-062-09 will continue from the point it ceased in the EEO administrative process.

　　　Mr. Higbie's formal EEO complaint #DOS-F-062-09 has been assigned to Ms. Eloisa Done, Equal Employment Opportunity (EEO) Specialist, for further processing.  Ms. Done will personally oversee the investigation of your client's complaint, which will be done by an independent contractor.  Ms. Done can be contacted via e-mail or at (202) 647- 9066.

**Arlene M. Brandon, MHS**
**EEO/ADR Specialist**
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C Street, N.W.
Washington, DC  20520
　(202) 647-8104

Begin forwarded message:

**From:** Cary Schulman <cary.schulman@live.com>
**Date:** October 13, 2013 7:45:24 PM CDT
**To:** Cary Schulman <cary@cwslegal.com>
**Subject: FW: Official Notification of EEO/ADR Mediation for Richard Higbie, #DOS-F-062-09**
**Reply-To:** <cary@cwslegal.com>

**Cary Schulman**
**Counselor & Attorney at Law**
_____
**Cary Schulman Law Firm PLLC**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**

Telephone: 214-739-0100 Facsimile: 214-739-0151

Confidentiality Rhyme & Notice

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§ 2510-2521),
and is legally privileged yeah that's where its at.
And much of what we send is covered by attorney-client privilege and such,
so honor this American cornerstone and if its not yours don't touch.
Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,
and you should not do that or you are a wrongful taker.
If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),
you are directed to contact the sender by telephone or e-mail you see,
and immediately destroy this message along with all copies & attachments because this stuff ain't free.
And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,
you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.
If you fail to honor this, rest assure,
we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
And we may throw in injunctive or declaratory relief just to scare you.
So now you know all about Confidentiality
and what will happen if you invade or violate our confidentiality & privacy.
So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

Subject: FW: Official Notification of EEO/ADR Mediation for Richard Higbie, #DOS-F-062-09
Date: Fri, 29 May 2009 15:56:14 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com; HigbieR@state.gov

Resending Agreement To Mediate.

**From:** Brandon, Arlene M
**Sent:** Thursday, May 21, 2009 4:01 PM
**To:** 'Cary Schulman'; Higbie, Richard
**Subject:** Official Notification of EEO/ADR Mediation for Richard Higbie, #DOS-F-062-09
**Importance:** High

Atty. Schulman/Mr. Higbie,

    Please find attached official notification of your client, Richard Higbie's scheduled mediation conducted via telephone conference on Friday**, May 29, 2009, 1:00 P.M. (Dallas time) in Suite 1040 at the Cary Schulman Law Firm.** Also, attached are the ADR Fact Sheet and the Agreement to Mediate for your review.  The Agreement to Mediate will be discussed at the beginning of the mediation and all parties will be required to sign.

    I have briefed Atty. Schulman on the ADR process, his role in the mediation and what he should expect.  I am also available to brief Mr. Higbie.  The briefing usually takes about 10-15 minutes and can be conducted via telephone or face to face.  Please advise via e-mail if you would like to be briefed prior to the scheduled mediation.

    Instructions regarding the telephone conference for this mediation will be forwarded under separate cover.  I tested the conference call equipment from the Washington, DC location, today.  However, a test between the Dallas, Houston, and Washington, DC sites will be conducted prior to the scheduled mediation.

*Arlene M. Brandon, MHS*
**EEO/ADR Specialist**
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C Street, N.W.
Washington, DC  20520
 (202) 647-8104



Agreement...e.doc (70 KB)


ADR Fact Sh...).doc (87 KB)


Comfirmed....pdf (343 KB)

Begin forwarded message:

**From:** Cary Schulman <cary.schulman@live.com>
**Date:** October 13, 2013 7:24:21 PM CDT
**To:** Cary Schulman <cary@cwslegal.com>
**Subject: FW: Mediator's Response, re: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09**
**Reply-To:** <cary@cwslegal.com>


**Cary Schulman**
**Counselor & Attorney at Law**

**Cary Schulman Law Firm PLLC**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

---

Confidentiality Rhyme & Notice

---

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§  2510-2521),
and is legally privileged yeah that's where its at.
And much of what we send is covered by attorney-client privilege and such,
so honor this American cornerstone and it its not yours don't touch.
Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,
and you should not do that or you are a wrongful taker.
If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),
you are directed to contact the sender by telephone or e-mail you see,
and immediately destroy this message along with all copies & attachments because this stuff ain't free.
And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,
you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.
If you fail to honor this, rest assure,
we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
And we may throw in injunctive or declaratory relief just to scare you.
So now you know all about Confidentiality
and what will happen if you invade or violate our confidentiality & privacy.
So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

---

From: cary.schulman@live.com
To: brandonam@state.gov
CC: higbier@state.gov; jacksonka2@state.gov
Subject: RE: Mediator's Response, re: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Thu, 28 May 2009 18:49:07 -0500

Dear Ms. Brandon:

Thank you for the email.  I wonder whether you paraphrased the mediator or conveyed it word for word.  If word for word, the fact that your mediators may be influenced one way or another when they are not there to make decisions but rather to facilitate discussion and resolution is troublesome.  Espousing that trained mediators, with presumably legal backgrounds, may be easily influenced by a position statement undermines and creates doubt in the entire mediation process as mediators come with more bias than a position statement could ever inject.

Moreover, if mediators are that easily influenced, one would want to keep the mediator selection process open to both sides.  If mediators can be swayed by a position statement, one certainly would not want a process where only one party communicates with the mediator prior to the mediation.  If mediators are easily biased, a fair and just system could not allow only one side corresponding with the mediator prior to the mediation.  If mediators are unable to hold judgment until hearing all facts and both sides of the story, one most definitely would not want an ADR process whereby one side gets control the mediator and the dissemination of material to the mediator.  But that is exactly what is taking place here or at a very minimum, it "has the appearance" of such "control and bias."

My earlier concerns regarding communications, correspondence and procedural discussions that took place in the selection and subsequent pre-

mediation stages and the further refusal by you to provide me with the documents of same heightens significantly when apparently the mediators you use are susceptible to pre-mediation manipulation.

Because I am a supporter of ADR programs and believe it is in my client's best interest to exhaust such avenues prior to electing more expensive, time consuming, and uncertain paths, and despite the fact that the process has been tainted with secrecy and bias and unnecessary one-sided control and as I have previously and unequivocally communicated to you:

> Mr. Richard Higbie, my client, and I will be attending the mediation on May 29, 2009, via teleconference, and will be available at 1:00 P.M. Central Standard time, at my office, telephone number 214-739-0100.

I still remain optomistic that resolution between the Department and Mr. Higbie shall be achieved in the ADR and for my view of your Department's handling of ADR's, well as one very good trial lawyer once said to me, "all sins die with a settlement."  I hope this is not the case here and the ADR process is brought into this decade.

I suspect that no further communication between us is necessary and so I do want to thank you for taking the time to communicate with me, I have learned a great deal in this process and feel the better for it.  I do wish you the very best in the future.

**Cary Schulman**
**Counselor & Attorney at Law**
_____

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

---

*Confidentiality Rhyme & Notice:*

---

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§  2510-2521),

> and is legally privileged yeah thats where its at.

And much of what we send is covered by attorney-client privilege and such,

> so honor this American cornerstone and if its not yours don't touch.

Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,

> and you should not do that or you are a wrongful taker.

If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),

> you are directed to contact the sender by telephone or e-mail you see,
> and immediately destroy this message along with all copies & attachments because this stuff ain't free.

And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,

> you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.

If you fail to honor this, rest assure,

> we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
> And we may throw in injunctive or declaratory relief just to scare you.

So now you know all about Confidentiality

> and what will happen if you invade or violate our confidentiality & privacy.

So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

---


**EMAILING FOR THE GREATER GOOD**
*Join me*

---

Subject: Mediator's Response, re: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Thu, 28 May 2009 15:46:31 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov; JacksonKA2@state.gov

Atty. Schulman,

Based on your request for a pre-conference caucus, Mr. Valentine Liu, Mediator has responded that both sides (complainant and management officials) would have to agree and also be provided the opportunity for a pre-conference caucus.  He further advised for them (the mediators) to only receive a positional statement from one side (you & your client) prior to an open session could prejudice their (mediators) outlook and make them tend to favor you & your client's side over management's side.  Therefore, to be fair, management would have to be notified and provided an opportunity for a pre-conference caucus or both parties would have to submit a positional statement for the mediators' review prior to the mediation.

Atty. Jackson has advised that time will not permit her to submit a written statement prior to the mediation.   In as much as there are time constraints, the mediation will proceed in the usual manner or as the mediator thinks best.

I hope the provided information is responsive and helpful.  Confirmation of you and your client's participation is requested to avoid any further delays.  Please advise at your earliest.  Thanks.

Ms. Brandon

---

**From:** Brandon, Arlene M
**Sent:** Wednesday, May 27, 2009 8:04 PM
**To:** 'Cary Schulman'
**Cc:** Higbie, Richard; Jackson, Kimberly A
**Subject:** Re-sending - Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
**Importance:** High

Atty. Schulman,

Typically, the Department of State's mediations begin at 9:00 a.m.  Please keep in mind that Mr. Higbie's mediation which will be conducted via telephone conference is time restricted to accommodate your afternoon availability – 1:00 p.m. (Dallas & Houston time) which is 2:00 p.m. (Washington, DC time).  This mediation will conclude no later than 5:00 p.m. (Dallas & Houston time) which is 6:00 p.m. (Washington, DC time).

The Department's mediation is structured to provide an opportunity for the mediator to caucus with each party separately and it is at the discretion of the mediator to determine when and how long a caucus will occur.  However, I will inform the mediator that you and your client have requested to meet from 1:00 p.m. to 2:00 p.m. (Dallas & Houston time) which is 2:00 p.m. to 3:00 p.m. (Washington, DC time).  Upon my receipt of the mediator's response, I will advise.

Ms. Brandon

---

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Wednesday, May 27, 2009 3:37 PM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard; Jackson, Kimberly A
**Subject:** RE: Responses to Additional Inquiries - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Dear Ms. Brandon:

With all due respect, your email highlights the systematic and institutionalized misguided philosophy of the Office of Intake regarding the mediation process and your own email highlights this.

You write:

Agencies may be flexible in designing their ADR programs to fit their environment and workforce, provided the programs confirm to the core principles set forth in EEOC's policy statement on ADR.

Neutrality is one of the ADR core principles, therefore for the Department's EEO/ADR Program to be effective, an ADR proceeding must be impartial and must be independent of any control by either party, in both perception and reality.

It is telling that you can make these above statements and then turn around in the same email and give the appearance that the ADR proceeding is not impartial and not independent of control by you.  You dictate who we are going to use, how it is going to proceed, who will attend, how information is disseminated to the mediator before the mediation, and so forth.  You have all of the control over the process, not just appearance, but blatantly arrogant about it as well.

Secondly, as you already know, the mediator may be given confidential information by a party and as you stated before, the mediator may be asked to keep some information confidential.  I have information I would like to communicate with the mediator.  Yet, you ask that i send it to you so that you can decide whether or not you would like to give it to the mediator.  Apparently, you would also give it to the responding officials if you liked.

Why do I have to go through you to speak with the mediator?  The Department apparently is speaking with the mediator.  And you refuse to give me the correspondence.  Why?  How can one not see that this procedure is impartial?  How can one not be given at a minimum, the appearance of such?  Clearly, you control the process.  You control what the mediator sees.  You control who the mediator is.  You control how the mediator is obtained.  You control the requesting documents and the correspondence between the mediator and the Department prior to the mediation and with that control you are exercising, you deny my client access to the same information.

This proceeding is tainted and smothered with the appearance of improper control and one sidedness.  Why must you hide in the shadows?  How do I know that the mediator was chosen impartially?  Am I to simply take your word for it?  In any system of government of procedural avenue for justice and remediation which spouts the principals of justice, fairness and impartiality, one cannot have concealment of the selection process, one sided access to the mediator and total control of all events leading up the mediation.

As a lawyer, I already know the effects of determining the playing field.  What you and the Department of State need to do is take a much closer look at your alleged impartial and unbiased ADR process because it clearly does not meet the standards and requirements put upon you by the laws that you yourself point to and that have been mandated by the legislature.

it is clear to me that when a person or department or organization cannot see the wrongdoing of their own procedures and means, that outside help is needed and required to implement proper procedures which incorporate fairness and justice.  You pay lip service to these principals and then flatly and blatantly violate all of them.

My client and I will attend your controlled mediation, with a mediator selected unilaterally by you in secrecy, and with participants solely selected by you and your department, and despite the fact that communications between the alleged impartial mediator and the department are not being disclosed, and we will evaluate your process.  I only thank the heavens above that we still have judicial recourse available to all in this Country.

Please let the mediator, the participants, and the Resolving Official know that my client and I will need approximately one hour with the mediator alone at the start of the mediation process.  I am not asking for this, I am requiring it.  It may turn out we need less.  Also, i ask that you immediately provide the mediator this email and the prior emails on providing  confidential position statements.

Confirmation of this is essential prior to the mediation.  Thank you for the response because I finally do have the answers and clarification I was looking for.

**Cary Schulman**
**Counselor & Attorney at Law**

---

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

A000094

*Confidentiality Rhyme & Notice:*

**This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§ 2510-2521),**
**and is legally privileged yeah thats where its at.**
**And much of what we send is covered by attorney-client privilege and such,**
**so honor this American cornerstone and if its not yours don't touch.**
**Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,**
**and you should not do that or you are a wrongful taker.**
**If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),**
**you are directed to contact the sender by telephone or e-mail you see,**
**and immediately destroy this message along with all copies & attachements because this stuff ain't free.**
**And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,**
**you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.**
**If you fail to honor this, rest assure,**
**we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.**
**And we may throw in injunctive or declaratory relief just to scare you.**
**So now you know all about Confidentiality**
**and what will happen if you invade or violate our confidentiality & privacy.**
**So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.**

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Wednesday, May 27, 2009 7:53 PM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard; Jackson, Kimberly A
**Subject:** RE: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

I did not receive the below message as it stated it was too big...please forward it again or break up the message.  Thank you.


**Cary Schulman**
**Counselor & Attorney at Law**
_____
**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

*Confidentiality Rhyme & Notice:*

**This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§ 2510-2521),**

> **and is legally privileged yeah thats where its at.**

**And much of what we send is covered by attorney-client privilege and such,**

> **so honor this American cornerstone and if its not yours don't touch.**

**Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,**

> **and you should not do that or you are a wrongful taker.**

**If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),**

> **you are directed to contact the sender by telephone or e-mail you see,**
> **and immediately destroy this message along with all copies & attachements because this stuff ain't free.**

**And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,**

> **you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.**

**If you fail to honor this, rest assure,**

> **we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.**
> **And we may throw in injunctive or declaratory relief just to scare you.**

**So now you know all about Confidentiality**

> **and what will happen if you invade or violate our confidentiality & privacy.**

So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

\-

**EMAILING FOR THE GREATER GOOD**
Join me

Subject: RE: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Wed, 27 May 2009 18:03:10 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov; JacksonKA2@state.gov

Begin forwarded message:

**From:** Cary Schulman <cary.schulman@live.com>
**Date:** October 13, 2013 7:22:24 PM CDT
**To:** Cary Schulman <cary@cwslegal.com>
**Subject:** FW: Mediator's Response, re: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
**Reply-To:** <cary@cwslegal.com>

**Cary Schulman**
**Counselor & Attorney at Law**

**Cary Schulman Law Firm PLLC**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

Confidentiality Rhyme & Notice

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§ 2510-2521),
and is legally privileged yeah that's where its at.
And much of what we send is covered by attorney-client privilege and such,
so honor this American cornerstone and if its not yours don't touch.
Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,
and you should not do that or you are a wrongful taker.
If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),
you are directed to contact the sender by telephone or e-mail you see,
and immediately destroy this message along with all copies & attachments because this stuff ain't free.
And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,
you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.
If you fail to honor this, rest assure,
we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
And we may throw in injunctive or declaratory relief just to scare you.
So now you know all about Confidentiality
and what will happen if you invade or violate our confidentiality & privacy.
So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

Subject: Mediator's Response, re: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Thu, 28 May 2009 15:46:31 -0400

From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov; JacksonKA2@state.gov

Atty. Schulman,

   Based on your request for a pre-conference caucus, Mr. Valentine Liu, Mediator has responded that both sides (complainant and management officials) would have to agree and also be provided the opportunity for a pre-conference caucus.  He further advised for them (the mediators) to only receive a positional statement from one side (you & your client) prior to an open session could prejudice their (mediators) outlook and make them tend to favor you & your client's side over management's side.  Therefore, to be fair, management would have to be notified and provided an opportunity for a pre-conference caucus or both parties would have to submit a positional statement for the mediators' review prior to the mediation.

   Atty. Jackson has advised that time will not permit her to submit a written statement prior to the mediation.   In as much as there are time constraints, the mediation will proceed in the usual manner or as the mediator thinks best.

   I hope the provided information is responsive and helpful.  Confirmation of you and your client's participation is requested to avoid any further delays.  Please advise at your earliest.  Thanks.

Ms. Brandon

---

**From:** Brandon, Arlene M
**Sent:** Wednesday, May 27, 2009 8:04 PM
**To:** 'Cary Schulman'
**Cc:** Higbie, Richard; Jackson, Kimberly A
**Subject:** Re-sending - Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
**Importance:** High

Atty. Schulman,

   Typically, the Department of State's mediations begin at 9:00 a.m.  Please keep in mind that Mr. Higbie's mediation which will be conducted via telephone conference is time restricted to accommodate your afternoon availability – 1:00 p.m. (Dallas & Houston time) which is 2:00 p.m. (Washington, DC time).  This mediation will conclude no later than 5:00 p.m. (Dallas & Houston time) which is 6:00 p.m. (Washington, DC time).

   The Department's mediation is structured to provide an opportunity for the mediator to caucus with each party separately and it is at the discretion of the mediator to determine when and how long a caucus will occur.  However, I will inform the mediator that you and your client have requested to meet from 1:00 p.m. to 2:00 p.m. (Dallas & Houston time) which is 2:00 p.m. to 3:00 p.m. (Washington, DC time).  Upon my receipt of the mediator's response, I will advise.

Ms. Brandon

---

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Wednesday, May 27, 2009 3:37 PM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard; Jackson, Kimberly A
**Subject:** RE: Responses to Additional Inquiries - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Dear Ms. Brandon:

With all due respect, your email highlights the systematic and institutionalized misguided philosophy of the Office of Intake regarding the mediation process and your own email highlights this.

You write:

Agencies may be flexible in designing their ADR programs to fit their environment and workforce, provided the programs confirm to the core principles set forth in EEOC's policy statement on ADR.

Neutrality is one of the ADR core principles, therefore for the Department's EEO/ADR Program to be effective, an ADR proceeding must be impartial and must be independent of any control by either party, in both perception and reality.

It is telling that you can make these above statements and then turn around in the same email and give the appearance that the ADR proceeding is not impartial and not independent of control by you.  You dictate who we are going to use, how it is going to proceed, who will attend, how information is disseminated to the mediator before the mediation, and so forth.  You have all of the control over the process, not just appearance, but blatantly arrogant about it as well.

Secondly, as you already know, the mediator may be given confidential information by a party and as you stated before,

the mediator may be asked to keep some information confidential. I have information I would like to communicate with the mediator. Yet, you ask that i send it to you so that you can decide whether or not you would like to give it to the mediator. Apparently, you would also give it to the responding officials if you liked.

Why do I have to go through you to speak with the mediator? The Department apparently is speaking with the mediator. And you refuse to give me the correspondence. Why? How can one not see that this procedure is impartial? How can one not be given at a minimum, the appearance of such? Clearly, you control the process. You control what the mediator sees. You control who the mediator is. You control how the mediator is obtained. You control the requesting documents and the correspondence between the mediator and the Department prior to the mediation and with that control you are exercising, you deny my client access to the same information.

This proceeding is tainted and smothered with the appearance of improper control and one sidedness. Why must you hide in the shadows? How do I know that the mediator was chosen impartially? Am I to simply take your word for it? In any system of government of procedural avenue for justice and remediation which spouts the principals of justice, fairness and impartiality, one cannot have concealment of the selection process, one sided access to the mediator and total control of all events leading up the mediation.

As a lawyer, I already know the effects of determining the playing field. What you and the Department of State need to do is take a much closer look at your alleged impartial and unbiased ADR process because it clearly does not meet the standards and requirements put upon you by the laws that you yourself point to and that have been mandated by the legislature.

it is clear to me that when a person or department or organization cannot see the wrongdoing of their own procedures and means, that outside help is needed and required to implement proper procedures which incorporate fairness and justice. You pay lip service to these principals and then flatly and blatantly violate all of them.

My client and I will attend your controlled mediation, with a mediator selected unilaterally by you in secrecy, and with participants solely selected by you and your department, and despite the fact that communications between the alleged impartial mediator and the department are not being disclosed, and we will evaluate your process. I only thank the heavens above that we still have judicial recourse available to all in this Country.

Please let the mediator, the participants, and the Resolving Official know that my client and I will need approximately one hour with the mediator alone at the start of the mediation process. I am not asking for this, I am requiring it. It may turn out we need less. Also, i ask that you immediately provide the mediator this email and the prior emails on providing confidential position statements.

Confirmation of this is essential prior to the mediation. Thank you for the response because I finally do have the answers and clarification I was looking for.

**Cary Schulman**
**Counselor & Attorney at Law**

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone: 214-739-0100 Facsimile: 214-739-0151**

***Confidentiality Rhyme & Notice:***

**This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§ 2510-2521),**
**and is legally privileged yeah thats where its at.**
**And much of what we send is covered by attorney-client privilege and such,**
**so honor this American cornerstone and if its not yours don't touch.**
**Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,**
**and you should not do that or you are a wrongful taker.**
**If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),**
**you are directed to contact the sender by telephone or e-mail you see,**
**and immediately destroy this message along with all copies & attachements because this stuff ain't free.**
**And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,**
**you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.**
**If you fail to honor this, rest assure,**

we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
And we may throw in injunctive or declaratory relief just to scare you.
So now you know all about Confidentiality
and what will happen if you invade or violate our confidentiality & privacy.
So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Wednesday, May 27, 2009 7:53 PM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard; Jackson, Kimberly A
**Subject:** RE: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

I did not receive the below message as it stated it was too big...please forward it again or break up the message.  Thank you.

**Cary Schulman**
**Counselor & Attorney at Law**

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

*Confidentiality Rhyme & Notice:*

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§ 2510-2521),

and is legally privileged yeah thats where its at.

And much of what we send is covered by attorney-client privilege and such,

so honor this American cornerstone and if its not yours don't touch.

Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,

and you should not do that or you are a wrongful taker.

If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),

you are directed to contact the sender by telephone or e-mail you see,
and immediately destroy this message along with all copies & attachements because this stuff ain't free.

And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,

you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.

If you fail to honor this, rest assure,

we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
And we may throw in injunctive or declaratory relief just to scare you.

So now you know all about Confidentiality

and what will happen if you invade or violate our confidentiality & privacy.

So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

EMAILING FOR THE GREATER GOOD
Join me

Subject: RE: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Wed, 27 May 2009 18:03:10 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov; JacksonKA2@state.gov
Begin forwarded message:

**From:** Cary Schulman <cary.schulman@live.com>
**Date:** October 13, 2013 7:21:14 PM CDT
**To:** Cary Schulman <cary@cwslegal.com>
**Subject:** **FW: Telephone # - Telephone Conference, re: Richard Higbie EEO/ADR Mediation, Friday, May 29, 2009**
**Reply-To:** <cary@cwslegal.com>


**Cary Schulman**
**Counselor & Attorney at Law**

**Cary Schulman Law Firm PLLC**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

---

Confidentiality Rhyme & Notice

---

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§ 2510-2521),
and is legally privileged yeah that's where its at.
And much of what we send is covered by attorney-client privilege and such,
so honor this American cornerstone and if its not yours don't touch.
Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,
and you should not do that or you are a wrongful taker.
If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),
you are directed to contact the sender by telephone or e-mail you see,
and immediately destroy this message along with all copies & attachments because this stuff ain't free.
And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,
you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.
If you fail to honor this, rest assure,
we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
And we may throw in injunctive or declaratory relief just to scare you.
So now you know all about Confidentiality
and what will happen if you invade or violate our confidentiality & privacy.
So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

---

From: cary.schulman@live.com
To: brandonam@state.gov; higbier@state.gov
CC: jacksonka2@state.gov
Subject: RE: Telephone # - Telephone Conference, re: Richard Higbie EEO/ADR Mediation, Friday, May 29, 2009
Date: Wed, 27 May 2009 20:52:17 -0500

The main telephone number to my office is 214-739-0100.

Thank you and if you need anything further, please let me know.


**Cary Schulman**
**Counselor & Attorney at Law**
_____
**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

---

*Confidentiality Rhyme & Notice:*

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§ 2510-2521),

    and is legally privileged yeah thats where its at.

And much of what we send is covered by attorney-client privilege and such,

    so honor this American cornerstone and if its not yours don't touch.

Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,

    and you should not do that or you are a wrongful taker.

If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),

    you are directed to contact the sender by telephone or e-mail you see,
    and immediately destroy this message along with all copies & attachements because this stuff ain't free.

And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,

    you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.

If you fail to honor this, rest assure,

    we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
    And we may throw in injunctive or declaratory relief just to scare you.

So now you know all about Confidentiality

    and what will happen if you invade or violate our confidentiality & privacy.

So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.


**EMAILING FOR THE GREATER GOOD**
Join me

Subject: Telephone # - Telephone Conference, re: Richard Higbie EEO/ADR Mediation, Friday, May 29, 2009
Date: Wed, 27 May 2009 21:25:44 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com; HigbieR@state.gov
CC: JacksonKA2@state.gov

Atty. Schulman/Mr. Higbie,

    Please provide the telephone number of your location regarding participation in Mr. Higbie's schedule telephone conference on Friday, May 29, 2009, 1:00 p.m. Dallas/Houston time which is 2:00 p.m. Washington, DC time via e-mail to me. The telephone conference will be initiated from Washington, DC.

Thanks.

*Arlene M. Brandon, MHS*
**EEO/ADR Specialist**
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C Street, N.W.
Washington, DC 20520
  (202) 647-8104

Begin forwarded message:

**From:** Cary Schulman <cary.schulman@live.com>
**Date:** October 13, 2013 7:20:52 PM CDT
**To:** Cary Schulman <cary@cwslegal.com>
**Subject: FW: Telephone # - Telephone Conference, re: Richard Higbie EEO/ADR Mediation, Friday, May 29, 2009**
**Reply-To:** <cary@cwslegal.com>

**Cary Schulman**
**Counselor & Attorney at Law**

**Cary Schulman Law Firm PLLC**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone: 214-739-0100  Facsimile: 214-739-0151**

Confidentiality Rhyme & Notice

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§ 2510-2521),
and is legally privileged yeah that's where its at.
And much of what we send is covered by attorney-client privilege and such,
so honor this American cornerstone and if its not yours don't touch.
Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,
and you should not do that or you are a wrongful taker.
If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),
you are directed to contact the sender by telephone or e-mail you see,
and immediately destroy this message along with all copies & attachments because this stuff ain't free.
And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,
you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.
If you fail to honor this, rest assure,
we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
And we may throw in injunctive or declaratory relief just to scare you.
So now you know all about Confidentiality
and what will happen if you invade or violate our confidentiality & privacy.
So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

Subject: Telephone # - Telephone Conference, re: Richard Higbie EEO/ADR Mediation, Friday, May 29, 2009
Date: Wed, 27 May 2009 21:25:44 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com; HigbieR@state.gov
CC: JacksonKA2@state.gov

Atty. Schulman/Mr. Higbie,

Please provide the telephone number of your location regarding participation in Mr. Higbie's schedule telephone conference on Friday, May 29, 2009, 1:00 p.m. Dallas/Houston time which is 2:00 p.m. Washington, DC time via e-mail to me. The telephone conference will be initiated from Washington, DC.

Thanks.

*Arlene M. Brandon, MHS*
**EEO/ADR Specialist**
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C Street, N.W.
Washington, DC 20520
 (202) 647-8104

Begin forwarded message:

**From:** Cary Schulman <cary.schulman@live.com>
**Date:** October 13, 2013 7:05:02 PM CDT
**To:** Cary Schulman <cary@cwslegal.com>
**Subject: FW: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09**

**Reply-To:** <cary@cwslegal.com>


**Cary Schulman**
**Counselor & Attorney at Law**

_____
**Cary Schulman Law Firm PLLC**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

_____
Confidentiality Rhyme & Notice
_____

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. §§  2510-2521),
and is legally privileged yeah that's where its at.
And much of what we send is covered by attorney-client privilege and such,
so honor this American cornerstone and if its not yours don't touch.
Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,
and you should not do that or you are a wrongful taker.
If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),
you are directed to contact the sender by telephone or e-mail you see,
and immediately destroy this message along with all copies & attachments because this stuff ain't free.
And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,
you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.
If you fail to honor this, rest assure,
we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
And we may throw in injunctive or declaratory relief just to scare you.
So now you know all about Confidentiality
and what will happen if you invade or violate our confidentiality & privacy.
So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

_____

Subject: RE: Request for caucus, prior to mediation w/mediator - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Wed, 27 May 2009 18:03:10 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov; JacksonKA2@state.gov

Atty. Schulman,

        Typically, the Department of State's mediations begin at 9:00 a.m. ?Please keep in mind that Mr. Higbie's mediation which will be conducted via telephone conference is time restricted to accommodate your afternoon availability – 1:00 p.m. (Dallas & Houston time) which is 2:00 p.m. (Washington, DC time).? This mediation will conclude no later than 5:00 p.m. (Dallas & Houston time) which is 6:00 p.m. (Washington, DC time).?

        The Department's mediation is structured to provide an opportunity for the mediator to caucus with each party separately and it is at the discretion of the mediator to determine when and how long a caucus will occur.? However, I will inform the mediator that you and your client have requested to meet from 1:00 p.m. to 2:00 p.m. (Dallas & Houston time) which is 2:00 p.m. to 3:00 p.m. (Washington, DC time).? Upon my receipt of the mediator's response, I will advise.

        Ms. Brandon

_____

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Wednesday, May 27, 2009 3:37 PM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard; Jackson, Kimberly A
**Subject:** RE: Responses to Additional Inquiries - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Dear Ms. Brandon:

With all due respect, your email highlights the systematic and institutionalized misguided philosophy of the Office of Intake regarding the mediation process and your own email highlights this.

You write:

Agencies may be flexible in designing their ADR programs to fit their environment and workforce, provided the programs confirm to the core principles set forth in EEOC's policy statement on ADR.

Neutrality is one of the ADR core principles, therefore for the Department's EEO/ADR Program to be effective, an ADR proceeding must be impartial and must be independent of any control by either party, in both perception and reality.

It is telling that you can make these above statements and then turn around in the same email and give the appearance that the ADR proceeding is not impartial and not independent of control by you.  You dictate who we are going to use, how it is going to proceed, who will attend, how information is disseminated to the mediator before the mediation, and so forth.  You have all of the control over the process, not just appearance, but blatantly arrogant about it as well.

Secondly, as you already know, the mediator may be given confidential information by a party and as you stated before, the mediator may be asked to keep some information confidential.  I have information I would like to communicate with the mediator.  Yet, you ask that i send it to you so that you can decide whether or not you would like to give it to the mediator.  Apparently, you would also give it to the responding officials if you liked.

Why do I have to go through you to speak with the mediator?  The Department apparently is speaking with the mediator.  And you refuse to give me the correspondence.  Why?  How can one not see that this procedure is impartial?  How can one not be given at a minimum, the appearance of such?  Clearly, you control the process.  You control what the mediator sees.  You control who the mediator is.  You control how the mediator is obtained.  You control the requesting documents and the correspondence between the mediator and the Department prior to the mediation and with that control you are exercising, you deny my client access to the same information.

This proceeding is tainted and smothered with the appearance of improper control and one sidedness.  Why must you hide in the shadows?  How do I know that the mediator was chosen impartially?  Am I to simply take your word for it?  In any system of government of procedural avenue for justice and remediation which spouts the principals of justice, fairness and impartiality, one cannot have concealment of the selection process, one sided access to the mediator and total control of all events leading up the the mediation.

As a lawyer, I already know the effects of determining the playing field.  What you and the Department of State need to do is take a much closer look at your alleged impartial and unbiased ADR process because it clearly does not meet the standards and requirements put upon you by the laws that you yourself point to and that have been mandated by the legislature.

it is clear to me that when a person or department or organization cannot see the wrongdoing of their own procedures and means, that outside help is needed and required to implement proper procedures which incorporate fairness and justice.  You pay lip service to these principals and then flatly and blatantly violate all of them.

My client and I will attend your controlled mediation, with a mediator selected unilaterally by you in secrecy, and with participants solely selected by you and your department, and despite the fact that communications between the alleged impartial mediator and the department are not being disclosed, and we will evaluate your process.  I only thank the heavens above that we still have judicial recourse available to all in this Country.

Please let the mediator, the participants, and the Resolving Official know that my client and I will need approximately one hour with the mediator alone at the start of the mediation process.  I am not asking for this, I am requiring it.  It may turn out we need less.  Also, i ask that you immediately provide the mediator this email and the prior emails on providing  confidential position statements.

Confirmation of this is essential prior to the mediation.  Thank you for the response because I finally do have the answers and clarification I was looking for.

**Cary Schulman**
**Counselor & Attorney at Law**

_____

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**

A000104

Telephone: 214-739-0100  Facsimile: 214-739-0151

*Confidentiality Rhyme & Notice:*

This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ??  2510-2521),

and is legally privileged yeah thats where its at.

And much of what we send is covered by attorney-client privilege and such,

so honor this American cornerstone and if its not yours don't touch.

Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,

and you should not do that or you are a wrongful taker.

If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),

you are directed to contact the sender by telephone or e-mail you see,
and immediately destroy this message along with all copies & attachements because this stuff ain't free.

And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,

you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.

If you fail to honor this, rest assure,

we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.
And we may throw in injunctive or declaratory relief just to scare you.

So now you know all about Confidentiality

and what will happen if you invade or violate our confidentiality & privacy.

So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.

EMAILING FOR THE GREATER GOOD
Join me

---

Subject: Responses to Additional Inquiries - RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Wed, 27 May 2009 14:33:51 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov; JacksonKA2@state.gov
Atty. Schulman,

In as much as Monday, May? 25, 2009 was a holiday, Tuesday, May 26, 2009, I was out of the office, today is my first opportunity to your respond to your e-mail date Friday, May 22, 2009.? Listed below is the Department's Office of Civil Rights' position regarding your inquiries:

**Inquiry #1** - ?I requested copies of correspondence, requests, and responses in connection with obtaining a mediator for my records.  It is usual and customary that both parties have input and access in the mediator selection process and the mediator prior to the mediation.  May I please be copied on those documents for my records and in this regard, I request any and all communications with the mediator?

**Response #1** – The design of the Department's Office of Civil Rights' EEO/ADR Program has the sole responsibility of obtaining Neutral Services (mediators) and does permit parties of the dispute to have input and access in the mediator selection process and/or the mediator prior to the mediation.? Also, it is not the policy or procedure of the Department's Office of Civil Rights to provide documents and/or any and all communications with the mediator to parties of the dispute.

In accordance with the Equal Employment Opportunity Management Directive? EEO MD 110, federal agencies covered by 29 C.F.R. Part 1614 are responsible for developing and implementing their own equal employment programs. EEOC's revised regulations at 29 CFR 1614.102(b)(2) require agencies to establish or make available an alternative dispute resolution program. Agencies may be flexible in designing their ADR programs to fit their environment and workforce, provided the programs confirm to the core principles set forth in EEOC's policy statement on ADR. ?

The majority of our EEO case accepted for processing through the Department's EEO/ADR Program are mediated by neutrals from external sources as recommended by the EEOC.? We utilize certified mediators and co-mediators from the Federal Sharing Neutrals Program which is a well established program with a pool of qualified individual federal employees who have received mediation training to act as mediators and who are capable of mediating internal federal agency disputes.? ?In accordance with MD 110, the Agency must ensure at all times the independence and objectivity of the neutral.? The conduit for providing information to the mediators is through the EEO/ADR Specialist, who will ensure that the additional information is also provided to all participants, prior to the mediation.? Neutrality is one of the ADR core principles, therefore for the Department's EEO/ADR Program to be effective, an ADR proceeding must be impartial and must be independent of any control by either party, in both perception and reality. ?

If you have additional information to provide to the mediator, please forward to me and I will provide for all parties review prior to the mediation.

**Inquiry #2** - ?Relates to providing your "position statement" which documents information regarding your client's complaint, allegations, background facts, parties' positions, and relief sought

**Response #2 –?** In as much as your client is in the formal stage of his EEO complaint, the mediator, along with all of the parties have been provided your client's accepted allegations (pursuant to 29 C.F.R. ? 1614 *et seq.,* based on a review of Mr. Higbie's formal EEO complaint & the EEO Counselor's Report), and requested remedies to resolve his complaint through the Department's EEO/ADR Program. ?Note:? Your client will have the opportunity to discuss specific examples of the hostile work environment in his opening statement during the mediation.

*If you have additional information regarding your client's EEO complaint to provide to the mediator, please forward to me and I will provide for all parties review prior to the mediation.

**Inquiry #3 a -** Are you communicating with the "responding officials" as parties in this matter?

**Response #3 a – ?**Yes, (as referenced on the provided ADR Fact Sheet, "Responding Officials" are identified as the Individual(s) who is/are responsible, in whole or in part, for the actions or conditions under dispute) I have communicated with the "responding officials" as I have with all of the parties for the purpose of explaining the mediation process, the components of the mediation, their roles in the mediation, what happens if the mediation settles or does not settle, etc. ?

**Inquiry #3 b -** Is it your contention that the "responding officials" must agree to a settlement in order for the Department of State and Higbie to settle this matter at mediation?

**Response #3 b – ?**No, I would not make a statement that the "responding officials" must agree to a settlement in order for the Department of State and Higbie to settle this matter at mediation. ?However, if the Resolving Official is amendable to terms to resolve for the purpose of mediation all management officials (including the Responding Officials) are in agreement.? The Resolving Official has settlement authority not the Responding Officials.? In accordance with MD 110, if the agency and the aggrieved person/complainant agree to resolution of the matter, EEOC regulations require that the terms of the resolution be reduced to writing and signed by both parties in order that the agency and the aggrieved person/complainant have the same understanding of the terms of the resolution.?

**Inquiry #3 c -** Is it your position that the "responding officials" are to be consulted and negotiate the procedural issues regarding the mediation including when, how, why, who, what, and where?

**Response #3 c –** No, the "Responding Officials" did not *negotiate the procedural issues regarding the mediation.*? However, it is my position, as previously written, that I communicated with the "responding officials" as I have with all of the parties for the purpose of explaining the mediation process, the components of the mediation, their roles in the mediation, what happens if the mediation settles or does not settle, etc. ??The mediation ?logistics ?- when, how, why,

A000106

who, what, and where were provided to all mediation participants in the e-mail with the memo dated May 21, 2009.

**Inquiry #3 d -** Is it your contention that the purpose of this mediation is to have a resolution between Higbie and the "responding officials?"

**Response #3 d –** Yes, the dispute is between your client, Mr. Higbie and the Responding Officials ( identified as the Individual(s) who is/are responsible, in whole or in part, for the actions or conditions under dispute), Mr. Jeff Thomas, Ms. Marina Cotter, and Mr. Paul Vallee, therefore the resolution would be between Higbie and the "responding officials."? As written in the provided ADR Fact sheet - Mediation is an informal structured process, which provides a forum for discussion of the issues in dispute and the opportunity to enter an agreement that satisfies the interests of all parties. ? The objective of mediation is to assist the parties to voluntarily reach an acceptable resolution of the issues in dispute.?

?
Regarding your written statement that the Department of State is THE PARTY – formal EEO complaints are filed against the Secretary of State.? In your client's case, if resolved the settlement agreement would read, Richard P. Higbie, Complainant vs. Hillary Rodham Clinton, Secretary of State.? However, for the purpose of the Department's EEO/ADR Program, specifically when using the ADR tool, mediation your client, Mr. Higbie, you (Mr. Higbie's attorney), Responding Officials, Mr. Jeff Thomas, Ms. Marina Cotter, and Mr. Paul Vallee, Mr. Stephen Mergens, Resolving Official, and Atty. Kimberly Jackson, Department's representative are referred to as the mediation parties and/or participants. ?

As previously written and further documented in the provided Department of State's Alternative Dispute Resolution (ADR) Fact Sheet - *While consenting Aggrieved Persons/Complainants and Management Officials are required to appear at a scheduled mediation session and engage in good faith attempts to resolve the matter, parties may conclude the mediation session without reaching an agreement.*? Participation in the Department's EEO/ADR Program is voluntary for Aggrieved Persons/Complainants (with approval from the Office of Civil Rights), the Department's Management Officials (Responding & Resolving officials) are required to appear at a scheduled mediation session, however the Aggrieved Persons/ Complainants and the Responding & Resolving officials management officials may conclude the mediation session without reaching an agreement.

Hopefully, the provided information is helpful and responsive to your questions and concerns. Also, if you have additional information to provide to the mediator, forward to me and I will provide to the parties prior to the mediation.? Please advise.

??
*Arlene M. Brandon, MHS*
**EEO/ADR Specialist**
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C  Street, N.W.
Washington, DC  20520
  (202) 647-8104
  (202) 647-4969 (fax)

---

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Friday, May 22, 2009 1:49 PM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard; Jackson, Kimberly A
**Subject:** RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Dear Mrs. Brandon:

Thank you for the recent emails, however, confusion lingures on a few issues and I did not receive a response to some of my inquiries.  I am sure it was an oversight.

1.  I requested copies of correspondence, requests, and responses in connection with obtaining a mediator for my records.  It is usual and customary that both parties have input and access in the mediator selection process and the mediator prior to the mediation.  May I please be copied on those documents for my records and in this regard, I request any and all communications with the mediator?

2.  This inquiry may be better directed to Mrs. Jackson.  If so, please feel free to let me know.  In regard to the "position statement," I think you misunderstood me and the purpose.  I am aware that a mediatior is not an advocate for a party

or a decision maker (I have mediated hundreds of cases), and that ONLY THE DEPARTMENT AS A PARTY IS A DECISION MAKER IN SETTLING THIS FORMAL DISCRIMINATION COMPLAINT AND POTENTIAL LAWSUIT AND NO OTHER.  That is the role of the "Resolving Official" and that is why the procedures require such person to "have authority to settle."  The purpose of the "position statement" is to allow the mediator to become acquainted with this case and the background.  By providing the mediator with a position statement the following is accomplished:

    a.  The mediator does not have to waste time the day of the mediation understanding the complaints, the allegations, background facts, parties' positions, the relief sought and so forth.  This allows the mediator to "jump right in."
    b.  The mediator will be familiar with the parties and participants, the laws involved and will not need clarification in opening statements as to who is speaking, what they are talking about and why.
    c.  The mediator will have a head start with respect to many items, but certainly, how best the mediation may be conducted, and what suggestions the mediator may propose in order to efficiently move the matter along.  For example, is an opening statement necessary or might it hamper settlement talks?  Who should the mediator first speak with?  What offers or relief has been requested and no need for clarification as to such.

In other words, your reasoning for not providing the mediator information is not sound and certainly not in line with the vast majority of ADR's being conducted throughout the United States.  Why you aquaint "position statement" with "advocate" I cannot for the life of me understand.  Please tell me what authority you are relying upon to mandate to me that I may not provide a "position statement" in advance to the mediator so as to save an hour of time from doing it at the start of the mediation.  My understanding of the procedures and rules and the benefit to this process is that the "Parties" could and should consider all beneficial procedures and that all of this could and should be negotiated by the "PARTIES."  Your unilateral decision against a "position statement" is strenuously objected to by me and I would like to know what authority you are relying upon to dictate this unusual and uncooperative stance upon my client which thwarts, not assists the process.

3.  This brings me to a vital and important inquiry that has remained unanswered and unclarified by you and I hereby request a clear and consise response.

    a.  Are you communicating with the "responding officials" as parties in this matter?
    b.  Is it your contention that the "responding officials" must agree to a settlement in order for the Department of State and Higbie to settle this matter at mediation?
    c.  Is it your position that the "responding officials" are to be consulted and negotiate the procedural issues regarding the mediation including when, how, why, who, what, and where?
    d.  Is it your contention that the purpose of this mediation is to have a resolution between Higbie and the "responding officials?"

This gravely concerns me as I do not see it this way at all and I believe this posture will greatly influence any liklihood of settlement at mediation or any measure of success for that matter.  The Department of State is THE PARTY.  If a lawsuit is filed, that is who it will be against.  The Department of State will be the named defendant, not the "responding officials."  Your interchangeable use of participants and parties confuses the issues and combines and comingles legal principles and meanings that do not and should not be intertwined.  For example, by calling the "responding officials" parties, it means that they must attend the mediation, must agree to a settlement and be allowed to negotiate the terms of a settlement and any procedural issues leading up to the mediation and regarding the conducting of the mediation.  Further, it would make sense that you need their approval each step of the way and in responding to my emails.  By calling "reponding officials" participants, you come to very different and justapose conclusions.  The "responding officials" do not all need to attend, cannot settle this case, will not be negotiating procedural issues or settlement, do not need to be consulted on my inquiries and such.  This can be carried out much farther but I think the point is made.

My reading of the Department rules and procedures is that the department of State is the only other party other then Higbie for settlement and so forth and the Department of State, by and through its "Resolving Official" has the authority to settle.  What are we settling is the question and the answer is Mr. Higbie's claims of discrimination.  If it is your position that we are going to this mediation regarding a formal complaint of discrimination in order to see if the "responding officials" and Higbie can get along or settle how the work together, than all of the participants and parties are not on the same page with regard to the purpose of this mediation and the liklihood of success is greatly diminished.

Please answer the above questions and please provide me with the mediator's contact information at your earliest convenience.  Thank you and I will await your reply.

A000108

**Cary Schulman**
**Counselor & Attorney at Law**
_____
**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone: 214-739-0100  Facsimile: 214-739-0151**

_Confidentiality Rhyme & Notice:_

**This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ??
2510-2521),**

> **and is legally privileged yeah thats where its at.**

**And much of what we send is covered by attorney-client privilege and such,**

> **so honor this American cornerstone and if its not yours don't touch.**

**Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly
prohibited by its maker,**

> **and you should not do that or you are a wrongful taker.**

**If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),**

> **you are directed to contact the sender by telephone or e-mail you see,
> and immediately destroy this message along with all copies & attachements
> because this stuff ain't free.**

**And if you are misnamed above, i.e. obviously the content does not fit and is not
intended for you,**

> **you are instructed to destroy this email, notify me, and therefore to
> yourself, the Law, and Justice & Integrity be true.**

**If you fail to honor this, rest assure,**

> **we will sue Loddy, Doddy & Everybody and payment in cash may be your
> cure.**
> **And we may throw in injunctive or declaratory relief just to scare you.**

**So now you know all about Confidentiality**

> **and what will happen if you invade or violate our confidentiality & privacy.**

**So heed this warning and follow the foregoing advice, because being a target
defendant in a federal lawsuit is not very nice.**

_____

**EMAILING FOR THE GREATER GOOD**
Join me

Subject: RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Thu, 21 May 2009 17:05:17 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov; JacksonKA2@state.gov

A000109

Atty. Schulman,

This is to respond to your following questions/concerns:

<u>Your Inquiry</u>: In this regard, I sent you an email on May 19, 2009 in summary asking:

"In summary, please let me know if a mediator has been requested, the identity of the mediator, whether you are opposed to me providing the mediator with a position statement, and whether all information conveyed or used in the mediation is confidential and cannot be used by any person, party or participant, outside of the mediation."

<u>My Response</u>:

?   Yes, a mediator and co-mediator have been identified and confirmed as indicated in your official notification memo dated 5/21/09 sent via e-mail dated 5/21/09.

?   Attorney's position statements are not provided to mediators in the Department of State's EEO/ADR mediations because as written in the ADR
????????? ??Fact Sheet (copy provided) - **ARE NOT** an advocate for the **Aggrieved Person**, **Complainant,** or **Management**, nor is he or she a decision-
????????? ?maker and cannot impose a solution on the parties.? Also, written in the Agreement to Mediate (copy provided) - The parties understand that
**????????? ??**the mediator(s) have **NO AUTHORITY** to decide the case and are not acting as advocates or attorneys for any party.? In addition,
????? ??????mediation is not a discovery process.

?   As written in the Agreement to Mediate (copy provided) - ?**Mediation is a confidential process.**? Any documents submitted to the mediator(s)
?????????? and statements made during the mediation are for settlement purposes only. ??Confidentiality will not extend to threats of imminent
?????????? physical harm, threats of violence, criminal activity, waste, fraud or abuse.? The parties agree not to subpoena the mediator(s) or any
?????????? documents prepared by or submitted to the mediator(s).? In no event will the mediator(s) voluntarily testify on behalf of any party or
?????????? submit any type of report in connection with this mediation.

<u>Your Inquiry:</u> ?In a May 20th response, and after a short email from me asking if you received my prior email, you indicated:

Atty. Schulman,

?????????? Yes, I received your e-mail message and I have communicated with the other parties.? I will advise before COB, today.

<u>My Response</u>:

?   I responded on May 20, 2009, regarding the reference to  "communicated with the other parties."  I meant that I had informed the parties that you and your client would not be participating in the mediation via video conference as originally planned but by telephone conference.   Often the term parties and participants are used interchangeably.

I hope the provided information is responsive and helpful.

*Arlene M. Brandon, MHS*
**EEO/ADR Specialist**
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C  Street, N.W.
Washington, DC  20520
  (202) 647-8104
  (202) 647-4969 (fax)

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Wednesday, May 20, 2009 9:56 PM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard; Jackson, Kimberly A
**Subject:** RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Dear Mrs. Brandon:

I hope all is well.  As time seems to advance quickly toward the May 29, 2009 expected Mediation, I wanted to insure any lingering procedural issues were timely addressed so as to not inconvenience any of the Parties and/or Participants to the Mediation.

In this regard, I sent you an email on May 19, 2009 in summary asking:

> "In summary, please let me know if a mediator has been requested, the identity of the mediator, whether you are opposed to me providing the mediator with a position statement, and whether all information conveyed or used in the mediation is confidential and cannot be used by any person, party or participant, outside of the mediation."

In a May 20th response, and after a short email from me asking if you received my prior email, you indicated:

> Atty. Schulman,
>
> ?????????? Yes, I received your e-mail message and I have communicated with the other parties.? I will advise before COB, today.

I wanted to insure that my prone-to-toss-emails-for-no-good-reason server did not fail to deliver yet another email.  I know you must be very busy, however, I do not wish to reach the day before mediation without resolution to my procedural inquiries if at all possible.

Additionally, your email of earlier today wherein you stated that the mediation is not confirmed was news to me.  My understanding is that the Department of State utilizes the services of mediators from the Federal Interagency Sharing Neutrals Program ("SN") and requests for mediators must be made two weeks in advance.  I would like to understand why we do not have a mediator at this time and what efforts are being made to obtain one as maybe I can assist in this endeavor.  And if I may, for my file records, please provide me with a copies of:

1.  The requests for a mediator to SN;
2.  Any SN responses;
3.  All correspondence with SN regarding this mediation.

This will get me up to speed with where we are at in selecting a mediator, what efforts have been made and what SN's responses to date has been.  Thank you so much for your anticipated cooperation in this matter.

**Cary Schulman**
**Counselor & Attorney at Law**
_____

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

*Confidentiality Rhyme & Notice:*

**This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ?? 2510-2521),**

> **and is legally privileged yeah thats where its at.**

**And much of what we send is covered by attorney-client privilege and such,**

> **so honor this American cornerstone and if its not yours don't touch.**

**Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker,**

> **and you should not do that or you are a wrongful taker.**

**If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"),**

> **you are directed to contact the sender by telephone or e-mail you see, and immediately destroy this message along with all copies & attachements because this stuff ain't free.**

**And if you are misnamed above, i.e. obviously the content does not fit and is not intended for you,**

> **you are instructed to destroy this email, notify me, and therefore to yourself, the Law, and Justice & Integrity be true.**

**If you fail to honor this, rest assure,**

> **we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.**
> **And we may throw in injunctive or declaratory relief just to scare you.**

**So now you know all about Confidentiality**

> **and what will happen if you invade or violate our confidentiality & privacy.**

**So heed this warning and follow the foregoing advice, because being a target defendant in a federal lawsuit is not very nice.**

EMAILING FOR THE GREATER GOOD
Join me

---

From: cary.schulman@live.com
To: brandonam@state.gov
CC: higbier@state.gov; jacksonka2@state.gov
Subject: RE: Response- RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Wed, 20 May 2009 15:04:56 -0500

Dear Ms. Brandon:

Thank you for the response. I am not meaning any disrespect and I am not trying to ruffle any feathers, but I would like to engage with counsel on the terms and procedures for the upcoming mediation if that is alright with you. Traditionally, I negotiate terms and procedures for mediation with the attorney representing the "Party" on the other side.

Further, I am no nearer to understanding what "parties" means as you use that term than I was prior to the latest email volley. Are you including "responding officials" in your definition or "parties"? Please clarify. I may be hyper technical here but as a lawyer, I always like to clarify who I represent (my party or parties) and I always desire to understand

A000112

who the other lawyer represents (their party or parties) so I am clear as to whether any participants or parties are unrepresented or have another status I should be aware of.

Thank you and I will await a reply to my inquiries of this and past emails.  Of course, you may always contact me by telephone on my cellular at 214-587-3013 and thank you for assisting me with understanding this process and the procedures necessary to provide appropriate representation to my client, Mr. Richard Higbie.


**Cary Schulman**
**Counselor & Attorney at Law**

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

Confidentiality Rhyme & Notice: This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ??  2510-2521), and is legally privileged yeah thats where its at.  Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker and you should not do that or you are a wrongful taker.  If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"), you are directed to contact the sender by telephone or e-mail you see, and immediately destroy this message along with all copies because this stuff ain't free.  If you fail to honor this, rest assure, we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.  So now you know know about Confidentiality and what will happen if you invade our privacy.  So heed our warning and follow the foregoing advice because being a defendant in a federal lawsuit is not very nice.



**EMAILING FOR THE GREATER GOOD**
*Join me*

---

Subject: Response- RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Wed, 20 May 2009 15:42:17 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com; JacksonKA2@state.gov
CC: HigbieR@state.gov
Atty. Schulman.

??????????? I can respond to what I meant regarding the reference to ?"communicated with the other parties."  ?I meant that I had informed the parties that you and your client would not be participating in the mediation via video conference as originally planned but by telephone conference.?? Often the term parties and participants are used interchangeably.

??????????? Also, I have not confirmed that the mediation will take place on Friday, May 29, 2009, because I have not received confirmation that a Mediator is available at 1:00 p.m. (Dallas/Houston time) which is 2:00 p.m. Washington, DC time.? As soon as I receive confirmation, I will advise.

??
*Arlene M. Brandon, MHS*
**EEO/ADR Specialist**
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C  Street, N.W.
Washington, DC  20520
 (202) 647-8104
 (202) 647-4969 (fax)

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Wednesday, May 20, 2009 3:18 PM
**To:** Jackson, Kimberly A
**Cc:** Brandon, Arlene M; Higbie, Richard
**Subject:** RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Dear Mrs. Jackson:

My understanding is that you are representing the Department in connection with the scheduled mediation of May 29, 2009 in the above referenced matter.  I must assume you have been kept in the loop with regard to the email correspondence being exchanged.  I would like to discuss with you the upcoming mediation and the last couple of emails exchanged between Ms. Brandon and myself.  I do not quite understand the last email (see below) and the reference to "communicated with the other parties."  My understanding is that responding officials are not parties in the legal sense of the word and as the term is meant with respect to ADR, but rather participants.

Please call me at your earliest convenience to discuss this matter and I would like to discuss the procedures for the mediation.

Thank you for your attention to this matter.  I may be reached on my cell telephone at 214-587-3013.


**Cary Schulman**
**Counselor & Attorney at Law**

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

Confidentiality Rhyme & Notice: This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ??  2510-2521), and is legally privileged yeah thats where its at.  Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker and you should not do that or you are a wrongful taker.  If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"), you are directed to contact the sender by telephone or e-mail you see, and immediately destroy this message along with all copies because this stuff ain't free.  If you fail to honor this, rest assure, we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.  So now you know know about Confidentiality and what will happen if you invade our privacy.  So heed our warning and follow the foregoing advice because being a defendant in a federal lawsuit is not very nice.

**EMAILING FOR THE GREATER GOOD**
Join me

Subject: RE: No Dallas VTC equipment/RE: Houston Video Conference-re: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Wed, 20 May 2009 12:05:49 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov
Atty. Schulman,

??????????? Yes, I received your e-mail message and I have communicated with the other parties.? I will advise before COB, today.

Ms. Brandon

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Wednesday, May 20, 2009 11:25 AM
**To:** Brandon, Arlene M

A000114

**Cc:** Higbie, Richard
**Subject:** RE: No Dallas VTC equipment/RE: Houston Video Conference-re: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Dear Ms. Brandon:

I wanted to confirm that you received my email delivered yesterday at 1:09 PM central standard time as I have not received a reply.  Please confirm.

Thank you.


**Cary Schulman**
**Counselor & Attorney at Law**
_____

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

Confidentiality Rhyme & Notice: This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ??  2510-2521), and is legally privileged yeah thats where its at.  Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker and you should not do that or you are a wrongful taker.  If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"), you are directed to contact the sender by telephone or e-mail you see, and immediately destroy this message along with all copies because this stuff ain't free.  If you fail to honor this, rest assure, we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.  So now you know about Confidentiality and what will happen if you invade our privacy.  So heed our warning and follow the foregoing advice because being a defendant in a federal lawsuit is not very nice.


**EMAILING FOR THE GREATER GOOD**
Join me

Subject: RE: No Dallas VTC equipment/RE: Houston Video Conference-re: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Tue, 19 May 2009 07:51:14 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov
Atty. Schulman,

        This is not a fact finding conference, it is mediation which is not an adversarial process. **Mediation** is an informal structured process, which provides a forum for discussion of the issues in dispute and the opportunity to enter an agreement that satisfies the interests of all parties.  Participation in this alternative process requires a trained Mediator, the Aggrieved Person/Complainant, and the Responding and Resolving Officials.  The purpose of the mediation is for all parties to appear at the  scheduled mediation session and engage in good faith attempts to resolve the matter, parties may conclude the mediation session without reaching an agreement.

        If you and your client would like to participate from your Dallas office or conference room, most likely it could be conducted via telephone conference.  However, regarding video conference, I am advised that the Houston office is the only DS field office equipped with VTC equipment, none of the DS field offices, including the Dallas Resident Office, have VTC equipment at this time.  Therefore, if you and your client, Mr. Higbie (based in the Dallas Resident Office) would like the mediation conducted via video conference you would  have to travel to Houston for the mediation.

        Please advise if you and your client will be available at 1:00 p.m. (Washington, DC) time on Friday, May 29, 2009 for the telephone conference.  I hope the provided information is helpful and addresses your questions and concerns.  I can be reached via e-mail or at (202) 647-8104 for further assistance.

**Arlene M. Brandon, MHS**
**EEO/ADR Specialist**
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C Street, N.W.
Washington, DC 20520
 (202) 647-8104
 (202) 647-4969 (fax)

---

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Monday, May 18, 2009 6:03 PM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard
**Subject:** RE: No Dallas VTC equipment/RE: Houston Video Conference-re: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Dear Mrs. Brandon:

I have 2 concerns/requests that I would like entertained.

1. If the stated purpose of the Mediation is to have the "Department...make a decision", I am concerned. Your statement:

It is necessary for the Responding Officials to participate *to respond to Mr. Higbie's allegations. The Department is not going to make a decision based on one side of the story.* The purpose of mediation is for the parties to resolve their conflict, *that is not the role of the Resolving Official* or the Department's attorney.

First off, it is my understanding that only the Resolving Official has authority to settle this matter, the Responding Officials do not have authority to settle and I am not sure that your statement "**that the purpose of mediation is for the parties to resolve their conflict, that is not the role of the resolving Official is correct.**" In fact, the parties are Mr. Higbie and the Department, the Responding Officials, I thought, were "**participants**."

If this is going to be a fact finding mini trial, then I request that some witnesses attend from the Dallas office which can attest to facts of my client's discrimination. We are not asking the Department to make a decision based upon one side of the story. Indeed, the Resolving Official should be "familiar with the facts" and of course is free to inquire by any means necessary to feel comfortable with the facts of the situation. But it seems unfair to me that if this is going to be a fact finding mission whereby the "sides of the story" are communicated, then 3 complained about individuals versus Mr. Higbie does not seem to satisfy the interests of fairness and justice. Clearly, the individuals accused of discrimination do not agree with the allegations and facts as set forth in Mr. Higbie's complaint.

My understanding conceptually of mediation is not to have a trial and determine facts, but rather settle a potential claim and potential lawsuit and come to a fair resolution that the Department and Higbie can live with. My client has already instituted a formal complaint which could eventually lead to a lawsuit after the administrative remedies are exhausted. Mr. Higbie is interested in resolving his complaint of discrimination at this early stage, however, he is not interested in arguing the facts with the complained about individuals and having a confrontational mini trial without the benefit of presenting witnesses.

2. In addition to the above concern, I am in need of knowing the location of the mediation before I can schedule the mediation. The fact that the location of our participation was not disclosed until minutes ago creates some concern on my behalf as to the timing of this mediation. I do want to inquire further as to whether we may participate by some means from Dallas so as to save Mr. Higbie the added expense of having me travel to Houston and as you forewarned, the expense would be born by him (I guess this is not even up for negotiation at mediation).

So to summarize, I would like know three things:

1. What is the exact stated purpose of this mediation?
2. Is there any means by which we can participate from Dallas?
3. If this is going to be a confrontational setting of determining facts, may Higbie present witnesses?

Traditionally, I do not try cases in mediation and confront wrongdoers and argue the facts, but rather attempt to settle

with the opposing party, in this case the Department and the Resolving Official who has authority to settle on behalf of the Department.  Typically, parties (i.e. Higbie and the Department) are aware of the facts enough to go to mediation and attempt settlement.  The Responding Officials could make the Resolving Official aware of "their side of the story" by written statement, discussions prior to the mediation, or by other means.

Thank you and I will await your reply.  You may reach me by telephone at 214-587-3013.  Be advised that I will not be able to attend the May 29, 2009 mediation if I need to travel that morning as I have prior engagements.  That is why I rearranged my schedule and stated I could make the afternoon available.  I sincerely hope that we can keep the afternoon and accommodate a conference room here in Dallas.  Indeed, if necessary, I can make the arrangements myself.


**Cary Schulman**
**Counselor & Attorney at Law**
_____

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

_____

Confidentiality Rhyme & Notice: This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ?? 2510-2521), and is legally privileged yeah thats where its at.  Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker and you should not do that or you are a wrongful taker.  If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"), you are directed to contact the sender by telephone or e-mail you see, and immediately destroy this message along with all copies because this stuff ain't free.  If you fail to honor this, rest assure, we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.  So now you know about Confidentiality and what will happen if you invade our privacy.  So heed our warning and follow the foregoing advice because being a defendant in a federal lawsuit is not very nice.

_____

**EMAILING FOR THE GREATER GOOD**
Join me

_____

Subject: No Dallas VTC equipment/RE: Houston Video Conference-re: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Mon, 18 May 2009 17:00:05 -0400
From: BrandonAM@state.gov
To: BrandonAM@state.gov; cary.schulman@live.com
CC: HigbieR@state.gov
Atty. Schulman,

        I am advised that the Houston office is the only DS field office equipped with VTC equipment, none of the DS Resident Offices, including the Dallas Resident Office, have VTC equipment at this time.  Therefore, you and your client, Mr. Higbie (based in the Dallas Resident Office) will have to travel to Houston for the mediation.

        Please advise.

Ms. Brandon

_____

**From:** Brandon, Arlene M
**Sent:** Monday, May 18, 2009 1:24 PM
**To:** 'Cary Schulman'
**Cc:** Higbie, Richard
**Subject:** RE: Houston Video Conference-re: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Atty. Schulman,

We have a DS office in Dallas and I am checking with the video technician in Houston to determine if Dallas has the capabilities to accommodate your participation from their office before requesting that you travel to Houston for your client's mediation. Keep in mind that your expense to travel to Houston would be between you and your client.

Hopefully, I will have a response before COB today from the technician in Houston.

Ms. Brandon

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Monday, May 18, 2009 11:54 AM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard
**Subject:** RE: Houston Video Conference-re: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Dear Mrs. Brandon:

Are you stating that my client and I will need to be in Houston on May 29, 2009? Please advise ASAP as I did not include flight time in rearranging my schedule.

**Cary Schulman**
**Counselor & Attorney at Law**
_____
**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone: 214-739-0100 Facsimile: 214-739-0151**

Confidentiality Rhyme & Notice: This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ?? 2510-2521), and is legally privileged yeah thats where its at. Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker and you should not do that or you are a wrongful taker. If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"), you are directed to contact the sender by telephone or e-mail you see, and immediately destroy this message along with all copies because this stuff ain't free. If you fail to honor this, rest assure, we will sue Loddy, Doddy & Everybody and payment in cash may be your cure. So now you know about Confidentiality and what will happen if you invade our privacy. So heed our warning and follow the foregoing advice because being a defendant in a federal lawsuit is not very nice.

**EMAILING FOR THE GREATER GOOD**
Join me

Subject: Houston Video Conference-re: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09
Date: Mon, 18 May 2009 08:50:33 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov
Atty. Schulman,

My mistake, the video conference is being conducted in Houston (not Dallas), the location of the alleged discrimination. It is necessary for the Responding Officials to participate to respond to Mr. Higbie's allegations. The Department is not going to make a decision based on one side of the story. The purpose of mediation is for the parties to resolve their conflict, that is not the role of the Resolving Official or the Department's attorney.
**Mediation** is an informal structured process, which provides a forum for discussion of the issues in dispute and the opportunity to enter an agreement that satisfies the interests of all parties. Participation in this alternative process requires a trained Mediator, the Aggrieved Person/Complainant, and the Responding and Resolving Officials.

Mediation is not an adversarial process, the mediator will ensure that the mediation is conducted in a professional and respectful manner Regarding your statement that - *I must trust that the decision to include the*

A000118

*Responding Officials is being made in an effort to give this process the best chance of success.* No one can predict what the outcome will be for any process but we do required <u>all parties</u> to appear at the  scheduled mediation session and <u>engage in good faith attempts to resolve the matter,</u> parties may conclude the mediation session without reaching an agreement.
If the parties are able to resolve the matter a settlement agreement will be produced if for some reason the parties reach an impasse then Mr. Higbie's formal EEO complaint will continue in the EEO administrative process with a formal EEO investigation.

      I have noted our records to reflect that you and your client wish to proceed with processing his formal EEO complaint, #DOS-F-062-09 through the Department's EEO/ADR Program.  I hope the provided information is helpful and addresses your questions and concerns.  I can be reached via e-mail or at (202) 647-8104 for further assistance.

**Arlene M. Brandon, MHS**
**EEO/ADR Specialist**
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C  Street, N.W.
Washington, DC  20520
 (202) 647-8104
 (202) 647-4969 (fax)

---

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Saturday, May 16, 2009 4:55 PM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard
**Subject:** RE: EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Dear Mrs. Brandon:

RE:  EEO/ADR Mediation, Richard P. Higbie, DOS-F-062-09

Thank you for the response and clarification as to the planned procedures for the mediation in the above referenced EEO/ADR Mediation.

In line with the stated purposes and goals of the ADR process as outlined by the Fact Sheet and other stated procedures, and without necessarily questioning the wisdom of having the "Responding Officials," **Mr. Jeff A. Thomas, Ms. Marian J. Cotter, & Mr. Paul A. Vallee,** in Dallas, I do wish to understand why this is the case.  Certainly, the Responding Officials could be involved via video conference from Houston.

The policy of the Department is:

> Typically, our mediations are conducted face to face in Washington, DC, however for employees outside of the Washington, DC area, their mediations are conducted via video or telephone conference.

Considering typical Department policy and advantages of ADR including Time Savings, Flexibility, and Cost Savings, may I inquire as to the necessity or advantage of having the Responding Officials in Dallas in conducting the Mediation?

To clarify, I was not indicating the withdrawal of Mr. Higbie's formal request for ADR in my prior email and do not believe I flirted with that notion.  Rather, I felt it necessary, getting involved a bit late in the process, to become familiar with the proposed procedures and insure that the parties and my client gain the most benefit possible from the mediation process and strive to format it in such a manner as to give this ADR the greatest chance of success.

Therefore, on behalf of Mr. Higbie, please let this email serve as our plan, request and desire to go forward with the ADR as initially requested by Mr. Higbie.  However, we do graciously request some participation and input in the format, participation and procedures if possible.

In this regard, I would like to explore having the Responding Officials participate, if at all, from Houston.  Since "Final

authority for granting access to the EEO/ADR process rests with the Office of Civil Rights' (S/OCR) Intake and Resolution Section" I must trust that the decision to include the Responding Officials is being made in an effort to give this process the best chance of success.  While I request that this decision be revisited as I am not convinced it is conducive to the greatest likelihood of resolution at the Mediation, if the Responding Officials are to participate, I would like to understand the manner of participation prior to our arrival at the mediation.  In addition to the location of the Responding Officials during the mediation, I further wanted to explore the wisdom of having a "joint session" although maybe that is best left for the Mediator and the day of Mediation.

Thank you and I will await your reply.  You may reach me anytime on my cell telephone at 214-587-3013 and I will be available for response through this weekend.  Pending satisfactory agreements on how the mediation is to be conducted, my schedule remains open the afternoon of the 29th of May, 2009.

**Cary Schulman**
**Counselor & Attorney at Law**
_____
**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

Confidentiality Rhyme & Notice: This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ??  2510-2521), and is legally privileged yeah thats where its at.  Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker and you should not do that or you are a wrongful taker.  If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"), you are directed to contact the sender by telephone or e-mail you see, and immediately destroy this message along with all copies because this stuff ain't free.  If you fail to honor this, rest assure, we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.  So now you know about Confidentiality and what will happen if you invade our privacy.  So heed our warning and follow the foregoing advice because being a defendant in a federal lawsuit is not very nice.



**EMAILING FOR THE GREATER GOOD**
Join me

Subject: Response, RE: Friday, May 29, 2009, EEO/ADR Mediation, re: Richard P. Higbie, DOS-F-062-09
Date: Sat, 16 May 2009 12:45:46 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: govhigbier@state.gov
Atty. Schulman,

          If I understand your e-mail dated 5/15/09 correctly, you are requesting information on the Department of State's Alternative Dispute Resolution Program (ADR) and the format/components of the mediation conference.  Attached, you will find a fact sheet on the Department of State's ADR Program for your review.   The Office of Civil Rights' Intake and Resolution Section administers the EEO/ADR program and utilizes mediation as the primary method of dispute resolution**.**

          Participation in the EEO/ADR process is at the discretion of the Aggrieved Person or Complainant.  Management's participation in the EEO/ADR process is mandatory.  Final authority for granting access to the EEO/ADR process rests with the Office of Civil Rights' (S/OCR) Intake and Resolution Section.  Your client, Richard P. Higbie filed a formal EEO complaint on 04/13/09 and also submitted an ADR Election form requesting that his formal EEO complaint be processed through the Department's ADR Program.  Your client's complaint was reviewed and determined that his case was appropriate for mediation.

          All parties receive a briefing (face to face or via telephone) on their perspective roles and what to expect in the mediation, prior to the scheduled date of the mediation and also receive a copy of the ADR Fact Sheet.  The ADR Fact Sheet features the program's authority statement, definition of mediation, the Office of Civil Right's EEO/ADR process,

participants in the mediation program, processing steps in EEO/ADR, inappropriate cases for the EEO/ADR process, time limits for the EEO/ADR process, and the advantages of mediation.

The section in the ADR Fact Sheet, under participants in the mediation program addresses **question #1**, parties in the mediation, specifically for your client's case: **Mr. Jeff A. Thomas, Ms. Marian J. Cotter, & Mr. Paul A. Vallee** (named by your client as **Responding Officials,** the management officials who are responsible, in whole or in part, for the actions or conditions under dispute). **Mr. Stephen J. Mergens, Executive Director** (**Resolving Official**, management official with authority to resolve), **Atty. Kimberly Jackson, Department of State's legal representative**, your client, **Mr. Richard P. Higbie, you (Mr. Higbie's legal representative) and the mediator.**

The remainder of your questions/concerns relate to the mediation conference format and components.  The following responses address the selection of mediators, the participant's role in the  mediation as well as the format and components.  The Department of State utilize the services of mediators from the Federal Interagency Sharing Neutrals Program.  Sharing Neutrals (SN) is an interagency mediation program in the metropolitan Washington, D.C. area. SN provides free mediators to participating Federal agencies. SN operates through a pool of trained and experienced collateral duty mediators who provide mediation services to agencies other than their own in exchange for like services to the program from the recipient agency.   Request for a mediator need to be submitted at least 2 weeks in advance of the scheduled mediation.  Typically, our mediations are conducted face to face in Washington, DC, however for employees outside of the Washington, DC area, their mediations are conducted via video or telephone conference.  Mr. Higbie's mediation will be conducted via video conference and a separate room in the Dallas office can be arranged for you and your client.

The components of the mediation include, the Mediator's Opening statement, remarks by the parties (opening remarks by Mr. Higbie and Responding Officials response to Mr. Higbie's allegations), joint discussion, caucus, reconvening the parties and writing the terms for settlement.  The Mediator's Opening statement sets the tone of the mediation and includes stating qualifications, claim neutrality, lays the ground rules, explains the nature of the mediation conference, and outlines the process.  Remarks by the parties, it is customary for **Mr. Higbie** to make his statement first without interruption after he has finished you (his representative) would add any additional information.  After Mr. Higbie and you have completed your statement, the Responding Officials, **Mr. Jeff A. Thomas, Ms. Marian J. Cotter, & Mr. Paul A. Vallee** will be given the opportunity to respond to Mr. Higbie's allegations without interruption .  After both parties have completed their opening statements, there will be a joint discussion.  Most likely the Mediator will summarize the statements and ask additional questions for clarification.  During the joint discussion, the parties may also ask questions of each other to clarify the issues.  At the conclusion of the joint discussion, the mediator will caucus with each party separately beginning with Mr. Higbie and you. (The caucus information may be confidential if the parties desire).  After the mediator caucus with the Responding Officials, Resolving Official, **Mr. Stephen J. Mergens, Executive Director** and **Atty. Kimberly Jackson,** Department of State's legal representative, the mediation conference will be reconvene to assess where the parties are in resolving the issues.  If agreement has been reached regarding terms to settle the complaint, the terms will be provided to S/OCR and we will finalize the settlement agreement.  If no agreement is reached, Mr. Higbie's formal EEO complaint will continue from the point it ceased in the EEO administrative process.

Please advise if you wish to withdraw your client's request to process his formal EEO complaint, #DOS-F-062-09 through the Department's EEO/ADR Program or wish to proceed.  I hope the provided information is helpful and addresses your questions and concerns.  I can be reached via e-mail or at (202) 647-8104 for further assistance.


*Arlene M. Brandon, MHS*
*EEO/ADR Specialist*
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C  Street, N.W.
Washington, DC  20520
  (202) 647-8104
  (202) 647-4969 (fax)

---

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Friday, May 15, 2009 5:34 PM
**To:** Brandon, Arlene M
**Cc:** govhigbier@state.gov
**Subject:** RE: Friday, May 29, 2009, EEO/ADR Mediation, re: Richard P. Higbie, DOS-F-062-09

A000121

Dear Mrs. Brandon:

I cannot confirm the May 29th day and time until I receive some clarification as to the procedures for the mediation. Therefore, please accept this letter as formal notification that we have not yet agreed to the date and time of the mediation, or the format of it. Some preliminary matters need to be addressed prior to setting the mediation. Please confirm this understanding.

I am in the process of reviewing the procedures for conducting this mediation. Please provide me the following so that I may gain a full understanding:

1. Who are the parties to this mediation?

2. Are there going to be opening remarks?

3. Are we planning on having the parties in a joint session to open up with?

4. With regard to the selected location, are you planning on providing a private room for my client and I? Your email indicated "conference room to be determined" however, I need an understanding prior to agreeing to the mediation as how we intend to conduct this mediation.

5. What is the purpose of having the "Responding Officials" in Dallas for this mediation? My understanding from a review of the procedures is:

> The charging party and **a representative** of the employer should attend the mediation session. **The person** representing the employer should be familiar with the facts of the charge and have the authority to settle the charge on behalf of the employer.

**Mr. Stephen J. Mergens, Executive Director** (**Resolving Official**, management official with authority to resolve), **Atty. Kimberly Jackson, Department of State's legal representative**, and my client, **Mr. Richard P. Higbie** constitutes the parties or representatives of the parties. I would appreciate some clarification as to the purpose of having **Mr. Jeff A. Thomas, Ms. Marian J. Cotter, & Mr. Paul A. Vallee** (named by my client as **Responding Officials**) attend this mediation.

With the forgoing questions answered, I will be in a better position to properly advise my client. I do ask that the scheduling the mediation be tabled until the parameters and procedures for conducting the mediation are determined as we may be *pulling the cart before the horse*.

Thank you for you anticipated cooperation and I look forward to your reply. You may always call me at 214-587-3013. I will be in a position to respond tonight and this weekend if necessary.

**Cary Schulman**
**Counselor & Attorney at Law**

**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone: 214-739-0100  Facsimile: 214-739-0151**

Confidentiality Rhyme & Notice: This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ?? 2510-2521), and is legally privileged yeah thats where its at. Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker and you should not do that or you are a wrongful taker. If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"), you are directed to contact the sender by telephone or e-mail you see, and immediately destroy this message along with all copies because this stuff ain't free. If you fail to honor this, rest assure, we will sue Loddy, Doddy & Everybody and payment in cash may be your cure. So now you know about Confidentiality and what will happen if you invade our privacy. So heed our warning and follow the foregoing advice because being a defendant in a federal lawsuit is not very nice.

**EMAILING FOR THE GREATER GOOD**
Join me

Subject: RE: Friday, May 29, 2009, EEO/ADR Mediation, re: Richard P. Higbie, DOS-F-062-09
Date: Thu, 14 May 2009 21:58:31 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.govHigbieR@state.gov
Atty. Schulman,

Thanks for your immediate response.  The May, 21st and 22nd dates are not available.  In addition, to asking you to provide your dates of availability, I also asked the other mediation participants, who include **Mr. Jeff A. Thomas, Ms. Marian J. Cotter, & Mr. Paul A. Vallee** (named by your client as **Responding Officials**), **Mr. Stephen J. Mergens, Executive Director** (**Resolving Official**, management official with authority to resolve), **Atty. Kimberly Jackson, Department of State's legal representative**, and **your client, Mr. Richard P. Higbie** to provide their dates of availability, everyone (including your client) is available on **Friday, May 29, 2009**.  Therefore, I needed to determine if you were available before I provided the logistics (time and place).

Thank you for rearranging your schedule on Friday, May 29, 2009, for your client's mediation.  We require mediation participants to be available for at least 4 hours, therefore I will schedule the mediation to begin at 1:00 p.m. (EST).  It may not take 4 hours or it may take longer.  If the mediation does not conclude by 5:00 p.m. and additional time is needed, the mediation can reconvene on another date (as long as all parties are in agreement).

The video conference will be coordinated by the Department's Office of Civil Rights  (Washington, DC) and the DS Field Office in Dallas, TX.  The following participants will be at the DS Field Office in Dallas, TX (video conference room to be determined): (5) Jeff A. Thomas, Marian J. Cotter, & Paul A. Vallee, Responding Officials, your client, Richard P. Higbie, and you.  In Washington, DC will be (3) Stephen J. Mergens, Resolving Official, Atty. Kimberly Jackson, Department of State's legal representative and the Mediator.
The mediator will be from the Federal Sharing Neutrals Program (Washington, DC) but has not been identified, yet.  I will advise when I receive his/her name.  Official notification to follow.

I hope the provided information is helpful.  If you have additional questions/concerns, please feel free to contact me via e-mail or at (202) 647-8104.

**Arlene M. Brandon, MHS**
**EEO/ADR Specialist**
U.S. Department of State
Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C  Street, N.W.
Washington, DC  20520
 (202) 647-8104

**From:** Cary Schulman [mailto:cary.schulman@live.com]
**Sent:** Thursday, May 14, 2009 8:13 PM
**To:** Brandon, Arlene M
**Cc:** Higbie, Richard
**Subject:** RE: Friday, May 29, 2009, EEO/ADR Mediation, re: Richard P. Higbie

Dear Mrs. Brandon:

I am in receipt of your email and request.  Is the 22nd and 21st unavailable?  I did not originally provide the

A000123

29th as an option and respectfully inquire as to the purpose in me even providing my available dates. Further, no time is listed.  Is the mediation planned for all day?  Is the time of day completely open?

Additionally, in order for me to properly prepare for the upcoming mediation, I need to know how long the mediation is planned for, the parameters or procedures if any, and any other information which may be necessary to properly represent my client.  Has a mediator been selected and confirmed?  If so, may I inquire as to who it will be?

Lastly, if the mediation is to be by video conference, is there a location selected for us to be at?  My office cannot accommodate video conferencing, but, I can inquire as to making those arrangements if necessary. What do you propose?  Please let me know at your earliest convenience.

If the 22, and 21st are out of the question, and the only available date is the 29th, then I will rearrange my schedule and make it happen.  I can try and rearrange my afternoon schedule making the afternoon of May 29th between 12:00 P.M. and 5:00P.M. possible.  Please advise.  Again, my cell number is 214-587-3013. You may reach me on this number anytime.

Thank you.


**Cary Schulman**
**Counselor & Attorney at Law**
_____
**Cary Schulman Law Firm**
**5910 N. Central Expwy.**
**Suite 1040**
**Dallas, TX 75206**
**Telephone:  214-739-0100  Facsimile:  214-739-0151**

Confidentiality Rhyme & Notice: This e-mail is covered by the Electronic Communications Privacy Act (18 U.S.C. ??  2510-2521), and is legally privileged yeah thats where its at.  Any unauthorized reading, copying, viewing, use, disclosure, or distribution is strictly prohibited by its maker and you should not do that or you are a wrongful taker.  If you are not the intended recipient (identified above in "To" or "Cc" or "Bcc"), you are directed to contact the sender by telephone or e-mail you see, and immediately destroy this message along with all copies because this stuff ain't free.  If you fail to honor this, rest assure, we will sue Loddy, Doddy & Everybody and payment in cash may be your cure.  So now you know about Confidentiality and what will happen if you invade our privacy.  So heed our warning and follow the foregoing advice because being a defendant in a federal lawsuit is not very nice.

**EMAILING FOR THE GREATER GOOD**
Join me

_____

Subject: Friday, May 29, 2009, EEO/ADR Mediation, re: Richard P. Higbie
Date: Thu, 14 May 2009 18:57:14 -0400
From: BrandonAM@state.gov
To: cary.schulman@live.com
CC: HigbieR@state.gov
Atty. Schulman,

        This is to advise that based on everyone's response, the best date for your client, Mr. Higbie's EEO/ADR mediation (conducted via video conference) is **Friday, May 29, 2009.**  Please advise ASAP,  if your schedule will accommodate this date.

        Thanks.


*Arlene M. Brandon, MHS*
**EEO/ADR Specialist**
U.S. Department of State

Office of Civil Rights, Room 7428
Intake and Resolution Section
2201 C  Street, N.W.
Washington, DC  20520
 (202) 647-8104

A000125



A000126

# United States Department of State
### Office of Civil Rights (S/OCR)

 EEO/ALTERNATIVE DISPUTE RESOLUTION
AGREEMENT TO MEDIATE

- ❑ The parties agree to engage in mediation in an effort to resolve issues raised in the Complainant, Richard P. Higbie's formal EEO complaint #DOS-F-062-09.

- ❑ While consenting Aggrieved Person/Complainants and management officials are required to appear at a scheduled mediation conference and engage in good faith attempts to resolve the matter, parties may withdraw from the mediation session and will not be forced into an agreement.

- ❑ The Aggrieved Person/Complainant has been informed of grievance and EEO processes, and the time frames associated with them. This agreement to mediate does not negate or suspend the statutory time frames of the EEO process. The negotiated or administrative grievance time frames may only be modified by mutual agreement of the parties.

- ❑ No admission of guilt or wrongdoing by any party is implied, and none should be inferred, by participating in this process.

- ❑ The parties understand that the mediator(s) have NO AUTHORITY to decide the case and are not acting as advocates or attorneys for any party.

- ❑ The Aggrieved Person/Complainant understand that they have the right to have a representative assist them during the mediation process.

- ❑ <u>Mediation is a confidential process</u>. Any documents submitted to the mediator(s) and statements made during the mediation are for settlement purposes only. Confidentiality will not extend to threats of imminent physical harm, threats of violence, criminal activity, waste, fraud or abuse.

- ❑ The parties agree not to subpoena the mediator(s) or any documents prepared by or submitted to the mediator(s). In no event will the mediator(s) voluntarily testify on behalf of any party or submit any type of report in connection with this mediation.

- ❑ No party shall be bound by anything said or done at the mediation unless a written settlement is reached and executed by all necessary parties. If a settlement is reached, the agreement shall be reduced to writing and, when signed and approved by the appropriate authorities for all parties, shall be binding upon all parties to the agreement.

- ❑ The parties understand that, where negotiated bargaining agreements exist, settlements may not violate the terms or intent of the agreement.

A000127

JUN-04-2009  15:56      DIPLOMATIC SECURITY                    713 209 3470     P.003

- 2 -

By signature below, we acknowledge that we have read, understand, and agree to this Mediation Agreement.

| | |
|---|---|
| Aggrieved Person/Complainant | Date |
| Representative | Date |
| Responding Official | Date |
| Resolving Official | Date |
| Party | Date |
| Party | Date |
| Party | Date |
| Party | Date |
| Mediator | Date |
| Co-Mediator | Date |

05/02.

A000128

- 2 -

By signature below, we acknowledge that we have read, understand, and agree to this Mediation Agreement.

| | |
|---|---|
| Aggrieved Person/Complainant | Date |

| | |
|---|---|
| Representative | Date |

| | |
|---|---|
| Responding Official | Date |

6/5/09    5/29/09

| | |
|---|---|
| Resolving Official | Date |

| | |
|---|---|
| Party | Date |

| | |
|---|---|
| Party | Date |

| | |
|---|---|
| Party | Date |

| | |
|---|---|
| Party | Date |

| | |
|---|---|
| Mediator | Date |

| | |
|---|---|
| Co-Mediator | Date |

05/02.

A000129

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RICHARD HIGBIE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 13-270C** |
| THE UNITED STATES, | ) | **(Judge Damich)** |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS

Pursuant to Rules 12(b)(1), 12(b)(6), and 7.2(b)(2) of the Rules of the United States

Court of Federal Claims (RCFC), defendant, the United States, respectfully submits this reply in

support of our previously filed motion to dismiss the complaint filed by plaintiff, Richard Higbie,

for lack of subject matter jurisdiction and failure to state a claim upon which relief can be

granted.  In our motion, we established four separate reasons that dismissal of the complaint is

appropriate.  Mr. Higbie's response affirms that this Court should dismiss the complaint based on

each of the reasons we articulated.  We address Mr. Higbie's response to each in turn.

## I.     The Court Of Federal Claims Lacks Jurisdiction To Consider Mr. Higbie's Claim Because A Claim Based On Substantially The Same Operative Facts Was Already Pending When This Case Was Filed

In our motion, we first established that dismissal of the complaint is necessary pursuant

to 28 U.S.C. § 1500 because the factual allegation upon which Mr. Higbie's complaint in this

Court is based is also one of the factual allegations underlying Mr. Higbie's complaint in his

district court case.  Dkt. 8 at 7-10.  In response, Mr. Higbie contends that "there is a vast

discrepancy in the operative facts between the Plaintiff's district court case and his claim before

the CFC."  Dkt. 9 at 6.  Mr. Higbie explains that within his "forty-page complaint in the district

court" the "fact section contains seventy-eight paragraphs upon which Plaintiff's claims of

retaliation and hostile work environment are premised." *Id.* (citing N.D. Tex.Case No. 3:11-cv-02636-L, Dkt. 123 at ¶ 9-87). Mr. Higbie then contends that "[t]he adverse employment actions that comprise the operative facts of Plaintiff's forty-page complaint in the district court complaint are wholly absent from Plaintiff's six-page transfer complaint because they are neither material nor operative to his breach of contract claims." *Id.* at 6-7. According to Mr. Higbie "[t]here is very little 'overlap' in the facts of both cases and 99% of the operative facts alleged in the District Court case are not operative facts and do not appear in the Federal Claims Court action." *Id.* at 8.

Mr. Higbie's attempt to avoid section 1500 fails for several reasons. As a threshold matter, the operative comparison is not between the complaint Mr. Higbie has filed in this Court and his third amended complaint found at number 123 of the district court's docket, which Mr. Higbie filed September 12, 2013. Rather, it is between the complaint in this Court and the complaint found at number 35 of the district court's docket. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) (noting that jurisdiction turns on "the state of things at the time of the action brought"). Nonetheless, that distinction is irrelevant because the operative facts that mandate dismissal of Mr. Higbie's complaint can be found at paragraph 54 of either version of Mr. Higbie's complaint. As we noted in our motion, in that paragraph Mr. Higbie contends that:

> In separate affidavits, both "Responding Officials" Marion Cotter (Special Agent in Charge of the Houston Field Office) and Jeffrey Thomas (Supervisory Special Agent of the Houston Field Office) provided to the EEO assigned Investigator, Robert Maddern, information held under strict confidentiality guidelines set by the aforementioned ADR Mediation. Both respective Responding Officials included in their affidavits information concerning the underlying facts of the ADR proceeding and records generated as part of the proceeding that are strictly prohibited from being made part of the EEO complaint record.

A000131

Case No. 3:11-cv-02636-L, Dkt. 10 ¶ 54, Dkt. 35 ¶ 54, Dkt. 123 ¶ 54. Mr. Higbie repeats that identical allegation in this Court. *See* Compl., Dkt. 5 ¶ 7.

Mr. Higbie attempts to avoid section 1500 by suggesting that the allegations underlying his complaint in this Court are not "operative" facts in his district court case. However, while Mr. Higbie's argument now is that "[t]he breach of confidentiality that is the subject of this lawsuit is conduct that is neither material nor operative to Plaintiff's retaliation claim and hostile work environment claims in district court," that position is belied by Mr. Higbie's district court complaint, which states that the alleged breach of confidentiality "demonstrated a willful attempt by the Responding Officials to further discriminate and retaliate against the Plaintiff for engaging in related protected activity." *Compare* Dkt. 9 at 6 *with* Case No. 3:11-cv-02636-L, Dkt. 35 ¶ 55. Thus, even while Mr. Higbie is informing this Court that the facts he alleges in this Court are not "operative" in his district court suit, his complaint in that court explicitly alleges that those are relevant evidence supporting his discrimination and retaliation claims. Moreover, even after filing his latest amended complaint, Mr. Higbie continues to assert those facts in his district court case, and to force the Government to respond to those assertions. *See* Case No. 3:11-cv-02636-L, Dkt. 123 ¶ 55. Mr. Higbie's contention that the sole factual allegation he presents to this Court is not "operative" in his district court case, despite the fact that he has retained that factual allegation in the district court complaint even after transferring his contract-based claim to this Court, strains credulity.

In addition, it is irrelevant that the complaint Mr. Higbie filed in district court contains many more factual allegations than does Mr. Higbie's complaint in this Court. According to Mr. Higbie's logic, a plaintiff could file a complaint with multiple causes of action in a district court and then maintain an action in this Court based upon one of those causes of action. That is not

A000132

the proper inquiry for a section 1500 assessment, however.  The question is not how much of the

factual basis from the district court complaint is repeated in this Court's complaint, but is instead

how much of the complaint in this Court can also be found in the district court complaint.  In this

case, it is apparent that the operative facts underlying the complaint in this Court are

substantially the same as the facts presented in the district court case because, as we have

demonstrated, not only is Mr. Higbie's claim in this Court based upon "substantially the same

operative facts" as a portion of the district court case, it is based upon identical operative facts.

*See T'ohono O'odham Nation*, 131 S.Ct. 1723, 1731 (2011); *compare* Case No. 3:11-cv-02636-

L, Dkt. 35 ¶ 54 *with* Compl., Dkt. 5 ¶ 7.

**II.    The Court Of Federal Claims Lacks Jurisdiction To Consider Mr. Higbie's
Allegation That The Department Of State Breached The Agreement To Mediate
Because That Agreement Is Not Money Mandating**

The second reason this Court does not possess jurisdiction to consider Mr. Higbie's

complaint is because, as we established in our motion, the mediation agreement cannot "fairly be

interpreted as contemplating money damages in the event of breach."  *Holmes v. United States*,

657 F.3d 1303, 1315 (Fed. Cir. 2011); Dkt. 8 at 11-14.  Mr. Higbie asserts that because the

agreement "does not disallow a claim for money damages," "there is no difference between the

*Holmes* settlement agreement done pursuant to Title VII and the mediation agreement entered

into by the parties in this matter in connection with a disability discrimination case between the

United States and one of its employees."  Dkt. 9 at 10.  Mr. Higbie is mistaken.

As the Federal Circuit explained in the *Holmes* decision, despite the presumption that

money damages are generally available in the event of breach, if an agreement involves "purely

nonmonetary relief," this Court does not possess subject matter jurisdiction to consider an

4

A000133

allegation of breach of that agreement.  *See* Dkt. 8 at 12 (quoting *Holmes*, 657 F.3d at 1315).[1]  In

addition to not possessing jurisdiction to consider alleged breaches of agreements that disclaim

money damages, the court also explained that this court does not possess jurisdiction when an

agreement cannot "fairly be interpreted as contemplating money damages in the event of

breach."  *Holmes*, 657 F.3d at 1315.  With respect to the Title VII settlement agreement at issue

in that case, the Federal Circuit found that standard satisfied because the provisions of the

agreement that Mr. Holmes alleged had been breached were included "to prevent Mr. Holmes

from being denied future employment."  *Id.* at 1316.  That court explained that therefore "the

agreements inherently relate to monetary compensation through relationship to Mr. Holmes's

future employment."  *Id.*  The court contrasted that circumstance with situations in which money

damages are not the remedy in case of breach, such as "a transfer from one agency office to

another" or when "the employee's remedy is enforcement of the settlement terms or rescission of

the settlement agreement and reinstatement of the underlying action."  *Id.* at 1315, n. 8.

The agreement to mediate at issue in this case cannot fairly be interpreted as mandating

compensation in the event of breach.  Rather, it is an agreement governing the conduct of the

parties during the mediation process and preventing information disclosed therein from being

used in any legal proceeding.  Like the "routine" situation described in the footnote in *Holmes*,

Mr. Higbie's remedy was to continue his EEOC action, armed with the assurance that anything

disclosed in the mediation would not be used in any legal proceedings.  Mr. Higbie asserts that

because of the alleged breach, information related to the mediation "may be introduced into a

---

[1]    Curiously, Mr. Higbie faults the Government for not addressing the Federal Circuit's
decision in *Holmes*.  *See* Dkt. 9 at 9 ("Defendant's failure to cite and address *Holmes* looms
large.").  In fact, our motion cited and relied upon that decision.  Dkt. 8 at 12 (quoting *Holmes*,
657 F.3d at 1315).

A000134

court of law and utilized for the proceedings or in other manners." Dkt. 9 at 12. As we explained in our motion, however, that is not the case. If a court were to conclude that the confidentiality of the mediation agreement were breached, that court would exclude those statements. *See, e.g. Facebook, Inc. v. Pacific Northwest Software, Inc.*, 640 F.3d 1034 (9th Cir. 2011) (upholding district court's exclusion of evidence based upon a confidentiality agreement entered into prior to mediation).

Mr. Higbie stresses that "there is no shortage of support for the need and importance of confidentiality in the mediation process." Dkt. 9 at 10. We do not disagree. The fact that confidentiality is important to the mediation process does not, however, render the agreement money-mandating any more than the importance of a promise to transfer an employee to another agency makes an agreement to do so money-mandating. *See Holmes*, 657 F.3d at 1315.

**III.  The Complaint Fails To State A Claim Because The Allegations In The Complaint Do Not Plausibly Suggest A Breach Of The Agreement**

The third reason this Court should dismiss the complaint is, as we established in our motion, because the "disclosed information" about which Mr. Higbie complains was only routine information about the status of the mediation efforts that could not be said to have breached the mediation agreement. *See* Dkt. 8 at 14-16. We cited two cases, out of the multitude of cases we could have cited, that demonstrate that reporting about the status of mediation is routine practice. Mr. Higbie attempts to distinguish those cases by noting that in both cases the "disclosures" were otherwise required by the courts, and that the "disclosures" were made to adjudicators, whereas in this case he alleges that they were made to an investigator. *See* Dkt. 9 at 13-14. What Mr. Higbie fails to appreciate is that his allegations do not even allege a "disclosure" of any

6

A000135

"confidential information" that could possibly have violated the terms of the mediation

agreement.

The mediation agreement states that "[a]ny documents submitted to the mediator(s) and

statements made during the mediation are for settlement purposes only." Dkt. 9-1 at 45; *see also*

Compl., Dkt. 5 ¶ 6. The complaint does not allege that any document or statement made during

mediation was disclosed outside of that mediation. Despite Mr. Higbie's repeated reference to

"confidential information," no information was even allegedly disclosed. *See* Dkt. 9 at 14.

Rather, the statements about which Mr. Higbie complains simply noted that no documents were

submitted, nor statements made, during the mediation. *See* Compl. ¶¶ 8-9. It is implausible, on

its face, that the statements Mr. Higbie has alleged improperly violated the mediation agreement

constitute breaches of that agreement.

**IV.    The Complaint Fails To State A Claim Because The Relief Sought Has No
         Relationship To The Alleged Breach Of The Mediation Agreement**

The fourth reason this Court should dismiss the complaint is because the relief Mr.

Higbie seeks has no relationship to the breach he has alleged. As we established in our motion,

in order to recover damages for a breach of contract, a plaintiff must demonstrate that "(1) the

damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the

breach is a substantial causal factor in the damages; and (3) the damages are shown with

reasonable certainty." *Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir.

2005). We also noted that "[w]hile the amount of damages need not be 'ascertainable with

absolute exactness or mathematical precision,' recovery for speculative damages is precluded."

*Id.* We established in our motion that the damages Mr. Higbie seeks in his complaint do not

meet any of those criteria.

7

In our motion, we first noted that it cannot have been reasonably foreseeable to the Government officials who submitted affidavits in the EEO investigation stating that "[n]othing was ever discussed and nothing was resolved," that Mr. Higbie would thereby incur $500,000.00 in damages.  *See* Dkt. 8 at 17; Dkt. 5-3 at 3.  In his response, Mr. Higbie does not refute, or even address, that fact.  We next pointed out that Mr. Higbie has provided no indication of how the alleged breach caused either the damage he claims or any damage at all.  In response, Mr. Higbie has directed the Court's attention to multiple cases in which a breach of confidentiality has resulted in damages.  Dkt. 9 at 17-18.  For example, Mr. Higbie notes that an employee who breached the confidentiality of her severance agreement with Hallmark Cards was found liable for breaching that confidentiality.  Dkt. 9 at 18 (citing *Hallmark Cards v. Murley*, 703 F.3d 456 (8th Cir. 2013).  What Mr. Higbie fails to note is that the former employee had "disclosed to [another company] confidential Hallmark information including slides from Hallmark's business model redesign, information regarding Hallmark's consumer buying process, and long-term industry analysis gathered from Hallmark's market research."  *Id.* at 459.  In damages, Hallmark sought, and was awarded, the amount of "the 735,000 severance payment it made to [the employee] under the parties' 2002 agreement and the $125,000 [the employee] received from [another company] in exchange for her consulting services."  *Id*.  Thus, the relationship between the breach and the damages sought was apparent.  In stark contrast, Mr. Higbie has provided no explanation for how the damages he seeks were caused by the alleged breach or, in other words, how "the breach is a substantial causal factor in the damages."  *Indiana Mich. Power Co.*, 422 F.3d at 1373.

Finally, with respect to the final element of his damages claim, the requirement that Mr. Higbie must show his damages "with reasonable certainty," Mr. Higbie's response confirms that

8

A000137

dismissal is appropriate.  *Indiana Mich. Power Co.*, 422 F.3d at 1373.  Even by Mr. Higbie's

estimation, the damages resulting from the alleged breach are "difficult to quantify or measure."

Dkt. 9 at 14.  In his response Mr. Higbie acknowledges that these damages are "not easy to

ascertain, or put a price tag on," and that they are "immeasurable."  Dkt. 9 at 14-15.  Mr.

Higbie's description underlines the speculative nature of the damages he is seeking.  Rather than

describing any loss he suffered as a result of the alleged breach, Mr. Higbie has stated that he,

"in his best wisdom and judgment, placed a value on the harm."  Dkt. 9 at 14.  The law demands

"reasonable certainty," which suggests a clearer relationship between an alleged contract breach

and damages than Mr. Higbie's subjective judgment.  *See Indiana Mich. Power Co.*, 422 F.3d at

1373.

Mr. Higbie notes that "for the failure to state a claim argument to prevail, the Defendant

must have issue with Plaintiff's elements of his cause of action, not whether Plaintiff's belie[f] of

the amount of damages is too high."  Dkt. 9 at 15.  Mr. Higbie is correct.  As we have

demonstrated, Mr. Higbie cannot plausibly demonstrate any of the necessary elements to prove

damages for the alleged breach.  Mr. Higbie's failure to "raise a right to relief above the

speculative level" necessitate that the complaint be dismissed.  *Cary v. United States*, 552 F.3d

1373, 1376 (Fed. Cir. 2009).

## CONCLUSION

Based upon the foregoing and the motion to dismiss, defendant respectfully requests that

this Court dismiss plaintiff's complaint due to lack of subject matter jurisdiction pursuant to

RCFC 12(b)(1) and for failure to state a claim pursuant to RCFC 12(b)(6).

A000138

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

Bryant G. Snee
Acting Director

s/Steve Gillingham
STEVE GILLINGHAM
Assistant Director

s/Michael P. Goodman
MICHAEL P. GOODMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480; Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-2087

October 25, 2013                              Attorneys for Defendant

A000139

# UNITED STATES DISTRICT COURT
## FEDERAL COURT OF  CLAIMS

| | | |
|---|---|---|
| **RICHARD HIGBIE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 13-270** |
| **v.** | ) | **(Judge Damich)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

## NOTICE OF APPEAL

Notice is hereby given that Richard Higbie, Plaintiff in the above named case, hereby appeals to the United States Court of Appeals for the Federal Circuit from the final judgment entered in this action on or about November 14, 2013 and the opinion and order of same date, and the Court's finding that jurisdiction is lacking.


Date:  January 9, 2013


Respectfully Submitted,


**Schulman | Mathias PLLC**


/s/ Damon Mathias

_____

Damon Mathias
State Bar No.: 24080170
Cary Schulman
State Bar No.: 00797390
8390 LBJ Freeway
Suite 500
Dallas, Texas 75243
Telephone:    214-739-0100
Facsimile:    214-739-0151
Email:        damon@schulmanmathias.com

**ATTORNEYS FOR APPELLANT**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| RICHARD HIGBIE, ) | |
| Plaintiff, ) | |
| VS. ) | |
| ) | CIVIL ACTION NO: 3-11-CV-2636-L |
| HILLARY RODHAM CLINTON, ) | |
| In her official capacity as Secretary ) | |
| of State ) | |
| 2201 C Street NW ) | |
| Washington, DC 20520 ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFF'S OPPOSED MOTION FOR LEAVE TO FILE PLAINTIFF'S SECOND AMENDED COMPLAINT

**TO THE HONORABLE DISTRICT JUDGE:**

**COMES NOW,** Plaintiff Ricard Higbie and files this his Opposed Motion for Leave to file Second Amended Complaint and shows the following:

**I.**

The Court's Scheduling Order issued in this case sets January 29, 2013 as the deadline to file motions seeking to amend pleadings.

Since the filing of this lawsuit, Plaintiff's second EEOC complaint appears to have been completed with Defendant issuing an FAD.[1]

Plaintiff has yet to receive any document production and competing motions to enter protective orders are pending. Defendant's responses to requests for production

---

[1] Defendant, in its Answer, stated that the investigation was ongoing. However, Defendant also supplied Plaintiff with the Report of Investigation (approximately October of 2012) and has further issued multiple confusing FAD's containing different cause numbers on them. Some of the FAD's seem to be replacing prior FAD's and the situation has not been clarified despite requests to do so.

were do on December 10, 2012.  Defendant objected and answered but has provided no documents pending the protective order.

Further, Defendant has thwarted Plaintiff's ability to narrow the issues and amend its complaint in a timely fashion with frivolous objections to discovery and continuing delay tactics.

Defendant opposes the amending of Plaintiff's complaint.

Plaintiff attaches his Second Amended Complaint hereto as Exhibit "A: This motion is not being filed to cause delay and will not prejudice the Defendant.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff pray that this Court grant Plaintiff's Motion for Leave to file Plaintiff's Second Amended Complaint.

Respectfully Submitted,

SCHULMAN | MATHIAS PLLC

/s/ Cary Schulman
_____
Cary Schulman
Texas Bar No.: 00797390
Damon Mathias
Texas Bar No.: 24080170
8390 LBJ Freeway
Suite 500
Dallas, Texas 75243
Telephone: (214) 739-0100
Facsimile: (214) 739-0151
cary@dallaslegalteam.com

**ATTORNEYS FOR PLAINTIFF RICHARD HIGBIE**

A000142

## CERTIFICATE OF CONFERENCE

The undersigned corresponded via telephone with D. Shane Read on January 25, 2013 regarding this motion. Opposing counsel indicated that he opposes the filing of this motion.

/s/ Cary Schulman

_____
Cary Schulman

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2013, I electronically filed the foregoing

document with the Clerk of Court for the United States District Court, Northern District of

Texas, using the electronic case filing system for the Court. The electronic case filing

system sent a "Notice of Electronic Filing" to the following attorney of record who has

consented in writing to accept this Notice as service of this document by electronic

means:

D. Shane Read
Assistant United States Attorney
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

/s/ Cary Schulman

_____
Cary Schulman

A000143

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| RICHARD HIGBIE,    ) | |
| Plaintiff,    ) | |
| VS.    ) | |
| ) | CIVIL ACTION NO: 3-11-CV-2636-L |
| HILLARY RODHAM CLINTON,    ) | |
| In her official capacity as Secretary    ) | |
| of State    ) | |
| 2201 C Street NW    ) | |
| Washington, DC 20520    ) | |
| ) | |
| Defendant.    ) | |

UNOPPOSED MOTION TO TRANSFER VENUE

Plaintiff Richard Higbie, by counsel, respectfully submits this unopposed Motion to Transfer Venue of breach of contract claims to the United States Court of Federal Claims pursuant to 28 U.S.C. § 1491(a)(1). As grounds therefor, Defendant states as follows:

I.

BACKGROUND

In his complaint, Plaintiff has alleged a number of breach of contract claims against Defendant. Specifically, under Count III of his amended complaint Plaintiff asserts that Defendant, acting by and through their employees and agents, entered into a contractual relationship with the Plaintiff to mediate. *See Plaintiff's Amended Complaint* ¶ 97. Defendant, by and through its employees and agents, violated the contract to mediate in that they breached the confidentiality provisions of the agreement, in violation of the confidentiality clause of the mediated agreement done pursuant to the Administrative

A000144

Dispute Resolution Act of 1996 (H.R. 4194, Public Law No. 104-230 signed into law on October 19, 1996 by the President [142 Cong. Rec. H12303-12304]; C.F.R 1614.102 / 105) in addition to Department of State Regulations. *Id.* at ¶ 97,98. The breach of the mediation agreement was done by "resolving officials" and/or responsible management officials in furtherance and in the scope of their employment with the Department. *Id. at ¶* 98. The acting officials for the Defendant entered as "parties" and or "resolving officials" to the contractual mediation agreement. *Id.* at ¶ 99. The Defendant is liable to the Plaintiff under vicarious liability as the officials, agents and or employees were acting in their official capacity with authority when entering and violating the agreements. *Id.* Defendant's breach was the direct and proximate cause of damages to the Plaintiff in excess of $10,000 *Id.* at ¶ 97, ¶110.

## II.

## GROUNDS FOR TRANSFER OF BREACH OF CONTRACT CLAIMS

The Court of Federal Claims derives its jurisdiction from the Tucker Act, which, in relevant part, gives the court "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States. . . ." 28 U.S.C. § 1491(a)(1). The Tucker Act is a jurisdictional provision "that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)." *United States v. Navajo Nation*, 556 U.S. 287, 129 S.Ct. 1547, 1551, 173 L.Ed.2d 429 (2009).

If the United States is a party to a contract that the Government is alleged to have breached, and the claim is for more than $10,000, the exclusive forum for the suit is in the Court of Federal Claims for the damages claimed to have resulted from the breach. *See* 28 U.S.C. § 1346(a)(2) with § 1491(a)(1). Thus, the Government's breach of an agreement, as in this case, involving damages of more than $10,000 is within the Tucker Act jurisdiction of the Court of Federal Claims. See *Holmes v. United States*, 657 F.3d 1303, 1317 (Fed.Cir.2011), *Vandesande v. United States*, 673 F.3d 1342 (2012)

### CONCLUSION

Plaintiff and the Government were a parties to a contract, the Government breached that contract, and the resulting damages are in excess of $10,000. Thus, the exclusive forum for the Plaintiff's breach of contract claims are in the Court of Federal Claims for the damages claimed to have resulted from the breach. Plaintiff respectfully requests that the Court transfer these breach of contract claims to the Court of Federal Claims

Respectfully submitted,

SCHULMAN | MATHIAS PLLC

/s/ Cary Schulman
_____
Cary Schulman
Texas Bar No.: 00797390
Damon Mathias
Texas Bar No.: 24080170
8390 LBJ Freeway
Suite 500

Dallas, Texas 75243
Telephone: (214) 739-0100
Facsimile: (214) 739-0151
cary@dallaslegalteam.com

**ATTORNEYS FOR PLAINTIFF RICHARD HIGBIE**

**CERTIFICATE OF CONFERENCE**

The undersigned corresponded via telephone conference with D. Shane Read on January 25, 2013 regarding this motion. Opposing counsel indicated that he is not opposed to the filing of this motion.

/s/ Cary Schulman

_____

Cary Schulman

**CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2013, I electronically filed the foregoing document with the Clerk of Court for the United States District Court, Northern District of Texas, using the electronic case filing system for the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means:

D. Shane Read
Assistant United States Attorney
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

/s/ Cary Schulman

_____

Cary Schulman

A000147

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **RICHARD P. HIGBIE**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:11-CV-2636-L** |
| | § | |
| **HILARY RODHAM CLINTON, Secretary** | § | |
| **U.S. Department of State**, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the court is Plaintiff's Unopposed Motion to Transfer Venue, filed January 29, 2013. Plaintiff seeks to transfer the breach of contract claims **only**; therefore, the court will treat the motion as one to sever and transfer venue. The court determines that the motion should be, and is hereby, **granted**. Accordingly, the court **directs** the clerk of court to **sever** Plaintiff's breach of contract claims from this action, **assign** them a new case number, and **transfer** the new action to the Court of Federal Claims.

**It is so ordered** this 5th day of February, 2013.

_Sam A. Lindsay_
Sam A. Lindsay
United States District Judge

**Order - Solo Page**

A000148

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **RICHARD HIGBIE,** ) | |
| **Plaintiff,** ) | |
| **VS.** ) | |
| ) | **CIVIL ACTION NO: 3-11-CV-2636-L** |
| **JOHN KERRY,** ) | |
| **In his official capacity as** ) | |
| **Secretary of** ) | |
| **State** ) | |
| **2201 C Street NW** ) | **JURY TRIAL DEMANDED** |
| **Washington, DC 20520** ) | |
| ) | |
| **Defendant.** ) | |

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

NOW COMES, Plaintiff, RICHARD HIGBIE (hereinafter "Plaintiff"), and

sues John Kerry, in his official capacity as the U.S. Secretary of State, and in

support thereof avers:

**NATURE OF LAWSUIT**

1.      This case involves multiple instances of discrimination of protected

activity under Section 501 and 504 of the Rehabilitation Act of 1973, as

amended, 29 U.S.C. § 791 & 794 (Federal Regulation 29 CFR § 1614),

applicable to the federal government as an employer, and the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12111 et seq. and 42 U.S.C. § 12201 et seq.,

expressly incorporated into the Rehabilitation Act, are the legal statutes

applicable to Higbie's claims and the wrongful actions alleged herein by the

United States Department of State against Plaintiff who is an employee of the

United States Government and employed by the Bureau of Diplomatic Security,

within the U.S. State Department, as a Civil Service employee.

## JURISDICTION AND VENUE

2**.**      This Court has jurisdiction over this suit pursuant to the Civil Rights Act of

1991 (Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub.

L. 111-2) amended several sections of Title VII. In addition, section 102 of the

CRA amends the Revised Statutes by adding a new section following section

1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive

damages in cases of intentional violations of Title VII, the Americans with

Disabilities Act of 1990, and section 501 of the Rehabilitation Act of 1973. The

Administrative Dispute Resolution (ADR) Act of 1996 (H.R. 4194, Public Law No.

104-230 was signed into law on October 19, 1996 by the President [142 Cong.

Rec. H12303-12304]; C.F.R 1614.102 / 105).  This Court has jurisdiction of the

action under 28 U.S.C. § 1331 because this matter involves a federal question

and pursuant to 42 U.S.C. §2000e-5(f) and 28 U.S.C. §1345 because this matter

involves a discrimination complaint.  This Court has jurisdiction over the pendent

state law causes of action plead herein.

3.      Venue lies in the Northern District of Texas because the plaintiff and the

actions that form the basis of this lawsuit occurred in the Northern District of

Texas and the responsible agency official's focus of the discriminatory acts

occurred in the District.  Further, the action based upon the prior protected activity was the subject of suit brought in this District and the hostile work environment that ensued.

## ADMINISTRATIVE REMEDIES EXHAUSTED

4.      All conditions precedent to the filing of this suit have been performed or have occurred and the Plaintiff has exhausted his administrative remedies accordingly.  The Plaintiff has further complied with all applicable reporting and complaint provisions necessary and precedent to bringing this action under applicable standards of law.

5.      This matter arises from ongoing and repeated acts of retaliation, reprisal and harassment against and to the Plaintiff due to prior protected activity.  The previous EEOC matter out of which this matter arises, was filed in 2001 through the respective administrative EEOC complaint process and was eventually filed in the Northern District of Texas and numbered Civil Action Number 3:04-CV-00725-K.  The suit was instituted by Agent Higbie after all administrative remedies were exhausted and thereafter, the case settled on or about July 11, 2005.

6.      This current action arises out of a series of actions and activity beginning on or about December 17, 2008 and and continuing thereafter.

## PARTIES

7.      Plaintiff Richard Higbie lives at 906 Carnegie Court, Allen, Texas 75002.
Plaintiff is currently serving as a Senior Criminal Investigator / Senior Special
Agent located within the Dallas Resident Office which operates under the
direction of Houston Field Office within the Bureau of Diplomatic Security.

8.      The Defendant is the Honorable Hillary Clinton, Secretary of State of the
U.S. Department of State.  Secretary Clinton was sworn as the 67th Secretary of
State on January 21, 2009.  She oversees the State Department, including the
supervision of Foreign Service and Civil Service personnel who serve both
abroad as well as domestically within the Continental United States.  Secretary
Clinton is an employer as that term is defined in Title VII, of the Act.

### FACTS

9.      Plaintiff specifically alleges violations that constitute a "continuing
violation" of discrimination against the Plaintiff.

10.      On July 11, 2005, the Northern District of Texas, United States District
Court issued an Order of Administrative Closure after the Court was notified that
both parties in the Civil Action Number 3:04-CV-00725-K agreed to a settlement.

11.      On September 13, 2005, the Plaintiff, and the Defendant, Cohn L. Powell.
Secretary, U.S. Department of State then jointly entered into a Motion to Dismiss
the EEO case.

12.      The settlement terms specified a conversion of the Plaintiff's occupational

position within the Department be converted from the Foreign Service to the

Civil Service within the Bureau of Diplomatic Security (BDS), Dallas Resident

Office.

13.    On August 9, 2007, the Plaintiff informed the newly assigned Special

Agent in Charge of the Houston Field Office. Marian Cotter, during a visit to the

Dallas Resident Office and in an introductory meeting of his prior protected

activity and his commitment to a work environment that is productive and free

from the past hostile work environment conditions.

14.    On August 23 and 24, 2011 the Assistant Secretary of State for Diplomatic

Security, Richard Griffin, the Assistant Director of Domestic Operations Edgar

Moreno, the Deputy 200 Assistant Secretary of State the Diplomatic Security's

Office of Foreign Mission, Claude Nebel, the Special Agent in Charge of the

Houston Field Office, Marian Cotter, and the Resident Agent in Charge, Edward

McGrath, all attended a visit to the Dallas Resident Office and conducted

meetings within the DFW area.

15.    Prior to this visit, the Plaintiff was the Acting Resident in Charge while the

assigned Resident Agent in Charge, Edward McGrath was on annual leave. The

plaintiff coordinated all of the senior management meetings with the HFO

supervisory team, the appropriate offices at the Bureau's headquarters, and all

of the local departmental heads wherein operational meetings were to be held.

The Plaintiff thanked the Assistant Secretary of State for Diplomatic Security,

Richard Griffin, for his role in reaching a settlement in his EEO lawsuit stated

above, and allowing the Plaintiff to be converted to a Civil Service position located within the Dallas Resident Office in Dallas, Texas.

16.    The Plaintiff also stated that he hoped that the chapter of his career, wherein he suffered discrimination, was over and that he would not be discriminated against any further. The Assistant Secretary stated to the Plaintiff that if he does experience any further discrimination he requested that the Plaintiff contact him immediately so that the behavior could be attended to. This conversation occurred in the presence of Assistant Director Edgar Moreno.

17.    This demonstrates the first existence of the Plaintiffs disclosure to the most senior responsible management official within his Area of Responsibility (AOR), the Special Agent in Charge of the Houston Field Office, Marian Cotter, thus depicting his prior protected activity. This also illustrates the Plaintiff's routine duty to act as the relief supervisor, i.e., the Acting Resident Agent in Charge, in the absence of the assigned Resident Agent in Charge. Additionally, the presence of the disclosure of the prior protected activity was again provided to the Special Agent in Charge of the Houston Field Office by the Resident Agent in Charge of the Dallas Resident Office, Edward McGrath on February 6, 2008. This disclosure occurred after the Plaintiff informed his immediate supervisor, Ed McGrath of instances related to a hostile work environment towards the Plaintiff and other line-level employees as a result of abusive behavior engaged by supervisory personnel in Houston, Texas, specifically, Jeff Thomas.

18.     On December 17, 2008, the Assistant Special Agent in Charge (ASAC),

Paul Valle, ordered the Resident Agent in Charge, Laviris Stubblefield, to

disallow and remove the Plaintiff from assuming his role as the relief supervisor

within his office, during Mr. Stubblefield's pending absence, as outlined in the

Plaintiffs current and previous annual work requirement statements / job duties.

The direct order cited by ASAC Valle delineated that the Plaintiff was not

promotable and should not therefore be afforded the same opportunity for

advancement opportunities as Foreign Service personnel, i.e., serving as the

relief supervisor for his office.

19.     ASAC Valle then issued the adverse employment action against the

Plaintiff when he states in an email to the Resident Agent in Charge Laviris

Stubblefield,

> "As we discussed when I was in Dallas. This 2 week period of
> time is the perfect opportunity for an FS-2501 to be acting
> RAC. This does no good for Rick in a non-promotable
> position.  Please pick one of your 3's to act in your stead,
> they can actually benefit from the experience."

20.     ASAC Valle denotes that he was recently in Dallas, he states that his

rationale pertains to the "opportunity" was only applicable to a "foreign service

employee" versus the Plaintiff.  It is important to note that the Plaintiff was

previously a member of the foreign service but was converted to a Civil Service

position pursuant to the above noted protected activity and settlement

agreement.  ASAC Valle then declares that the Plaintiff is not promotable, and

lastly he delineates that the Foreign Service employee can 'benefit from the experience'.

21.     The Plaintiff was verbally told of the email correspondence by the then incumbent Resident Agent in Charge of the Dallas Resident Office, Laviris Stubblefield on the evening of December 17, 2008 after his multiple discussions with ASAC Vallee and SAC Marion Cotter regarding his lack of concurrence and dissenting opinion of the management directive pertaining to the relief supervisory duties and statements made referring specifically to the Plaintiff. The Plaintiff documented his discussions with the RAC in an email sent to himself as a "memorandum to file" wherein he noted that RAC Stubblefield was told that the premise or rationale for the management decision was punitive in nature as a result of the Plaintiff's discussions with the Bureau's Director regarding the Dallas operational strategic plans, goals, and operations.  Mr. Stubblefield then assigned another member of his staff to serve as the relief supervisor in his absence who was a member of the Foreign Service.

22.     The verbal statements made by the ASAC (Vallee) and the SAC (Cotter) regarding the adverse employment action taken against the Plaintiff were contrary to the remitted email sent earlier the same day by ASAC Vallee.

23.     On or about November 18, 2008, the Special Agent in Charge of the Houston Field Office, Marian Cotter, the Assistant Special Agent in Charge of the Houston Field Office Paul Vallee, at the Dallas Resident Office convened a meeting at SAC Cotter's direction.

24.    During the brief meeting. Marian Cotter, noted her dissent to a Strategic

Action Plan developed by office personnel and its eventual routing to the

Director of the Bureau and all Senior Bureau management which included the

Houston management personnel.

25.    Following the meeting, the SAC (Cotter) and the ASAC (Vallee) met with

the RAC of the Dallas Resident Office, Laviris Stubblefield, wherein Cotter and

Vallee issued a written counseling statement pertaining to Stubblefield's

decision as to how to comply with the Director's request for information related

to the Dallas Strategic Action Planning Report.  Also, during this meeting, the

ASAC (Vallee) signed and approved the Plaintiffs work requirement statement

that maintained his responsibilities, to include serving as the relief supervisor,

i.e., "Acting Resident Agent in Charge" in the absence of the assigned Resident

Agent in Charge, Laviris Stubblefield.  RAC Stubblefield stated to the Plaintiff on

several occasions prior to and after the November 18, 2008 counseling session

with SAC Cotter, ASAC Vallee issued to RAIC Stubblefield, that ASAC Vallee

ordered RAC Stubblefield to issue a written reprimand to the Plaintiff for

violating chain of command communication protocol with senior management

personnel.  This directive by ASAC Vallee did not occur due to the fact that RAC

Stubblefield believed the action against Plaintiff to be discriminatory and without

merit or cause.

26.    On March 10, 2009, the Plaintiff was again notified by RAC Laviris

---

Stubblefield that ASAC Vallee communicated to him via email that the Plaintiff was not allowed to assume the Acting RAC duties in his absence. This directive was again met with the disagreement by RAC Stubblefield and Plaintiff's work requirements / job duties were not changed.  In this same communication, the ASAC (Vallee) again referred to the Plaintiffs lack of promotability and his direction to only use Foreign Service personnel for this responsibility which RAC Stubblefield viewed as retaliatory and punitive issued without cause or merit. The ASAC further stated in the communication that RAC Stubblefield was directed to bring a copy of the Plaintiffs Work Performance Plan / Work Requirements / Job Duties to a meeting with him in Houston, but did not request the same Plan for the other Civil Service Criminal Investigator, Tim Forte for review.

27.    The Plaintiff has served as the Acting Resident in Charge, in addition to Foreign Service personnel, in short and long durations of time, in the absence of the assigned Resident Agent in Charge through the term of the his last two previous supervisors, Edward McGrath and Randy Steen, consistent with his annual work requirement statements.

28.    Plaintiff's employment discrimination complaint from which an administrative investigation was spawned, stated the following and is pertinent to this suit:

    a. During the summer months in 2008, Plaintiff assumed supervisory responsibility for the Dallas Resident Office as the acting Resident Agent in Charge (RAIC) while the supervisory position was in transition between

---

the outgoing and incoming (RAIC). These temporary supervisory duties were outlined in the Plaintiff's work requirement statement in the current and previous rating period(s) accordingly.

b. Plaintiff would like to have the S/OCR office made aware of the fact that the outgoing RAIC, Ed McGrath, retired from his position in Dallas and with the Department before he planned to seek post retirement employment as a direct result of SAIC Cotter's unwillingness to remedy the abusive behavior of her subordinate supervisory staff.

c. During the summer of 2008, the Houston Field Office senior management, specifically, SAIC Marian Cotter and SSA Jeff Thomas, did not maintain regular communication nor involve the Dallas Resident Office with management programs, goals/objectives, or interim policies. Plaintiff worked diligently to maintain a high-level of protective and investigative performance during a period of high personnel attrition. Under the Plaintiff's tutelage, objectives were met satisfactorily met with little to no support from HFO management. The Plaintiff often made management decisions as the acting RAIC, void of guidance from his superiors.  On several occasions, the Plaintiff's decisions  were harshly scrutinized by senior management, creating a hostile work environment.

d.     At the end of the transitional period of the Plaintiff serving as the acting RAIC, the SAIC sent an abrasive and hostile email to the Plaintiff expressing her dissent with his management decisions. In this email correspondence, the SAIC further delineated her distain and unwillingness to forge a working relationship with subordinate civil service personnel, specifically as it relates to Plaintiff.

29.   Special Agent in Charge, Marian Cotter, stated that DRO (Dallas Resident Office) volunteered agents for protective assignments, however, a DS wide broadcast email stipulated that the clearance required for agent personnel to request consideration for supervisory roles at the United Nations General Assembly was their immediate supervisor's approval.

30.   Agents within the Dallas Resident Office submitted such requests and the

Plaintiff approved the requests as the headquarters directive required and

submitted the DRO personnel for assignments as deemed necessary. The

Plaintiff was unaware of the additional approval process through the Houston

Field Office Management. This policy was brought to the Plaintiffs knowledge

after SAC Cotter sent the above referenced derogative email.

31.     The Plaintiff was also operating under the belief that the previous RAC

(McGrath) had communicated the aforementioned protection assignments and

manpower allocation decisions made at the end of his tenure. SAC Cotter also

claims that the Plaintiff approved leave for an employee without permission

which was inconsistent with previous policies followed by the previous RAC

McGrath. The Plaintiff did authorize an employee with the Dallas Resident Office

to facilitate his household belongings and living arrangements upon arrival to his

duty location consistent with the Foreign Affairs Manual/Handbook.

32.     Consistent with the Plaintiff's work environment having the clear presence

of a hostile and retaliatory nature, this is an example of how the SAC's inept

management approach caused problems related to her performance which was

then unjustly deferred or annotated as a result of the Plaintiff's actions.

33.     From January of 2008 following the abusive outburst of Supervisory

Special Agent Jeff Thomas with several members of the Dallas Resident Office

to include the Plaintiff, to the summer months following the assigned Resident

Agent in Charge Ed McGrath's abrupt retirement, to the end of the year in the

---

absence of the assigned Resident Agent in Charge, Laviris Stubblefield, the

existence is a hostile work environment is well documented.

34.   As cited in the Plaintiff's employment discrimination complaint:

> a) During the RAC's (Stubblefield) leave, HFO managers. specifically
> SSA Jeff Thomas and ASAIC Paul Vallee, repeatedly implemented
> abusive management actions against the Plaintiff, including hostile
> communications. Upon his return his office while on leave, RAIC
> Stubblefield became aware of the hostile work environment and
> informed the Diplomatic Security Principal Deputy Assistant
> Secretary (P/DAS) of these concerns. RAIC Stubblefield opined that
> managerial actions in Houston required reform to provide immediate
> and corrective action regarding the abusive and hostile work
> environment that has rendered the working relationship ineffective
> and again cited a willful neglect in communicating with the Dallas
> Resident Office and its personnel. As a potential solution, the RAIC
> requested the P/DAS quickly initiate a senior DS management
> review to provide managerial guidance for HFO senior management.
>
> b. During the week of January 12-16, 2009, acting on the RAIC's
> request, the P/DAS assigned an experienced and seasoned senior
> management review panel to travel to the Dallas and Houston
> offices to remedy the hostile work environment and communication
> impasse that had formed between HFO management and DRO
> management to better achieve organizational goals and objectives.
> The managerial review written reports have not yet been provided to
> HFO and DRO personnel as of this writing, however the reports are
> expected to be forthcoming in the near future.

35.   The above noted report (referred to in subsection "b" above) was

eventually completed and submitted by the Directorate of Domestic Operations

(ICI Director Scott Bultrowicz) to the Director's office (Gregory Starr) for review

and onward action. Upon receipt of the first submission of the report, the

Director returned the report to be amended to more clearly outline the facts

involved, the Directorate of Domestic Operations then completed a second draft

---

and the report was re-submitted. The facts surrounding the report, its two drafts,

and the eventual attempt to hide the existence of these reports can be clarified

by the Director's executive advisor, Senior Special Assistant to the Director Scot

Folensbee (FS-OC Retired).

36.     The Bureau, especially its own senior leadership, has a duty as defined

by:

> (1) 3 FAM 1526.2. THE DEPARTMENT'S RESPONSIBILITIES UNDER
> THIS POLICY (CT:PER-567; 09-22-2005)
> (State)
> (Foreign Service and Civil Service Employees)
>
> (2)     c.  Supervisors and other responsible Department officials who
> observe, are informed of, or reasonably suspect incidents of possible
> discriminatory harassment must immediately report such incidents to
> SIOC'R. which will either initiate or oversee a prompt investigation. Failure
> to report such incidents to SiOCR will be considered a violation of this
> policy and may result in disciplinary Action.

37.     Upon completion of the management review conducted by the Bureau of

Diplomatic Security, the incidents of EEO violations should have been

immediately reported to the Office of Civil Rights and the related employees

should have been contacted to ascertain their complaints. The Plaintiff nor the

other employees involved were contacted regarding their complaints lodged

with management officials in their Bureau.  Instead, this lack of administrative

action which should have been immediate and corrective in nature worsened the

work environment and heightened its hostile and retaliatory demeanor. This lack

of action coupled with the attempts to inaccurately judge raised employment

discrimination concerns by the Plaintiff exemplify the retaliatory

---

animus against such employees from tiling relevant complaints of discrimination.

38.    When the above management review was conducted it negated the

fairness doctrine of the employee's discrimination complaint process that

should have included the Office of Civil Rights independent follow-up inquiry.

39.    Further demonstration of the pre-disposition to hinder such employment

discrimination complaints is the failure of SAC Cotter, ASAC Vallee, and SSA

Thomas to post the employee's equal employment opportunity rights under the

law in the workplace under their oversight.

40.    This posting requirement is defined under:

> (1) 29 CODE OF  FEDERAL REGULATIONS VOLUME 4, PART 1601
> AND 1627
> Sec. 1627.10 Notices to be posted.
>
> (2) Every employer, employment agency, and labor organization which has
> an obligation under the Age Discrimination in Employment Act of 1967
> shall post and keep posted in conspicuous places upon its premises the
> notice pertaining to the applicability of the Act prescribed by the
> Commission or its authorized representative. Such a notice must be
> posted in prominent and accessible places where it can readily be
> observed by employees, applicants for employment and union members.

41.    On December 29, 2009, the Plaintiff  was asked by Special Agent Joe

White (FS), for guidance as to how to proceed with schedule/itinerary

information for an upcoming visit of a foreign dignitary that was provided to him

in the course of his duties. The JTTF Agent was instructed by the Plaintiff that he

should forward the information to the Protective Liaison Division in Headquarters

so that it could be determined what, if any, protection responsibilities would be

assigned to this visiting dignitary.

---

42.     The Plaintiff noted to the Agent that it was important to provide this

information to the appropriate headquarters elements so they could benefit from

the itinerary in concert with ascertaining whether to obligate protective

resources accordingly. Once the Dignitary Protection and Protective Liaison

Divisions made such protective assignments decisions, appropriate direction

would then be provided to the Houston Field Office management and DRO

personnel would be better informed as to how to

proceed in coordinating efforts with local law enforcement and the other

agencies involved in the visit respectively. The assigned Acting RAC, Special

Agent Treyler Ray (FS), had departed the area and the next most senior member

of the office was the Plaintiff.

43.     On December 30, 2008, the ASAC (Vallee) then emailed the Plaintiff and

stated that, "of all people in the Dallas Office, you know better than to go

straight to Washington without communicating with the Field Office, I suggest

you take a real hard look, get in step, and do not go out of the chain of

command again. This is documented in your personnel file in the Field Office."

The instructional guidance provided to the SA White agent by the Plaintiff was

consistent with years of experience with regard to handling such matters in the

Dallas office and was a routine practice in domestic offices. The guidance and

action taken by DRO personnel in this matter, to include the Plaintiff, was in

compliance with the previous Resident Agent in Charge supervisors and such a

change in policy was not clearly provided to the Plaintiff nor the DRO personnel

involved.  This email and its affect on the office in the days to follow were
perceived to be threatening in nature and was forwarded and discussed at
length with the assigned Resident Agent in Charge Stubblefield who agreed with
decisions made by Plaintiff.

44.     On January 5, 2009, the assigned RAC Stubblefield received an email
from ASAC Vallee that stated that the Plaintiff needed to be formally counseled,
denoting a punitive action was in order, for his role in the above noted handling
of the communication with headquarters offices.  RAC Stubblefield again,
disagreed with order to take punitive action without merit against Plaintiff and so
the counseling did not occur as its basis was viewed to be discriminatory and
retaliatory in nature.

45.     On January 15, 2009, the Plaintiff timely contacted an EEO Counselor to
begin the process of filing a discrimination complaint.  Following the informal
and formal processes of filing a discrimination complaint, Plaintiff timely filed a
formal complaint of discrimination on April 13, 2009, after all efforts by the
Plaintiff to resolve the complaint through Alternative Dispute Resolution
procedures were unsuccessful.  In the first week in July, 2011, Plaintiff's attorney
received the Agency's Final Order (DOS-F-062-09) Fully Implementing
Administrative Judge Robert W. Kimball's decision.

46.     The following employees have informed the Plaintiff that similar
grievances and/or complaints within the same proximity as the Plaintiff's
complaint have been filed or are in the process of being filed that evidence

relevant conduct: Alejandro Johnson, Treyler Ray, Colin Kimpton, Christopher Quirk, Kristen Sivertson, Sarah Cope, and Laviris Stubblefield.  These witness collaborate the Plaintiff's allegations made in his EEOC complaint.

47.    Plaintiff filed a second claim of discrimination, not including the previous claims and lawsuit, that is styled as DOS-F-115-11 and was pending a Final Agency Decision (FAD) for the claims accepted for investigation when this suit was filed.  The claims that were not accepted for investigation were provided to the Plaintiff in a letter he received on September 30, 2011 and are incorporated below respectively.

48.    On May 12, 2011, the Plaintiff timely contacted the Department's Office of Civil Rights (S/OCR) to request an EEO Counselor be assigned to field his complaint of onward discrimination.   The Plaintiff's contact via email was sent on the evening of May 12, 2011 and received the next business day on May 13, 2011 by the case manager of his underlying/ existing complaint of discrimination.  After a lengthy period of time was exhausted by the Plaintiff, in an attempt to mediate and settle the second complaint of discrimination for the on-going discrimination/retaliation/hostile work environment, Plaintiff was left with no other recourse but to further his complaint in the formal process as a result of the resolution process being unsuccessful and not participated in by the Bureau of Diplomatic Security.  On August 22, 2011, Plaintiff completed and submitted a timely formal complaint of discrimination to the Department's Office

of Civil Rights, later styled and numbered DOS-F-115-11 by the Department's

OCR Intake Division.

49.     As stated previously, Plaintiff is currently in a Civil Service position and

has held his position within his current assignment and office locale since July of

2005.  The Plaintiff previously was a member of the Foreign Service and after his

prior protected activity (i.e. Civil Action Number 3:04-CV-00725-K) had

concluded his position within the Department of State was converted from the

Foreign Service to the Civil Service and was part of the settlement.  The

Plaintiff's employment position was titled "Senior Investigating Agent" or "Senior

Criminal Investigator."

50.     The settlement did not stipulate that the position was without promotion

potential at the Dallas Resident Office and all rights of such remained intact and

in accordance with federal policies and regulations regarding promotions to

apply as in any other instance.

51.     The Plaintiff alleged in his second complaint and re-alleges herein that he

participated in a Title VII protected activity and he suffered an adverse

employment action by his employer, and there is a causal connection between

the protected activity and the adverse action."

52.     Plaintiff alleged in his second EEOC complaint and re-alleges here that

"[a] hostile work environment existed in that the workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or

---

pervasive to alter the conditions of the victim's employment and creates an

abusive working environment" as follows:

53.     On May 29, 2009, the following Responding Officials signed an "EEO/

ALTERNATIVE DISPUTE RESOLUTION – AGREEMENT TO MEDIATE" that

stipulated the following standard confidentiality clause of the ADR Act and

relevant federal law:

> "Mediation is a confidential process. Any documents submitted to the
> mediators    and statements made during the mediation are for settlement
> purposes only."

54.     In separate affidavits, both "Responding Officials" Marion Cotter (Special

Agent in Charge of the Houston Field Office) and Jeffrey Thomas (Supervisory

Special Agent of the Houston Field Office) provided to the EEO assigned

Investigator, Robert Maddern, information held under strict confidentiality

guidelines set by the aforementioned ADR Mediation.  Both respective

Responding Officials included in their affidavits information concerning the

underlying facts of the ADR proceeding and records generated as part of the

proceeding that are strictly prohibited from being made part of the EEO

complaint record.

55.     This demonstrated a willful attempt by the Responding Officials to further

discriminate and retaliate against the Plaintiff for engaging in related protected

activity. Plaintiff, in the complaint stated that he is providing "due notice to the

Office of Civil Rights as to the above noted violation, but reserves the right to

amend this discrimination complaint as to remove this allegation and seek relief in an appropriate state/federal court of jurisdiction under a separate civil claim."

56.     On or about September 30, 2010 the Department of State, acting under the direction of its Bureau management officials that encompasses the Bureau of Diplomatic Security, promoted Jeffrey A. Thomas from the rank/grade of FS-02 to the rank/grade of FS-01 in direct violation of the Department of State regulations relating to Responding/Responsible officials named by a Plaintiff in a discrimination complaint under the direction of the Office of Civil Rights.

57.     Also, on the above noted date, the Department of State, acting under the direction its Bureau management officials that encompasses the Bureau of Diplomatic Security, authorized the receipt of a Meritorious Service Increase (MSI) to Paul A. Vallee, for "the quality of his cumulative and competitive performance" wherein he was recommended but not promoted in rank/ grade "because of limited promotion opportunities."

58.     The "Promotion and MSI list" was issued pursuant to UNCLAS State Cable 102241 accordingly. The Plaintiff confirmed the action was in violation of the Department of State's regulations during the deposition of Human Resources employee Mario Cantu during the underlying complaint of discrimination.

59.     This lack of accountability after which an EEO Investigation had been completed, but a Final Agency Decision (FAD) had not been issued pertaining to whether the actions of Mr. Thomas or Mr. Vallee constituted violations of both

Department of State policy and/or federal law denigrates the integrity of the EEO

process within the Department of State and signified its lack of sincerity and

further deteriorates a Plaintiff's, including the Plaintiff's, confidence in the EEOC

administrative proceedings.

60.     Further, the Principal Deputy Assistant Secretary of State for the Bureau of

Diplomatic Security demonstrated a blatant disregard for the institution of the

EEOC and its core principles, in addition to the Department of State's Office of

Civil Rights and its mission by approving Mr. Thomas and Mr. Vallee for

promotion and/or a MSI receipt.

61.     This personnel practice instituted by the management officials within the

Bureau of Diplomatic Security fosters an ongoing hostile environment and

retaliatory animus against the Plaintiff with regard to supervisory personnel who

work in the Bureau, specifically within the Domestic Operations Directorate,

wherein relevant violations of Department policies pertaining to EEO Complaints

and federal labor laws will not be held accountable nor impact career

advancement or promotions to a higher rank/grade with more responsibility.

62.     This promotion policy and personnel action constitutes a systematic

process of discrimination. As a result, Mr. Vallee continued his efforts to

influence his subordinates as to the Plaintiff's protected activity and further the

discriminatory actions taken against the Plaintiff, notwithstanding the

furtherance of the "institutional memory" of the discriminatory practices that

have occurred within the Houston Field Office during Mr. Vallee's tenure in his

position.

63.    The lack of adherence to the Department's policies, designed to promote

confidence and to prevent the promotion of those that are committing

discriminatory actions and therefore, insure that the federal mandates against

such are implemented and effective, sends a message to and allows those

committing discriminatory actions to continue violating federal laws designed to

protect against such activities.

64.    On or about March 9, 2011, during the deposition of Mr. Vallee in the

underlying complaint of discrimination, the attorney for the Department of State

Jennifer Toole (also serving as the Resolving Official for the Department), was

made aware of and/or informed of further violations of discrimination and

violations of the ADR Act (as noted above) throughout an extensive review of the

breach of confidentiality engaged in by Marion Cotter and Jeffrey Thomas during

the EEO Investigation conducted by Robert Maddern.

65.    DOS Attorney Toole did not immediately report the information as a

reasonable suspect incident to the Department of State's Office of Civil Rights

(S/OCR). This failure to report such incidence of possible discriminatory acts is a

direct violation of the Departmental regulation as set forth by the Foreign Affairs

Manual and S/OCR.  Plaintiff was never contacted by S/OCR to determine if a

violation of Departmental regulations occurred and when the Plaintiff initiated

this informal complaint process was told that no such report was filed.

---

66.    This prescribed protocol employed by Ms. Toole demonstrates a systematic process of discrimination. As a result, Mr. Vallee continued his efforts to influence his subordinates as to the Plaintiff's protected activity and further the discriminatory actions taken against the Plaintiff, notwithstanding the furtherance of the "institutional memory" of the discriminatory practices that have occurred within the Houston Field Office during Mr. Vallee's tenure in his position against the Plaintiff.   Furthermore, the Plaintiff alleged to the respective EEOC administrative court, through his counsel, onward retaliation that was occurring in his workplace under the charge of the Mr. Vallee after his deposition took place. The Plaintiff suffered greatly from Ms. Toole's failure to act, report, and attempt to prevent further retaliatory discrimination and a worsening hostile work environment.

67.    On or about January 26, 2011, the Plaintiff's newly arrived Supervisor, Clifford Taliaferro – the Resident Agent in Charge (RAC) of the Dallas Resident Office, directed the Plaintiff to remove and reduce key areas of responsibility from what his previous supervisor, Laviris Stubblefield, incorporated into past civil service performance plan and appraisal reports. This discriminatory action was aimed at supporting the defense / position opined by Mr. Vallee in the underlying complaint of discrimination after being duly informed of the prior protected activity and the nature of the complaint of discrimination on December 19, 2010 via email.

68.     Attached to the December 19th email was the "Issues to be investigated"

letter sent to the Plaintiff's attorney dated August that included the prevailing

complaint of discrimination's S/OCR DOS Case Number (F-062-09 – RICHARD

HIGBIE) and a brief description of the issues as follows:

> "You were subjected to a hostile work environment in reprisal for your
> protected EEO activity, characterized but not limited to, harsh scrutiny of
> your decisions by  senior management, abrasive and hostile e-mails, and
> a decision not to permit  you to function as the Acting Regional Agent in
> Charge (RAIC)."

69.     The new RAC (Taliaferro) also directed the Plaintiff that he was to remove

any mention of senior within his position title and/or job description. The Plaintiff

disagreed with the RAC and voiced his concern regarding the appearance of

promoting the "Vallee agenda", but had no choice but to agree to the issue(s) in

contention being directed to the Bureau of Human Resources for a final

determination.

70.     The Plaintiff also informed the RAC that the title "Senior Criminal

Investigator" was the title provided in a job announcement/description used in

the settlement agreement of his previous EEO/ Labor lawsuit filed in the

Northern District of Texas and maintained accordingly by his previous two

supervisors in both his workplace and within his previous performance plan and

appraisal reports. The RAC (Taliaferro) then added a section within his job

description entitled "NOTE" that will be viewed in a derogative manner and a

part of his official personnel file after officially challenging the usage of "Senior

Criminal Investigator" and whether the Plaintiff "is indeed considered the next

---

A000173

senior officer/agent in the Dallas Resident Office" while maintaining the usage of the title contained in the Title/ Grade/Series section of the top of the same page of his official civil service performance plan and appraisal.

71.     The RAC's usage of the "NOTE" within the official personnel record is derogatory and the request for guidance should have been completed before finalizing the performance plan and job description. To date, the Plaintiff has not been contacted by the Bureau of Human Resources nor has he been advised by the RAC (Taliaferro) that a request for guidance was ever sent. Therein, the action taken by the RAC was aimed at supporting the discriminatory intent and animus of his superior officer, the Acting Special Agent in Charge of the Houston Field Office, Mr. Paul Vallee, whom was one of the Responsible/Responding Officials in the initial/prevailing complaint filed by the Plaintiff.

73.     In addition to the specific actions described above, Plaintiff will show a pattern of retaliation and reprisal which evidences that the motives and impetus behind the actions of the complained of officials is rooted in his prior protected activity and the settlement therefrom, in particular, the permanency of his position in Dallas.

74.     As a result of the discrimination described herein, Plaintiff has suffered severe mental anguish and stress which has manifested itself into physical symptoms and injuries for which Plaintiff brings suit.

75.     Furthermore, Plaintiff has conveyed the discriminatory actions to management officials, however, the discriminatory conduct has not ceased and was escalated.

76.     Despite his efforts and compliance with the legal mandates and throughout the respective administrative complaint processes, Plaintiff has received no relief.

77.     In a letter dated September 22, 2011, the Department specifically dismissed certain allegations complained of herein and for which Plaintiff brings this cause.  The remaining sections of the Plaintiff's second complaint of discrimination for which the Department accepted for an investigation have not been included in this complaint and remain in the administrative process accordingly.

## FURTHER CONTINUING ACTS OF RETALIATION, ABUSE OF PROCESS AND RELEVANT CONDUCT DEMONSTRATING AN ONGOING PATTERN OF BEHAVIOR IN VIOLATION OF AGENT HIGBIE'S RIGHTS

78.     Regarding the second investigation, DOS-F-115-11, despite request and lawful requirement, Plaintiff never received a copy of the second EEO investigation conducted by Robert Maddern who demanded that Plaintiff provide additional sworn affidavits supporting the complaints which involved the failed and unlawful second ADR.

79.     Additionally, the Plaintiff never received a copy of the agreement to participate in the second ADR.  Plaintiff requested the executed agreement on

several occasions, in emails, to the ADR "mediator" or "facilitator", the Office Of

Civil Rights, and the EEO investigator to no avail.

80.    Prior to engaging in the second ADR, Plaintiff was assured and promised

that he would received the executed ADR agreement which would reflect the

"participating" and "resolving" officials in the process.

81.    Upon information and belief, Plaintiff alleges that officials which were the

subject of Plaintiff's complaints of discrimination and or retaliation, participated

in the second ADR unbeknownst to the Plaintiff and his counsel.

82.    Since the filing of the Complaint, and prior to the filing of this Amended

Complaint, additional actions have taken place further evidencing the extreme

degree of unfairness to which Agent Higbie has been subjected in the

administrative proceedings.

83.    A second FAD was issued in connection with the Plaintiff's complaint.

However, this was prior to the concluding of the EEO investigation as a result of

this second complaint.

84.    However, the EEO investigator required additional information and or

response despite being advised by Plaintiff's counsel that the Defendant issued

an FAD.

85.    After the the investigator apparently finalized the investigation, another

FAD (now a third binding decision) was issued by the Defendant further in an

attempt to deny the Plaintiff's due process.

86.    The two FAD's were not lawfully ordered and fail to conform to federal
legal and administrative requirements.  The Defendant's behavior is not one of
an erroneous nature.  Instead this behavior constitutes a systematic and
continuing pattern of retaliation and failure to comply with procedural
requirements.

87.    In short, and without restating all continuing retaliatory actions, and in
addition to the other pleaded facts, they include, failure to follow ADR
procedures, failure to mediate in good faith, failure to deliver promised executed
ADR agreements, failure to abide by due process requirements including
wrongfully transferring the EEO complaints to a venue without providing notice
or following procedural requirements, failure to provide copies of the
investigations, failure to keep the ADR confidential, making false false claims
during the administrative process in order to wrongfully influence the
administrative judge, failed to abide by and follow Departmental policies on
regarding promotions, involving responsible management officials the basis of
Plaintiff's complaints as "resolving official" and or "parties" to the ADR,
misrepresenting facts about Plaintiff's participation in the ADR to his immediate
supervisors creating a larger riff between the parties and individuals and various
other actions as described herein and throughout the process.

87.    Further, the Department of State, Bureau of Diplomatic Security rebuffs
and knowingly disregards the federal laws relating to retaliation and ignores its
own policies regarding promotions of accused EEO offenders, wherein several

responsible management officials have been promoted to higher grades and received career enhancing onward assignments that has fully denigrated the integrity of the Department's duty to abide by due process of administrative policies and federal laws.

### FIRST COUNT
### (Retaliation)

88.    Plaintiff re-asserts and alleges paragraphs 1 through 87 as though fully set forth herein verbatim.

89.    Plaintiff brings suit for retaliation pursuant to Section 501 and 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 & 794 (Federal Regulation 29 CFR § 1614), applicable to the federal government as an employer, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 et seq. and 42 U.S.C. § 12201 et seq., expressly incorporated into the Rehabilitation Act.

90.    Furthermore, and pleading in addition to or in the alternative with, Plaintiff seeks all allowable damages, relief and recovery permitted under any of the discrimination statutes which pertains to retaliation in disability discrimination including, but not limited to, the employment provisions of The Rehabilitation Act and or Title I of the ADA which incorporates the enforcement and relief provisions of Title VII of the Civil Rights Act of 1964, and the compensatory and punitive damages provisions of the Civil Rights Act of 1991.  Further, plaintiff seeks all damages allowable under Section 5 to the Lilly Ledbetter Act, which

applies in certain wage discrimination cases, incorporates the protections of the

Act to the ADA and certain provisions of Title V of the Rehabilitation Act and the

ADA, the Rehabilitation Act, and Title VII of the Civil Rights Act of 1964 have

been revised under the ADA Amendments Act and/or the Lilly Ledbetter Fair Pay

Act of 2009.

91.    Plaintiff expressly invokes all rights and remedies permitted pursuant to

Section 12117 of the ADA which simply adopts the remedial provisions of Title

VII of the Civil Rights Act of 1964 providing that "[t]he powers, remedies, and

procedures set forth in Sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and

2000e-9 of this title shall be the powers, remedies, and procedures [that] this

subchapter provides to . . . any person alleging discrimination on the basis of

disability in violation of any provision of this chapter." Id. § 12117(a).

92.    Plaintiff expressly invokes all rights, remedies and relief in connection with

Section 102 of the Civil Rights Act of 1991 which provides the same remedies

for intentional violations of the federal employee provisions of the Rehabilitation

Act of 1973, 29 U.S.C. § 791, and Title I of the Americans with Disabilities Act of

1990, 42 U.S.C. §12101 et seq.   This pleading is in addition to every other or in

the alternative as necessary.

93.    Title VII of the Civil Rights Act, the Rehabilitation Act, and the Americans

with Disabilities Act mandate against and prohibit retaliation or reprisal against

any employee because of that person's participation in prior EEO protected

activity.

94.    As a result of the Defendant's wrongful conduct as described herein, Plaintiff suffered damages for which this suit is brought. Plaintiff seeks all damages permitted under the Rehabilitation Act and/or the ADA and/or Title VII of the Civil Rights Act.  This paragraphs is expressly plead in addition to any and all other remedies for which Plaintiff may be justly entitled or in the alternative.

95.    The second complaint of discrimination lead to the EEOC investigation, DOS-F-115-11.  Defendant issued multiple FAD's with confusingly different cause numbers.  Further, the Defendant denied that such FAD's had to do with this matter claiming that an investigation is still ongoing.

96.    Plaintiff alleges that the Defendant discriminatorily, on March 30, 2011, removed him from his position as the DS Representative to the Bureau of Consular Affairs within the Passport Agency; and

97.    On April 1, 2011, changed the duties and tasks in Plaintiff's performance plan.

98.    Plaintiff alleges that both actions were a direct result of his continuing outspoken opposition to the hostile work place and other continuing discriminatory actions taken against him.

99.    Plaintiff and Defendant settled the previous discrimination lawsuit.  As a result of and in conjunction with the settlement agreement, Plaintiff received a civil service GS 1811 position with the title Senior Criminal Investigator and job duties and responsibilities that go along with it.

100.   In the Defendant's own policy manual, titled the Civil Service Position

Classification Guide it expressly states that:

> "Position classification under Title 5 is a system for managing organizations by:
>
> * Establishing organization structures
> * Assigning title, series, and grade designations to individual positions
> * Establishing career paths
> * Ensuring equal pay for substantially equal work
>
> Position classification affects pay; it rewards substantially equal work with equal pay. Classification is a tool for achieving management objectives such as structuring effective organizations, responding to changes in mission or technology, attracting a high-quality work force, and emphasizing accountability for results.
>
> Principles of classification under Title 5:
>
> * Equal pay for substantially equal work
> * Rank in the position, not in the person * Title, series, and grade are established based on assigned duties and responsibilities, not personal qualifications
> * Title, series, and grade are determined by reference to Office of Personnel Management (OPM) published standards and guides
> Internal equity and external equity. Internal equity involves equal pay for substantially equal work and establishing a position structure that defines and rewards the most difficult work.
>
> Written Record of Duties and Responsibilities
> A position description is a written record of the major (regular and recurring) duties and responsibilities assigned to a position by management, including:
>
> * Knowledge and skill required to perform the duties
> * Complexity of work performed
> * Nature of available guides used to perform the work *
> Supervisory controls over the work

* Nature of personal contacts required by the work."

Principles

* The position is evaluated, not the position description. However, the position
description and evaluation statement must be consistent with each other.  The position description has to match the reality that the evaluation reflects.
* Positions are evaluated in context, not in a vacuum. In-order to evaluate a position, it is necessary to know the organizational location, the supervisory/ subordinate relationships, and the relationship to other positions in the unit, program, or function. Department position management policy is contained in 3 FAM 2610, Position Management."

101.   Defendant intentionally violates its own rules when dealing with Plaintiff in

a retaliatory and discriminatory manner.  Further, the Defendant makes up new

policy as it goes along in order to discriminate against Plaintiff.  Defendant

violates its policies and procedures, ignores plaintiff's rights, job duties and

responsibilities and takes intentional adverse actions against Plaintiff in

retaliation for Plaintiff filing the first EEO Claim and pursuing the administrative

remedies and further, for filing the second EEO claim.  Defendant's management

officials and senior officials intentionally "labeled" Higbie due to his participation

in protected activity in the previous disability lawsuit.  Due to Higbie's

participation activities in filing and participating in two EEO's proceedings and in

Higbie's opposition he displayed at Defendant's senior management took

retaliatory adverse employment actions against Higbie.

102.   Despite receiving a Senior Criminal Investigator position and Defendant using such to induce the Plaintiff to settle the previous suit, Defendant posted and employed Plaintiff with a position under 12 FAH-3 H-036 "Senior Special Agent" as opposed to 12 FAH-3 H-037 "Special Agent."

103.   This position reflected Plaintiff's tenure with the Defendant as well as his duties, capabilities and performance.  In any event, from 2006, and the date of the settlement, Plaintiff performed duties as a "Senior Special Agent" until Defendant, in a retaliatory and discriminatory manner, ignored the settlement, ignored the job Plaintiff received and derogated his position and effectively demoted Plaintiff.

104.   According to the Defendant's own regulations, 12 FAH-3 H-036, a Senior Special Agent "serve[s] as a working supervisor...and devote a major part of their time conducting the most sensitive and complex investigations.  This was the case with Plaintiff as he provided newer agents with support and conducted the most complex investigations in the Dallas Field Office.  Indeed, he is frequently asked to assist other agents due to his knowledge and expertise and capabilities.

105.   However, in a series of retaliatory actions, the complained of officials named above began denigrating his duties, job description and supervisory responsibilities including refusing to recognize Higbie as the next senior ranking agent in Dallas and as a "senior" criminal investigator.

A000183

106.   The individuals committing the discriminatory actions are doing so with full knowledge of the settlement agreement, with full knowledge that Plaintiff had been performing as a Senior Criminal Investigator for some time and such constitutes discrimination on its face in violation of the previous agreement entered into by the Defendant.  The Defendant's retaliatory actions and continuing discrimination are directly related to and a result of the prior protected activity.

107.   Senior ranking officials, without any legitimate basis, and solely sue to Higbie's continued participation and opposition to protected activities, derogated his tile and ranking, refusing to recognize it, refused to have a HR determination made on his title and rank, refused to correct lower level managers, misrepresented the matter and for over two years, intentionally refused to recognize Higbie for his actual title and rank.

### SECOND COUNT
### (Continuing Retaliatory Hostile Work Environment)

108.   Plaintiff re-asserts and alleges paragraphs 1 through 91 as though fully set forth herein verbatim.

109.   Plaintiff brings suit for discrimination in his employment by Defendant in connection with his prior protected activity, the complaints and disability discrimination lawsuit he filed previously and the subsequent settlement.

110.   Plaintiff bring this lawsuit pursuant to the Rehabilitation Act and the ADA and the retaliatory conduct against Plaintiff which has been ongoing and

continuous for years, including the complete derogation of Plaintiff's title and rank and the refusal of senior management take any corrective measures.  In fact, senior ranking officials have participated and or orchestrated the retaliation against Higbie, with no legitimate business purpose provided and none exists.

111.   Plaintiff was subjected to a hostile work environment due to the prior protected activity and due to the previous filing and subsequent settlement but moreover, due to the two EEO filing in 2009 and 2011.  As a result of those filing and Higbie's participation in the protected activity, Defendant took egregious adverse employment actions without any just right or cause.  Defendant then misrepresented the matters pretending as if it did not take the adverse employment actions and misrepresented the matter to the court.Plaintiff suffered damages as a result of Defendant's actions.

112.   Plaintiff has suffered the derogation of his title and rank for over two years, each day, each week, and including humiliation and emotional distress to the point of serious health problems.  The Defendant's constant egregious adverse employment action and continued retaliation constitutes a continuing violation which continues through this day and constitutes an ongoing retaliation or ongoing hostile work environment.

**JURY DEMAND**

113.   Plaintiffs demands a jury at this time.

**DAMAGES**

114.  Plaintiff seeks damages as follows:

a.  compensatory and actual damages;

b.   economic damages by failing to be promoted; loss of opportunity to receive a promotion; and lost pay and benefits;

c.  mental pain and anguish in the past and in all reasonable probability, mental anguish in the future;

d.  stress related illness and aggravation of such illnesses;

e.  Civil penalties and punitive damages and all statutorily permitted damages;

f.  Reasonable and necessary attorney's fees in the past and in the future through trial of this cause;

g.  Loss reputation and character assassination damages;

h.  Wrongful removal of Plaintiff's donated sick and or leave time;

j.  Unliquidated damages associated with Defendant's breach of contract and breach of the confidentiality provisions of the ADR agreements - Plaintiff pleads that the breach of confidentiality, the provision used to induce ADR, was breached and that the proper measure of damages associated with a loss of confidentiality is immeasurable and is immense.  Plaintiff seeks $500,000.00 in damages for each breach of confidentiality by the Defendant as well as all attorney's fees associated with such breaches.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff  prays that this matter be set for jury trial and upon final hearing of the matter, that Plaintiff recover a judgment against Defendant, for  compensatory and actual damages; economic damages by failing to be promoted; loss of opportunity to receive a promotion; and lost pay and benefits; mental pain and anguish in the past and future; stress related illness and aggravation of such illnesses; Civil penalties and punitive damages and all statutorily permitted damages; attorney's fees in the past and in the future through trial of this cause; Loss reputation and character assassination damages, pre-judgment and post-judgment interest at the maximum rate allowed by law, and for such other and further relief to which Plaintiff demonstrates he is entitled and is warranted by the laws and which are the the interest of justice.

Respectfully Submitted,

SCHULMAN | MATHIAS PLLC

/s/ Cary Schulman

_____

Cary Schulman
Texas Bar No.: 00797390
Damon Mathias
Texas Bar No.: 24080170
8390 LBJ Freeway
Suite 500
Dallas, Texas 75243
Telephone: (214) 739-0100

Facsimile: (214) 739-0151
cary@dallaslegalteam.com

**ATTORNEYS FOR RICHARD HIGBIE**

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2013, I electronically filed the foregoing Response to Defendant's Motion to Dismiss with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

D. SHANE READ
Assistant United States Attorney
1100 Commerce Street, Third Floor
Dallas, Texas 75242

/s/ Cary W. Schulman
_____

Cary Schulman

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| **RICHARD HIGBIE,** ) | |
| **Plaintiff,** ) | |
| **VS.** ) | |
| ) | **CIVIL ACTION NO: 3-11-CV-2636-L** |
| **HILLARY RODHAM CLINTON,** ) | |
| **In her official capacity as** ) | |
| **Secretary of** ) | |
| **State** ) | |
| **2201 C Street NW** ) | **JURY TRIAL DEMANDED** |
| **Washington, DC 20520** ) | |
| ) | |
| **Defendant.** ) | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

NOW COMES, Plaintiff, RICHARD HIGBIE (hereinafter "Plaintiff"), and

sues Hillary Rodham Clinton, in her official capacity as the U.S. Secretary of

State, and in support thereof avers:

## NATURE OF LAWSUIT

1.      This case involves multiple instances of discrimination of protected

activity under Title VII of the Civil Rights Act of 1964 by the United States

Department of State against Plaintiff who is an employee of the United States

Government and employed by the Bureau of Diplomatic Security, within the U.S.

State Department, as a Civil Service employee.

## JURISDICTION AND VENUE

2**.**      This Court has jurisdiction over this suit pursuant to the Civil Rights Act of

1991 (Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub.

L. 111-2) amended several sections of Title VII. In addition, section 102 of the

CRA amends the Revised Statutes by adding a new section following section

1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive

damages in cases of intentional violations of Title VII, the Americans with

Disabilities Act of 1990, and section 501 of the Rehabilitation Act of 1973. The

Administrative Dispute Resolution (ADR) Act of 1996 (H.R. 4194, Public Law No.

104-230 was signed into law on October 19, 1996 by the President [142 Cong.

Rec. H12303-12304]; C.F.R 1614.102 / 105).  This Court has jurisdiction of the

action under 28 U.S.C. § 1331 because this matter involves a federal question

and pursuant to 42 U.S.C. §2000e-5(f) and 28 U.S.C. §1345 because this matter

involves a discrimination complaint.  This Court has jurisdiction over the pendent

state law causes of action plead herein.

3.      Venue lies in the Northern District of Texas because the plaintiff and the

actions that form the basis of this lawsuit occurred in the Northern District of

Texas and the responsible agency official's focus of the discriminatory acts

occurred in the District.  Further, the action based upon the prior protected

activity was the subject of suit brought in this District and the hostile work

environment that ensued.

## ADMINISTRATIVE REMEDIES EXHAUSTED

4.      All conditions precedent to the filing of this suit have been performed or have occurred and the Plaintiff has exhausted his administrative remedies accordingly.  The Plaintiff has further complied with all applicable reporting and complaint provisions necessary and precedent to bringing this action under applicable standards of law.

5.      This matter arises from ongoing and repeated acts of retaliation, reprisal and harassment against and to the Plaintiff due to prior protected activity.  The previous EEOC matter out of which this matter arises, was filed in 2001 through the respective administrative EEOC complaint process and was eventually filed in the Northern District of Texas and numbered Civil Action Number 3:04-CV-00725-K.  The suit was instituted by Agent Higbie after all administrative remedies were exhausted and thereafter, the case settled on or about July 11, 2005.

6.      This current action arises out of a series of actions and activity beginning on or about December 17, 2008 and and continuing thereafter.

## PARTIES

7.      Plaintiff Richard Higbie lives at 906 Carnegie Court, Allen, Texas 75002. Plaintiff is currently serving as a Senior Criminal Investigator / Senior Special Agent located within the Dallas Resident Office which operates under the direction of Houston Field Office within the Bureau of Diplomatic Security.

8.      The Defendant is the Honorable Hillary Clinton, Secretary of State of the

U.S. Department of State.  Secretary Clinton was sworn as the 67th Secretary of

State on January 21, 2009.  She oversees the State Department, including the

supervision of Foreign Service and Civil Service personnel who serve both

abroad as well as domestically within the Continental United States.  Secretary

Clinton is an employer as that term is defined in Title VII, of the Act.

### FACTS

9.      Plaintiff specifically alleges violations that constitute a "continuing

violation" of discrimination against the Plaintiff.

10.     On July 11, 2005, the Northern District of Texas, United States District

Court issued an Order of Administrative Closure after the Court was notified that

both parties in the Civil Action Number 3:04-CV-00725-K agreed to a settlement.

11.     On September 13, 2005, the Plaintiff, and the Defendant, Cohn L. Powell.

Secretary, U.S. Department of State then jointly entered into a Motion to Dismiss

the EEO case.

12.     The settlement terms specified a conversion of the Plaintiff's occupational

position within the Department be converted from the Foreign Service to the

Civil Service within the Bureau of Diplomatic Security (BDS), Dallas Resident

Office.

13.     On August 9, 2007, the Plaintiff informed the newly assigned Special

Agent in Charge of the Houston Field Office. Marian Cotter, during a visit to the

Dallas Resident Office and in an introductory meeting of his prior protected

---

activity and his commitment to a work environment that is productive and free from the past hostile work environment conditions.

14.     On August 23 and 24, 2011 the Assistant Secretary of State for Diplomatic Security, Richard Griffin, the Assistant Director of Domestic Operations Edgar Moreno, the Deputy 200 Assistant Secretary of State the Diplomatic Security's Office of Foreign Mission, Claude Nebel, the Special Agent in Charge of the Houston Field Office, Marian Cotter, and the Resident Agent in Charge, Edward McGrath, all attended a visit to the Dallas Resident Office and conducted meetings within the DFW area.

15.     Prior to this visit, the Plaintiff was the Acting Resident in Charge while the assigned Resident Agent in Charge, Edward McGrath was on annual leave. The plaintiff coordinated all of the senior management meetings with the HFO supervisory team, the appropriate offices at the Bureau's headquarters, and all of the local departmental heads wherein operational meetings were to be held. The Plaintiff thanked the Assistant Secretary of State for Diplomatic Security, Richard Griffin, for his role in reaching a settlement in his EEO lawsuit stated above, and allowing the Plaintiff to be converted to a Civil Service position located within the Dallas Resident Office in Dallas, Texas.

16.     The Plaintiff also stated that he hoped that the chapter of his career, wherein he suffered discrimination, was over and that he would not be discriminated against any further. The Assistant Secretary stated to the Plaintiff that if he does experience any further discrimination he requested that the

Plaintiff contact him immediately so that the behavior could be attended to. This conversation occurred in the presence of Assistant Director Edgar Moreno.

17.    This demonstrates the first existence of the Plaintiffs disclosure to the most senior responsible management official within his Area of Responsibility (AOR), the Special Agent in Charge of the Houston Field Office, Marian Cotter, thus depicting his prior protected activity. This also illustrates the Plaintiff's routine duty to act as the relief supervisor, i.e., the Acting Resident Agent in Charge, in the absence of the assigned Resident Agent in Charge. Additionally, the presence of the disclosure of the prior protected activity was again provided to the Special Agent in Charge of the Houston Field Office by the Resident Agent in Charge of the Dallas Resident Office, Edward McGrath on February 6, 2008. This disclosure occurred after the Plaintiff informed his immediate supervisor, Ed McGrath of instances related to a hostile work environment towards the Plaintiff and other line-level employees as a result of abusive behavior engaged by supervisory personnel in Houston, Texas, specifically, Jeff Thomas.

18.    On December 17, 2008, the Assistant Special Agent in Charge (ASAC), Paul Valle, ordered the Resident Agent in Charge, Laviris Stubblefield, to disallow and remove the Plaintiff from assuming his role as the relief supervisor within his office, during Mr. Stubblefield's pending absence, as outlined in the Plaintiffs current and previous annual work requirement statements / job duties. The direct order cited by ASAC Valle delineated that the Plaintiff was not

promotable and should not therefore be afforded the same opportunity for

advancement opportunities as Foreign Service personnel, i.e., serving as the

relief supervisor for his office.

19.     ASAC Valle then issued the adverse employment action against the

Plaintiff when he states in an email to the Resident Agent in Charge Laviris

Stubblefield,

> "As we discussed when I was in Dallas. This 2 week period of
> time is the perfect opportunity for an FS-2501 to be acting
> RAC. This does no good for Rick in a non-promotable
> position.  Please pick one of your 3's to act in your stead,
> they can actually benefit from the experience."

20.     ASAC Valle denotes that he was recently in Dallas, he states that his

rationale pertains to the "opportunity" was only applicable to a "foreign service

employee" versus the Plaintiff.  It is important to note that the Plaintiff was

previously a member of the foreign service but was converted to a Civil Service

position pursuant to the above noted protected activity and settlement

agreement.  ASAC Valle then declares that the Plaintiff is not promotable, and

lastly he delineates that the Foreign Service employee can 'benefit from the

experience'.

21.     The Plaintiff was verbally told of the email correspondence by the then

incumbent Resident Agent in Charge of the Dallas Resident Office, Laviris

Stubblefield on the evening of December 17, 2008 after his multiple discussions

with ASAC Vallee and SAC Marion Cotter regarding his lack of concurrence and

dissenting opinion of the management directive pertaining to the relief

supervisory duties and statements made referring specifically to the Plaintiff. The

Plaintiff documented his discussions with the RAC in an email sent to himself as

a "memorandum to file" wherein he noted that RAC Stubblefield was told that

the premise or rationale for the management decision was punitive in nature as a

result of the Plaintiff's discussions with the Bureau's Director regarding the

Dallas operational strategic plans, goals, and operations.  Mr. Stubblefield then

assigned another member of his staff to serve as the relief supervisor in his

absence who was a member of the Foreign Service.

22.    The verbal statements made by the ASAC (Vallee) and the SAC (Cotter)

regarding the adverse employment action taken against the Plaintiff were

contrary to the remitted email sent earlier the same day by ASAC Vallee.

23.    On or about November 18, 2008, the Special Agent in Charge of the

Houston Field Office, Marian Cotter, the Assistant Special Agent in Charge of the

Houston Field Office Paul Vallee, at the Dallas Resident Office convened a

meeting at SAC Cotter's direction.

24.    During the brief meeting. Marian Cotter, noted her dissent to a Strategic

Action Plan developed by office personnel and its eventual routing to the

Director of the Bureau and all Senior Bureau management which included the

Houston management personnel.

25.    Following the meeting, the SAC (Cotter) and the ASAC (Vallee) met with

the RAC of the Dallas Resident Office, Laviris Stubblefield, wherein Cotter and

Vallee issued a written counseling statement pertaining to Stubblefield's

decision as to how to comply with the Director's request for information related to the Dallas Strategic Action Planning Report.  Also, during this meeting, the ASAC (Vallee) signed and approved the Plaintiffs work requirement statement that maintained his responsibilities, to include serving as the relief supervisor, i.e., "Acting Resident Agent in Charge" in the absence of the assigned Resident Agent in Charge, Laviris Stubblefield.  RAC Stubblefield stated to the Plaintiff on several occasions prior to and after the November 18, 2008 counseling session with SAC Cotter, ASAC Vallee issued to RAIC Stubblefield, that ASAC Vallee ordered RAC Stubblefield to issue a written reprimand to the Plaintiff for violating chain of command communication protocol with senior management personnel.  This directive by ASAC Vallee did not occur due to the fact that RAC Stubblefield believed the action against Plaintiff to be discriminatory and without merit or cause.

26.    On March 10, 2009, the Plaintiff was again notified by RAC Laviris Stubblefield that ASAC Vallee communicated to him via email that the Plaintiff was not allowed to assume the Acting RAC duties in his absence. This directive was again met with the disagreement by RAC Stubblefield and Plaintiff's work requirements / job duties were not changed.  In this same communication, the ASAC (Vallee) again referred to the Plaintiffs lack of promotability and his direction to only use Foreign Service personnel for this responsibility which RAC Stubblefield viewed as retaliatory and punitive issued without cause or merit. The ASAC further stated in the communication that RAC Stubblefield was

Case: 14-5042 Case: 14-5042 Document: PARTICIPANTS ONLY Document: 24716 Page: 247 Filed: 04/23/2014 Page: 247 Filed: 04/23/2014

Case 3:11-cv-02636-L   Document 35   Filed 02/08/13   Page 10 of 41   PageID 786

directed to bring a copy of the Plaintiffs Work Performance Plan / Work Requirements / Job Duties to a meeting with him in Houston, but did not request the same Plan for the other Civil Service Criminal Investigator, Tim Forte for review.

27.     The Plaintiff has served as the Acting Resident in Charge, in addition to Foreign Service personnel, in short and long durations of time, in the absence of the assigned Resident Agent in Charge through the term of the his last two previous supervisors, Edward McGrath and Randy Steen, consistent with his annual work requirement statements.

28.     Plaintiff's employment discrimination complaint from which an administrative investigation was spawned, stated the following and is pertinent to this suit:

> a. During the summer months in 2008, Plaintiff assumed supervisory responsibility for the Dallas Resident Office as the acting Resident Agent in Charge (RAIC) while the supervisory position was in transition between the outgoing and incoming (RAIC). These temporary supervisory duties were outlined in the Plaintiff's work requirement statement in the current and previous rating period(s) accordingly.

> b. Plaintiff would like to have the S/OCR office made aware of the fact that the outgoing RAIC, Ed McGrath, retired from his position in Dallas and with the Department before he planned to seek post retirement employment as a direct result of SAIC Cotter's unwillingness to remedy the abusive behavior of her subordinate supervisory staff.

> c. During the summer of 2008, the Houston Field Office senior management, specifically, SAIC Marian Cotter and SSA Jeff Thomas, did not maintain regular communication nor involve the Dallas Resident Office with management programs, goals/objectives, or interim policies. Plaintiff worked diligently to maintain a high-level of protective and investigative performance during a period of high personnel attrition. Under the

Plaintiff's tutelage, objectives were met satisfactorily met with little to no support from HFO management. The Plaintiff often made management decisions as the acting RAIC, void of guidance from his superiors.  On several occasions, the Plaintiff's decisions  were harshly scrutinized by senior management, creating a hostile work environment.

d.      At the end of the transitional period of the Plaintiff serving as the acting RAIC, the SAIC sent an abrasive and hostile email to the Plaintiff expressing her dissent with his management decisions. In this email correspondence, the SAIC further delineated her distain and unwillingness to forge a working relationship with subordinate civil service personnel, specifically as it relates to Plaintiff.

29.   Special Agent in Charge, Marian Cotter, stated that DRO (Dallas Resident Office) volunteered agents for protective assignments, however, a DS wide broadcast email stipulated that the clearance required for agent personnel to request consideration for supervisory roles at the United Nations General Assembly was their immediate supervisor's approval.

30.   Agents within the Dallas Resident Office submitted such requests and the Plaintiff approved the requests as the headquarters directive required and submitted the DRO personnel for assignments as deemed necessary. The Plaintiff was unaware of the additional approval process through the Houston Field Office Management. This policy was brought to the Plaintiffs knowledge after SAC Cotter sent the above referenced derogative email.

31.   The Plaintiff was also operating under the belief that the previous RAC (McGrath) had communicated the aforementioned protection assignments and manpower allocation decisions made at the end of his tenure. SAC Cotter also claims that the Plaintiff approved leave for an employee without permission

which was inconsistent with previous policies followed by the previous RAC McGrath. The Plaintiff did authorize an employee with the Dallas Resident Office to facilitate his household belongings and living arrangements upon arrival to his duty location consistent with the Foreign Affairs Manual/Handbook.

32.    Consistent with the Plaintiff's work environment having the clear presence of a hostile and retaliatory nature, this is an example of how the SAC's inept management approach caused problems related to her performance which was then unjustly deferred or annotated as a result of the Plaintiff's actions.

33.    From January of 2008 following the abusive outburst of Supervisory Special Agent Jeff Thomas with several members of the Dallas Resident Office to include the Plaintiff, to the summer months following the assigned Resident Agent in Charge Ed McGrath's abrupt retirement, to the end of the year in the absence of the assigned Resident Agent in Charge, Laviris Stubblefield, the existence is a hostile work environment is well documented.

34.    As cited in the Plaintiff's employment discrimination complaint:

> a) During the RAC's (Stubblefield) leave, HFO managers. specifically SSA Jeff Thomas and ASAIC Paul Vallee, repeatedly implemented abusive management actions against the Plaintiff, including hostile communications. Upon his return his office while on leave, RAIC Stubblefield became aware of the hostile work environment and informed the Diplomatic Security Principal Deputy Assistant Secretary (P/DAS) of these concerns. RAIC Stubblefield opined that managerial actions in Houston required reform to provide immediate and corrective action regarding the abusive and hostile work environment that has rendered the working relationship ineffective and again cited a willful neglect in communicating with the Dallas Resident Office and its personnel. As a potential solution, the RAIC

requested the P/DAS quickly initiate a senior DS management
review to provide managerial guidance for HFO senior management.

b. During the week of January 12-16, 2009, acting on the RAIC's
request, the P/DAS assigned an experienced and seasoned senior
management review panel to travel to the Dallas and Houston
offices to remedy the hostile work environment and communication
impasse that had formed between HFO management and DRO
management to better achieve organizational goals and objectives.
The managerial review written reports have not yet been provided to
HFO and DRO personnel as of this writing, however the reports are
expected to be forthcoming in the near future.

35.     The above noted report (referred to in subsection "b" above) was

eventually completed and submitted by the Directorate of Domestic Operations

(ICI Director Scott Bultrowicz) to the Director's office (Gregory Starr) for review

and onward action. Upon receipt of the first submission of the report, the

Director returned the report to be amended to more clearly outline the facts

involved, the Directorate of Domestic Operations then completed a second draft

and the report was re-submitted. The facts surrounding the report, its two drafts,

and the eventual attempt to hide the existence of these reports can be clarified

by the Director's executive advisor, Senior Special Assistant to the Director Scot

Folensbee (FS-OC Retired).

36.     The Bureau, especially its own senior leadership, has a duty as defined

by:

(1) 3 FAM 1526.2. THE DEPARTMENT'S RESPONSIBILITIES UNDER
THIS POLICY (CT:PER-567; 09-22-2005)
(State)
(Foreign Service and Civil Service Employees)

---

(2)    c.  Supervisors and other responsible Department officials who observe, are informed of, or reasonably suspect incidents of possible discriminatory harassment must immediately report such incidents to SIOC'R. which will either initiate or oversee a prompt investigation. Failure to report such incidents to SiOCR will be considered a violation of this policy and may result in disciplinary Action.

37.    Upon completion of the management review conducted by the Bureau of Diplomatic Security, the incidents of EEO violations should have been immediately reported to the Office of Civil Rights and the related employees should have been contacted to ascertain their complaints. The Plaintiff nor the other employees involved were contacted regarding their complaints lodged with management officials in their Bureau.  Instead, this lack of administrative action which should have been immediate and corrective in nature worsened the work environment and heightened its hostile and retaliatory demeanor. This lack of action coupled with the attempts to inaccurately judge raised employment discrimination concerns by the Plaintiff exemplify the retaliatory animus against such employees from tiling relevant complaints of discrimination.

38.    When the above management review was conducted it negated the fairness doctrine of the employee's discrimination complaint process that should have included the Office of Civil Rights independent follow-up inquiry.

39.    Further demonstration of the pre-disposition to hinder such employment discrimination complaints is the failure of SAC Cotter, ASAC Vallee, and SSA Thomas to post the employee's equal employment opportunity rights under the law in the workplace under their oversight.

40.    This posting requirement is defined under:

(1) 29 CODE OF  FEDERAL REGULATIONS VOLUME 4, PART 1601
AND 1627
Sec. 1627.10 Notices to be posted.

(2) Every employer, employment agency, and labor organization which has
an obligation under the Age Discrimination in Employment Act of 1967
shall post and keep posted in conspicuous places upon its premises the
notice pertaining to the applicability of the Act prescribed by the
Commission or its authorized representative. Such a notice must be
posted in prominent and accessible places where it can readily be
observed by employees, applicants for employment and union members.

41.    On December 29, 2009, the Plaintiff  was asked by Special Agent Joe

White (FS), for guidance as to how to proceed with schedule/itinerary

information for an upcoming visit of a foreign dignitary that was provided to him

in the course of his duties. The JTTF Agent was instructed by the Plaintiff that he

should forward the information to the Protective Liaison Division in Headquarters

so that it could be determined what, if any, protection responsibilities would be

assigned to this visiting dignitary.

42.    The Plaintiff noted to the Agent that it was important to provide this

information to the appropriate headquarters elements so they could benefit from

the itinerary in concert with ascertaining whether to obligate protective

resources accordingly. Once the Dignitary Protection and Protective Liaison

Divisions made such protective assignments decisions, appropriate direction

would then be provided to the Houston Field Office management and DRO

personnel would be better informed as to how to proceed in coordinating efforts

with local law enforcement and the other agencies involved in the visit

respectively. The assigned Acting RAC, Special Agent Treyler Ray (FS), had

departed the area and the next most senior member of the office was the

Plaintiff.

43.     On December 30, 2008, the ASAC (Vallee) then emailed the Plaintiff and

stated that, "of all people in the Dallas Office, you know better than to go

straight to Washington without communicating with the Field Office, I suggest

you take a real hard look, get in step, and do not go out of the chain of

command again. This is documented in your personnel file in the Field Office."

The instructional guidance provided to the SA White agent by the Plaintiff was

consistent with years of experience with regard to handling such matters in the

Dallas office and was a routine practice in domestic offices. The guidance and

action taken by DRO personnel in this matter, to include the Plaintiff, was in

compliance with the previous Resident Agent in Charge supervisors and such a

change in policy was not clearly provided to the Plaintiff nor the DRO personnel

involved.  This email and its affect on the office in the days to follow were

perceived to be threatening in nature and was forwarded and discussed at

length with the assigned Resident Agent in Charge Stubblefield who agreed with

decisions made by Plaintiff.

44.     On January 5, 2009, the assigned RAC Stubblefield received an email

from ASAC Vallee that stated that the Plaintiff needed to be formally counseled,

denoting a punitive action was in order, for his role in the above noted handling

of the communication with headquarters offices.  RAC Stubblefield again,

disagreed with order to take punitive action without merit against Plaintiff and so the counseling did not occur as its basis was viewed to be discriminatory and retaliatory in nature.

45.     On January 15, 2009, the Plaintiff timely contacted an EEO Counselor to begin the process of filing a discrimination complaint.  Following the informal and formal processes of filing a discrimination complaint, Plaintiff timely filed a formal complaint of discrimination on April 13, 2009, after all efforts by the Plaintiff to resolve the complaint through Alternative Dispute Resolution procedures were unsuccessful.  In the first week in July, 2011, Plaintiff's attorney received the Agency's Final Order (DOS-F-062-09) Fully Implementing Administrative Judge Robert W. Kimball's decision.

46.     The following employees have informed the Plaintiff that similar grievances and/or complaints within the same proximity as the Plaintiff's complaint have been filed or are in the process of being filed that evidence relevant conduct: Alejandro Johnson, Treyler Ray, Colin Kimpton, Christopher Quirk, Kristen Sivertson, Sarah Cope, and Laviris Stubblefield.  These witness collaborate the Plaintiff's allegations made in his EEOC complaint.

47.     Plaintiff filed a second claim of discrimination, not including the previous claims and lawsuit, that is styled as DOS-F-115-11 and was pending a Final Agency Decision (FAD) for the claims accepted for investigation when this suit was filed.  The claims that were not accepted for investigation were provided to

the Plaintiff in a letter he received on September 30, 2011 and are incorporated

below respectively.

48.     On May 12, 2011, the Plaintiff timely contacted the Department's Office of

Civil Rights (S/OCR) to request an EEO Counselor be assigned to field his

complaint of onward discrimination.   The Plaintiff's contact via email was sent

on the evening of May 12, 2011 and received the next business day on May 13,

2011 by the case manager of his underlying/ existing complaint of

discrimination.  After a lengthy period of time was exhausted by the Plaintiff, in

an attempt to mediate and settle the second complaint of discrimination for the

on-going discrimination/retaliation/hostile work environment, Plaintiff was left

with no other recourse but to further his complaint in the formal process as a

result of the resolution process being unsuccessful and not participated in by

the Bureau of Diplomatic Security.  On August 22, 2011, Plaintiff completed and

submitted a timely formal complaint of discrimination to the Department's Office

of Civil Rights, later styled and numbered DOS-F-115-11 by the Department's

OCR Intake Division.

49.     As stated previously, Plaintiff is currently in a Civil Service position and

has held his position within his current assignment and office locale since July of

2005.  The Plaintiff previously was a member of the Foreign Service and after his

prior protected activity (i.e. Civil Action Number 3:04-CV-00725-K) had

concluded his position within the Department of State was converted from the

Foreign Service to the Civil Service and was part of the settlement.  The

Plaintiff's employment position was titled "Senior Investigating Agent" or "Senior Criminal Investigator."

50.    The settlement did not stipulate that the position was without promotion potential at the Dallas Resident Office and all rights of such remained intact and in accordance with federal policies and regulations regarding promotions to apply as in any other instance.

51.    The Plaintiff alleged in his second complaint and re-alleges herein that he participated in a Title VII protected activity and he suffered an adverse employment action by his employer, and there is a causal connection between the protected activity and the adverse action."

52.    Plaintiff alleged in his second EEOC complaint and re-alleges here that "[a] hostile work environment existed in that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and creates an abusive working environment" as follows:

53.    On May 29, 2009, the following Responding Officials signed an "EEO/ ALTERNATIVE DISPUTE RESOLUTION – AGREEMENT TO MEDIATE" that stipulated the following standard confidentiality clause of the ADR Act and relevant federal law:

> "Mediation is a confidential process. Any documents submitted to the mediators    and statements made during the mediation are for settlement purposes only."

54.     In separate affidavits, both "Responding Officials" Marion Cotter (Special

Agent in Charge of the Houston Field Office) and Jeffrey Thomas (Supervisory

Special Agent of the Houston Field Office) provided to the EEO assigned

Investigator, Robert Maddern, information held under strict confidentiality

guidelines set by the aforementioned ADR Mediation.  Both respective

Responding Officials included in their affidavits information concerning the

underlying facts of the ADR proceeding and records generated as part of the

proceeding that are strictly prohibited from being made part of the EEO

complaint record.

55.     This demonstrated a willful attempt by the Responding Officials to further

discriminate and retaliate against the Plaintiff for engaging in related protected

activity. Plaintiff, in the complaint stated that he is providing "due notice to the

Office of Civil Rights as to the above noted violation, but reserves the right to

amend this discrimination complaint as to remove this allegation and seek relief

in an appropriate state/federal court of jurisdiction under a separate civil claim."

56.     On or about September 30, 2010 the Department of State, acting under

the direction of its Bureau management officials that encompasses the Bureau

of Diplomatic Security, promoted Jeffrey A. Thomas from the rank/grade of

FS-02 to the rank/grade of FS-01 in direct violation of the Department of State

regulations relating to Responding/Responsible officials named by a Plaintiff in a

discrimination complaint under the direction of the Office of Civil Rights.

57.     Also, on the above noted date, the Department of State, acting under the direction its Bureau management officials that encompasses the Bureau of Diplomatic Security, authorized the receipt of a Meritorious Service Increase (MSI) to Paul A. Vallee, for "the quality of his cumulative and competitive performance" wherein he was recommended but not promoted in rank/ grade "because of limited promotion opportunities."

58.     The "Promotion and MSI list" was issued pursuant to UNCLAS State Cable 102241 accordingly. The Plaintiff confirmed the action was in violation of the Department of State's regulations during the deposition of Human Resources employee Mario Cantu during the underlying complaint of discrimination.

59.     This lack of accountability after which an EEO Investigation had been completed, but a Final Agency Decision (FAD) had not been issued pertaining to whether the actions of Mr. Thomas or Mr. Vallee constituted violations of both Department of State policy and/or federal law denigrates the integrity of the EEO process within the Department of State and signified its lack of sincerity and further deteriorates a Plaintiff's, including the Plaintiff's, confidence in the EEOC administrative proceedings.

60.     Further, the Principal Deputy Assistant Secretary of State for the Bureau of Diplomatic Security demonstrated a blatant disregard for the institution of the EEOC and its core principles, in addition to the Department of State's Office of

Civil Rights and its mission by approving Mr. Thomas and Mr. Vallee for promotion and/or a MSI receipt.

61.    This personnel practice instituted by the management officials within the Bureau of Diplomatic Security fosters an ongoing hostile environment and retaliatory animus against the Plaintiff with regard to supervisory personnel who work in the Bureau, specifically within the Domestic Operations Directorate, wherein relevant violations of Department policies pertaining to EEO Complaints and federal labor laws will not be held accountable nor impact career advancement or promotions to a higher rank/grade with more responsibility.

62.    This promotion policy and personnel action constitutes a systematic process of discrimination. As a result, Mr. Vallee continued his efforts to influence his subordinates as to the Plaintiff's protected activity and further the discriminatory actions taken against the Plaintiff, notwithstanding the furtherance of the "institutional memory" of the discriminatory practices that have occurred within the Houston Field Office during Mr. Vallee's tenure in his position.

63.    The lack of adherence to the Department's policies, designed to promote confidence and to prevent the promotion of those that are committing discriminatory actions and therefore, insure that the federal mandates against such are implemented and effective, sends a message to and allows those committing discriminatory actions to continue violating federal laws designed to protect against such activities.

64.     On or about March 9, 2011, during the deposition of Mr. Vallee in the underlying complaint of discrimination, the attorney for the Department of State Jennifer Toole (also serving as the Resolving Official for the Department), was made aware of and/or informed of further violations of discrimination and violations of the ADR Act (as noted above) throughout an extensive review of the breach of confidentiality engaged in by Marion Cotter and Jeffrey Thomas during the EEO Investigation conducted by Robert Maddern.

65.     DOS Attorney Toole did not immediately report the information as a reasonable suspect incident to the Department of State's Office of Civil Rights (S/OCR). This failure to report such incidence of possible discriminatory acts is a direct violation of the Departmental regulation as set forth by the Foreign Affairs Manual and S/OCR.  Plaintiff was never contacted by S/OCR to determine if a violation of Departmental regulations occurred and when the Plaintiff initiated this informal complaint process was told that no such report was filed.

66.     This prescribed protocol employed by Ms. Toole demonstrates a systematic process of discrimination. As a result, Mr. Vallee continued his efforts to influence his subordinates as to the Plaintiff's protected activity and further the discriminatory actions taken against the Plaintiff, notwithstanding the furtherance of the "institutional memory" of the discriminatory practices that have occurred within the Houston Field Office during Mr. Vallee's tenure in his position against the Plaintiff.   Furthermore, the Plaintiff alleged to the respective EEOC administrative court, through his counsel, onward retaliation that was

---

*Plaintiff's Second Amended Complaint*                                          *Page     23*

occurring in his workplace under the charge of the Mr. Vallee after his deposition took place. The Plaintiff suffered greatly from Ms. Toole's failure to act, report, and attempt to prevent further retaliatory discrimination and a worsening hostile work environment.

67.    On or about January 26, 2011, the Plaintiff's newly arrived Supervisor, Clifford Taliaferro – the Resident Agent in Charge (RAC) of the Dallas Resident Office, directed the Plaintiff to remove and reduce key areas of responsibility from what his previous supervisor, Laviris Stubblefield, incorporated into past civil service performance plan and appraisal reports. This discriminatory action was aimed at supporting the defense / position opined by Mr. Vallee in the underlying complaint of discrimination after being duly informed of the prior protected activity and the nature of the complaint of discrimination on December 19, 2010 via email.

68.    Attached to the December 19th email was the "Issues to be investigated" letter sent to the Plaintiff's attorney dated August that included the prevailing complaint of discrimination's S/OCR DOS Case Number (F-062-09 – RICHARD HIGBIE) and a brief description of the issues as follows:

> "You were subjected to a hostile work environment in reprisal for your protected EEO activity, characterized but not limited to, harsh scrutiny of your decisions by  senior management, abrasive and hostile e-mails, and a decision not to permit  you to function as the Acting Regional Agent in Charge (RAIC)."

69.    The new RAC (Taliaferro) also directed the Plaintiff that he was to remove any mention of senior within his position title and/or job description. The Plaintiff

---

A000212

disagreed with the RAC and voiced his concern regarding the appearance of

promoting the "Vallee agenda", but had no choice but to agree to the issue(s) in

contention being directed to the Bureau of Human Resources for a final

determination.

70.     The Plaintiff also informed the RAC that the title "Senior Criminal

Investigator" was the title provided in a job announcement/description used in

the settlement agreement of his previous EEO/ Labor lawsuit filed in the

Northern District of Texas and maintained accordingly by his previous two

supervisors in both his workplace and within his previous performance plan and

appraisal reports. The RAC (Taliaferro) then added a section within his job

description entitled "NOTE" that will be viewed in a derogative manner and a

part of his official personnel file after officially challenging the usage of "Senior

Criminal Investigator" and whether the Plaintiff "is indeed considered the next

senior officer/agent in the Dallas Resident Office" while maintaining the usage of

the title contained in the Title/ Grade/Series section of the top of the same page

of his official civil service performance plan and appraisal.

71.     The RAC's usage of the "NOTE" within the official personnel record is

derogatory and the request for guidance should have been completed before

finalizing the performance plan and job description. To date, the Plaintiff has not

been contacted by the Bureau of Human Resources nor has he been advised by

the RAC (Taliaferro) that a request for guidance was ever sent. Therein, the

action taken by the RAC was aimed at supporting the discriminatory intent and

animus of his superior officer, the Acting Special Agent in Charge of the Houston

Field Office, Mr. Paul Vallee, whom was one of the Responsible/Responding

Officials in the initial/prevailing complaint filed by the Plaintiff.

73.     In addition to the specific actions described above, Plaintiff will show a

pattern of retaliation and reprisal which evidences that the motives and impetus

behind the actions of the complained of officials is rooted in his prior protected

activity and the settlement therefrom, in particular, the permanency of his

position in Dallas.

74.     As a result of the discrimination described herein, Plaintiff has suffered

severe mental anguish and stress which has manifested itself into physical

symptoms and injuries for which Plaintiff brings suit.

75.     Furthermore, Plaintiff has conveyed the discriminatory actions to

management officials, however, the discriminatory conduct has not ceased and

was escalated.

76.     Despite his efforts and compliance with the legal mandates and

throughout the respective administrative complaint processes, Plaintiff has

received no relief.

77.     In a letter dated September 22, 2011, the Department specifically

dismissed certain allegations complained of herein and for which Plaintiff brings

this cause.  The remaining sections of the Plaintiff's second complaint of

discrimination for which the Department accepted for an investigation have not

been included in this complaint and remain in the administrative process

accordingly.

### FURTHER CONTINUING ACTS OF RETALIATION, ABUSE OF PROCESS AND RELEVANT CONDUCT DEMONSTRATING AN ONGOING PATTERN OF BEHAVIOR IN VIOLATION OF AGENT HIGBIE'S RIGHTS

78.    Regarding the second investigation, DOS-F-115-11, despite request and

lawful requirement, Plaintiff never received a copy of the second EEO

investigation conducted by Robert Maddern who demanded that Plaintiff

provide additional sworn affidavits supporting the complaints which involved the

failed and unlawful second ADR.

79.    Additionally, the Plaintiff never received a copy of the agreement to

participate in the second ADR.  Plaintiff requested the executed agreement on

several occasions, in emails, to the ADR "mediator" or "facilitator", the Office Of

Civil Rights, and the EEO investigator to no avail.

80.    Prior to engaging in the second ADR, Plaintiff was assured and promised

that he would received the executed ADR agreement which would reflect the

"participating" and "resolving" officials in the process.

81.    Upon information and belief, Plaintiff alleges that officials which were the

subject of Plaintiff's complaints of discrimination and or retaliation, participated

in the second ADR unbeknownst to the Plaintiff and his counsel.

82.    Since the filing of the Complaint, and prior to the filing of this Amended

Complaint, additional actions have taken place further evidencing the extreme

degree of unfairness to which Agent Higbie has been subjected in the

administrative proceedings.

83.    A second FAD was issued in connection with the Plaintiff's complaint.

However, this was prior to the concluding of the EEO investigation as a result of

this second complaint.

84.    However, the EEO investigator required additional information and or

response despite being advised by Plaintiff's counsel that the Defendant issued

an FAD.

85.    After the the investigator apparently finalized the investigation, another

FAD (now a third binding decision) was issued by the Defendant further in an

attempt to deny the Plaintiff's due process.

86.    The two FAD's were not lawfully ordered and fail to conform to federal

legal and administrative requirements.  The Defendant's behavior is not one of

an erroneous nature.  Instead this behavior constitutes a systematic and

continuing pattern of retaliation and failure to comply with procedural

requirements.

87.    In short, and without restating all continuing retaliatory actions, and in

addition to the other pleaded facts, they include, failure to follow ADR

procedures, failure to mediate in good faith, failure to deliver promised executed

ADR agreements, failure to abide by due process requirements including

wrongfully transferring the EEO complaints to a venue without providing notice

or following procedural requirements, failure to provide copies of the

investigations, failure to keep the ADR confidential, making false false claims

during the administrative process in order to wrongfully influence the

administrative judge, failed to abide by and follow Departmental policies on

regarding promotions, involving responsible management officials the basis of

Plaintiff's complaints as "resolving official" and or "parties" to the ADR,

misrepresenting facts about Plaintiff's participation in the ADR to his immediate

supervisors creating a larger riff between the parties and individuals and various

other actions as described herein and throughout the process.

87.     Further, the Department of State, Bureau of Diplomatic Security rebuffs

and knowingly disregards the federal laws relating to retaliation and ignores its

own policies regarding promotions of accused EEO offenders, wherein several

responsible management officials have been promoted to higher grades and

received career enhancing onward assignments that has fully denigrated the

integrity of the Department's duty to abide by due process of administrative

policies and federal laws.

## FIRST COUNT
### (Violation of Title VII, Retaliation/Reprisal)

88.     Plaintiff re-asserts and alleges paragraphs 1 through 87 as though fully set

forth herein verbatim.

89.     Plaintiff brings suit for retaliation and reprisal under Title VII of the Civil

Rights Act of 1964 (42 USC  §§ 2000e et seq.); the Civil Rights Act of 1991 (Pub.

L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111-2)

---

amended several sections of Title VII. In addition, section 102 of the CRA amends the Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII, the Americans with Disabilities Act of 1990, and section 501 of the Rehabilitation Act of 1973.

90.     Title VII of the Civil Rights Act, the Rehabilitation Act, and the Americans with Disabilities Act mandate against and prohibit retaliation or reprisal against any employee because of that person's participation in prior EEO protected activity.

91.     As a result, Plaintiff suffered damages recoverable under Title VII for which he brings suit.

92.     The second complaint of discrimination lead to the EEOC investigation, DOS-F-115-11.  Defendant issued multiple FAD's with confusingly different cause numbers.  Further, the Defendant denied that such FAD's had to do with this matter claiming that an investigation is still ongoing.

93.     Plaintiff alleges that the Defendant discriminatorily, on March 30, 2011, removed him from his position as the DS Representative to the Bureau of Consular Affairs within the Passport Agency; and

94.     On April 1, 2011, changed the duties and tasks in Plaintiff's performance plan.

95.     Plaintiff alleges that both actions were a direct result of his continuing

outspoken opposition to the hostile work place and other continuing

discriminatory actions taken against him.

96.     Plaintiff and Defendant settled the previous discrimination lawsuit.  As a

result of and in conjunction with the settlement agreement, Plaintiff received a

civil service GS 1811 position with the title Senior Criminal Investigator and job

duties and responsibilities that go along with it.

97.     In the Defendant's own policy manual, titled the Civil Service Position

Classification Guide it expressly states that:

> "Position classification under Title 5 is a system for managing
> organizations by:
>
> * Establishing organization structures
> * Assigning title, series, and grade designations to individual
> positions
> * Establishing career paths
> * Ensuring equal pay for substantially equal work
>
> Position classification affects pay; it rewards substantially
> equal work with equal pay. Classification is a tool for
> achieving management objectives such as structuring
> effective organizations, responding to changes in mission or
> technology, attracting a high-quality work force, and
> emphasizing accountability for results.
>
> Principles of classification under Title 5:
>
> * Equal pay for substantially equal work
> * Rank in the position, not in the person * Title, series, and
> grade are established based on assigned duties and
> responsibilities, not personal qualifications
> * Title, series, and grade are determined by reference to
> Office of Personnel Management (OPM) published standards
> and guides

Internal equity and external equity. Internal equity involves
equal pay for substantially equal work and establishing a
position structure that defines and rewards the most difficult
work.

Written Record of Duties and Responsibilities
A position description is a written record of the major (regular
and recurring) duties and responsibilities assigned to a
position by management, including:

\* Knowledge and skill required to perform the duties
\* Complexity of work performed
\* Nature of available guides used to perform the work \*
Supervisory controls over the work
\* Nature of personal contacts required by the work."

Principles

\* The position is evaluated, not the position description.
However, the position
description and evaluation statement must be consistent with
each other.  The position description has to match the reality
that the evaluation reflects.
\* Positions are evaluated in context, not in a vacuum. In-order
to evaluate a position, it is necessary to know the
organizational location, the supervisory/
subordinate relationships, and the relationship to other
positions in the unit, program, or function. Department
position management policy is contained in 3 FAM 2610,
Position Management."

98.    Defendant intentionally violates its own rules when dealing with Plaintiff in

a retaliatory and discriminatory manner.  Further, the Defendant makes up new

policy as it goes along in order to discriminate against Plaintiff.

99.    Despite receiving a Senior Criminal Investigator position and Defendant

using such to induce the Plaintiff to settle the previous suit, Defendant posted an

employed Plaintiff with a position under 12 FAH-3 H-036 "Senior Special Agent"

as opposed to 12 FAH-3 H-037 "Special Agent."

100.   This position reflected Plaintiff's tenure with the Defendant as well as his

duties, capabilities and performance.  In any event, from 2006, and the date of

the settlement, Plaintiff performed duties as a "Senior Special Agent" until

Defendant, in a retaliatory and discriminatory manner, ignored the settlement,

ignored the job Plaintiff received and demoted the Plaintiff.

101.   According to the Defendant's own regulations, 12 FAH-3 H-036, a Senior

Special Agent "serve[s] as a working supervisor...and devote a major part of

their time conducting the most sensitive and complex investigations.  This was

the case with Plaintiff as he provided newer agents with support and conducted

the most complex investigations in the Dallas Field Office.  Indeed, he is

frequently asked to assist other agents due to his knowledge and expertise and

capabilities.

102.   However, in a series of retaliatory actions, the complained of officials

named above began denigrating his duties, job description and supervisory

responsibilities.

103.   The individuals committing the discriminatory actions are doing so with

full knowledge of the settlement agreement, with full knowledge that Plaintiff had

been performing as a Senior Criminal Investigator for some time and such

constitutes discrimination on its face in violation of the previous agreement

entered into by the Defendant.  The Defendant's retaliatory actions and

continuing discrimination are directly related to and a result of the prior

protected activity.

## SECOND COUNT
### (Title VII, Discrimination - Hostile Work Environment)

104.   Plaintiff re-asserts and alleges paragraphs 1 through 91 as though fully set

forth herein verbatim.

105.   Plaintiff brings suit for discrimination in his employment by Defendant in

connection with his prior protected activity, the complaints and lawsuit he filed

previously under Title VII and the subsequent settlement.

106.   Plaintiff bring this lawsuit pursuant to Title VII of the Civil Rights Act of

1964 (42 USC  §§ 2000e et seq.) and further pursuant to  the Civil Rights Act of

1991 (Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub.

L. 111-2) amended several sections of Title VII. In addition, section 102 of the

CRA amends the Revised Statutes by adding a new section following section

1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive

damages in cases of intentional violations of Title VII, the Americans with

Disabilities Act of 1990, and section 501 of the Rehabilitation Act of 1973.

107.   Plaintiff was subjected to a hostile work environment due to the prior

protected activity and due to the previous filing and subsequent settlement.  As

a result, Plaintiff suffered damages recoverable under Title VII for which he

brings suit.

## THIRD COUNT
### (Texas Common Law Breach of Contract/Federal Law)

108.   Plaintiff re-asserts and alleges paragraphs 1 through 87 as though fully set forth herein verbatim.

109.   Pursuant to the common laws of the State of Texas, Plaintiff brings suit for breach of contract in that the Defendant, acting by and through their employees and agents, entered into a contractual relationship with the Plaintiff to mediate, the Defendant, by and through its employees and agents, violated the contract to mediate in that they violated the confidentiality provisions of the agreement, and such breach was the direct and proximate cause of damages to the Plaintiff.

110.   Plaintiff brings suit pursuant to the violation of the confidentiality clause of the mediated agreement done pursuant to the Administrative Dispute Resolution Act of 1996 (H.R. 4194, Public Law No. 104-230 signed into law on October 19, 1996 by the President [142 Cong. Rec. H12303-12304]; C.F.R 1614.102 / 105) in addition to Department of State Regulations.  The breach of the mediation agreement was done by "resolving officials" and/or responsible management officials in furtherance and in the scope of their employment with the Department.

111.   The acting officials for the Defendant entered as "parties" and or "resolving officials" to the contractual mediation agreement.  The Defendant is liable to the Plaintiff under vicarious liability as the officials, agents and or

---

A000223

employees were acting in their official capacity with authority when entering and violating the agreements.

112.   Pleading further, the Defendant entered into another subsequent agreement to mediate.  Under the terms of the agreements and promises made, the Defendant agreed to provide the Plaintiff and the Plaintiff's counsel with a copy of the "second mediated contract" the parties entered.  However, despite promises from the Defendant, its agents, servants and representatives, the Defendant has failed to comply with its promises and contractual agreements and has failed to provide a signed copy of the "second mediated agreement."  It is anticipated and by information and belief, the Defendant violated this second mediated agreement.

113.   Plaintiff herein, upon information and belief, believes that the deliberate attempt to cover up the breach by the Defendant, is the basis for the Defendant's refusal, despite multiple requests, to produce the executed and signed "second agreement to mediate."

114.   Defendant is the sole entity in possession of such agreement.  Defendant made representations and warranties that should Plaintiff agree to a second ADR, that Plaintiff would be provided with a complete and executed copy of the "second agreement to mediate."

115.   Plaintiff requested the document from the individual conducting the mediation, from the EEOC investigator, and from the Office of Civil Rights, in writing, by emails.  Despite the promises that the agreement would be forth

coming, Plaintiff and Plaintiff's counsel have not been provided with the "second agreement."

116.   Plaintiff entered the second ADR under the expressed representation that Defendant would provide Plaintiff with a copy of the agreement prior to the ADR. The agreement required that the persons entering the ADR on behalf of the Defendant, the "resolving officials," would be listed and would be required to sign the confidentiality provisions.

117.   However, Plaintiff, till this day, does not know who the "resolving officials" were or are and such has never been disclosed.

118.   Defendant breached the second ADR agreement by failing to provide Plaintiff with the "resolving officials" prior to the second ADR and by failing to deliver a copy of the executed agreement.  Such breach of Texas Common Law (breach of contract) directly and proximately caused Plaintiff damages and pleading further, such actions constitute continuing discrimination against the Plaintiff.

119.   Upon information and belief, the basis for the Defendant's failure to provide the second agreement for ADR is that persons that were the basis of Agent Higbie's complaints of discrimination were involved wrongfully in the ADR and are the resolving officials that actually executed the second ADR agreement.

120.   Defendant knew that Plaintiff would not have entered the second ADR agreement  knowing that complained of officials were acting in the capacity for the Defendant as "resolving officials."  Accordingly, Defendant, upon information

and belief, is also liable to the Plaintiff for breaching the contractual agreements of the parties by tricking Plaintiff into an ADR under false and misleading and deceptive acts.  Such false, misleading and deceptive actions constitute a breach of the contract for the second ADR.

### JURY DEMAND

121.   Plaintiffs demands a jury at this time.

### DAMAGES

122.   Plaintiff seeks damages as follows:

   a.    compensatory and actual damages;

   b.     economic damages by failing to be promoted; loss of opportunity to receive a promotion; and lost pay and benefits;

   c.    mental pain and anguish in the past and in all reasonable probability, mental anguish in the future;

   d.    stress related illness and aggravation of such illnesses;

   e.    Civil penalties and punitive damages and all statutorily permitted damages;

   f.    Reasonable and necessary attorney's fees in the past and in the future through trial of this cause;

   g.    Loss reputation and character assassination damages;

   h.    Wrongful removal of Plaintiff's donated sick and or leave time;

     j.    Unliquidated damages associated with Defendant's breach of contract and breach of the confidentiality provisions of the ADR agreements - Plaintiff pleads that the breach of confidentiality, the provision used to induce ADR, was breached and that the proper measure of damages associated with a loss of confidentiality is immeasurable and is immense.  Plaintiff seeks $500,000.00 in damages for each breach of confidentiality by the Defendant as well as all attorney's fees associated with such breaches.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff  prays that this matter be set for jury trial and upon final hearing of the matter, that Plaintiff recover a judgment against Defendant, for  compensatory and actual damages; economic damages by failing to be promoted; loss of opportunity to receive a promotion; and lost pay and benefits; mental pain and anguish in the past and future; stress related illness and aggravation of such illnesses; Civil penalties and punitive damages and all statutorily permitted damages; attorney's fees in the past and in the future through trial of this cause; Loss reputation and character assassination damages, pre-judgment and post-judgment interest at the maximum rate allowed by law, and for such other and further relief to which Plaintiff demonstrates he is entitled and is warranted by the laws and which are the the interest of justice.

Respectfully submitted,

SCHULMAN | MATHIAS PLLC

/s/ Cary Schulman
_____
Cary Schulman
Texas Bar No.: 00797390
Damon Mathias
Texas Bar No.: 24080170
8390 LBJ Freeway
Suite 500
Dallas, Texas 75243
Telephone: (214) 739-0100
Facsimile: (214) 739-0151
cary@dallaslegalteam.com

**ATTORNEYS FOR PLAINTIFF RICHARD HIGBIE**

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2013, I electronically filed the foregoing

document with the Clerk of Court for the United States District Court, Northern District of

Texas, using the electronic case filing system for the Court. The electronic case filing

system sent a "Notice of Electronic Filing" to the following attorney of record who has

consented in writing to accept this Notice as service of this document by electronic

means:

D. Shane Read
Assistant United States Attorney
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

/s/ Cary Schulman
_____

Cary Schulman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **RICHARD HIGBIE,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| **VS.** | ) | |
| | ) | **CIVIL ACTION NO._____** |
| **HILLARY RODHAM CLINTON,** | ) | |
| **In her official capacity as Secretary of** | ) | |
| **State** | ) | |
| **2201 C Street NW** | ) | **JURY TRIAL DEMANDED** |
| **Washington, DC 20520** | ) | |
| | ) | |
| **Defendant** | ) | |

### COMPLAINT

NOW COMES, Plaintiff, RICHARD HIGBIE (hereinafter "Plaintiff"), and sues

Hillary Rodham Clinton, in her official capacity as the U.S. Secretary of State, and in

support thereof avers:

### NATURE OF LAWSUIT

1.      This case involves multiple instances of discrimination of protected activity under

Title VII of the Civil Rights Act of 1964 by the United States Department of State against

Plaintiff who is an employee of the United States Government and employed by the

Bureau of Diplomatic Security, within the U.S. State Department, as a Civil Service

employee.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over this suit pursuant to the Civil Rights Act of 1991

(Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111-2)

amended several sections of Title VII. In addition, section 102 of the CRA amends the

Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII, the Americans with Disabilities Act of 1990, and section 501 of the Rehabilitation Act of 1973. The Administrative Dispute Resolution (ADR) Act of 1996 (H.R. 4194, Public Law No. 104-230 was signed into law on October 19, 1996 by the President [142 Cong. Rec. H12303-12304]; C.F.R 1614.102 / 105).  This Court has jurisdiction of the action under 28 U.S.C. § 1331 because this matter involves a federal question and pursuant to 42 U.S.C. §2000e-5(f) and 28 U.S.C. §1345 because this matter involves a discrimination complaint.

3.      Venue lies in the Northern District of Texas because the plaintiff and the actions that form the basis of this lawsuit occurred in the Northern District of Texas and the responsible agency official's focus of the discriminatory acts occurred in the District. Further, the action based upon the prior protected activity was the subject of suit brought in this District and the hostile work environment that ensued.

## ADMINISTRATIVE REMEDIES EXHAUSTED

4.      All conditions precedent to the filing of this suit have been performed or have occurred and the Plaintiff has exhausted his administrative remedies accordingly.  The Plaintiff has further complied with all applicable reporting and complaint provisions necessary and precedent to bringing this action under applicable standards of law.

5.      This matter arises from ongoing and repeated acts of retaliation, reprisal and harassment against and to the Plaintiff due to prior protected activity.  The previous EEOC matter out of which this matter arises, was filed in 2001 through the respective administrative EEOC complaint process and was eventually filed in the Northern District

A000231

of Texas and numbered Civil Action Number 3:04-CV-00725-K.  The suit was instituted

by Agent Higbie after all administrative remedies were exhausted and thereafter, the

case settled on or about July 11, 2005.

6.      This current action arises out of a series of actions and activity beginning on or

about December 17, 2008 and through March 30, 2011

## PARTIES

7.      Plaintiff Richard Higbie lives at 906 Carnegie Court, Allen, Texas 75002.  Plaintiff

is currently serving as a Senior Criminal Investigator / Senior Special Agent located

within the Dallas Resident Office which operates under the direction of Houston Field

Office within the Bureau of Diplomatic Security.

8.      The Defendant is the Honorable Hillary Clinton, Secretary of State of the U.S.

Department of State.  Secretary Clinton was sworn as the 67th Secretary of State on

January 21, 2009.  She oversees the State Department, including the supervision of

Foreign Service and Civil Service personnel who serve both abroad as well as

domestically within the Continental United States.  Secretary Clinton is an employer as

that term is defined in Title VII, of the Act.

## FACTS

9.      Plaintiff specifically alleges violations that constitute a "continuing violation" of

discrimination against the Plaintiff.

10.     On July 11, 2005, the Northern District of Texas, United States District Court

issued an Order of Administrative Closure after the Court was notified that both parties

in the Civil Action Number 3:04-CV-00725-K agreed to a settlement.

---

11.     On September 13, 2005, the plaintiff, and the Defendant, Cohn L. Powell.

Secretary, U.S. Department of State then jointly entered into a Motion to Dismiss the

EEO case.

12.     The settlement terms specified a conversion of the Plaintiff's occupational

position within the Department be converted from the Foreign Service to the Civil

Service within the Bureau of Diplomatic Security (BDS), Dallas Resident Office.

13.     On August 9, 2007, the Plaintiff informed the newly assigned Special Agent in

Charge of the Houston Field Office. Marian Cotter, during a visit to the Dallas Resident

Office and in an introductory meeting of his prior protected activity and his commitment

to a work environment that is productive and free from the past hostile work

environment conditions.

14.     On August 23 and 24, 2011 the Assistant Secretary of State for Diplomatic

Security, Richard Griffin, the Assistant Director of Domestic Operations Edgar Moreno,

the Deputy 200 Assistant Secretary of State the Diplomatic Security's Office of Foreign

Mission, Claude Nebel, the Special Agent in Charge of the Houston Field Office, Marian

Cotter, and the Resident Agent in Charge, Edward McGrath, all attended a visit to the

Dallas Resident Office and conducted meetings within the DFW area.

15.     Prior to this visit, the Plaintiff was the Acting Resident in Charge while the

assigned Resident Agent in Charge, Edward McGrath was on annual leave. The plaintiff

coordinated all of the senior management meetings with the HFO supervisory team, the

appropriate offices at the Bureau's headquarters, and all of the local departmental

heads wherein operational meetings were to be held. The Plaintiff thanked the Assistant

A000233

Secretary of State for Diplomatic Security, Richard Griffin, for his role in reaching a settlement in his EEO lawsuit stated above, and allowing the Plaintiff to be converted to a Civil Service position located within the Dallas Resident Office in Dallas, Texas.

16.     The Plaintiff also stated that he hoped that the chapter of his career, wherein he suffered discrimination, was over and that he would not be discriminated against any further. The Assistant Secretary stated to the Plaintiff that if he does experience any further discrimination he requested that the Plaintiff contact him immediately so that the behavior could be attended to. This conversation occurred in the presence of Assistant Director Edgar Moreno.

17.     This demonstrates the first existence of the Plaintiffs disclosure to the most senior responsible management official within his Area of Responsibility (AOR), the Special Agent in Charge of the Houston Field Office, Marian Cotter, thus depicting his prior protected activity. This also illustrates the Plaintiff's routine duty to act as the relief supervisor, i.e., the Acting Resident Agent in Charge, in the absence of the assigned Resident Agent in Charge. Additionally, the presence of the disclosure of the prior protected activity was again provided to the Special Agent in Charge of the Houston Field Office by the Resident Agent in Charge of the Dallas Resident Office, Edward McGrath on February 6, 2008. This disclosure occurred after the Plaintiff informed his immediate supervisor, Ed McGrath of instances related to a hostile work environment towards the Plaintiff and other line-level employees as a result of abusive behavior engaged by supervisory personnel in Houston, Texas, specifically, Jeff Thomas.

18.     In December 17, 2008, the Assistant Special Agent in Charge (ASAC), Paul Valle, ordered the Resident Agent in Charge, Laviris Stubblefield, to disallow and

remove the Plaintiff from assuming his role as the relief supervisor within his office,

during Mr. Stubblefield's pending absence, as outlined in the Plaintiffs current and

previous annual work requirement statements / job duties. The direct order cited by

ASAC Valle delineated that the Plaintiff was not promotable and should not therefore be

afforded the same opportunity for advancement opportunities as Foreign Service

personnel, i.e., serving as the relief supervisor for his office.

19.     ASAC Valle then issues the adverse employment action against the Plaintiff

when he states in an email to the Resident Agent in Charge Laviris Stubblefield,

> "As we discussed when I was in Dallas. This 2 week period of time is the perfect
> opportunity for an FS2.501 to be acting RAC. This does no good for Rick in a
> non-promotable position.  Please pick one of your 3s to act in your stead, they
> can actually benefit from the experience."

20.     ASAC Valle denotes that he was recently in Dallas, he states that his rationale

pertains to the "opportunity" was only applicable to a "foreign service employee" versus

the Plaintiff.  It is important to note that the Plaintiff who was previously a member of the

foreign service but was converted to a Civil Service position pursuant to the above

noted protected activity and settlement agreement.  ASAC Valle then declares that the

Plaintiff is not promotable, and lastly he delineates that the Foreign Service employee

can 'benefit from the experience'.

21.     The Plaintiff was verbally told of the email correspondence by the then incumbent

Resident Agent in Charge of the Dallas Resident Office, Laviris Stubblefield on the

evening of December 17, 2008 after his multiple discussions with ASAC Vallee and SAC

Marion Cotter regarding his lack of concurrence and dissenting opinion of the

management directive pertaining to the relief supervisory duties and statements made

referring specifically to the Plaintiff. The Plaintiff documented his discussions with the

RAC in an email sent to himself as a memorandum to file wherein he noted that RAC

Stubblefield was told that the premise or rationale for the management decision was

punitive in nature as a result of the Plaintiff's discussions with the Bureau's Director

regarding the Dallas operational strategic plans, goals, and operations. Mr. Stubblefield

then assigned another member of his staff to serve as the relief supervisor in his

absence who was a member of the Foreign Service.

22.     The verbal statements made by the ASAC (Vallee) and the SAC (Cotter)

regarding the adverse employment action taken against the Plaintiff were contrary to the

remitted email sent earlier the same day by ASAC Vallee.

23.     On November 18, 2008, the Special Agent in Charge of the Houston Field Office,

Marian Cotter, the Assistant Special Agent in Charge of the Houston Field Office Paul

Vallee, at the Dallas Resident Office convened a meeting at SAC Cotter's direction.

24.     During the brief meeting. Marian Cotter, noted her dissent to a Strategic Action

Plan developed by office personnel and its eventual routing to the Director of the

Bureau and all Senior Bureau management which included the Houston management

personnel.

25.     Following the meeting, the SAC (Cotter) and the ASAC (Vallee) met with the RAC

of the Dallas Resident Office, Laviris Stubblefield, wherein Cotter and Vallee issued a

written counseling statement pertaining to Stubblefield's decision as to how to comply

with the Director's request for information related to the Dallas Strategic Action Planning

Report.  Also, during this meeting, the ASAC (Vallee) signed and approved the Plaintiffs

work requirement statement that maintained his responsibilities, to include serving as

the relief supervisor, i.e., "Acting Resident Agent in Charge" in the absence of the

---

*Complaint*                                                                      *Page*      7

assigned Resident Agent in Charge, Laviris Stubblefield.  RAC Stubblefield stated to the

Plaintiff on several occasions prior to and after the November 18, 2008 counseling

session with SAC Cotter, ASAC Vallee  issued to RAIC Stubblefield, that ASAC Vallee

ordered RAC Stubblefield to issue a written reprimand to the Plaintiff for violating chain

of command communication protocol with senior management personnel.  This directive

by ASAC Vallee did not occur due to the fact that RAC Stubblefield believed the action

against Plaintiff to be discriminatory and without merit or cause.

26.     On March 10, 2009, the Plaintiff was again notified by RAC Laviris

Stubblefield that ASAC Vallee communicated to him via email that the Plaintiff was not

allowed to assume the Acting RAC duties in his absence. This directive was again met

with the disagreement by RAC Stubblefield and Plaintiff's work requirements / job duties

were not changed.  In this same communication, the ASAC (Vallee) again referred to

the Plaintiffs lack of promotability and his direction to only use Foreign Service

personnel for this responsibility which RAC Stubblefield viewed as retaliatory and

punitive issued without cause or merit. The ASAC further stated in the communication

that RAC Stubblefield was directed to bring a copy of the Plaintiffs Work Performance

Plan / Work Requirements / Job Duties to a meeting with him in Houston, but did not

request the same Plan for the other Civil Service Criminal Investigator, Tim Forte for

review.

27.     The Plaintiff has served as the Acting Resident in Charge, in addition to Foreign

Service personnel, in short and long durations of time, in the absence of the assigned

Resident Agent in Charge through the term of the his last two previous supervisors,

Edward McGrath and Randy Steen, consistent with his annual work requirement

A000237

statements.

28.     Plaintiffs employment discrimination complaint from which an administrative

investigation was spawned, stated the following and is pertinent to this suit:

> a. During the summer months in 2008, Plaintiff assumed supervisory
> responsibility for the Dallas Resident Office as the acting Resident Agent in
> Charge (RAIC) while the supervisory position was in transition between the
> outgoing and incoming (RAIC). These temporary supervisory duties were
> outlined in the Plaintiff's work requirement statement in the current and
> previous rating period(s) accordingly.

> b. Plaintiff would like to have the S/OCR office made aware of the fact that
> the outgoing RAIC, Ed McGrath, retired from his position in Dallas and with the
> Department before he planned to seek post retirement employment as a direct
> result of SAIC Cotter's unwillingness to remedy the abusive behavior of her
> subordinate supervisory staff.

> c. During the summer of 2008, the Houston Field Office senior management,
> specifically, SAIC Marian Cotter and SSA Jeff Thomas, did not maintain regular
> communication nor involve the Dallas Resident Office with management
> programs, goals/objectives, or interim policies. Plaintiff worked diligently to
> maintain a high-level of protective and investigative performance during a period
> of high personnel attrition. Under the Plaintiff's tutelage, objectives were met
> satisfactorily met with little to no support from HFO management. The
> Plaintiff often made management decisions as the acting RAIC, void of
> guidance from his superiors.  On several occasions, the Plaintiff's decisions
> were harshly scrutinized by senior management, creating a hostile work
> environment.

> d.      At the end of the transitional period of the Plaintiff serving as the acting
> RAIC, the SAIC sent an abrasive and hostile email to the Plaintiff expressing her
> dissent with his management decisions. In this email correspondence, the SAIC
> further delineated her distain and unwillingness to forge a working relationship
> with subordinate civil service personnel, specifically as it relates to Plaintiff.

29.     Special Agent in Charge, Marian Cotter, stated that DRO (Dallas Resident Office)

volunteered agents for protective assignments, however, a DS wide broadcast email

stipulated that the clearance required for agent personnel to request consideration for

supervisory roles at the United Nations General Assembly was their immediate supervisor's approval.

30.     Agents within the Dallas Resident Office submitted such requests and the Plaintiff approved the requests as the headquarters directive required and submitted the DRO personnel for assignments as deemed necessary. The Plaintiff was unaware of the additional approval process through the Houston Field Office Management. This policy was brought to the Plaintiffs knowledge after SAC Cotter sent the above referenced derogative email.

31.     The Plaintiff was also operating under the belief that the previous RAC (McGrath) had communicated the aforementioned protection assignments and manpower allocation decisions made at the end of his tenure. SAC Cotter also claims that the Plaintiff approved leave for an employee without permission which was inconsistent with previous policies followed by the previous RAC McGrath. The Plaintiff did authorize an employee with the Dallas Resident Office to facilitate his household belongings and living arrangements upon arrival to his duty location consistent with the Foreign Affairs Manual/Handbook.

32.     Consistent with the Plaintiff's work environment having the clear presence of a hostile and retaliatory nature, this is an example of how the SAC's inept management approach caused problems related to her performance which was then unjustly deferred or annotated as a result of the Plaintiff's actions.

33.     From January of 2008 following the abusive outburst of Supervisory Special Agent Jeff Thomas with several members of the Dallas Resident Office to include the Plaintiff, to the summer months following the assigned Resident Agent in Charge Ed

McGrath's abrupt retirement, to the end of the year in the absence of the assigned

Resident Agent in Charge, Laviris Stubblefield, the existence is a hostile work

environment is well documented.

34.     As cited in the Plaintiff's employment discrimination complaint:

> a) During the RAC's (Stubblefield) leave, HFO managers. specifically
> SSA Jeff Thomas and ASAIC Paul Vallee, repeatedly implemented
> abusive management actions against the Plaintiff, including hostile
> communications. Upon his return his office while on leave, RAIC
> Stubblefield became aware of the hostile work environment and informed
> the Diplomatic Security Principal Deputy Assistant Secretary (P/DAS) of
> these concerns. RAIC Stubblefield opined that managerial
> actions in Houston required reform to provide immediate and corrective
> action regarding the abusive and hostile work environment that has
> rendered the working relationship ineffective and again cited a willful
> neglect in communicating with the Dallas Resident Office and its
> personnel. As a potential solution, the RAIC requested the P/DAS quickly
> initiate a senior DS management review to provide managerial guidance
> for HFO senior management.

> b. During the week of January 12-16, 2009, acting on the RAIC's request,
> the P/DAS assigned an experienced and seasoned senior management
> review panel to travel to the Dallas and Houston offices to remedy the
> hostile work environment and communication impasse that had formed
> between HFO management and DRO management to better achieve
> organizational goals and objectives. The managerial
> review written reports have not yet been provided to HFO and DRO
> personnel as of this writing, however the reports are expected to be
> forthcoming in the near future.

35.     The above noted report (referred to in subsection "b" above) was eventually

completed and submitted by the Directorate of Domestic Operations (ICI Director Scott

Bultrowicz) to the Director's office (Gregory Starr) for review and onward action. Upon

receipt of the first submission of' the report, the Director returned the report to be

amended to more clearly outline the facts involved, the Directorate of Domestic

Operations then completed a second draft and the report was re-submitted. The facts

surrounding the report, its two drafts, and the eventual attempt to hide the existence of

these reports can be clarified by the Director's executive advisor, Senior Special

Assistant to the Director Scot Folensbee (FS-OC Retired).

36.     The Bureau, especially its own senior leadership, has a duty as defined by:

> (1) 3 FAM 1526.2. THE DEPARTMENT'S RESPONSIBILITIES UNDER
> THIS POLICY (CT:PER-567; 09-22-2005)
> (State)
> (Foreign Service and Civil Service Employees)
>
> (2)      c.  Supervisors and other responsible Department officials who observe,
> are informed of, or reasonably suspect incidents of possible discriminatory
> harassment must immediately report such incidents to SIOC'R. which will either
> initiate or oversee a prompt investigation. Failure to report such incidents to
> SiOCR will be considered a violation of this policy and may result in disciplinary
> Action.

37.     Upon completion of the management review conducted by the Bureau of

Diplomatic Security, the incidents of EEO violations should have been immediately

reported to the Office of Civil Rights and the related employees should have been

contacted to ascertain their complaints. The Plaintiff nor the other employees involved

were contacted regarding their complaints lodged with management officials in their

Bureau.  Instead, this lack of administrative action which should have been immediate

and corrective in nature worsened the work environment and heightened its hostile and

retaliatory demeanor. This lack of action coupled with the attempts to inaccurately judge

raised employment discrimination concerns by the Plaintiff exemplify the retaliatory

animus against such employees from tiling relevant complaints of discrimination.

38.     When the above management review was conducted it negated the fairness

doctrine of the employee's discrimination complaint process that should have included

the Office of Civil Rights independent follow-up inquiry.

39.     Further demonstration of the pre-disposition to hinder such employment

discrimination complaints is the failure of SAC Cotter, ASAC Vallee, and SSA Thomas

to post the employee's equal employment opportunity rights under the law in the

workplace under their oversight.

40.     This posting requirement is defined under:

> (1) 29 CODE OF FEDERAL REGULATIONS VOLUME 4, PART 1601
> AND 1627
> Sec. 1627.10 Notices to be posted.

> (2) Every employer, employment agency, and labor organization which has
> an obligation under the Age Discrimination in Employment Act of 1967
> shall post and keep posted in conspicuous places upon its premises the
> notice pertaining to the applicability of the Act prescribed by the
> Commission or its authorized representative. Such a notice must be
> posted in prominent and accessible places where it can readily be
> observed by employees, applicants for employment and union members.

41.     On December 29, 2009, the Plaintiff was asked by Special Agent Joe White

(FS), for guidance as to how to proceed with schedule/itinerary information for an

upcoming visit of a foreign dignitary that was provided to him in the course of his duties.

The JTTF Agent was instructed by the Plaintiff that he should forward the information to

the Protective Liaison Division in Headquarters so that it could be determined what, if

any, protection responsibilities would be assigned to this visiting dignitary.

42.     The Plaintiff noted to the Agent that it was important to provide this information to

the appropriate headquarters elements so they could benefit from the itinerary in

concert with ascertaining whether to obligate protective resources accordingly. Once the

Dignitary Protection and Protective Liaison Divisions made such protective assignments

decisions, appropriate direction would then be provided to the Houston Field Office

management and DRO personnel would be better informed as to how to

proceed in coordinating efforts with local law enforcement and the other agencies

involved in the visit respectively. The assigned Acting RAC, Special Agent Treyler Ray

(FS), had departed the area and the next most senior member of the office was the

Plaintiff.

43.    On December 30, 2008, the ASAC (Vallee) then emailed the Plaintiff and stated

that, "of all people in the Dallas Office, you know better than to go straight to

Washington without communicating with the Field Office, I suggest you take a real hard

look, get in step, and do not go out of the chain of command again. This is documented

in your personnel file in the Field Office."  The instructional guidance provided to the SA

White agent by the Plaintiff was consistent with years of experience with regard to

handling such matters in the Dallas office and was a routine practice in domestic offices.

The guidance and action taken by DRO personnel in this matter, to include the Plaintiff,

was in compliance with the previous Resident Agent in Charge supervisors and such a

change in policy was not clearly provided to the Plaintiff nor the DRO personnel

involved.  This email and its affect on the office in the days to follow were perceived to

be threatening in nature and was forwarded and discussed at length with the assigned

Resident Agent in Charge Stubblefield who agreed with decisions made by Plaintiff.

44.    On January 5, 2009, the assigned RAC Stubblefield received an email from

ASAC Vallee that stated that the Plaintiff needed to be formally counseled, denoting a

punitive action was in order, for his role in the above noted handling of the

communication with headquarters offices.  RAC Stubblefield again, disagreed with order

to take punitive action without merit against Plaintiff and so the counseling did not occur

as its basis was viewed to be discriminatory and retaliatory in nature.

A000243

45.      On January 15, 2009, the Plaintiff timely contacted an EEO Counselor to begin the process of filing a discrimination complaint.  Following the informal and formal processes of filing a discrimination complaint, Plaintiff timely filed a formal complaint of discrimination on April 13, 2009, after all efforts by the Plaintiff to resolve the complaint through Alternative Dispute Resolution procedures were unsuccessful.  In the first week in July, 2011, Plaintiff's attorney received the Agency's Final Order (DOS-F-062-09) Fully Implementing Administrative Judge Robert W. Kimball's decision.

46.      The following employees have informed the Plaintiff that similar grievances and/ or complaints within the same proximity as the Plaintiff's complaint have been filed or are in the process of being filed that evidence relevant conduct: Alejandro Johnson, Treyler Ray, Colin Kimpton, Christopher Quirk, Kristen Sivertson, Sarah Cope, and Laviris Stubblefield.  These witness collaborate the Plaintiff's allegations made in his EEOC complaint.

47.      Plaintiff filed a second claim of discrimination, not including the previous claims and lawsuit, that is styled as DOS-F-115-11 and is pending a Final Agency Decision (FAD) for the claims accepted for investigation.  The claims that were not accepted for investigation were provided to the Plaintiff in a letter he received on September 30, 2011 and are incorporated below respectively.

48.      On May 12, 2011, the Plaintiff timely contacted the Department's Office of Civil Rights (S/OCR) to request an EEO Counselor be assigned to field his complaint of onward discrimination.   The Plaintiff's contact via email was sent on the evening of May 12, 2011 and received the next business day on May 13, 2011 by the case manager of his underlying/ existing complaint of discrimination.  After a lengthy period of time was

exhausted by the Plaintiff, in an attempt to mediate and settle the second complaint of discrimination for the on-going discrimination/retaliation/hostile work environment, Plaintiff was left with no other recourse but to further his complaint in the formal process as a result of the resolution process being unsuccessful and not participated in by the Bureau of Diplomatic Security.  On August 22, 2011, Plaintiff completed and submitted a timely formal complaint of discrimination to the Department's Office of Civil Rights, later styled and numbered DOS-F-115-11 by the Department's OCR Intake Division.

49.     As stated previously, Plaintiff is currently in a Civil Service position and has held his position within his current assignment and office locale since July of 2005.  The Plaintiff previously was a member of the Foreign Service and after his prior protected activity (i.e. Civil Action Number 3:04-CV-00725-K) had concluded his position within the Department of State was converted from the Foreign Service to the Civil Service and was part of the settlement.  The Plaintiff's employment position was titled "Senior Investigating Agent."

50.     The settlement did not stipulate that the position was without promotion potential at the Dallas Resident Office and all rights of such remained intact and in accordance with federal policies and regulations regarding promotions to apply as in any other instance.

51.     The Plaintiff alleged in his second complaint and re-alleges herein that he participated in a Title VII protected activity and he suffered an adverse employment action by his employer, and there is a causal connection between the protected activity and the adverse action."

A000245

52.    Plaintiff alleged in his second complaint and re-alleges here that "[a] hostile work environment existed in that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and creates an abusive working environment as follows:

53.    On May 29, 2009, the following Responding Officials signed an "EEO/ ALTERNATIVE DISPUTE RESOLUTION – AGREEMENT TO MEDIATE" that stipulated the following standard confidentiality clause of the ADR Act and relevant federal law:

> "Mediation is a confidential process. Any documents submitted to the mediators and statements made during the mediation are for settlement purposes only."

54.    In separate affidavits, both "Responding Officials" Marion Cotter (Special Agent in Charge of the Houston Field Office) and Jeffrey Thomas (Supervisory Special Agent of the Houston Field Office) provided to the EEO assigned Investigator, Robert Maddern, information held under strict confidentiality guidelines set by the aforementioned ADR Mediation.  Both respective Responding Officials included in their affidavits information concerning the underlying facts of the ADR proceeding and records generated as part of the proceeding that are strictly prohibited from being made part of the EEO complaint record.

55.    This demonstrated a willful attempt by the Responding Officials to further discriminate and retaliate against the Plaintiff for engaging in related protected activity. Plaintiff, in the complaint stated that he is providing "due notice to the Office of Civil Rights as to the above noted violation, but reserves the right to amend this discrimination complaint as to remove this allegation and seek relief in an appropriate state/federal court of jurisdiction under a separate civil claim."

56.     On or about September 30, 2010 the Department of State, acting under the direction of its Bureau management officials that encompasses the Bureau of Diplomatic Security, promoted Jeffrey A. Thomas from the rank/grade of FS-02 to the rank/grade of FS-01 in direct violation of the Department of State regulations relating to Responding/Responsible officials named by a Plaintiff in a discrimination complaint under the direction of the Office of Civil Rights.

57.     Also, on the above noted date, the Department of State, acting under the direction its Bureau management officials that encompasses the Bureau of Diplomatic Security, authorized the receipt of a Meritorious Service Increase (MSI) to Paul A. Vallee, for "the quality of his cumulative and competitive performance" wherein he was recommended but not promoted in rank/ grade "because of limited promotion opportunities."

58.     The "Promotion and MSI list" was issued pursuant to UNCLAS State Cable 102241 accordingly. The Plaintiff confirmed the action was in violation of the Department of State's regulations during the deposition of Human Resources employee Mario Cantu during the underlying complaint of discrimination.

59.     This lack of accountability after which an EEO Investigation had been completed, but a Final Agency Decision (FAD) had not been issued pertaining to whether the actions of Mr. Thomas or Mr. Vallee constituted violations of both Department of State policy and/or federal law denigrates the integrity of the EEO process within the Department of State and signified its lack of sincerity and further deteriorates a Plaintiff's, including the Plaintiff's, confidence in the EEOC administrative proceedings.

60.    Further, the Principal Deputy Assistant Secretary of State for the Bureau of Diplomatic Security demonstrated a blatant disregard for the institution of the EEOC and its core principles, in addition to the Department of State's Office of Civil Rights and its mission by approving Mr. Thomas and Mr. Vallee for promotion and/or a MSI receipt.

61.    This personnel practice instituted by the management officials within the Bureau of Diplomatic Security fosters an ongoing hostile environment and retaliatory animus against the Plaintiff with regard to supervisory personnel who work in the Bureau, specifically within the Domestic Operations Directorate, wherein relevant violations of Department policies pertaining to EEO Complaints and federal labor laws will not be held accountable nor impact career advancement or promotions to a higher rank/grade with more responsibility.

62.    This promotion policy and personnel action constitutes a systematic process of discrimination. As a result, Mr. Vallee continued his efforts to influence his subordinates as to the Plaintiff's protected activity and further the discriminatory actions taken against the Plaintiff, notwithstanding the furtherance of the "institutional memory" of the discriminatory practices that have occurred within the Houston Field Office during Mr. Vallee's tenure in his position.

63.    The lack of adherence to the Department's policies, designed to promote confidence and to prevent the promotion of those that are committing discriminatory actions and therefore, insure that the federal mandates against such are implemented and effective, sends a message to and allows those committing discriminatory actions to continue violating federal laws designed to protect against such activities.

A000248

64.     On or about March 9, 2011, during the deposition of Mr. Vallee in the underlying complaint of discrimination, the attorney for the Department of State Jennifer Toole (also serving as the Resolving Official for the Department), was made aware of and/or informed of further violations of discrimination and violations of the ADR Act (as noted above) throughout an extensive review of the breach of confidentiality engaged in by Marion Cotter and Jeffrey Thomas during the EEO Investigation conducted by Robert Maddern.

65.     DOS Attorney Toole did not immediately report the information as a reasonable suspect incident to the Department of State's Office of Civil Rights (S/OCR). This failure to report such incidence of possible discriminatory acts is a direct violation of the Departmental regulation as set forth by the Foreign Affairs Manual and S/OCR. Plaintiff was never contacted by S/OCR to determine if a violation of Departmental regulations occurred and when the Plaintiff initiated this informal complaint process was told that no such report was filed.

66.     This prescribed protocol employed by Ms. Toole demonstrates a systematic process of discrimination. As a result, Mr. Vallee continued his efforts to influence his subordinates as to the Plaintiff's protected activity and further the discriminatory actions taken against the Plaintiff, notwithstanding the furtherance of the "institutional memory" of the discriminatory practices that have occurred within the Houston Field Office during Mr. Vallee's tenure in his position against the Plaintiff.   Furthermore, the Plaintiff alleged to the respective EEOC administrative court, through his counsel, onward retaliation that was occurring in his workplace under the charge of the Mr. Vallee after his deposition took place. The Plaintiff suffered greatly from Ms. Toole's failure to act,

report, and attempt to prevent further retaliatory discrimination and a worsening hostile

work environment.

67.     On or about January 26, 2011, the Plaintiff's newly arrived Supervisor, Clifford

Taliaferro – the Resident Agent in Charge (RAC) of the Dallas Resident Office, directed

the Plaintiff to remove and reduce key areas of responsibility from what his previous

supervisor, Laviris Stubblefield, incorporated into past civil service performance plan

and appraisal reports. This discriminatory action was aimed at supporting the defense /

position opined by Mr. Vallee in the underlying complaint of discrimination after being

duly informed of the prior protected activity and the nature of the complaint of

discrimination on December 19, 2010 via email.

68.     Attached to the December 19th email was the "Issues to be investigated" letter

sent to the Plaintiff's attorney dated August that included the prevailing complaint of

discrimination's S/OCR DOS Case Number (F-062-09 – RICHARD HIGBIE) and a brief

description of the issues as follows:

> "You were subjected to a hostile work environment in reprisal for your protected
> EEO activity, characterized but not limited to, harsh scrutiny of your decisions by
> senior management, abrasive and hostile e-mails, and a decision not to permit
> you to function as the Acting Regional Agent in Charge (RAIC)."

69.     The new RAC (Taliaferro) also directed the Plaintiff that he was to remove any

mention of senior within his position title and/or job description. The Plaintiff disagreed

with the RAC and voiced his concern regarding the appearance of promoting the "Vallee

agenda", but had no choice but to agree to the issue(s) in contention being directed to

the Bureau of Human Resources for a final determination.

70.     The Plaintiff also informed the RAC that the title "Senior Criminal Investigator"

was the title provided in a job announcement/description used in the settlement

Case: 14-5042 Case 3:11-cv-02636-L Document 1 Filed 10/05/11 Page 22 of 26 PageID 22
Case: 14-5042 CASE PARTICIPANTS ONLY Document 3016 Filed: 04/23/2014
Case 3:11-cv-02636-L   Document 1   Filed 10/05/11   Page 22 of 26   PageID 22

agreement of his previous EEO/ Labor lawsuit filed in the Northern District of Texas and maintained accordingly by his previous two supervisors in both his workplace and within his previous performance plan and appraisal reports. The RAC (Taliaferro) then added a section within his job description entitled "NOTE" that will be viewed in a derogative manner and a part of his official personnel file after officially challenging the usage of "Senior Criminal Investigator" and whether the Plaintiff "is indeed considered the next senior officer/agent in the Dallas Resident Office" while maintaining the usage of the title contained in the Title/ Grade/Series section of the top of the same page of his official civil service performance plan and appraisal.

71.    The RAC's usage of the "NOTE" within the official personnel record is derogatory and the request for guidance should have been completed before finalizing the performance plan and job description. To date, the Plaintiff has not been contacted by the Bureau of Human Resources nor has he been advised by the RAC (Taliaferro) that a request for guidance was ever sent. Therein, the action taken by the RAC was aimed at supporting the discriminatory intent and animus of his superior officer, the Acting Special Agent in Charge of the Houston Field Office, Mr. Paul Vallee, whom was one of the Responsible/Responding Officials in the initial/prevailing complaint filed by the Plaintiff.

73.    In addition to the specific actions described above, Plaintiff will show a pattern of retaliation and reprisal which evidences that the motives and impetus behind the actions of the complained of officials is rooted in his prior protected activity and the settlement therefrom, in particular, the permanency of his position in Dallas.

A000251

74.    As a result of the discrimination described herein, Plaintiff has suffered severe

mental anguish and stress which has manifested itself into physical symptoms and

injuries for which Plaintiff brings suit.

75.    Furthermore, Plaintiff has conveyed the discriminatory actions to management

officials, however, the discriminatory conduct has not ceased and was escalated.

76.    Despite his efforts and compliance with the legal mandates and throughout the

respective administrative complaint processes, Plaintiff has received no relief.

77.    In a letter dated September 22, 2011, the Department specifically dismissed

certain allegations complained of herein and for which Plaintiff brings this cause.  The

remaining sections of the Plaintiff's second complaint of discrimination for which the

Department accepted for an investigation have not been included in this complaint and

remain in the administrative process accordingly.


### FIRST COUNT
### (Violation of Title VII, Retaliation/Reprisal)

78.    Plaintiff re-asserts and alleges paragraphs 1 through 77 as though fully set forth

herein verbatim.

79.    Plaintiff brings suit for retaliation and reprisal under Title VII of the Civil Rights Act

of 1964 (42 USC  §§ 2000e et seq.); the Civil Rights Act of 1991 (Pub. L. 102-166)

(CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111-2) amended several

sections of Title VII. In addition, section 102 of the CRA amends the Revised Statutes

by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the

recovery of compensatory and punitive damages in cases of intentional violations of

Title VII, the Americans with Disabilities Act of 1990, and section 501 of the

Rehabilitation Act of 1973.

80.     Title VII of the Civil Rights Act, the Rehabilitation Act, and the Americans with

Disabilities Act mandate against and prohibit retaliation or reprisal against any employee

because of that person's participation in prior EEO protected activity.

81.     As a result, Plaintiff suffered damages recoverable under Title VII for which he

brings suit.

## SECOND COUNT
### (Title VII, Discrimination - Hostile Work Environment)

82.     Plaintiff re-asserts and alleges paragraphs 1 through 81 as though fully set forth

herein verbatim.

83.     Plaintiff brings suit for discrimination in his employment by Defendant in

connection with his prior protected activity, the complaints and lawsuit he filed

previously under Title VII and the subsequent settlement.

84.     Plaintiff bring this lawsuit pursuant to Title VII of the Civil Rights Act of 1964 (42

USC §§ 2000e et seq.) and further pursuant to  the Civil Rights Act of 1991 (Pub. L.

102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111-2) amended

several sections of Title VII. In addition, section 102 of the CRA amends the Revised

Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for

the recovery of compensatory and punitive damages in cases of intentional violations of

Title VII, the Americans with Disabilities Act of 1990, and section 501 of the

Rehabilitation Act of 1973.

A000253

85.     Plaintiff was subjected to a hostile work environment due to the prior protected activity and due to the previous filing and subsequent settlement.  As a result, Plaintiff suffered damages recoverable under Title VII for which he brings suit.

### THIRD COUNT
### (Breach of Mediated Agreement & Confidentiality)

86.     Plaintiff brings suit pursuant to the violation of the confidentiality clause of the mediated agreement done pursuant to the Administrative Dispute Resolution Act of 1996 (H.R. 4194, Public Law No. 104-230 signed into law on October 19, 1996 by the President [142 Cong. Rec. H12303-12304]; C.F.R 1614.102 / 105) in addition to Department of State Regulations.  The breach of the mediation agreement was done by "resolving officials" in furtherance and in the scope of their employment with the Department.

### JURY DEMAND

87.     Plaintiffs demands a jury at this time.

### DAMAGES

88.     Plaintiff seeks damages as follows:

    a.      actual damages;

    b.      economic damages by failing to be promoted; loss of opportunity to receive a promotion; and lost pay and benefits;

    c.      mental pain and anguish in the past;

    d.      stress related illness and aggravation of such illnesses;

    e.      Civil penalties and punitive damages and all statutorily permitted damages;

    f.      attorney's fees in the past and in the future through trial of this cause;

g.      Loss reputation and character assassination damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff  prays that this matter be set for jury trial and upon final

hearing of the matter, that Plaintiff recover a judgment against Defendant, for  actual

damages; economic damages by failing to be promoted; loss of opportunity to receive a

promotion; and lost pay and benefits; mental pain and anguish in the past; stress

related illness and aggravation of such illnesses; Civil penalties and punitive damages

and all statutorily permitted damages; attorney's fees in the past and in the future

through trial of this cause; Loss reputation and character assassination damages, and

for such other and further relief to which Plaintiff demonstrates he is entitled and is

warranted by the laws.


Respectfully submitted,


_____/S/_____Cary Schulman_____


CARY SCHULMAN LAW FIRM
Cary W. Schulman
cary.schulman@live.com
Texas Bar No. 00797390
5910 N. Central Expressway, Suite 1040
Dallas, Texas 75206
Phone:      (214) 739-0100
Fax:      (214) 739-0151
Email:      Cary@CWSlegal.com

**ATTORNEY FOR PLAINTIFF RICHARD HIGBIE**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD HIGBIE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:11-CV-2636 |
| | § | |
| HILLARY RODHAM CLINTON, | § | |
| In her official capacity as Secretary | § | |
| of State, | § | |
| | § | |
| Defendant. | § | |

## AGREED MOTION FOR PROTECTIVE ORDER

The parties request the court to enter the Order attached as exhibit A to this motion. There are currently two motions before the court (Doc. 21 and Doc. 23). The parties agree to dismiss their motions and enter the attached Agreed Protective Order.

The parties request that the court enter the attached Order which has been agreed to by the parties.

Respectfully Submitted,

SARAH R. SALDAÑA
UNITED STATES ATTORNEY

/s/ D. Shane Read
D. SHANE READ
Assistant United States Attorney
Texas State Bar No. 16623950
1100 Commerce Street, Third Floor
Dallas, Texas  75242-1699

**Agreed Motion for Protective Order – Page 1**

A000256

Tel:    214.659.8688
Fax:    214.659.8807
Email: Shane.read@usdoj.gov

Attorneys for Defendant

*         *         *

/s/ Cary Schulman
CARY SCHULMAN LAW FIRM
Cary W. Schulman
Texas State Bar No. 00797390
8390 LBJ Freeway, Suite 500
Dallas, Texas 75243
Tel:    214.739.0100
Fax:    214.739.0151
Email: Cary@CWSlegal.com
Attorney for Plaintiff

**Agreed Motion for Protective Order – Page 2**